## PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

FILED

Name    Uvalles                    Raul
           (Last)                (First)            (Initial)

Prison Number    T-59954

Institutional Address    H.D.S.P. B-3-130 P.O.Box 3030 Susanville, CA 96127

RECEIVED

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

FEB 15 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RAUL UVALLES

**Full Name of Petitioner**

    vs.

THOMAS FELKER, Warden,

**Name of Respondent**
**(Warden or jailor)**

Case No. C=05-2779-MJJ (PR)

(To be supplied by the Clerk,
U.S. District Court)

MJJ

# C 07    1064

PETITION FOR WRIT OF HABEAS CORPUS

C 05-2779 MJJ (PR)

### Read Comments Carefully Before Filling In

#### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties:  Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo, and Sonoma.

If you file in the Northern District because you are now in a prison in this District but you were **not** convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court in which is located the State Court which convicted and sentenced you.  The Federal District Courts in California prefer that a petition should be considered in the district of conviction and sentencing.  The records can be more easily consulted and witnesses are available if a hearing is necessary.

1

## Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county, or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the State judgment against which you seek relief but may be subject to such custody in the future (e.g. detainers), you must name the person in whose custody you are now and the Attorney General of the State in which the judgment you seek to attack was entered.

## PART A - JURISDICTION

The federal district court can only consider your petition if you satisfy certain jurisdictional requirements. The information below will allow the court to determine whether those requirements are met.

1. For what crime were you sentenced? (If you seek habeas corpus based upon a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are seeking habeas corpus as to more than one sentence, a different petition should be filed for each sentence.)

Alleged first degree murder, and alleged second degree robbery

2. The sentence from which you seek relief is as follows:

(a) Name and location of court which imposed sentence (for example; Alameda County Superior Court, Oakland):

Sup. Ct. of Santa Clara County 190 W. Hedding St. San Jose, CA 95110
**Court**                                    **Location**

(b) Case number, if known  CC121250

(c) Date and terms of sentence  June 14, 2002, 25 years to life

(d) Are you now in custody serving this term?  Yes  X    No ____

(Custody means being in jail, on parole or probation. You are not in custody if you are released on bail, on your own recognizance or if there is a stay of execution of sentence.)

Where?  H.D.S.P. Susanville, CA 96127
**(Name of Institution)**              **(Address)**

2

3.   What post-conviction relief have you sought?

## APPEAL

(a)   Did you take an appeal from your conviction?   Yes  _X_   No ____

(b)   To what court(s)?   Check

| | | | |
|---|---|---|---|
| Court of Appeal | Yes _X_ | No ____ | Oct. 28, 2003 denied |
| | | | (Give year)   (Result) |
| Supreme Court of California | Yes ____ | No _X_ | _____ |
| | | | (Give year)   (Result) |
| Any other court | Yes ____ | No _X_ | _____ |
| | | | (Give year)   (Result) |

(c)   If you appealed, were the grounds the same as those which will be set forth in this petition?       Yes ____       No _X_

(d)   Was any opinion rendered?   Yes _X_       No ____

(e)   If you did not appeal, what were your reasons?

_____

_____

_____

(f)   Did you seek permission to file a late appeal under Rule 31(a)?
      Yes ____       No _X_

If you answered "Yes" give _____
                                          (Name of Court)

_____
                      (and result)

## OTHER POST-CONVICTION REVIEW

(g)   Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?       Yes _X_       No ____

(h)   If you answered "Yes" give the following information about each proceeding.

I.    **Name of Court** Superior Court of Santa Clara County

      **Type of Proceeding** Petition for writ of habeas corpus

      **Grounds raised (Be brief and specific):**

      a. Prosecutor   misconduct

      b. Ineffective assistance of trial counsel

      c. _____

      d. _____

      e. _____

      **Result** denied                    **Date of Result** Not available

      **Citation of opinion, if any and known** CC121250

II.   **Name of Court** Court of Appeal Sixth Appellate District

      **Grounds raised (Be brief and specific):**

      a. Prosecutor   misconduct

      b. Ineffective assistance of trial counsel

      c. _____

      d. _____

      e. _____

      **Result** denied                    **Date of Result** Not available

      **Citation of opinion, if any and known** Not available

III.  **Name of Court** Supreme Court of California

      **Grounds raised (Be brief and specific):**

      a. Prosecutor   misconduct

      b. Ineffective assistance of trial counsel

      c. _____

      d. _____

      e. _____

4

Result <u>denied</u>                          Date of Result <u>Not available</u>

Citation of opinion, if any and known <u>N/A</u>
(Use back side of this page if you need more space.  Fill in the same questions for each.)

(i)  If you answered "No" explain briefly why you have not sought any post-conviction review?

_____

_____

(j)  Is any petition or other post-conviction proceeding now pending in any court?  Yes <u>x</u>   No ____

<u>United States Dist. Ct Northern Dist. of CA 950 Golden Gate Ave. San F.</u>
(Name and location of Court)

## PART B - TRIAL INFORMATION

4.  Check if any of the following were held in your case:

Arraignment:  Yes <u>x</u>  No ___   Preliminary Hearing:  Yes <u>x</u>  No ___

Motion to Suppress:  Yes ___  No <u>x</u>

5.  Check whether a finding of guilty was made after a plea of

Guilty ____        Not Guilty <u>x</u>        Nolo Contendere ____

Any other plea _____
                              (Specify)
6.  Check kind of trial:

Jury <u>x</u>           Judge alone ____

Judge alone on a transcript ____

7.  Did you testify at your trial?   Yes ____        No <u>x</u>

## PART C - GROUNDS FOR RELIEF FROM CONVICTION

State briefly and concisely every ground which you believe supports your claim that you are being held in unlawful confinement.  This means telling the court the facts upon which you rely.  You should avoid legal arguments with numerous case citations.   Thus, what legal right or privilege were you deprived of in your case?  What happened to deprive you of this right?  Who made the error of which you complain?  What did he do wrong?  When did he do it?  If you lack space to state all your grounds, use the back side of the page.

5

**NOTE WELL:**  You must present ALL of your claims in your first federal habeas petition.  Subsequent petitions are subject to dismissal without review on the merits for abuse of the writ.  **McCleskey v. Zant**, 111 S.Ct. 1454 (1991), 113 L.Ed. 2d 517, 59 U.S.L.W. 4288.

8.  **Grounds for Relief**

    (a)  **Ground One:**  SEE PAGE 6A

    **Supporting Facts:**  SEE PAGE 6F THROUGH PAGE 6L

    (b)  **Ground Two:**  SEE PAGE 6M

    **Supporting Facts:**  SEE PAGE 6M THROUGH PAGE 6P

    (c)  **Ground Three:**  SEE PAGE 6Q

    **Supporting Facts:**  SEE PAGE 6Q THROUGH PAGE 6S

9.  **If any of the grounds listed were not previously presented to** any **other court, state briefly which grounds were not so presented and why:**

All the present grounds were presented in the California Court of

Appeal and in the Supreme Court of California

I.

## NO EVIDENCE PROVED THE CONVICTION AND SENTENCE OF FIRST DEGREE MURDER

Reasonable doubt is defined in California Penal Code § 1096 as follows:

"It is not a mere possible doubt; because everything relating to human affairs ... is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they ... cannot say they feel an abiding conviction ... of the truth of the charge."

In 1894. . . the court interpreted the predecessor of 28 U.S.C. § 2243 as vesting federal courts "with the largest power to control and direct the form of judgment to be entered in cases brought up before it on Habeas Corpus." Rogers v. Richmond, 365 U.S. 534, 549 (1951); Dowd v. United States ex rel Cook, 340 U.S. 206, 210 (1951); In re Bonner, 151 U.S. 242, 261-62 (1894).

The United States Court of Appeals for the Ninth Circuit and the United States Supreme Court of the United States indicated, our standards of review for addressing the sufficiency of the evidence to support a conviction is the same on habeas review as it is on direct appeal. See Mike v. Borg, 947 F.2d 353, 356 n. 5 (9th Cir. 1991); see also Jackson v. Virginia, 443 U.S. 307, 309, 99 S.CT. 2781, 2789 61 L.Ed.2d 560 (1979) (setting forth standard in a habeas corpus proceeding). Quoting Walter v. Maass, 45 F.3d 1355 (9th Cir. 1995).

6A

1    In re  Winship, (1970) 90 S.CT. 1068, 1071, the requirement
2    that guilt of a criminal charge be established by proof  beyond
3    a reasonable doubt dates at least from our early years as a Nation.
4    The "demand for higher degree of persuasion in criminal cases was
5    recurrently expressed fron ancient times, [though] its crystalliza-
6    tion into the formula 'beyond a reasonable doubt' seems to have
7    occurred as late as 1798.  Its now accepted in common law
8    jurisdictions as the measure of persuasion by which the prosecution
9    must convince the trier of all the essential elements of guilt."
10   C. McCormick, Evidence section 321, pp. 681-682 (1954); See also
11   9 J. Wigmore, Evidence, section 2497 (3d ed. 1940).  Although
12   virtually unanimous adherence to the reasonable-doubt standard
13   in  common law jurisdictions may not conclusively establish it
14   as a requirement of due process, such adherence does "reflect a
15   profound judgment about the way in which law should be enforced
16   and justice administere."  Duncan v. Louisiana, 391 U.S. 145, 155,
17   88 S.CT. 1444, 1451, 20 L.Ed.2d 491 (1968).

18   Expressions in many opinions of the United States Supreme
19   Court indicate that it has long been assumed that proof of a
20   criminal charge be a reasonable doubt is constitutionally
21   required.  See, for example, Miles v. United States, 103 U.S. 304,
22   312, 26 L.Ed. 481 (1881); Davis v. United States, 160 U.S. 469,488,
23   16 S.CT. 353, 358, 40 L.Ed. 499 (1895); Holt v. United States,
24   218 U.S. 245, 253, 31 S.CT. 2, 6, 54 L.Ed. 1021 (1910); Wilson v.
25   United States, 232 U.S. 563, 569-570, 34 S.CT. 347, 349, 350, 58
26   L.Ed. 728 (1914); Brinegar v. United States, 338 U.S. 160, 174, 69
27   S.CT. 1302, 1310, 93 L.Ed. 1879 (1949); Leland v. Oregon, 343 U.S.
28   790, 795, 72 S.CT. 1002, 1005, 1006, 96 L.Ed. 1320 (1952);

6B

1  reasonable doubt whether he was capable in law of committing
2  crime. * * * No man should be deprived of his life under the
3  forms of law unless the jurors who try him are able, upon their
4  consciences, to say that the evidence before them * * * is
5  sufficient to show beyond a reasonable doubt the existence of
6  every fact necessary to constitute the crime charged." Id., at
7  484, 493, 16 S.CT., at 357, 360. quoting, In re Winship, supra,
8  (90 S.CT., at 1071-1072.

9      Mr. Justice HARLAN, concurring. I view the requirement of
10  proof beyond a reasonable doubt in a criminal case as bottomed on
11  a fundamental value determination of our society that it is far
12  worse to convict an innocent man than to let a guilty man go free.
13  It is only because the nearly complete and long-standing accep-
14  tance of the reasonable-doubt standard by the States in criminal
15  trials that the Court has not before today had to hold explicitly
16  that due process, as an expression of fundamental procedural
17  fairness, requires a more stringer standard for criminal trials
18  than for ordinary civil litigation. In re Winship, supra, 90 S.CT.,
19  at  1077.

20      In Jackson v. Virginia, (1979) 443 U.S. 307, the United States
21  Supreme Court announced the constitutionally mandated standard
22  applicable to review of the sufficiency of the evidence to support
23  a conviction in a criminal case. The Supreme Court held that the
24  Due Process Clause of the Fourteenth Amendment to the United States
25  Constitution protects a criminal defendant against conviction
26  "except upon proof- defined as evidence necessary to convince a
27  trier of fact beyond a reasonable doubt of the existence of every
28  element of the offense." (Id. at p. 315.)  Thus, the constitutiona-

1  Holland v. United States, 348 U.S. 121, 138, 75 S.CT. 127, 136, 137,
2  99 L.Ed. 150 (1954); Spenser v. Randall, 357 U.S. 513, 525-526,
3  78 S.CT. 1332, 1342, 2 L.Ed.2d 1460 (1958).  Cf. Coffin v. United
4  States,  156 U.S. 432, 15 S.CT. 394, 39 L.Ed. 481 (1895).  Mr.
5  Justice Frankfurter stated that "[i]t is the duty of the government
6  to establish * * * guilt beyond a reasonable doubt.  This notion-
7  basic in our law and rightly one of the boasts of a free society-is
8  a requirement and a safeguard of due process of law in the historic,
9  procedural content of 'due process.'"  Leland v. Oregon, supra,
10 343 U.S. at 802-803, 72 S.CT., at 1009 (dissenting opinion).  In
11 a similar vein, the Court said in Brinegar v. United States,  supra,
12 338 U.S., at 174, 69 S.CT., at 1310, that "[g]uilt in a criminal
13 case must be proved beyond a reasonable doubt and by evidence
14 confined to that which long experience in the common-law tradition,
15 to some extent embodied in the constitution, has crystallized
16 into rules of evidence consistent with that standard.  These rules
17 are historically grounded rights of our system, developed to
18 safeguard men from dubious and unjust convictions with resulting
19 forfeitures of life, liberty, and property."  Davis v. United
20 States, supra, 160 U.S., at 488, 16 S.CT., at 358 stated  that the
21 requirement is implicit in "constitutions * * *  [wich] recognize
22 the fundamental principles that are deemed essential for the
23 protection of life and liberty."  In Davis a murder conviction was
24 reversed because the trial judge instructed the jury that it was
25 their duty to convict when the evidence was equally balanced
26 regarding the sanity of the accused.  The United States Supreme
27 Court said:  "On the contrary, he is entitled to an acquittal of
28 the specific crime charged, if upon all the evidence, there is

6D

1 lly required standard applicable to determining a claim of insuffi-
2 ciency of the evidence in a criminal case is "whether, after
3 viewing the evidence in the light most favorable to the prosecution,
4 any rational trier of fact could have found the essential elements
5 of the crime charged beyond a reasonable doubt." (Id. at p. 320.)
6 The opinion in Jackson represents a continuing, consistent, and
7 unequivocal line of U.S. Supreme Court decisions giving contour
8 to due process and Sixth Amendment imperatives from In re Winship,
9 to the present. (See, e.g., People v. Korbin (1995) 11 Cal.4th
10 416, 422-423.) Thus, for a period spanning 30 years, the rule has
11 been the prosecution has the burden of proving every fact necessary
12 to constitute the crime charged beyond a reasonable doubt. (In re
13 Wiship, (1970) 397 U.S. 358, 364.)

14 California case law is substantially in accord with the standards
15 established by the United States Supreme Court. The test is whether,
16 reviewing the whole record in the light most favorable to the
17 judgment below, substantial evidence is disclosed such that a
18 reasonable trier of fact could find the essential elements of the
19 crime beyond a reasonable doubt. (People v. Johnson, (1980) 26
20 Cal. 3d 557, 578.) Substantial evidence is that which is "reasona-
21 ble, credible, and of solid value." (Ibid.) The focus of the
22 substantial evidence test is on the whole record of evidence
23 presented to the trier of fact, rather than on isolated bits of
24 evidence torn from the record. (People v. Cueveas, (1995) 12
25 Cal.4th 252, 261.) The reviewing court must "presume in support
26 of the judgment the existence of every fact the trier could
27 reasonably deduce from the evidence. (People v. Reilly, (1970)
28 3 Cal.3d 421, 425.) The reviewing court may not reweigh the

1  evidence.  (People v. Culver, (1973) 10 Cal.3d 542, 548), reappraise

2  the credibility of the witnesses (People v. Barnes, (1986) 42 Cal.

3  3d 284, 303-304), or resolve factual conflicts, since these are

4  functions reserved for the trier of fact (In re Federick G., (1979)

5  96 Cal.App.3d 353, 367).  Reversal is not warranted unless it

6  appears "'that upon no hypothesis whatsoever is there sufficient

7  substantial evidence to support [the conviction].'  [Citation.]

8  (People v. Bolin, (1998) 18 Cal.4th 297, 331.)

9      The evidence presented by the people is insufficient on the

10  following areas:

11      The prosecution and the police claimed that petitioner ran with

12  the victim's ATM card and that victim chased petitioner, then

13  a  struggling occurred.  Petitioner never ran with the ATM card.

14  The police and the prosecution invented this story.  The police and

15  the prosecution knew that if the victim chased petitioner to retrieve

16  the ATM card and then the victim died, that is evidence to convict

17  petitioner to first degree murder.  In short, the police and the

18  prosecution  falsely told the jury that the petitioner ran with

19  the victim's ATM card, and that constituted a robbey because the

20  victim was killed in the process of getting her ATM card, and  that

21  constituted a first degree murder even if the victim attacked

22  petition.

23      Is a fact that the victim withdrawed $40 from ATM card at the

24  Bank of America.  See Exhibit A at page 9.  Also this page shows that

25  petitioner put Mancera's ATM card in his pocket.  This petitioner

26  denied because he does not remember having putting the card in

27  his pocket.  Petitioner thinks that the putting of the card in his

28  pocket is another fabrication of the police and the prosecution.

6F

1   In 2003, two men convicted of Santa Clara County murders were

2   set free amid judicial findings that police or prosecutor miscon-

3   duct helped convict people who were probably innonce.  One involved

4   Glen "Buddy" Nickerson, who served 19 years before U.S. District

5   Judge Marilyn Hall Patel overturned his conviction.  The second

6   was Quedellis Ricardo "Ricky" Walker, who spent nearly 12 years

7   in prison before top prosecutors acknowledged that improper deals

8   with unreliable witnesses had caused an injustice.  Please see

9   Exhibit A at p. 3 paragraph 7.

10   Is the custom of the police and the prosecutor in Santa Clara

11   to work in concert to convict innocent people.  Petitioner is

12   not the one  saying this.  The Mercuryd News said it.  In the

13   present case the prosecution and the police fabricated the story

14   that petitioner ran with the victim's ATM card and then the

15   victim chased petitioner and then a struggling occurred and the

16   victim was killed in the struggling.  The police and the prosecu-

17   tion knew that placing petitioner running with the victim's

18   ATM card constituted a robbery.  And if the victim was killed

19   after a fight for the card did not constituted a manslaughter.

20   These people are very experienced, and they knew the importance

21   of placing petitioner running with the victim's ATM card and the

22   victim chasing petitioner to retrieve it.  But the truth is that

23   petitioner never ran with the victim's ATM card.  The victim

24   never chased petitioner to retrieve the ATM card.  The struggling

25   and killing of the victim was in self-defense because for some

26   reason unknown to petitioner, they fought and the victim fell

27   and was killed.  The prosecution claimed that petitioner tried to

28   used the ATM card of Mancera.  That is not true.  Like the Mercury

1  News said that the prosecution of Santa Clara County like to fabrica-
2  te evidence to convict people.    The prosecution has an obligation
3  to prove beyond a reasonable doubt that petitioner killed the
4  victim for the whole purpose to take the ATM card.  in this case
5  the prosecution had failed to prove the above.

6  Maria Mancera A.K.A John Mancera's blood alcohol level had
7  been determined to be. .22.  (RT 280-281.)  The blood alcohol
8  level of .22% indicated to Chief Medical Examiner Gregory Schmunk
9  that Mancera had consumed approximately 10 drinks within a few
10  hours of her death.  (RT 219.)  Such a blood alcohol level would
11  result in signs of gross intoxication, such as slurre speech and
12  loss of balance with difficulty standing and walking.  (RT 273-274,
13  282-283.)  Mr. Schmunk noted that between 11:10 a.m. and 12:20
14  p.m. on August 20, Mancera's body was in full rigor mortis,
15  meaning that she had died approximately six to eight hours earlier.
16  (RT 213.)  The level of lividity present at the same time was
17  not fixed, as would be expected eight to 12 hours after death.
18  (CT 215-216.)  Mr. Schmunk indicated that many of the injuries
19  were consistent with a fall of 27 to 31 feet.  (RT 204.) Mr.
20  Schmunk opined that Mancera was alive at the time of the fall
21  based on the large amount of blood on the track and inside the
22  body.  (RT 205.)  In addition, the arm fracture had some-tissue
23  swelling which would not have occurred without blood pressure.
24  (RT 205-206.)  Other factors which led Schmunk  to believe that
25  Mancera was alive before hitting the ground were bleeding on the
26  surface of the brain, in the deep chest, at the rib fractures,
27  and in the abdominal cavity.  (RT 206.)

28  On May 7, 2002, testimony began.  (CT 121.)  On May 8, 2002,

1  the parties entered into four stipulations: that a blood sample
2  was properly drawn from petitioner and accurately analyzed by
3  the Santa Clara County Crime Laboratory and was determined to be
4  positive of "BE"; that a blood sample was properly drawn from
5  the body of Mancera, accurately analyzed by the Santa Clara County
6  Crime Laboratory, and was positive for both cocaine and alcohol,
7  the blood alcohol level being measured at .22%; that Mancera's
8  bank records were admissible; and that on August 20, 2001 at
9  12:48 a.m., Mancera's ATM card was used at an automatic teller
10  machine at the Union Bank in San Jose, and at 12:55 a.m. at the
11  Bank of America-Hester Branch in San Jose, that the video tapes
12  taken during each transaction accurately reflected the transaction,
13  and that photograph were accurately made from the video taken
14  during the transaction.  (CT 124.)

15      At approximately 11:15 p.m. on August 19, 2001, San Jose
16  Police Officer Joaquin Barreto was on foot patrol in the area
17  of the Alameda and Hedding Street.  (RT 129-130.)  He and his
18  partner, Officer Keith Neumer, were standing on the Alameda at
19  Sunol Street when they saw petitioner and Maria Mancera walking
20  on the Alameda.  (RT 132, 150.)  They seemed to be "ambling along"
21  with no specific direccion.  (RT 132.)

22      Barreto approached the pair and asked them what they were
23  doing.  (RT 133.)  Mancera replied that they were looking for
24  an ATM machine, and pulled an ATM card out of the purse she was
25  carrying.  (RT 133.)  Barreto observed that the card was
26  emblazoned with the name "Maria Mancera."  (RT 134.)  It was
27  obvious to Barreto that Mancera was a man presenting himself as
28  a woman.  (RT 135-136, 144-145.)  She did not have any injuries

1   and appeared to have all of her teeth.  (RT 138, 145.)  Her hands

2   were dirty.  (RT 146.)  Mancera and petitioner appeared to be

3   friendly with each other.  (RT 136.)

4       While speaking to them, Barreto believed they were both under

5   the influence of alcohol.  (RT 134-144.)  He based this upon the

6   fact that there was an odor of alcohol on them, their eyes were

7   watery and bloodshot, and they were somewhat unsteady on their

8   feet.  (RT 135.)  Neumer also smelled alcohol, and recalled that

9   they admitted they had been drinking.  (RT 154.)  They also had

10  delated pupils, which Barreto knew was a sympton of stimulant use.

11  (RT 144.)  Barreto did not see anything that he immediately

12  recognized as symptoms of cocaine use, but it was possible that

13  they were under the influence of cocaine as well.  (RT 148.)

14  Barreto thought they were both at about the same level of intoxi-

15  cation.  (RT 135.)  They did not have trouble communication with

16  him, and their level of intoxication was not severe enough to

17  warrant booking them for being drunk in public or booking into

18  a non-custodial  detention facility to sober up.  (RT 135.)

19      Petitioner's conviction is one of manslaughter.  The evidence

20  in this case only proves that two drunkers fought together for

21  not apparent reasons.  To convict petitioner for first degree

22  murder is ludicrous because there is no evidence beyond a reaso-

23  nable doubt that petitioner killed Mancera  intentionally, with

24  premeditation aforethought.  In short the fall of Mancera  was no

25  intentional.  The evidence that petitioner ran with the ATM card

26  and Mancera  chasing petitioner to retrieve the ATM card from

27  petitioner came from the police and the prosecution.  The police

28  said that petitioner told them that he ran with the ATM card

1   and that Mancera chased petitioner for the purpose to retrieve

2   the ATM card.  That is ludicrous, because petitioner never told

3   the police the above.  Petitioner fought with Mancera because

4   Mancera attacked petitioner without a reason.  Mancera attacked

5   petitioner because Mancera was under the influence of cocaine and

6   alcohol as petitioner too was.  The police and the prosecution

7   claimed that petitioner took items from the purse of Mancera after

8   she fell to the track below.  The prosecution and the police claims

9   are not    true.        Petitioner is only guilty of accidentally

10  killing Mancera when Mancera jumped on petitioner back and

11  petitioner tried to take Mancera from his back and accidentally

12  Mancera fell to the track below.  See Exhibit A at page 9.

13      The police and the prosecution of the Santa Clara County had

14  a custom of working in concert to convict people said the Mercury

15  News.  See Exhibit A at page 3 paragraph 7.

16      The police said in this case that petitioner told them that

17  he fled the scene with the card still in his possession.  The

18  victim chased after the defendant and they began to wrestle.

19  The victim jumped on top of the defendant as she was trying to

20  get her card back, making the defendant hit the guardrail, causing

21  her to let go of the fefendant and fall to the track below.  The

22  defendant went down to check on the victim, panicked and left

23  the scene without calling 911.  Please see Exhibit A at page 9.

24  The last paragraph is a pure fabrication of the police and the

25  prosecution because petitioner never said what the last paragraph

26  said.  These people are very experienced and they knew that

27  petitioner can be convicted of first degree murder if the victim

28  died while she was trying to retrieve the ATM card even thought

1    the victim died during the struggling.

2        A review of the interrogation will show that the police and

3    the prosecution of the County of Santa Clara are lying just for

4    the purpose of convicting petitioner to first degree murder.  The

5    statement of petitioner to the police shall be reviewed very

6    closely to clarifying the fabrication of these people.  Petitioner

7    is REQUESTING AN EVIDENTIARY HEARING ON ISSUE ONE TO REVIEW THE

8    STATEMENT OF PETITIONER TO THE POLICE.  And after the evidentiary

9    hearing, petitioner is requesting a reversal of his conviction

10   and sentecing of first degree murder.  Petitioner is only guilty

11   of accidentally killing Mancera, while both of them were under

12   the influence of alcohol and cocaine.  Petitioner's right of

13   the Federal Due Process Clause of the Fourteenth Amendment had

14   been violated.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.

## PETITIONER'S STATEMENT TO THE POLICE WAS USED
## INTO EVIDENCE IN VIOLATION OF MIRANDA V. ARIZONA

On May 6, 2002, the trial court ruled that petitioner's state-
ments to police had been taken in violation of Miranda v. Arizona,
284 U.S. 436 (1966) and could not be introduced in the prosecution's
case in chief.  (CT 117; RT 94.)

The trial court gave the order to the prosecution not to use
the statements of petitioner to the police.  But because is the
custom of the prosecution in the County of Santa Clara to ignoring
the orders of the judges, the prosecution in this case told the
jury that petitioner ran with the ATM card of Mancera, then
Mancera chased after petitioner to retrieve her card, and Mancera
fell to the truck killing herself.  But all because she was trying
to have possession of her card.  The prosecution's comments were
false and a refusal to obey the orders of the judge not to use
the statements of petitioner in his case in chief because it was
obtained in violation of Miranda.

When petitioner was interviewed by the police, he was under the
influence of alcohol and cocaine.  The waiver of petitioner's
Miranda rights were not voluntary, intelligent, and knowingly
made because of petitioner's condition when he was interviewed.
The police claimed that petitioner told them that he ran with the
ATM card of Mancera.  Petitioner does not remember saying that
to the police.  Is more likely that the police is fabricating the
running of petitioner with Mancera's card.  After all, the police
and the prosecution of Santa Clara County had the custom of working
together to convict people even if they are innocent.  See what

1  the Mercury News said in Exhibit A at page 3 paragraph 7.
2  Petitioner is not saying the above, the Mercury news says it.
3      When petitioner was interrogated, a blood sample was drawn
4  from him.  (RT 270.)  A test indicated the presence of cacaine
5  metabolite, meaning he had most likely ingested cocaine more than
6  six hours earlier.  (RT 270, 276-277.)  This is evidence that
7  petitioner was under the influence of cocaine and alcohol when
8  he was interviewed by the police.
9      The police and the prosecutoon kept saying that petitioner
10 told the police that he ran with the card of Mancera, then Mancera
11 chased after petitioner to retrieve the card, then both fought and
12 in the process, Mancera fell the track below and killed herself.
13 Well if petitioner told the police that he ran with the card of
14 Mancera, petitioner is requesting an examination of the Original
15 tape of the recorded statement to the police that petitioner made.
16 If what the police and the prosecution claimed is true, the
17 original tape of petitioner's statement to the police should
18 reflect this.  But petitioner is requesting an expert to examine
19 the tape recorded of the original tape of his statements to the
20 police.  The reason petitioner is requesting the service of an
21 expert to examine the original tape of his statements is because
22 the police and the prosecution are inventing that petitioner told
23 them that he ran with the card of Mancera and then Mancera chased
24 him.  That is false.  Petitioner does not remember saying that
25 to the police.
26     If an expert on cassette says that the original tape of
27 petitioner's statements to the police says that petitioner says
28 in the recorded statements that he ran with the card of Mancera

6N

1  and Mancera chased after him to retrieve her card.  Then petitioner
2  will accept the expert findings.  But if not expert on cassettes
3  examine the original tape of the statements recorded of petitioner's
4  statements to the police, petitioner will not accept that he ran
5  with the card of Mancera and Mancera chased after him to retrieve
6  the card.  Petitioner fought with Mancera because both were drunk
7  or under the influence of cocaine and alcohol.  Petitioner never
8  ran with the card of Mancera.  The police and the prosecution are
9  inventing this story.

10      The reason petitioner is requesting the service of an expert
11  on cassette is because petitioner wants to challenge the authenti-
12  city of the original tape recorded of his statements to the police.
13  The Mercury News says that the Santa Clara County police and the
14  prosecution work in concert to convict people that are innocent.
15  Like indicated above, is the position of petitioner that he never
16  told the police that he ran with the card of Mancera.  The police
17  is not been candid.

18      If any part in the case in chief was used by the prosecution,
19  petitioner's conviction then should be reversed because the trial
20  court found that petitioner's statements violated his Miranda
21  rights.  Petitioner did not testify.  Then any part of his state-
22  ment that was used was a violation of his Fifth Amendment.

23      The people bear the burden of proving by a preponderance of
24  evidence that a defendant's custodial statement complied with
25  Miranda.  (Colorado v. Connelly, (1986) 479 U.S. 157, 168-169
26  [107 S.Ct. 515, 93 L.Ed.2d 473]·

27      Criminal defendants undergoing custodial interrogations by
28  the police must be advised of their constitutional right to

1   remain silent, have an attorney present during the interrogation,
2   have an attorney appointed if the defendant is indigent, and of
3   the state's ability to use incriminating statements against them.
4   (Stansbury v. California,(1994) 511 U.S. 318, 321 [114 S.Ct. 1526,
5   128 L.Ed.2d 293]; Miranda v. Arizona, 384 U.S. 436, 444 (1966);
6   People v. Aguilera, (1996) 51 Cal.App.4th 1151, 1161.)  Unless
7   the defendant waives these constitutional rights, any statements
8   obtained during a custodial interrogation are inadmissible to
9   establish a defendant's guilty.  (Michigan v. Tucker, (1974) 417
10  U.S. 433, 444, 446 [94 S.Ct. 2357, 41 L.Ed.2d 182]; Miranda v.
11  Arizona, supra, 384 U.S. at p. 444; People v. Aguilera supra,
12  51 Cal.4th at p. 1161; People v. Clair, (1992) 2 Cal.4th 629,
13  678.)

14      This case is being done without any aid from the trial
15  transcripts.  It been done just with the aid of Appellant's
16  Opening Brief that was sent by Appellate Counsel on 9/12/06  See
17  Exhibit A pages 15-16.

18      **PETITIONER REQUESTS AN EXPERT ON CASSETTE, AND AN EVIDENTIARY**
19  **HEARING ON ISSUE TWO.**  Petitioner also is requesting a reversal
20  of his conviction.  Petitioner's right under the Fifth Amendment
21  to the United States Constitution had been violated.

22

23

24

25

26

27

28

III.

### PETITIONER IS REQUESTING A COPY OF
### HIS TRIAL TRANSCRIPTS.

1
2
3

4   A Jailhouse Lawyer, whose name is not available right now,
5   but will be provided in the future, was doing the case of
6   petitioner.  The Jailhouse Lawyer went to the hole (SHU).
7   Petitioner did an appeal (602) requesting to the authorities to
8   retrieve his trial transcripts from the Jailhouse Lawyer.  The
9   appeal (602) was responded and petitioner was told that he should
10  have done the appeal (602) within 15 days from the day the Jail-
11  house Lawyer went to the hole.

12  This prison should not have refused to retrieve the trial
13  transcripts from the Jailhouse Lawyer because they are very vital
14  to petitioner.  Now petitioner is doing this case without the
15  trial transcripts.  Petitioner received the Appellant's Opening
16  Brief from his appellate counsel on September 12, 2006.  Please
17  see Exhibit A at page 16.  On July 23, 2006 petitioner requested
18  a copy of his trial transcripts to Ms. Lori A. Quick (Appellate
19  Counsel)  Please see Exhibit A at page 15.  Like petitioner is
20  saying in his letter that he needs a copy of the trial transcripts
21  because a Jailhouse Lawyer have them and the Jailhouse Lawyer
22  informed petitioner that the trial transcripts were taken from
23  him and thrown away when he (Jailhouse Lawyer) went to the hole.

24  If petitioner does not have his trial transcripts is the
25  fault of High Desert State Prison because it thrown them away.
26  The High Desert State Prison's Warden, Thomas Felker is an arm
27  or branch of the Government of the State of California.  Therefore
28  this Court should provide a copy of the trial transcripts to

6Q

1  petitioner.

2  In King v. Bell, 378 F.3d 550 (6th Cir. 2004) the United
3  States Court of Appeals for the Sixth Circuit ordered an evidentiary
4  hearing because the government delayed in providing petitioner
5  with the trial transcripts.  See also Keenan v. Bagley, 400 F.3d
6  421 (6th Cir. 2005)

7  In Holloway v. Roe, 31 Fed.Appx. 376, 377 (9th Cir. 2002)
8  Holloway his Jailhouse Lawyer died, he did not prepare a timely
9  petition because, his (Holloway') Jailhouse Lawyer had all the
10 files and records.  The United States Court of Appeals for the Ninth
11 Circuit  remand      for further development of the record and
12 consideration of the equitable tolling claim in view of the record.
13 See Whalem/Hunt v. Early, 233 F.3d 1146, 1148 (9th Cir. 2000)
14 (en banc) (remand appropriate where there are "circumstances
15 consistent with petitioner's petition and declaration under which
16 he would be entitled to a finding of . . . . equitable tolling.")

17 Morrison contends that the district court erred by not granting
18 him equitable tolling for the period during which he was incarce-
19 rated outside of Montana and denied access to necessary materials.
20 See Miles v. Prunty, 187 F.3d 1104, 1105, 1107 (9th Cir. 1999)
21 (concluding that when external forces rather than the petitioner's
22 lack of deligence, account for the failure to file a timely claim,
23 equitable tolling may be appropriate).  Because the district
24 court did not have the benefit of our en banc decision in
25 Whalem/Hunt v. Early, 233 F.3d 1146 (9th Cir. 2000) (en banc)
26 (per curiam), and no evidentiary hearing was held, we reversed
27 and remand to the district court for appropriate development of
28 the record and factual findings.  Id. at 1148. (determining that

1  where it cannot be said that there are no circumstance consistent

2  with petitioner's petition and declaration under which he would

3  be entitled to equitable tolling, reversal is proper).  Morrison

4  v. Mahoney, 31 Fed.Appx. 389, 390 (9th Cir. 2002).

5       If this Court fails to provide the trial transcripts to

6  petitioner, he will be entitled to submit another petition in the

7  future after petitioner gets the transcripts.  This Court should

8  provide the trial transcripts to petitioner now to prevent that

9  the tax payers resources be spent unnecessary in the future.

10 Petitioner has been raised the present issues without the trial

11 transcripts and due to that, the issues are not properly done.

12 **PETITIONER IS REQUESTING AN EVIDENTIARY HEARING ON THIS ISSUE**

13 **THREE.**  After it, petitioner is requesting a reversal of his

14 conviction because his Fourteenth Amendment right to transcript

15 had been violated by the Warden Thomas Felker when his subordinates

16 took and threw away the trial transcripts of petitioner that were

17 in possession of petitioner's Jailhouse Lawyer.

18

19

20

21

22

23

24

25

26

27

28

IV.

## PETITIONER WAS DENIED HIS
## PRESENCE DURING THE READBACK.

On May 14, 2002, 9:39 A.M. Not reported- The Jury informs the deputy that they have a question.  The Court is notified. The Court instructs the deputy to enter the deliberation room and ask the jury to be more specific as to the question.

9:50 a.m. Not reported- the jury inform the deputy that they have specified the area requested.  The court and counsel are notified.

10:23    not reported the jury informs the deputy that they have another question.  The court and counsel are notified.

10:38 a.m. not reported, Cindy Mohr, enters the deliberation room to do the readback requested by the jury and to provide the written answer to the second question requested.

10:40 a.m. not reported the reporter leaves the deliberation room after completing the readback.  The jury continue delibera- ting.

11:01 a.m. Court is in session with both counsel present. the Court reviews the first question received from the jury this morning.  Defense Attorney Gillan is heard regarding his odjection. the People are heard briefly.

11:04 a.m. The court reads the second question received and reads the answer which was provided to the jury.  **Defense counsel Gillan waives the defendant's presence.**  Both counsel stipulate that the reporter may enter the deliberation room for readback.  See (CT 193.)

Defendant has a constitutional right to be present at all

6T

1   stages of the trial where his absence might frustrate the fairness

2   of the proceedings-Cohen v. Senkowski, 290 F.3d 485; see also

3   Rushen v. Spain, 464 U.S. 114 (1983) 2005 L.W. 1728, 6/7/05.

4      Petitioner did not waive his presence.  Therefore, his convic-

5   tion should be reversed.  **PETITIONER IS REQUESTING AN EVIDENTIARY**

6   **HEARING ON ISSUE SIX.**  Petitioner's right under the Sixth Amend-

7   ment has been violated.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

V.

2

## TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE
BY FAILING TO PRESENT THE DEFENSE OF SELF-DEFENSE.

3

4      Maria Mancera A.K.A John Mancera's blood alcohol level had

5   been determined to be .22%. (RT 280-281.)  The blood alcohol level

6   of .22% indicated Chief Medical Examiner Gregory Schmunk that

7   Mancera had consumed approximately 10 drinks within a few hours

8   of her death.  (RT 219.)  Such a blood alcohol level would result

9   of signs of gross intoxication, such as slurs speech and loss

10   of balance with difficulty standing and walking.  (RT 273-274, 282-

11   283.)

12      Officer Barreto on the day of the incident spoke with Mancera

13   and petitioner.  Barreto believed that Mancera and petitioner were

14   both under the influence of alcohol.  (RT 134-144.)  He based this

15   upon the fact that there was an odor of alcohol on them, their

16   eyes were watery and bloodshot,  and they were somewhat unsteady

17   on their feet.  (RT 135.)  Officer Neumer also smelled alcahol,

18   and recalled that they admitted they had been driking.  (RT 154.)

19   They also had delated pupils, which Barreto knew was a sympton

20   of stimulant use.  (RT 144.)  Barreto did not see anything that

21   he immediately recognized as symptons of cocaine use, but it was

22   possible that they were under the influence of cocaine as well.

23   (RT 148.)  Barreto thought they were both at about the same

24   level of intoxication.  (RT 135.)

25      Petitioner fought with Mancera after she jumped on petitioner

26   for no apparent reasons.  Mancera fought with petitioner because

27   she was under the influence of alcohol and cocaine.  At no time

28   petitioner tried to run with the ATM card of Mancera as the

1    police and prosecution claimed.  Was the position of the prosecu-
2    tion that Mancera was killed when she was trying to retrieve her
3    card from petitioner when petitioner was running with it.  That
4    is a pure fabrication that Mancera was chasing after petitioner
5    for her card.

6        Petitioner told trial counsel that he fought with Mancera
7    for no apparent reasons.  Petitioner told trial counsel that
8    during the struggling Mancera fell the track down and killed
9    herself during the fall.  Trial counsel refused to argue that
10   petitioner had killed Mancera in the heat of passion, and that
11   the charged offense is a pure manslaughter.  If trial counsel
12   would have used the defense of self-defense, the result of the
13   proceeding would have been different.

14       In In re Hall, 30 Cal.3d 408, 179 Cal.Rptr. 223.  (Defendant
15   was denied competent counsel by failing to prepare case)  Court
16   granted defendant's habeas corpus petition because of a combina-
17   tion of newly discovered evidence and trial counsel's failure to
18   adequately prepare the defense.  Court went to considerable
19   length in detailings the failings of defense to properly prepare
20   and investigate the defense of the case.

21       Thelen has been granted a certificate of appealability by the
22   United States Court of Appeals for the Sixth Circuit to seek
23   review of the issue of whether his trial counsel rendered
24   ineffective assistance by failing to object to the use of a 1986
25   Oklahoma deferred sentence which occurred more than ten years
26   prior to the commencement of the instant offense as a predicate to
27   a career offender enhancement.  Thelen v. United States, 131 Fed.
28   Appx. 61-63 (6th Cir. 2005).

6W

1    Deferential standard of review applies to ineffective assis-
2  tance claims.  A defendant must show that counsel's representation
3  was so "thoroughly ineffective that defeat was 'snatched from
4  the jaws of victory.'"  West v. Seabold, 73 F.3d 81, 84 (6th Cir.
5  1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th
6  Cir. 1992) (en banc).

7    Inexperience and inattention can be enough to constitute
8  constitutional deficient performance.  Grevley v. Mills, 87 F.3d
9  779, 786 (6th Cir, 1996).

10    Petitioner's conviction should be reversed.  **PETITIONER IS**
11  **REQUESTING AN EVIDENTIARY HEARING ON ISSUE FIVE.**  Petitioner's
12  right under the Sixth Amendment had been violated.

A.    Trial Counsel Prevented Petitioner From Testifying.

If petitioner would have been let to testifying, he would have told the jury that Mancera never chased after him to try to retrieve his ATM card.  Petitioner  would have told the jury that because both were under the influence of cocaine and alcohol, they fought for no apparent reasons.  Petitioner would have told the jury that he never told the interrogation officers that he ran with the card of Mancera and that police invented the story that petitioner ran with the card of Mancera.  Petitioner would have told the jury that Mancera and him started the fight over the track and then accidentally, Mancera fell below the track.

Trial counsel told petitioner that he was no let him to testify because petitioner was going to be impeached with his priors if he testify.  Petitioner told trial counsel that he wanted to testify even though he could be impeached with his priors.

The constitutional right to testify is found in the Due Process Clause, the Fifth Amendment's guarantee against compelled testimony, and the Sixth Amendment.  Rock v. Arkansas, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2708-10, 97 L.Ed.2d 37 (1987).  Quoting United States v. Moreno, 102 F.3d 994, 998 (9th Cir. 1986); see also Nicholas v. Batler, (1990) 917 F.2d 518; United States v. Teague, 908 F.2d 488 (11th Cir. 1990).

Petitioner's conviction should be reversed.  **PETITIONER IS REQUESTING AN EVIDENTIARY HEARING ON ISSUE V(A).**    Petitioner has been denied his Fifth and Sixth Amendments of the United States Constitution.

B. **Failure To Request Jury Instruction of the defense of Self-Defense.**

In U.S. v. Span, 75 F.3d 1383 (9th Cir. 1996) (Counsel's failure to request instructions on viable defense theory denies defendant right to effective counsel). Defendants were charged and convicted of assaulting federal marshalls. Although counsel had requested jury instructions covering the affirmative defense of self-defense and mistake of fact, and privilege to resist an unlawfull arrest, he neglected to see instructions on the theory that a person has a right to resist an officer who is using excessive force. Court here found that counsel's failure to seek instructions on this theory which given the evidence, was defendants' only viable defense and one that had a strong likely of success, was ineffective assistance of counsel.

In the present case, trial counsel neglected to seek instructions on the theory that Mr. Uvalles has a right to resist the attack of Mancera who was using excessive force against petitioner.

Gregory Schmunk is the Chief Medical Examiner and Coroner for Santa Clara County who is an expert in the area of forensic pathology and wound recognition. (RT 196-198.) He performed an autopsy on Mancera's body during which he discovered that Mancera was in fact a man. (RT 198-199.) Mancera's blood alcohol level had been determined to be .22. (RT 280-281.) The blood alcohol level of .22% indicated to Schmunk that Mancera had consumed approximately 10 drinks within a few hours. (RT 219.) Such a blood alcohol level would result in signs of gross intoxication, such as slurred speech and loss of balance with difficulty

1  standing and walking.  (RT 273-274, 282-283.)  He noted that

2  between 11:10 a.m. and 12:20 p.m. on August 20, Mancera's body

3  was in full rigor mortis, meaning that she had died approximately

4  six to eight hours earlier.  (RT 213.)  The level of livility

5  present at the same time was not fixed, as would be expected

6  eight to 12 hours after death.  (RT 215-216.)

7      Mancera was a man, He must have been violent because for no

8  reason attacked petitioner.  Maybe Mancera was violent due to

9  the amount of alcohol and cocaine in his system.  Trial counsel

10  never investigated Mancera for any pattern of violence.  Mancera

11  was a violent person and due to that he attacked petitioner.  Or

12  like petitioner indicated above, maybe the alcohol and the cocaine

13  made Mancera to be violent.  The only thing petitioner can say

14  is that Mancera attacked him and he defended himself.  And trial

15  counsel would have requested the instruction that petitioner had

16  a right to defend the attack of Mancera.  Also trial counsel

17  would have requested the instruction of the defense of self-defen-

18  se.  Because he failed to do so.  He was ineffective.

19      Petitioner's conviction should be reversed.  **PETITIONER IS**

20  **REQUESTING AN EVIDENTIARY HEARING ON ISSUE FIVE(B).**  Petitioner's

21  rights under the Sixth Amendment to the United States Constitu-

22  tion had been violated.

23

24

25

26

27

28

VI.

**APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE**

If this Court finds any issue raised in this petition merito-
rious, them this Court will find that appellate counsel was
ineffective by failing to raise the meritorious issue that this
Court finds that have merits.

In evaluating a claim of ineffective assistance of appellate
counsel, we look to the analysis established by the United States
Supreme Court in Strickland v. Washington, 466 U.S. 668, 688 104
S.Ct. 2052, 80 L.Ed.2d 674 (1984).  See also Willis v. Smith,
351 F.3d 741, 745 (6th Cir. 2003).  The Strickland involves two
prongs: the "performance prong," where a petitioner is required
to show that her attorney's representation "fell below an objective
standard of reasonableness," Id, and the "prejudiced prong,"
which requires the petitioner to demonstrate that there exists
"a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different,"
id, (emphasis added).  Ballard v. United States, 400 F.3d 404,
407 (6th Cir. 2005).

The question presented here is whether an appellate counsel
prejudices a client where the attorney fails to raise on appeal
a [meritorious] claim.  We answer in the affirmative, because
but for the appellate counsel's ineffectiveness, there is a
reasonable probability that the result of the [] appeal may have
been different.  Cover v. Straub, 349 F.3d 340, 349-50 (6th Cir.
2003).  Quoting Ballard v. United States, supra, 400 F.3d 404,
409 (6th Cir. 2005).

1    A showing that a defendant received ineffective assistance of

2  counsel will establish cause excusing a procedural default.

3  Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 379

4  (1986) quoting Ellis v. Hargett, 303 F.3d 1183, 1186 (10th Cir.

5  2002).

6    Petitioner's conviction should be reversed.  **PETITIONER IS**

7  **REQUESTING AN EVIDENTIARY HEARING ON ISSUE EIGHT.**  Petitioner's

8  right under the Sixth and Fourteenth Amendments have been denied.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  .

26

27

28

10.  Supporting cases, if any.  List by name and citation only, the cases which you think are close factually to yours so that it is an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning of these cases:

SEE PAGES 6A THROUGH PAGE 6CC

_____

_____

_____

_____


## PART D - ATTORNEY INFORMATION

11.  Give the name and address of each attorney who represented you in the following proceedings:

(a)  Arraignment _Not available_

(b)  At preliminary hearing _Not available_

(c)  At time of plea _Not available_

(d)  At trial _Charlie Gillan PD 120 West Mission St. San Jose, CA 95110_

(e)  At sentencing _Same as above mentioned_

(f)  On appeal _Lori A. Quick 100 N. Winchester Blvd. #310 Santa Clara_, CA 95050

(g)  Other post-conviction proceeding _Jailhouse Lawyers help me with_ my case before and now.

12.  Was the attorney hired by you or your family?  Yes ____   No _x_

     Appointed by the Court?   Yes ____   No _x_

     Are you alleging as one ground for relief that your attorney gave you ineffective legal assistance?  If so, who and at what stage?

Trial counsel and appellate counsel rendered ineffective assistance

13.  If you did not have an attorney represent you, did you represent yourself?   Yes ____   No _x_

     With consent of the Court?   Yes ____   No _x_

14.  Are you represented by an attorney in this petition?
                                          Yes ____  No _x_

7

If you answered "Yes" give name and address of your attorney

Not applicable

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

Executed at _____H.D.S.P._____ Dated: ___Feb. 11, 2007___

Raul Valles
Signature of Petitioner

## FORMA PAUPERIS AFFIDAVIT
### (See Instructions Attached to This Form)

I hereby apply for leave to proceed with this habeas corpus petition without prepayment of fees or costs or security therefor. In support of my application, I state that the following facts are true:

(1)  I am the petitioner in said petition, and I believe I am entitled to redress.

(2)  I am unable to pay the costs of said action or give security because:

_____

_____

_____

_____
Signature of Petitioner
(Sign here only if you seek to proceed without payment of fees)

STATE OF _____ )

COUNTY OF _____ )

I declare under penalty of perjury that the foregoing is true and correct.

Signed on _____
(Date)

_____
Signature of Petitioner

8

EXHIBIT A

Posted on Sun, Jan. 22, 2006

**FIRST OF FIVE PARTS**

# Review of more than 700 appeals finds problems throughout the justice system

**By Fredric N. Tulsky**
**Mercury News**

The Santa Clara County criminal justice system failed Miguel Sermeno.

Sermeno was arrested on felony hit-and-run charges after walking the half-block from his house to the scene of an accident. An overzealous deputy district attorney ignored evidence that pointed to a more likely suspect, instead winning a wrongful conviction.

The system failed Bobby Herrera.

Herrera pleaded guilty to assault for a shooting he did not commit, buckling to pressure from an incompetent lawyer who bled his family for thousands of dollars but never investigated the case. Even after the key witness admitted she falsely accused him, indifferent state appellate court justices let his five-year prison sentence stand without explanation.

The system failed Frederick Brown. Brown was sentenced to 26 years to life for possessing stolen property, after he hauled away a truck that had been stripped of parts as it sat idly near his home for a year. The trial judge refused to instruct the jury on a key point of law: Brown was not guilty if he believed the truck was abandoned.

The three cases are among hundreds examined in an unprecedented three-year Mercury News investigation of the Santa Clara County criminal justice system that shows a disturbing truth:

A dramatic number of cases were infected with errors by prosecutors, defense attorneys and judges, and those errors were routinely tolerated. In dozens of cases, the errors robbed defendants of their right to a fair trial. And in a small number of the very worst cases, they led people to be wrongly convicted.

The study reveals ``a basic truth about how the criminal justice system operates,'' said Laurie Levenson, a former federal prosecutor who teaches criminal law and ethics at Loyola Law School in Los Angeles. Levenson was one of seven experts in criminal procedures and ethics who reviewed the Mercury News findings. ``A lot of sausage gets pushed through that machine. Errors that help the prosecution are common. The uneven nature of criminal justice is a serious concern.''

The Mercury News began its investigation in late 2002, as concerns emerged about the quality of justice in a series of high-profile cases. To test how the system worked more broadly, the newspaper reviewed the records of five years of criminal jury trial appeals decided by the California 6th District Court of Appeal -- 727 cases in all. In addition, the newspaper uncovered about 200 cases of questionable conduct that were not part of the study period, by reviewing files and interviewing lawyers.

The result is an unparalleled look at the extent, nature and impact of errors in a criminal justice system.

The review established that in 261 of the appellate cases reviewed -- more than one in every three of the total -- the criminal trial had been marred by questionable conduct that worked against the defendant. In only about one in 20 cases did the defendant win meaningful relief -- either a new trial or a significantly reduced sentence -- from higher courts.

The problems occurred at every phase of a trial, and in every part of the system.

• **Prosecutors.** In nearly 100 cases, the prosecution engaged in questionable conduct that bolstered its effort to win convictions, the examination revealed. Some Santa Clara County prosecutors withheld evidence that could have helped defendants, some defied judge's orders and some misled juries during closing arguments.

But they did not act in a vacuum. In an adversary system in which defense attorneys and judges are responsible for guarding against prosecutors' excesses, the newspaper study found, those checks on the system too often fall short.

• **Defense attorneys.** In 100 cases, defense attorneys acted in ways that harmed their clients. In nearly 50 cases, the attorneys failed to take the most basic of measures, from properly investigating their case to presenting the evidence they gathered. Defense attorneys failed in dozens more cases to object as prosecutors or judges engaged in questionable conduct, in effect excusing the mistakes.

• **Trial judges.** In more than 150 cases, judges made missteps or questionable rulings that favored the prosecution. Violating legal precedents, trial judges allowed evidence that unfairly tainted defendants and prohibited evidence that might have supported their defense. Repeatedly, judges failed to properly instruct jurors on legal principles, instead offering direction that made a guilty verdict more likely.

• **The appellate court.** The 6th District Court of Appeal, the primary court of review for Santa Clara County cases, upheld verdicts in more than 100 cases even as it acknowledged errors had occurred. The appellate court simply concluded those errors made no difference in the outcome of the case. Sometimes those conclusions were appropriate, but a review of the appellate record and consultations with experts established that in more than 50 cases the court misstated facts, twisted logic and devised questionable rationales to dismiss the error.

In nearly all the cases, the 6th District designates its opinions as ``not to be published'' -- a distinction that means they are not to be cited as legal authority in subsequent cases, and thus have little relevance beyond the parties to a case. The Mercury News found that higher courts are extremely unlikely to review unpublished opinions, making the 6th District the final word on most criminal trials in Santa Clara County.

The unpublished designation also has served to shield the cases from outside review. Past academic and journalistic studies of criminal justice, here and elsewhere, have examined published opinions, even though they represent a tiny proportion of court decisions. The Mercury News review is unprecedented in its comprehensive analysis of criminal decisions, published and unpublished alike.

State court statistics show the 6th District over time has published a smaller portion of its criminal cases -- 2 percent -- than any other appellate district in the state. The statewide average is 4 percent.

Taken together, the Mercury News findings offer a picture of a system that often turns on its head the presumption that defendants are innocent until proven guilty. Prosecutors, defense attorneys, judges and appellate justices often act in ways that cause defendants' rights to be violated.

The newspaper study points to a ``skewed system that disproportionately bends over backward to help the DA win,'' said Bennett Gershman, a former prosecutor and professor of criminal law at Pace University School of Law who has written on prosecutorial and judicial ethics. ``Admitting and excluding evidence unevenhandedly and overlooking serious errors is not a pretty state of affairs if one is concerned about fair trials. Nor if one is concerned about the appearance of justice.''

Another outside check on the system -- media attention -- also has largely failed. The few defendants with money or connections often can command attention for their complaints against the system. But the overwhelming number of cases in the Mercury News examination, even involving the most serious allegations of error or misconduct, have received scant publicity, if any.

To be sure, the review established that the system usually works. Most of the county's more than 300 criminal jury trials annually are marked by judicial rulings that correctly interpret and administer the law, and prosecutors who faithfully follow court rules and judges' rulings. In most appeals, the justices properly apply the law to the facts before them. And even in cases tainted by error, there is rarely reason to doubt the guilt of those convicted.

But Gershman and other experts say the problems exposed in the Mercury News examination are serious and reflect a nationwide trend in criminal justice. The expansion of the rights of the accused identified with U.S. Supreme Court decisions through the term of Chief Justice Earl Warren in the 1950s and '60s has waned in recent years. The public mood, worried about crime and clamoring for more safety, is reflected in tougher laws and court decisions. Prosecutors and judges who fail to lock up violent criminals do so at their own political peril.

## Defending conduct
### • DA reiterates concern for ethics

It was not possible to compare Santa Clara County directly to other areas, because of the lack of similar studies in any other jurisdiction. But this county has long been conservative on law-and-order issues and prides itself on a remarkably

low crime rate. The district attorney takes an aggressive approach to charging dangerous criminals, statistics show, and enjoys one of the highest conviction rates in the state. Judges in the county dismiss fewer cases than most of their counterparts elsewhere.

District Attorney George Kennedy and his assistants emphasize their concern for ethics and fairness, and say they have taken many steps to ensure that trial deputies care more about justice than about winning convictions at all costs. `` The tenor in the office, for fairness and ethics, is better than anywhere I know," Kennedy said.

His top assistant, Karyn Sinunu, reviewed with the Mercury News more than 100 cases in which concerns were raised about the prosecutor's behavior, and conceded that she was troubled by some of the conduct. But she said that in many instances, proper conduct was wrongly criticized, and that in other cases, the problems amounted to nothing more than honest mistakes.

But the Mercury News review uncovered a series of cases that raised more troubling questions about the conduct of prosecutors and whether the district attorney's office is doing enough to curb questionable behavior. While many errors were isolated incidents, others fell into patterns that suggested broader problems. And certain prosecutors engaged in questionable behavior in multiple cases, suggesting either sloppiness or a deliberate disregard for ethical rules. The Mercury News found repeated instances of troubling conduct in the career of one of the county's highest-profile prosecutors, Benjamin Field, including withholding evidence, making misleading arguments at trial and violating judicial orders.

Instances in which prosecutors, defense attorneys or judges err generally have little impact on the outcome of a case -- while any error raises, at least marginally, the likelihood of conviction, few cases go to trial without overwhelming evidence of guilt. But the Mercury News examination shows a number of cases in which the problems seemed to have greater impact.

`` The system is built to tolerate errors," said Levenson, the former prosecutor. `` One problem is that errors increase the small risk that innocent people can be convicted. And no one can say for sure how often that happens."

In 2003, two men convicted of Santa Clara County murders were set free amid judicial findings that police or prosecutor misconduct helped convict people who were probably innocent. One involved Glen `` Buddy" Nickerson, who served 19 years before U.S. District Judge Marilyn Hall Patel overturned his conviction. The second was Quedellis Ricardo `` Ricky" Walker, who spent nearly 12 years in prison before top prosecutors acknowledged that improper deals with unreliable witnesses had caused an injustice.

The newspaper probe identified several other cases in which doubts about guilt lingered after trials marred by questionable conduct. Some of those convictions were ultimately overturned in subsequent proceedings, although without the public notice the Walker and Nickerson cases drew. In two of those cases, the decision not to retry the defendant occurred as prosecutors reviewed concerns raised by the Mercury News.

After the Walker case, the district attorney's office took several significant steps, including mandatory training of assistants, to re-emphasize the need to be vigilant against wrongful prosecutions.

Kennedy said he has sought to guard against wrongful prosecutions since he took office in 1990. But, he said, the Walker case was a revelation to him. `` I thought before Ricky Walker that it was impossible" for an innocent defendant to be convicted and lose a motion for a new trial. `` I thought it was impossible. Now I know that it isn't."

## Worst nightmare
### • Mistakes lead to jail in hit-and-run case

The case against Miguel Sermeno is the system's worst nightmare: A series of misjudgments and mistakes led to the wrongful conviction of a man who was in the wrong place at the wrong time.

The yearlong ordeal began as Sermeno stood among a small crowd around the scene of an East San Jose hit-and-run in August 1995. A group of three bystanders thought he resembled the driver, and told police.

The investigating officer approached a frightened passenger who remained with the hit-and-run vehicle after the driver fled. He told her she could be locked up if she tried to cover up a crime, and asked whether Sermeno was the driver. She said yes, then quickly recanted.

Prosecutor Terence Tighe developed a theory that the passenger was lying to protect Sermeno because of their `` relationship," even though there was no indication the two knew each other. Tighe overlooked evidence suggesting the registered owner of the car was the driver who fled, and then withheld information that could have helped the

defense find the owner.

The assistant public defender chose not to present testimony from the children who also were in the car -- and who maintained all along that Sermeno was not the driver.

The trial judge refused to accept as evidence a photograph of the registered owner of the car, and rebuffed the public defender's complaints that he had no opportunity to show the picture to the witnesses and ask whether the owner might have been the driver instead.

After Sermeno was convicted for a felony hit-and-run, evidence emerged casting further doubt on Tighe's theory that the passenger was protecting Sermeno and not the far more logical suspect: The car's registered owner, whom she had denied knowing, was the father of her newborn baby.

The prosecution opposed granting Sermeno a new trial nonetheless. His court-appointed appellate attorney, Sheri Cohen, became baffled by the system's unwillingness to recognize her client's innocence. ``When I would go to a party and talk to people about the case, they couldn't believe that this man had been convicted and that officials were fighting to keep him convicted,'' she recalled.

A 6th District panel affirmed the conviction but ordered a hearing to consider the impact of the public defender's failure to call the children in the car as witnesses.

Finally, supervisors in the district attorney's office elected to drop the charges rather than retry Sermeno. By then, more than two years had passed since Sermeno's conviction and he had long since served his eight-month term in jail.

But the district attorney's office never formally acknowledged his innocence. In a recent interview, after hearing a reporter recount the reasons to question Sermeno's guilt, District Attorney Kennedy responded: ``If you have concluded he is innocent, I accept that.''

## Holding back
### • Crucial evidence often withheld from defense

Few cases in the Mercury News' review were as thoroughly twisted by a series of transgressions as Sermeno's. But the review demonstrates that such errors widely infect criminal cases, from before the trial through the appeal.

Perhaps the most contentious area involves the obligations of prosecutors and defense attorneys to exchange evidence promptly before trial, a process called discovery.

These disputes often begin with a complaint from a defense attorney that prosecutors ignored their legal obligation to turn over material needed to prepare the defense case. In dozens of cases reviewed by the Mercury News, judges stepped in to order prosecutors to turn over additional evidence; often they chastised the prosecutors for not being more cooperative.

Discovery issues continue post-trial as well; 25 appellate cases reviewed by the Mercury News involved significant concerns that prosecutors withheld evidence that might have cast doubt on the defendant's guilt. Over and over again, defense attorneys learned only after the case was tried that prosecution witnesses had questionable backgrounds that cast doubt on their credibility; that scientific reports were not as conclusive as juries were led to believe; that there was evidence that someone other than the defendant had committed the crime.

To defense lawyers, such issues are especially troubling for two reasons. They complain there is no way to know the number of cases in which evidence that might have changed the outcome was withheld. And they express distrust about prosecutors' motives, suggesting some evidence is intentionally hidden.

But after reviewing the cases raised by the Mercury News, chief assistant district attorney Sinunu said evidence often was withheld not for nefarious reasons, but because of mistakes or because the prosecutor was not aware of its existence. Kennedy said he believes appellate defense attorneys regularly exaggerate claims of withheld evidence, in a desperate effort to overturn convictions. Kennedy and Sinunu both said that their office policy is to err in favor of turning over evidence and that attorneys who fail to do so are warned about such conduct.

Still, problems persist.

Apolonio Solorio spent five months in jail, accused of a February 2003 robbery at a liquor store in San Jose, after the store owner identified him as one of the culprits. It took defense attorney Andy Gutierrez months, and request after

request, before a clear copy of a store videotape that captured the robbers was turned over. After the tape was digitally enhanced, the deputy district attorney quickly realized Solorio was the wrong man and moved to dismiss the charges.

It might seem an exceptional situation: A defendant's alleged crime is on videotape, and yet his attorney must fight to get this crucial evidence. But it wasn't exceptional for Gutierrez. Five years earlier, a similar thing happened when he represented Shehabeddin Elmarouk, charged with assaulting officers in the Santa Clara County jail.

The videotape that was initially provided showed only an inconclusive portion of the incident. Three weeks before trial, after six months of trying, Gutierrez obtained the full videotape, which showed the corrections officers brutally beating his client. A jury acquitted Elmarouk, who later received $110,000 after suing the county over the incident.

But when evidence of importance to the defense does not surface in a timely way, jurors are left with a misleading picture of the case as they deliberate.

Take the case of Mark Crawford, who had five prior drug-related convictions when he was arrested in January 1998. In his house, police armed with a search warrant found a duffel bag containing methamphetamine under a staircase. They also found drug paraphernalia elsewhere in the house and methamphetamine in Crawford's system.

Only one thing complicated the case. Inside the duffel bag were a motorcycle repair receipt and a traffic ticket, both bearing the name Richard Hara.

The prosecutor, Troy Benson, was undeterred. He called a police sergeant at trial to testify that drug dealers often stash false identity papers with their drugs.

The defense presented no evidence. In his closing argument, defense attorney Eben Kurtzman argued to the jury that the drugs belonged to Hara. Benson rebutted that argument by telling the jury, ``The fact is, you have no evidence that Richard Hara possessed these drugs. The only evidence that you have are two receipts. You have no evidence that Richard Hara ever lived in this house or was ever in this house.''

What Benson never did, he acknowledged to the Mercury News, was conduct inquiries into Hara. Neither did Kurtzman, who, like at least 18 other defense attorneys in cases reviewed by the Mercury News, failed to take simple steps to investigate or prepare for trial. He later said he did not hire an investigator because Crawford had no money for one.

Yet as an appellate attorney discovered after Crawford's conviction, there was plenty of easily obtainable evidence that the drugs may not have been Crawford's.

Witnesses were available to testify that Hara stayed in the apartment and that the duffel bag was his. And at the very time the charges against Crawford were pending, Hara himself was arrested in Santa Clara County for allegedly possessing methamphetamine. Months before Benson would hint to a jury there was no evidence that Hara existed, his office agreed to a deal that sentenced Hara to four months in jail and a required rehabilitation program. Benson said he did not know of Hara's arrest and therefore had no information to provide during discovery.

Asked by the Mercury News to review the case, top officials in the district attorney's office were not perturbed by evidence that Hara existed after all, and offered a new theory of the crime: Hara and Crawford probably were involved in drugs together, so the evidence implicating Hara did not necessarily exonerate Crawford.

To date no court has been willing to say that Crawford was denied a fair trial. He remains in prison, having never had the opportunity to present the evidence on Hara to a jury.

## `Again and again'
### • Frequency, nature of problems worry experts

Withholding evidence is just one of many types of questionable prosecutorial conduct documented by the newspaper review. In 37 cases, prosecutors or their witnesses revealed evidence that the judge had banned from the trial; in more than 40 cases, prosecutors misstated the law, disparaged the defendant or his attorney, or made other sorts of improper statements during closing arguments; in eight cases, prosecutors took advantage of judicial rulings, telling jurors that no evidence existed to support a defense argument when the truth was the judge had prohibited the defense from presenting the evidence.

In more than 50 other cases, judges endorsed the prosecutors' behavior, making the questionable conduct the judges' own responsibility.

Experts who reviewed the Mercury News findings said the number and nature of the issues involving prosecutors suggest that some of the conduct was deliberate -- or at least was not being effectively prevented. Of particular concern was some conduct that occurred in patterns.

`` When you see something happening again and again, you have to question if it isn't happening by design," said Gershman, the law professor at Pace.

Prosecutors in nine cases trivialized `` reasonable doubt" in ways that drew criticism from the appellate court. Using strikingly similar analogies, these prosecutors sought to convince juries that it was easy to overcome such doubt, comparing it to the minor doubt one might have about the risk of an accident when driving through a green light, or making a left turn, or getting on an elevator, or boarding an airplane.

In 16 cases, prosecutors or their witnesses revealed to juries that defendants were in custody, or on probation, or on parole, generally despite specific orders from a judge not to do so. Judges typically prohibit evidence that could bias the jury against a defendant when it has no direct connection to the crime.

Sinunu, the chief assistant district attorney, admitted that the improper disclosure of evidence does recur. But, she noted, sometimes it is inadvertent -- lawyers and witnesses on occasion blunder as they try to follow the rulings. And at times, she said, witnesses -- police and victims, especially -- wrongly think they are helping the prosecutor when they blurt out information the jury is not supposed to learn.

But after reviewing the Mercury News findings, University of California-Berkeley law Professor David A. Sklansky, a former federal prosecutor, said the number of such improper revelations seemed high. `` This is the type of thing that prosecutors should be able to stop if they wanted to, by making it clear to witnesses that it will not help and is improper to say."

Asked about Sklansky's conclusion, Kennedy conceded it was `` a fair point."

Another matter of concern, experts said, are cases in which a single prosecutor engages in a series of questionable actions. Such cases suggest, they said, that the deputy district attorney either did not respect ethical boundaries or had, in the heat of the courtroom battle, lost a sense of fair play.

In 2001, Joey Villarreal was charged with possessing methamphetamine for sale after the police found him with a duffel bag of drugs and, when patting him down, a pocketknife. Before trial, Judge Marliese Kim told Deputy District Attorney Sumerle Pfeffer Davis to instruct her witnesses that the knife was not to be mentioned.

Nevertheless, during trial, Davis asked a police officer what he found when he patted down Villarreal. He responded, `` I remember locating a large pocketknife in his pocket."

Away from the jury, Davis told the judge she had failed to advise the officer of the judge's order.

But that was not Davis' only mistake. In a sharply critical ruling, the 6th District also found that Davis had failed to provide to the defense statements by Villarreal at the time of his arrest, and that she overstated, in opening and closing arguments, the amount of methamphetamine in evidence. Even as the appellate panel upheld the verdict, it stated that Davis' `` repeated failures -- to uphold her duties as an officer of the court -- were injurious to the dignity and integrity of our criminal justice system and raise questions about her ability or willingness to adhere to the laws of this state."

Sinunu, the chief assistant district attorney, said that although Davis had erred at trial -- and had received training on courtroom conduct as a result -- officials in her office believed that the 6th District had unfairly exaggerated the error.

## Excusing mistakes
### • Appeals court routinely justifies alleged errors

Although the court's language in the Villarreal case was unusually sharp, its conclusion was typical. In a system in which errors can lead to disastrous consequences, the ultimate check on most questionable conduct -- the 6th District Court of Appeal -- routinely excuses it.

The 6th District, which covers Santa Clara, Santa Cruz, Monterey and San Benito counties, was carved more than two decades ago out of the 1st District Court of Appeal, which oversees the rest of the Bay Area. It has long been regarded as the most conservative appellate court overseeing an urban area in California -- a reputation stemming in part from the role of law-and-order Gov. George Deukmejian, a former attorney general, in appointing its first eight justices.

6

Supervising Assistant District Attorney David Tomkins said he remains convinced of Butler's guilt, despite the court's ruling and the problems with the evidence. Defense attorney Patrick Kelly is no happier.

Although colleagues offered Kelly congratulations on winning freedom for Butler, he told a reporter, ``I feel horrible about it. I believe my client was innocent, and that makes it impossible to feel good about this outcome.''

## Refusing to act
## • Court says most errors are too small to matter

The Butler case stands out as one of the rare instances in which the appellate court was concerned enough about the evidence of guilt to overturn the verdict. More commonly, the court concludes the evidence is so overwhelming that whatever errors marred the trial do not matter.

The Mercury News' analysis of five years of appeals showed that in at least 107 instances, the court agreed that a prosecutor, defense attorney or judge had erred, but it called the errors harmless. In 79 other instances, the appellate court said there was no need to determine whether an error had occurred, because it would have been harmless anyway.

The U.S. Supreme Court has made clear that some level of error is acceptable: Defendants are not entitled to perfect trials, an impossible goal, but to fair trials.

But experts note there are dangers when a court routinely upholds convictions in the face of serious errors. For one thing, the appellate court is doing less than it might to discourage misconduct. If the appellate court, for instance, regularly finds that trivializing reasonable doubt is harmless, prosecutors are not necessarily deterred from doing so.

Even worse is the danger that the justices may wrongly assess the impact the errors had on the case. Not only is it difficult to determine how much an error influenced the jury, but justices also may misjudge the strength of the case themselves because of evidence that was excluded or wrongly included.

Nowhere is the court's tendency to shrug off errors more striking than in cases that involved heinous, high-profile crimes, where a reversal might lead to the release of a dangerous criminal.

One powerful example is the appeal of Sonya Daniels, a Milpitas resident whose young son, Jory, starved to death in 1994. The case was shocking, and created outrage in the community.

Daniels was tried along with her husband, Brian. The two were convicted of second-degree murder and sentenced to 15 years to life in prison. But both the trial and appellate courts reacted contemptuously to Sonya Daniels' argument that her role in Jory's death could not be considered without appreciation for her status as a battered wife.

In a three-month trial in 1998, the jury heard a sordid story of child abuse. Jory, 5, weighed 19 pounds at the time of his death and was so thin that the shape of his bones could be seen through his skin.

The jury heard that Jory and his younger brother often complained of being hungry and were sometimes denied food and water as punishment. They also heard that the abuse had a long history -- as an infant, Jory had been removed from his parents because of a fractured skull and leg.

But an equally sordid tale was not told at trial. Sonya Daniels claimed she experienced extreme abuse at the hands of her husband, including rape, sodomy and beatings with a belt. Once, angry over her refusal to have an abortion, she said, Brian Daniels had locked her in a closet and deprived her of food and water for three days.

A 1991 state law encourages judges to admit testimony about Battered Women's Syndrome and its effects on the behavior of victims of domestic violence, but Superior Court Judge Thomas Hastings ruled that law did not apply in this case. He refused to permit a psychotherapist who specialized in family violence to testify that Sonya Daniels had been battered so severely that she was not aware of the danger to her children, and that she lived in fear that made her incapable of protecting them.

In a highly emotional scene, the prosecutor repeatedly asked Sonya Daniels why she failed to protect her son from starvation, knowing she could not mention her claims of abuse. Over and over, Hastings reprimanded her and threatened contempt as she complained that she was not allowed to answer.

Her attorney, James Leininger, continued to complain to Hastings. But Leininger's efforts, which later drew a rebuke from the appellate court for showing `` appalling disrespect'' to the judge, failed to persuade Hastings to change his ruling.

7

But Sonya Daniels' difficulties in presenting her defense were just beginning. After both she and her husband were convicted of second-degree murder, Leininger introduced her parents to another attorney, Brenda Malloy, who Leininger contended would be a good choice for the appeal. She would turn out to be a better choice for Leininger than for Sonya Daniels.

Malloy told her it would cost $25,000 for the appeal, and months later, according to court records, the first $10,000 was countersigned and deposited in Leininger's account.

Malloy filed an appellate brief on Sonya Daniels' behalf that was thoroughly lacking in legal research, offering only the barest indication of past court decisions that would normally be the heart of any appeal. The attorney general, in a rare step, argued that the appeal's discussion of the battered-woman issue was not coherent enough to warrant a response.

Then, on July 21, 2001 -- the day that the case was scheduled for oral argument before a panel of justices -- Malloy failed to show up altogether, and the argument went ahead without Sonya Daniels being represented.

Malloy was out of the country at the time, and was being investigated by the State Bar of California concerning allegations of shoddy representation of other Santa Clara County defendants. She eventually gave up the practice of law, state records show, after the state bar disciplined her as a result of its investigation.

Reached in Ireland, Malloy twice hung up when a reporter asked about the Daniels case. Leininger did not return phone calls.

Sonya Daniels found a new attorney days after the oral argument, but the 6th District would not permit her to file a new brief.

Seven weeks later, the appellate court issued its opinion, one that stands out even for a court that has routinely dismissed appeals. Even as it sharply criticized the work of Leininger and ridiculed the appeal of Malloy, the three-justice panel rejected the idea that better legal work might have made a difference.

The court said it would consider the question of whether Hastings improperly restricted Daniels' defense even though Malloy's brief was below ``the standards of competent appellate counsel," because at least she had ``presented some discernible arguments."

But it rejected other issues Malloy sought to raise, saying her woeful submission did not merit consideration on those issues.

The court went on to endorse Hastings' ruling barring the battered-woman defense, and to affirm the convictions of Brian and Sonya Daniels. Sonya Daniels appealed without success to the California Supreme Court and has now turned to federal court.

The 6th District rulings ``completely distorted the process," said Janice Lagerlof, who now represents Sonya Daniels. ``Instead of hearing the issues properly argued, they made up what the arguments should have been, and then answered those arguments. Sonya Daniels was kept from defending herself at trial, and then 6th District denied her the chance to present her case on appeal."

© 2006 MercuryNews.com and wire service sources. All Rights Reserved.
http://www.mercurynews.com

8

## APPELLATE SUMMARY SHEET

**APPELLANT'S NAME:**    **RAUL UVALLES**
**A.K.A.:**

**CO-D:**

**DCA NUMBER:**    **H024674A1**
**COUNTY:**    SANTA CLARA    **COUNTY #:**  CC121250

**JUDGE:**    Thomas C. Hastings    **TRIAL ATTY:**    Charlie Gillan,
Public Defender

**MOTIONS:**    Marsden, denied, 6-14-02
**PROCEEDINGS:**    6 day jury trial
**SENTENCE:**    25 years to Life
**CONVICTIONS:**    PC 187(a): First degree murder;
PC 211-212.5: Second degree robbery

**ENHANCEMENTS:**

**VOP:**
**STRIKES:**
**CERT OF PC:**

## FACTS:

On August 19, 2001, San Jose police made contact with the defendant and victim on the Alameda as they were walking, looking for an ATM machine. Both were asked for identification, released and given directions to the closest ATM machine. Approximately eight (8) hours later, police receive a call regarding a dead person at the Bellarmine High School Football Field. Officers recognized the victim as the person they stopped earlier with the defendant. The police go to the defendant's house to make contact.

The defendant gave the police consent to search his residence, and they found in his bedroom the jeans and shoes the defendant wore the night before. The defendant was not truthful when talking to police about his contact with the victim, and the police take the defendant into custody. Laboratory tests conclude that the blood on the defendant's pants and shoes match that of the victim. Video tape from an ATM showed the victim and defendant using the victim's ATM card at Bank of America. The defendant put the victim's ATM card in his pocket after they got money from the ATM.

The defendant told the police that the defendant and victim were later walking on the overpass at Hedding when the victim asked for her ATM card back. The defendant fled the scene with the card still in his possession. The victim chased after the defendant and they began to wrestle. The victim jumped on top of the defendant as she was trying to get her card back, making the defendant hit the guardrail, causing her to let go of the defendant and fall to the track below. The defendant went down to check on the victim, panicked and left the scene without calling 911.

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

SUPPLEMENTAL INFORMATION:

None

SUMMARY OF OFFENSE:

The court is familiar with the facts in this case having presided over the jury trial.

On August 19, 2001, at approximately 11:15 p.m., Officers of the San Jose police department made contact with victim Maria Mancera, and the defendant, as they walked westbound on the Alameda near Sunol.  Both individuals appeared to be under the influence of alcohol and were asked for identification.  Maria  gave officers her identification and informed them she and the defendant were looking for an ATM.  The defendant, who was also asked for his identification, said he was unable to provide it as his driving privileges had previously been suspended.  He provided his name and date of birth and informed officers he lived with his sister on Cleaves Ave.  A field interview card was completed on the defendant and officers directed them to an ATM machine located on the Alameda at Pershing.

Less than eight hours later, at 6:30 a.m. on the morning of August 20, 2001 officers responded to the report of a "person down" at the Bellarmine High School Football field.  Officers who responded to the scene recognized victim Maria Mancera from contact made the night before.  Investigation revealed the defendant's address and officers subsequently responded to question him about the victim.

Officers arrived at the defendant's residence and made contact with him.  Officers requested and received consent to search the defendant's residence.  Found within the defendant's bedroom was a pair of pants and shoes owned by the defendant, which later laboratory tests revealed to have the bloodstains of the victim's blood on them.  During police questioning the defendant made several contradictory statements regarding his last contact with the victim.  The defendant was arrested and booked into the Santa Clara County Main Jail.

Additional investigation revealed video footage of the victim and defendant using the victim's ATM card at the Bank of American on the Alameda at 11:35 p.m. on the evening of August 19th.  In addition, the defendant was found on video attempting to use the victim's ATM card at 12:48 a.m. on August 20 at the Union Bank on the Alameda and then again at 12:55 a.m. on the Bank of America on Hester Ave.  No monies were dispensed at either location as the incorrect pin was entered.  The victim's ATM card was found in a trash can on the Alameda between the Bank of America and the defendant's house.

10                                                  202

In the Case of RAUL UVALLES
Info. #: CC121250                                          June 13, 2002

An autopsy conducted report later determined victim Maria Mancera
was born, and remained at time of death, biologically, a male.
The cause of death was determined to be multiple blunt force
trauma caused by the fall from the overpass.  Additionally, it
was determined the victim was alive prior to her fall and the
body had been moved from the original point of impact.

STATEMENT OF NEXT OF KIN:  (will be present-statement attached)

Correspondence has been sent to the victim(s) family in this case
advising of the date, time, and place of sentencing, the right to
be present and to be heard pursuant to Section 1191.1 and 1191.3
of the Penal Code, as well as requesting information regarding
any losses suffered.

Yvonne Rodriguez, the victim's sister,  is the spokesperson for
the family.  She reports the murder of her sister has been
extremely difficult for the family and the tragedy was further
compounded by the victim's representation in the media.  On the
day her sister was discovered, the newspaper reported that a
man's body had been found.  Maria was born biologically a male
but had been living as a transgender female for over twenty
years.  Many people in Maria's life including her coworkers,
nieces and nephews were unaware of this and knew her only as
Maria.  Ms. Rodriguez and her family were hurt and troubled with
the insensitivity of the media regarding the issue of the
victim's sexual orientation.  They have included copies of the
newspaper articles they found offensive in regard to the
reference to the gender of the victim.

Ms. Rodriguez reports all of Maria's funeral expenses were
covered by insurance through Maria's work.  The family is seeking
no restitution at this time.  With regard to sentencing, she and
the family believe the defendant should be punished to the
fullest extent of the law.  A eulogy describing Maria has also
been submitted and attached for the courts review.

DEFENDANT'S STATEMENT:

The defendant was interviewed by the undersigned officer at the
Santa Clara County Main Jail on May 28, 2002.  Throughout the
probation interview, the defendant referred to the victim as
"he".  For consistency in this report, the victim's name has been
used.

On the evening of the present offense he was walking from his
house downtown, looking for someone to "party" with.  While
walking down the Alameda he came upon the victim who was lying
intoxicated in the gutter.  He helped Maria up and asked her if
she wanted to "party".  Together they got high by smoking
cocaine.

11                                                      203

In the Case of RAUL UVALLES
Info. #: CC121250                                      June 13, 2002

The victim told him they could go together to get money out of
the ATM machine to purchase more cocaine.  While walking down the
Alameda, they were stopped by two police officers who directed
them to an ATM machine.  He and Maria went to the ATM machine
where Maria withdrew $40.  She was too intoxicated to complete
the transaction, so she gave him the card and asked him to
complete the withdrawal.  Once completed, he placed the ATM card
in his pocket.   The defendant said he then attempted to call his
drug connection but was unable to contact him.  After another
attempt to contact his connection, he and Maria began to walk up
the overpass at Hedding.  On the top, Maria confronted him and
asked if he\her ATM card.  The defendant explained that it was at
that moment that he attempted to flee with the card.  He does not
know why he was stealing the card, because he did not need the
money.  As he was running away from Maria, Maria grabbed his
shirt and when he turned around he threw her to the ground.
Again, he attempted to run, at which time Maria jumped on his
back.  As he was trying to remove Maria from his back, he began
knocking her against the guardrail, ultimately causing her to let
go and fall to the track below.

The defendant maintains he immediately ran down to check on
Maria.  When he found her, he observed the extent of her
injuries.  Prior to leaving, he realized he did not have his
wallet with him and went through Maria's purse in an attempt to
locate it.  He did not call an ambulance or attempt to give first
aid to the victim because he got scared and panicked.  He
immediately went to get additional money to get high.  He
maintains he spent the rest of the evening getting high before
returning home to his house in the morning.

The defendant explained he did not need money when he met Maria
and does not know why he decided to rob her when she requested
her ATM card back.  He further explained her death as an accident
and his actions being that of self-defense.  He did not
intentionally push her over the bridge and was only trying to
flee with the ATM card when he was attacked physically by the
victim.  In addition, he feels terrible for what happened and
would like her family to know he is truly sorry.  He believes he
is not guilty of the crime of first degree murder, but rather the
lesser charge of involuntary manslaughter.

With regard to sentencing, the defendant would like the judge to
know he does not believe his attorney provided him a defense and
wishes he had been able to go on the stand and tell his side of
the story.  Although he admits to lying to police initially, he
believes had his post Miranda statements been admissible, the
jury would have understood this was not an intentional act.  In
addition, he believes the jury was hand selected by the district
attorney and as there were no minorities on the jury, it was not
a jury of his peers.  In closing, the defendant would like the
court to know he is not trying to avoid punishment for taking the

In the Case of RAUL UVALLES
Info. #: CC121250                                      June 13, 2002

victim's life, but rather the crime he was convicted of is not
the crime he committed.

With regard to substance abuse, the defendant, now age 39, began
the use of alcohol at the age of 12.  By the age of 17 he was
drinking daily.  He continued to drink daily until his arrest for
his involvement in the present offenses.  He began the use of
marijuana also at the age of 12 and by his late teens was using
the substance daily.  He continued to use the substance daily
until his involvement in the present offenses.  He was introduced
to methamphetamines at the age of 21 and used the substance daily
until the age of 37.  He began the use of Heroin at the age of 21
and used the substance daily until the age of 30. At the time of
the present offense he was using the substance every couple of
months.  He began the use of cocaine at the age of 25 and used
the substance daily until his involvement in the present offense.
The defendant also admits to using PCP, LSD and mushroom in his
twenties.  He estimates his drug habit cost him $500 a month to
support and he did so through legitimate earnings and the sale of
personal property.  The defendant believes his significant
substance abuse contributed to the demise of his marriage as well
as contributed to his involvement in the present offense.


INTERESTED PARTIES:

None

JUDICIAL COUNCIL RULES 4.414, 4.421, 4.423    : (attached)

CASE EVALUATION:

Appearing before the court for sentencing is 39 year old Raul
Uvalles after being found guilty by jury of Murder in the First
Degree and Robbery in the Second Degree.  The present offense
involves the defendant stealing the victim's ATM card and killing
her.

The defendant admits to robbing the victim and being responsible
for her death.  He describes his actions as self-defense, which
the result of him accidentally knocking her over the railing of
the overpass where she fell to her death.  After committing this
act, the defendant said he went to the victim and rummaged
through her purse rather than attempting to administer first aid
or contact emergency personnel to possibly assist the victim.

The defendant is a divorced father of two who reports steady
employment as a Mover at the time of the offenses.  A review of
his criminal record reveals eleven misdemeanor convictions which
include exhibition of a deadly weapon, battery (2), possession of
controlled substance paraphernalia, being under the influence of
a controlled substance(3), fighting in public, driving under the

                    13                         **205**

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

influence of alcohol causing bodily injury, hit and run resulting
in property damage, and resisting a public officer.

The undersigned recommends probation be denied.  Given the
seriousness of these crimes and their tragic consequences, the
undersigned officer feels the defendant presents a serious threat
to society and is deserving of incarceration for a significant
period of time.  It is felt the sentence being recommended will
serve to adequently punish the defendant and protect the
community.

SUGGESTED TERM:

| CHARGE | MIT | AGG | RANGE | ENHANCEMENTS | TOTAL TERM |
|--------|-----|-----|-------|--------------|------------|
| Ct. 1<br>187 PC | N/A | N/A | 25 years<br>to life | | 25 years to<br>life |
| Ct. 2<br>211-<br>212.5(c)PC | No | No | 2,3,5<br>years | | 3 years c/c |
| | | | | TOTAL TERM: | 25 years to<br>life |

14

**206**

Raul Uvalles, #T59954/B1-202
P.O. Box 3030
Susanville, CA 96127-3030

7/23/06

Sixth District Appellate Program
ATTN: Lori A. Quick, Attorney
100 N. Winchester Blvd., Ste. 310
Santa Clara, CA 95050

Dear Ms. Quick:

I trust this reaches you in the best of health and spirits.

While in the possession of a Jailhouse lawyer who was assisting me on Habeas Corpus, my records on appeal (all transcripts and anything that was later augmented) were thrown out by prison staff. As you served as counsel of record on my 2002, Santa Clara County appeal, would it be possible to get another copy from you or advice on how I would go about doing so? Thank you.

Sincerely,

Raul Uval.

15

MAR 10 2003

Dear Ms. Quick,                                                    3-6-03

I recieved your letter and packet and I want you in fact to pursue the avennue of the writ of habeas corpus. I strongly believe that if I had been able to testify it would have brought a whole new set of jury instructions for the jury to consider and in fact would have been a more favorable out come I also want you to look into the possibility of ineffective Assistance of Council the reason being Mr. Guillen was told that this was a self defence / accidental incident and choose not to bring it to the D.A. or the courts attention I believe this is a direct violation of my rights to give me a fair trial not presenting all or any evidence in my behalf I myself told him that I needed to testify because the evidence against me was overwelming. The judge in his decision to exculde the tapes of my interview commented on record that if the tapes were used it was clearly accidental instead Mr. Guillen chose to as he put it punch holes in the D.A's case which obviously resulted in the worst possible senero All through the trial evidence to support a accidental / off Defence from the coroners initial testimony to the D.A's own expert witness I don't understand why this is so dificult to see I would like to be sent the trial transcripst including the marsden motion transcrips at sentencing and also I want to know what time restraints I have. I would appreciate your cooperation and if my assumption of inaffective Assistance of Council is vague please enlighten me to cause and effect and I will explain more indepth but as once I have not gotten any responce from you as to the other questions Ive asked in previous letters pertaining to this case. I await

LEGAL MAIL
Attorney - Client
Correspondence

$B/-2021$

**SDAP**

⚖

**SIXTH DISTRICT**
**APPELLATE PROGRAM**
100 N. Winchester Blvd. Suite 310
Santa Clara, CA 95050

Raul Uvalles
T-59954
High Desert State Prison
P.O. Box 3030
Susanville, CA 96127-3030

First Class Mail

**PRIORITY**
**MAIL**
UNITED STATES POSTAL SERVICE ™
www.usps.gov

LABEL 107R, OCT 1997

# SIXTH DISTRICT APPELLATE PROGRAM
A Non-Profit Corporation

| | |
|---|---|
| 100 N Winchester Blvd., Suite 310 | (408) 241-6171 - Main |
| Santa Clara, CA 95050 | (408) 241-2877 - Fax |

Executive Director                                                        Assistant Director
*Michael A. Kresser*                                                    *Dallas Sacher*

Law Office Manager                                                    Staff Attorneys
*Yolanda G. Edwards*                                                *Lori A. Quick*
                                                                                *Vicki I. Firstman*
                                                                                *William M. Robinson*
                                                                                *Jonathan Grossman*
                                                                                *Paul Couenhoven*

October 17, 2002


Charlie Gillan, Esq.
Office of the Public Defender
120 West Mission Street
San Jose, CA 95110

Re: <u>People v. Raul Uvalles</u>
Santa Clara County Superior Court #CC121250
Court of Appeal #H024674

Dear Mr. Gillan,

I was talking to Raul the other day, and he told me that the probation officer's report contained many factual inaccuracies. According to Raul, his story of how the death occurred was very different from what the probation officer put in her report. Raul told me that he wrote his own letter containing his version of events which was given to the court. It is not part of the record on appeal. Raul told me that you would have a copy of the letter. Depending on what the letter says, it could be very important to Raul's appeal. Please send me a copy of the letter as soon as possible. If you don't have a copy, please give me a call so that we can discuss the issue, and I can try to obtain it elsewhere.

Thank you in advance for your anticipated cooperation. Please feel free to contact me if you have any questions.

Sincerely,

Lori A. Quick
Staff Attorney

# SIXTH DISTRI⌣⸱ APPELLATE PR⌣ ⸱⸱AM
A Non-Profit Corporation

---

100 N Winchester Blvd., Suite 310                                  (408) 241-6171 - Main
Santa Clara, CA 95050                                              (408) 241-2877 - Fax

Executive Director                                                  Assistant Director
*Michael A. Kresser*                                                *Dallas Sacher*

Law Office Manager                                                  Staff Attorneys
*Yolanda G. Edwards*                                                *Lori A. Quick*
                                                                    *Vicki I. Firstman*
                                                                    *William M. Robinson*
                                                                    *Jonathan Grossman*
                                                                    *Paul Couenhoven*

January 13, 2003


Raul Uvalles
T-59954
High Desert State Prison
P.O. Box 3030
Susanville, CA  96127-3030

Dear Mr. Uvalles,

I am still working on potential issues. I don't believe we will have much to raise on direct appeal, but there may be some issues to raise in a petition for a writ of habeas corpus. One important question if have for you is this. I am very concerned about whether you believed you could testify even if Mr. Gillan didn't want you to. Did he ever tell you that it was your right to testify, no matter what he wanted you to do, and that it was your call to make?

I have reviewed what you told the court at the <u>Marsden</u> hearing, and it's a little confusing. It seems to me that what you told the judge is that Mr. Gillan said "it's your decision." If in fact he told you that it was your decision, then we don't have an issue regarding whether you were deprived of your right to testify on your own behalf. Mr. Gillan told the court that you told him you wanted to testify, that each time you said that, the two of you discussed the issue and decided that it was not in your best interests. However, you still seemed to be saying that you had told Mr. Gillan that you wanted to testify and that he said no.

It is very important that you tell me exactly what happened. When you told him you wanted to testify, did he advise you that you had the right to testify, although he thought that you should not? Or did he make the decision for you, without making sure you understood that it was your call

1

19

to make?

     Please call me collect or write as soon as possible to let me know exactly what happened. I look forward to hearing from you soon.

Sincerely,

Lori A. Quick
Staff Attorney

# SIXTH DISTR.. ⌐ APPELLATE PRC . :AM
A Non-Profit Corporation

---

100 N. Winchester Blvd., Suite 310                    **(408) 241-6171 - Main**
Santa Clara, CA 95050                                 **(408) 241-2877 - Fax**


**Executive Director**                                **Assistant Director**
*Michael A. Kresser*                                  *Dallas Sacher*

**Law Office Manager**                                **Staff Attorneys**
*Yolanda G. Edwards*                                  *Lori A. Quick*
                        January 9, 2003                *Vicki I. Firstman*
                                                       *William M. Robinson*
                                                       *Jonathan Grossman*
                                                       *Paul Couenhoven*

Charlie Gillan, Esq.
Office of the Public Defender
120 West Mission Street
San Jose, CA 95110

                        Re: <u>People v. Raul Uvalles</u>
                Santa Clara County Superior Court #CC121250
                        Court of Appeal #H024674

Dear Mr. Gillan,

     I received the FAX you sent the other day. Thank you for providing Raul's letter.

     Having reviewed it, I have determined that I need to review your entire trial file. I would be happy to either have my paralegal come and pick it up, or you can send it to me. Of particular interest is Raul's story to you about how the homicide occurred. I would appreciate it if you would either call me or send in writing, in as much detail as you can, answers to the following questions.

     1. What was Raul's story **to you** prior to trial and during trial about how the homicide occurred?

     2. What was it that made you decide to advise him against testifying?

I would very much appreciate the file and answers to the above questions as soon as possible. Thank you in advance for your anticipated cooperation. Please feel free to contact me if you have any questions.

     Sincerely,

Lori A. Quick
Staff Attorney

Court of Appeal, Sixth Appellate District - No. H030758
**S148301**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re RAUL UVALLES on Habeas Corpus

Petition for review DENIED.

Moreno, J., was absent and did not participate.

SUPREME COURT
**FILED**

JAN 1 7 2007

**Frederick K. Ohlrich Clerk**

**DEPUTY**

GEORGE

Chief Justice

22

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

RAUL UVALLES

**PLAINTIFF or PETITIONER**

v.

**Case Number:** C-05-2779-MJJ (PR)

THOMAS FELKER, Warden,

**Defendant or Respondent**

## PROOF OF SERVICE

_____ ,

I hereby certify that on ___Feb. 11___ , 20 _07_ , I served a copy
of the attached ___PETITION FOR WRIT OF HABEAS CORPUS_____ , by placing a copy in
a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope
in the United States Mail at ___H.D.S.P._____ :

      Mark S. Howell
      Deputy Atttorney General
      455 Golden Gate Ave. Suite 11000
      San Francisco, CA 94102-5969

I declare under penalty of perjury that the foregoing is true and correct.

                              Raul Uvalles