1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14   **RAUL UVALLES,**                          C 05-2779 MJJ (PR)

15                                 Petitioner,

16            v.

17   **D.L. RUNNELS, Warden,**

18                                 Respondent.

19

     **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

                                        **EXHIBIT B-3**

1     TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

2           SIXTH APPELLATE DISTRICT

3             ---oOo---

4

5  PEOPLE OF THE STATE OF      )      **COPY**
    CALIFORNIA,               )

6                      )

7       PLAINTIFF-RESPONDENT,   )

8     VS.                )    CASE NO. CC121250,
                      )         H024674

9  **RAUL UVALLES,**           )

10       DEFENDANT-APPELLANT.    )
                      )

11

12

13

14         REPORTER'S TRANSCRIPT ON APPEAL
      FROM THE JUDGMENT OF THE SUPERIOR COURT

15         OF THE STATE OF CALIFORNIA
      IN AND FOR THE COUNTY OF SANTA CLARA

16   BEFORE THE HONORABLE JAMES H. CHANG, JUDGE

17

18               VOLUME III

19    JUNE 13, 2002 - PAGES 447 THROUGH 452

20    JUNE 14, 2002 - PAGES 453 THROUGH 496
         **(SEALED PAGES 455 - 492)**

21            ---oOo---

22

23  FOR THE PLAINTIFF-RESPONDENT:
          WILLIAM LOCKYER, ATTORNEY GENERAL

24          OFFICE OF THE ATTORNEY GENERAL
          STATE OF CALIFORNIA

25

26  FOR THE DEFENDANT-APPELLANT:  RAUL UVALLES,
                    IN PROPRIA PERSONA

27

28

B-3
(RT)

447

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF SANTA CLARA

3          THE HONORABLE THOMAS C. HASTINGS, JUDGE PRESIDING

4                         ---oOo---

5
   THE PEOPLE OF THE STATE OF CALIFORNIA,   )
6                                           )
               PLAINTIFF,                   )
7                                           )
               VS.                          )   CASE NO. CC121250
8                                           )
   **RAUL UVALLES**,                        )
9                                           )
               DEFENDANT.                   )
10   _____)

11

12

13                REPORTER'S TRANSCRIPT OF PROCEEDINGS

14
   SAN JOSE, CALIFORNIA                        JUNE 13, 2002
15
                                               PAGES 447 - 452
16

17

18
                         APPEARANCES
19

20   FOR THE PEOPLE:      OFFICE OF THE DISTRICT ATTORNEY

21                        BY:  TERRY BOWMAN, D.D.A.

22
   FOR THE DEFENDANT:  OFFICE OF THE PUBLIC DEFENDER
23
                        BY:  CHARLIE GILLAN, D.P.D.
24

25

26   OFFICIAL COURT REPORTER:        PATRICK CROWLEY, C.S.R.
                                     CERTIFICATE NO. 11271
27

28

<u>PROCEEDINGS</u>

1

2  JUNE 13, 2002                          SUPERIOR COURT

3  MORNING SESSION                        SAN JOSE, CALIFORNIA

4            (WHEREUPON, COURT CONVENED AND THE FOLLOWING

5        PROCEEDINGS WERE HAD:)

6        THE COURT:  GOOD MORNING.  WE HAVE SEVERAL MATTERS

7  ON CALENDAR FOR SENTENCING, AND I APOLOGIZE FOR THE DELAY

8  BUT WE HAD ANOTHER MATTER ASSIGNED WE HAD TO DISCUSS

9  SOMEWHAT IN CHAMBERS, AND WE HAVE A JURY WAITING FOR US

10 ALSO, SO WE WILL DO OUR BEST TO COMPLETE THESE MATTERS IN A

11 TIMELY FASHION AND THEN CONTINUE WITH THE TRIAL.

12        THE FIRST MATTER I'M GOING TO CALL IS A SENTENCING

13 MATTER WHICH IS PEOPLE VERSUS RAUL UVALLES, ACTION NUMBER

14 CC121250.  MAY WE HAVE THE APPEARANCES PLEASE?

15        MR. GILLAN:  MR. UVALLES IS REPRESENTED BY THE

16 PUBLIC DEFENDER'S OFFICE, CHARLIE GILLAN ON HIS BEHALF.

17        MS. BOWMAN:  TERRY BOWMAN ON BEHALF OF THE PEOPLE,

18 YOUR HONOR.  GOOD MORNING.

19        THE COURT:  GOOD MORNING.  THIS IS THE DATE AND

20 TIME SET FOR IMPOSITION OF SENTENCE.  IS FORMAL ARRAIGNMENT

21 FOR JUDGMENT WAIVED?

22        MR. GILLAN:  YES.

23        THE COURT:  IS THERE ANY LEGAL CAUSE AT THIS TIME

24 AS TO WHY JUDGMENT SHOULD NOT BE IMPOSED?

25        THE DEFENDANT:  YOUR HONOR, IF I MAY SAY

26 SOMETHING?

27        THE COURT:  IN A MOMENT, MR. UVALLES.  THIS IS A

28 LEGAL ISSUE FIRST I'M TAKING UP WITH YOUR LAWYER.  AND AFTER

```
 1   WE CONCLUDE WITH THAT, YOU CAN CONSULT WITH MR. GILLAN,

 2   OKAY?  SO, I'M ASKING RIGHT NOW IS THERE ANY LEGAL CAUSE AS

 3   TO WHY JUDGMENT SHOULD NOT BE IMPOSED.

 4          MR. GILLAN:  WE'VE HAD THE REPORT WITHIN THE

 5   STATUTORY PERIOD.  IT'S BEEN GIVEN TO MR. UVALLES FOR

 6   REVIEW.  THERE ARE SOME CREDITS THAT NEED TO BE MADE, BUT

 7   THERE'S NO LEGAL CAUSE PREVENTING IMPOSITION OF SENTENCE.

 8          THE COURT:  ALL RIGHT, THANK YOU.  I MIGHT

 9   INDICATE FOR THE RECORD THAT I HAVE RECEIVED THE PROBATION

10   REPORT.  I HAVE REVIEWED THE SAME.  AND APPARENTLY WHEN THIS

11   WAS REVIEWED WITH THE DEFENDANT, MR. UVALLES, HE DID MAKE

12   SOME CORRECTIONS THAT HE WOULD LIKE TO HAVE APPENDED TO THE

13   PROBATION REPORT BY WAY OF HIS STATEMENT; IS THAT CORRECT?

14          MR. GILLAN:  THAT'S ACCURATE.  YOUR HONOR, CAN I

15   APPROACH WITH THE -- WITH THE DISTRICT ATTORNEY BRIEFLY?

16          THE COURT:  YES, CERTAINLY.

17             (WHEREUPON, A DISCUSSION WAS HAD OFF THE

18             RECORD.)

19          THE COURT:  WE'RE BACK ON THE RECORD.  I HAVE

20   DISCUSSED THE MATTER WITH COUNSEL.  I UNDERSTAND

21   MR. UVALLES, THROUGH COUNSEL, THAT YOU INTEND TO ADDRESS THE

22   COURT BY WAY OF A MARSDEN MOTION, AND I'LL CERTAINLY

23   ACCOMMODATE YOU AND LISTEN TO WHAT YOU HAVE TO SAY, BUT WE

24   CAN'T DO IT TODAY.  WE'LL DO IT TOMORROW AT A TIME

25   CONVENIENT FOR EVERYBODY.  AND I'LL GIVE YOU ADEQUATE

26   OPPORTUNITY TO ADDRESS THE COURT.

27          BUT BECAUSE WE DO HAVE MEMBERS OF THE VICTIM'S

28   FAMILY WHO HAVE RESPONDED TO THE COURT TODAY I {RESPOND} AM
```

1   GOING TO ACCOMMODATE THEM, AND THEY CAN ADDRESS THE COURT AT

2   THIS TIME, IF THEY SO DESIRE.

3           MS. BOWMAN:  THANK YOU, YOUR HONOR.  THE VICTIM'S

4   SISTER, YVONNE RODRIGUEZ, WOULD LIKE TO BE HEARD.

5           THE WITNESS:  GOOD MORNING.

6           THE COURT:  WOULD YOU KINDLY STATE YOUR NAME FOR

7   THE RECORD PLEASE.

8           THE WITNESS:  YVONNE RODRIGUEZ.

9           THE COURT:  ALL RIGHT, AND GO AHEAD.

10          THE WITNESS:  I'D LIKE TO SAY THAT I'M A LITTLE

11  NERVOUS RIGHT NOW.

12          THE COURT:  SURE, I UNDERSTAND.

13          THE WITNESS:  AND I HAVE A LETTER, BUT THERE'S ONE

14  LETTER I'M GOING TO READ THAT MY SON WROTE TODAY.

15          THE COURT:  FINE.

16          THE WITNESS:  AND IT'S GOING TO GO DIRECTLY TO

17  HIM, BUT...  IT SAYS -- FIRST THIS IS FROM MY SISTER, MARIA

18  RODRIGUEZ.

19          FIRST OF ALL, I WOULD LIKE TO SAY THAT WHATEVER

20  SENTENCE YOU RECEIVE WON'T EVEN COMPARE TO THE LIFE YOU TOOK

21  AWAY.  NOT ONLY DID YOU TAKE AWAY A BEAUTIFUL LIFE, BUT YOU

22  TOOK AWAY A SISTER, A DAUGHTER, AN AUNT THAT WAS SO MUCH SO

23  LOVED ALL FOR A -- OVER A FEW DOLLARS AND SOME MATERIAL

24  POSITIONS.

25          I GUESS THE QUESTION IS HERE IS WHY.  I MEAN, WHAT

26  WERE YOU THINKING?  DID YOU REALLY THINK YOU WOULD GET AWAY

27  WITH IT?  I HOPE THIS HAUNTS YOU FOR THE REST OF YOUR LIFE,

28  BUT, HEY, AT LEAST YOU STILL HAVE YOUR LIFE.  MY AUNT LOST

1   HERS, BUT, YOU KNOW WHAT, YOU MAY HAVE TOOK HER LIFE.

2   {RACHEL} NEVER TOOK HER SPIRIT.  HER SPIRIT WILL LIVE ON

3   THROUGH HER FAMILY AND FRIENDS, THROUGH HER FAMILY, FRIENDS,

4   MY SON STEVEN JR.  THAT'S ALL I HAVE TO SAY.

5           THE COURT:  THANK YOU, MISS RODRIGUEZ.  DID YOU

6   HAVE SOMETHING YOU WANTED TO SUBMIT TO THE COURT?

7           THE WITNESS:  YEAH.

8           MR. GILLAN:  THAT'S ATTACHED.

9           PROBATION OFFICER:  I THINK THEY'RE ALREADY IN

10  THERE.

11          MS. BOWMAN:  I THINK THESE MIGHT BE --

12          PROBATION OFFICER:  ARE THESE NEW ONES?

13          THE WITNESS:  YES, THEY'RE FROM --

14          MS. BOWMAN:  THESE ARE ADDITIONAL LETTERS, YOUR

15  HONOR.

16          THE COURT:  THAT'S WHAT I THOUGHT BECAUSE SHE

17  INDICATED THEY WERE ADDITIONAL TO WHAT WE RECEIVED

18  PREVIOUSLY.  YOU CAN FILE THESE WITH THE CLERK OF THE COURT.

19          MS. BOWMAN:  THANK YOU, YOUR HONOR.

20          THE COURT:  WE'LL HAVE COPIES MADE FOR COUNSEL.

21          MS. BOWMAN:  THANK YOU, YOUR HONOR.

22          THE COURT:  WE HAD A MATTER SET TOMORROW AT TEN

23  O'CLOCK, AND WE CAN PUT THIS MATTER OVER UNTIL TOMORROW AT

24  10:30 FOR FURTHER PROCEEDINGS.  THE MOTION ON BEHALF OF THE

25  DEFENDANT, WHICH IS IN CAMERA, AND THEN DEPENDING UPON THE

26  COURT DECISION, EITHER THEIR MATTER WILL BE SET FOR FURTHER

27  PROCEEDINGS OR THE MATTER WILL PROCEED TO SENTENCING.  SO,

28  IT WILL BE PUT OVER FOR THAT PURPOSE TO TOMORROW, WHICH IS

452

1 | JUNE 14TH, AT 10:30 A.M. IN THIS DEPARTMENT.

2 |          AND, MR. UVALLES, AT THAT TIME I'LL CERTAINLY

3 | LISTEN TO WHAT YOU HAVE TO SAY.  IT WILL BE IN CAMERA

4 | OUTSIDE THE PRESENCE OF THE PUBLIC AND THE DISTRICT

5 | ATTORNEY.  AND THEN DEPENDING UPON THE COURT DECISION, WE

6 | WILL EITHER IMPOSE SENTENCE TOMORROW FOR THE MURDER

7 | CONVICTION, OR WE WILL SET IT FOR FURTHER PROCEEDINGS IN THE

8 | FUTURE; DO YOU UNDERSTAND?

9 |          THE DEFENDANT:  YES.

10 |          THE COURT:  ALL RIGHT.  THAT WILL BE THE ORDER OF

11 | THE COURT.

12 |          MS. BOWMAN:  THANK YOU, YOUR HONOR.

13 |          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

453

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF SANTA CLARA

3          THE HONORABLE THOMAS C. HASTINGS, JUDGE PRESIDING

4                          ---oOo---

5

6   THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                              )
7            PLAINTIFF,                        )
                                              )
8            VS.                               )    CASE NO. CC121250
                                              )
9   RAUL UVALLES,                             )    MARSDEN HEARING
                                              )    AND SENTENCING
10           DEFENDANT.                        )
    _____)

11

12              **SEALED PAGES 455-492**

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14

15  SAN JOSE, CALIFORNIA                    JUNE 14, 2002

16                                          PAGES 453 - 496

17                                          **SEALED PAGES 455 - 492**

18

19                     APPEARANCES

20

21  FOR THE PEOPLE:    OFFICE OF THE DISTRICT ATTORNEY

22                     BY:  TERRY BOWMAN, D.D.A.

23  FOR THE DEFENDANT:  OFFICE OF THE PUBLIC DEFENDER

24                     BY:  CHARLIE GILLAN, D.P.D.

25

26  OFFICIAL COURT REPORTER:      PATRICK CROWLEY, C.S.R.
                                  CERTIFICATE NO. 11271

27

28

454

<u>PROCEEDINGS</u>

1

2  JUNE 14, 2002                          SUPERIOR COURT

3  MORNING SESSION                    SAN JOSE, CALIFORNIA

4           (WHEREUPON, COURT CONVENED AND THE FOLLOWING

5       PROCEEDINGS WERE HAD:)

6           THE COURT:  OKAY.  LET'S GO ON THE RECORD.  THIS

7  IS THE MATTER OF THE PEOPLE OF STATE OF CALIFORNIA VERSUS

8  RAUL UVALLES, ACTION 121250.  MAY I HAVE THE APPEARANCES?

9           MR. GILLAN:  MR. UVALLES IS REPRESENTED BY THE

10  PUBLIC DEFENDER'S OFFICE, CHARLIE GILLAN APPEARING ON HIS

11  BEHALF.  HE'S PRESENT.

12           MS. BOWMAN:  TERRY BOWMAN APPEARING ON BEHALF OF

13  THE PEOPLE, YOUR HONOR.  GOOD MORNING.

14           THE COURT:  GOOD MORNING, MR. UVALLES.

15           THE DEFENDANT:  GOOD MORNING.

16           THE COURT:  YOU INDICATED YESTERDAY WHEN THE

17  MATTER WAS BEFORE THE COURT FOR THE IMPOSITION OF SENTENCE

18  THAT YOU WANTED TO MAKE A MOTION BEFORE THE COURT.

19           THE DEFENDANT:  YES.

20           THE COURT:  DOES THAT MOTION DEAL WITH THE

21  COMPETENCY OR ALLEGED INCOMPETENCY OF YOUR ATTORNEY?

22           THE DEFENDANT:  YES, YOUR HONOR.

23           THE COURT:  ALL RIGHT.  AT THIS TIME I WILL TAKE

24  THAT TO MEAN THAT MR. UVALLES WANTS TO MOVE THE COURT

25  PURSUANT TO THE MARSDEN DECISION, AND I'LL ASK THAT THE

26  COURTROOM WILL BE CLEARED OF THE PUBLIC AND THE DISTRICT

27  ATTORNEY, AND WE WILL OPEN THE COURTROOM AFTER WE HEAR THE

28  MARSDEN MOTION.  **(THE FOLLOWING PAGES 455 - 492 ARE SEALED.)**

PATRICK K. CROWLEY, CSR 11271

1    (WHEREUPON, THE DISTRICT ATTORNEY ENTERED THE

2    COURTROOM.)

3    THE COURT:  ALL RIGHT.  THE RECORD WILL NOW

4 REFLECT THAT THE COURTROOM HAS BEEN OPENED TO THE PUBLIC,

5 AND MR. UVALLES IS STILL PRESENT, AND MR. GILLAN IS STILL

6 PRESENT, AND NOW MS. BOWMAN IS PRESENT ON BEHALF OF THE

7 PEOPLE.

8    THIS IS THE DATE AND TIME WE SET FOR IMPOSITION OF

9 SENTENCE AFTER THE MATTER WAS CONTINUED FROM YESTERDAY'S

10 CALENDAR, PENDING A DECISION ON THE DEFENDANT'S MOTION WHICH

11 HAS BEEN DECIDED BY THE COURT.  IS FORMAL ARRAIGNMENT FOR

12 JUDGMENT WAIVED?

13    MR. GILLAN:  YES.

14    THE COURT:  ANY LEGAL CAUSE AT THIS TIME AS TO WHY

15 JUDGMENT SHOULD NOT BE IMPOSED?

16    MR. GILLAN:  NO.

17    THE COURT:  YOU HAVE SUBMITTED TO THE COURT,

18 MR. GILLAN, A SUPPLEMENT OF SORTS THAT YOU DID WISH ATTACHED

19 TO THE PROBATION REPORT?

20    MR. GILLAN:  YES, YOUR HONOR.  AND THE -- AND THE

21 RECORD SHOULD REFLECT THAT MR. UVALLES WAS GIVEN A COPY OF

22 THE PROBATION REPORT.  HE HAD A CHANCE TO READ WHAT HAS BEEN

23 REPRESENTED IS HIS STATEMENT, AND HE BELIEVES THAT PAGE 4

24 WITH RESPECT TO THE FIRST PARAGRAPH AND THIRD PARAGRAPH

25 INACCURATELY REPRESENT WHAT HE TOLD THE PROBATION

26 DEPARTMENT.  AND HE CORRECTED THAT BY ATTACHING HIS OWN

27 VERSION OF WHAT HE BELIEVES HE TOLD THE PROBATION

28 DEPARTMENT.

1    AND ALSO THE -- ON PAGE 5 WHEN IT SAYS, "THE

2  DEFENDANT ADMITS TO ROBBING THE VICTIM AND BEING RESPONSIBLE

3  FOR HER DEATH," MR. UVALLES DENIES MAKING THAT STATEMENT TO

4  THE PROBATION DEPARTMENT.  BUT WHAT HE DID TELL THE

5  PROBATION DEPARTMENT WITH RESPECT TO THE FACTS AND THE

6  CIRCUMSTANCES OF THE DEATH OF MARIA MANCERA IS CONTAINED

7  WITHIN HIS WRITTEN STATEMENT, WHICH I'VE GIVEN TO THE COURT

8  THE ORIGINAL, AND I BELIEVE IT'S BEEN ATTACHED TO THE COURT

9  FILE.

10    THE COURT:  YES.

11    MR. GILLAN:  THERE HAVE BEEN COPIES GIVEN TO THE

12  DISTRICT ATTORNEY AND THE PROBATION DEPARTMENT AND ALSO A

13  COPY TO BE SENT UP WITH HIM AND HIS PRISON PACKET.

14    THE COURT:  YES.  MADAM CLERK, DO WE HAVE THAT

15  ADDENDUM TO THE PROBATION REPORT?

16    THE CLERK:  YES, YOUR HONOR.  I HAVE THOSE

17  DOCUMENTS.

18    THE COURT:  ALL RIGHT.

19    MR. GILLAN:  THAT BEING SAID, WE'VE HAD THE REPORT

20  FOR THE STATUTORY PERIOD, AND WE'RE READY -- THERE'S NO

21  LEGAL CAUSE.

22    THE COURT:  NO LEGAL CAUSE WHY JUDGMENT SHOULD NOT

23  BE IMPOSED?

24    MR. GILLAN:  YES.

25    THE COURT:  ALL RIGHT.  THANK YOU, MR. GILLAN.

26  MS. BOWMAN?

27    MS. BOWMAN:  NO COMMENTS FROM THE PEOPLE, YOUR

28  HONOR, AND THE VICTIM'S FAMILY WAS HEARD YESTERDAY.

1    THE COURT:  ALL RIGHT.  I WANTED TO JUST REVIEW

2  AGAIN SOME OF THESE ATTACHMENTS THAT HAVE BEEN SUBMITTED TO

3  THE COURT ON BEHALF OF THE VICTIM'S FAMILY.  AND THE ONE

4  POINT THAT WAS MADE WITH RESPECT TO THE VICTIM IS THAT THE

5  VICTIM IS MARIA, NOT JOHN.  AND THE NEWSPAPER, FOR WHATEVER

6  REASON, DID NOT ACKNOWLEDGE THAT, EXCEPT IN THE OBITUARY

7  COLUMN.  AND I UNDERSTAND HOW THE FAMILY FEELS ABOUT THAT.

8  IT'S NOT PROPER, AND I DON'T KNOW HOW YOU CAN RECTIFY THAT.

9    SHE CERTAINLY WAS MORE DESERVING OF WHAT THE

10  NEWSPAPER DID.  AND THE FACT THERE'S NOBODY HERE FROM THE

11  NEWSPAPER TODAY KIND OF TELLS THE STORY ALSO.  BUT I CAN'T

12  DO ANYTHING ABOUT THAT.  AND I AGREE WITH THE FAMILY THAT

13  SHE CERTAINLY WAS ENTITLED TO MORE DIGNITY THAN WHAT WAS

14  ACCORDED TO HER.  SHE WAS KNOWN AS MARIA.  SHE WAS KNOWN AS

15  THE AUNT TO MANY OF THE REMAINING RELATIVES, THE SISTER AND

16  SO ON.  SO, I UNDERSTAND WHERE YOU'RE COMING FROM ON THAT

17  SCORE, AND THE LACK OF SENSITIVITY ON THE PART OF THE

18  NEWSPAPER IS SOMETHING THAT SHOULD BE NOTED.

19    IN THIS PARTICULAR CASE, MR. UVALLES, UNDER THE

20  LAW, BECAUSE YOU HAVE BEEN CONVICTED OF MURDER OF THE FIRST

21  DEGREE, YOU ARE STATUTORILY INELIGIBLE FOR A GRANT OF

22  PROBATION.  YOU CANNOT BE GRANTED PROBATION.  UNDER THE LAW,

23  THERE IS ONLY ONE SENTENCE FOR A CONVICTION OF FIRST DEGREE

24  MURDER, AND THE COURT AT THIS TIME WILL IMPOSE THAT

25  SENTENCE, THAT YOU ARE ORDERED COMMITTED TO THE CALIFORNIA

26  DEPARTMENT OF CORRECTIONS FOR THE TERM OF 25 YEARS TO LIFE.

27  THAT'S COUNT 1.

28    COUNT 2 IS THE ROBBERY CONVICTION.  AS TO THE

1    ROBBERY CONVICTION, THE COURT IMPOSES A TERM OF THREE YEARS,

2    WHICH IS THE MIDTERM, TO BE SERVED CONCURRENT TO THE TERM

3    IMPOSED IN COUNT 1.  THE TOTAL PRISON COMMITMENT IS 25 YEARS

4    TO LIFE IN STATE PRISON.  UPON COMPLETION OF THE PRISON

5    TERM, IF YOU ARE PAROLED, YOU'LL BE SUBJECT TO SEVEN YEARS

6    TO LIFE.  YOU'RE ORDERED TO MAKE RESTITUTION AS DETERMINED

7    BY THE COURT.  YOU'RE ORDERED TO A PAY RESTITUTION FUND FINE

8    OF $10,000 PURSUANT TO 1202.4(B) OF THE PENAL CODE.  YOU'RE

9    ORDERED TO PAY AN ADDITIONAL RESTITUTION FINE, AND THAT

10   AMOUNT IS SUSPENDED PURSUANT TO 1202.45.

11          YOU'RE ORDERED TO PROVIDE ONE BLOOD AND TWO SALIVA

12   SAMPLES PURSUANT TO 296 OF THE PENAL CODE.

13          THERE IS NO GOOD TIME CREDITS, BUT THERE'S ACTUAL

14   TIME CREDITS OF 299 CREDITS FOR TIME SERVED.  ZERO DAYS

15   PURSUANT TO 2933.2.

16          MR. UVALLES, YOU HAVE AN ABSOLUTE RIGHT TO FILE A

17   NOTICE OF APPEAL FROM THE JURY VERDICT AND FROM THE SENTENCE

18   IMPOSED TODAY.  TO PROTECT YOUR RIGHT TO FILE OR HAVE AN

19   APPEAL YOU MUST FILE YOUR NOTICE WITHIN 60 DAYS FROM TODAY'S

20   DATE.  THE MARSDEN MOTION YOU MADE TODAY WILL BE INCLUDED IN

21   YOUR APPELLATE PROCESS.  IF YOU DON'T HAVE FUNDS TO HIRE A

22   LAWYER TO REPRESENT YOU ON APPEAL, THE APPELLATE COURT WILL

23   APPOINT A LAWYER TO REPRESENT YOU, BUT YOU MUST FILE YOUR

24   NOTICE OF APPEAL WITHIN 60 DAYS FROM TODAY'S DATE.  ANYTHING

25   FURTHER?  ALL RIGHT.  WE'LL BE IN RECESS.

26          MS. BOWMAN:  THANK YOU, YOUR HONOR.

27          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

28

1  STATE OF CALIFORNIA      )
                            )
2  COUNTY OF SANTA CLARA    )

3

4          I, PATRICK K. CROWLEY, CSR #11271, HEREBY
   CERTIFY:

5

6      THAT THE FOREGOING IS A FULL, TRUE, AND CORRECT

7  TRANSCRIPT OF THE TESTIMONY GIVEN, OF THE EVIDENCE OFFERED

8  AND RECEIVED, AND STATEMENTS OF THE COURT, ALSO ALL

9  OBJECTIONS OF COUNSEL AND ALL MATTERS TO WHICH THE SAME

10 RELATE, IN THE PROCEEDINGS HAD, ENTITLED:  IN THE MATTER OF:

11 PEOPLE VERSUS RAUL UVALLES, CASE NUMBER CC121250, TAKEN ON

12 JUNE 13 & 14, 2002;

13     THAT I REPORTED THE SAME IN STENOTYPE TO THE BEST OF MY

14 ABILITY, BEING THE DULY-APPOINTED, QUALIFIED, AND ACTING

15 OFFICIAL STENOGRAPHIC REPORTER OF SAID COURT, AND THEREAFTER

16 TRANSCRIBED THE SAME INTO TYPEWRITING AS HEREIN APPEARS.

17     I FURTHER CERTIFY THAT I HAVE COMPLIED WITH CCP § 237

18 (A) (2) IN THAT ALL PERSONAL JUROR-IDENTIFYING INFORMATION

19 HAS BEEN REDACTED, IF APPLICABLE.

20

21

22     DATED:  JULY 18, 2002

23

24

25

26

27     _____

28          PATRICK K. CROWLEY, CSR  #11271

PATRICK K. CROWLEY, CSR 11271

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13
   **RAUL UVALLES,**                          C 05-2779 MJJ (PR)
14
                              Petitioner,
15
             v.
16
   **D.L. RUNNELS, Warden,**
17
                              Respondent.
18

19
       **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**
20

21

22

23

24

25

26

27

28

                                        **EXHIBIT C-1**

# SIXTH DISTRICT APPELLATE PROGRAM
A Non-Profit Corporation

---

100 N Winchester Blvd., Suite 310
Santa Clara, CA 95050

(408) 241-6171 - Main
(408) 241-2877 - Fax

COPY

Executive Director
*Michael A. Kresser*

Assistant Director
*Dallas Sacher*

Law Office Manager
*Yolanda G. Edwards*

Staff Attorneys
*Lori A. Quick*
*Vicki I. Firstman*
*William M. Robinson*
*Jonathan Grossman*
*Paul Couenhoven*

**DOCKETED**
**SAN FRANCISCO**

AUG 2 9 2002

By _D. VELASCO_
No. SF2002 04 0867

August 28, 2002

Superior Court, Appeals Clerk
191 N. First St.
San Jose, CA 95110

Re: People v. Raul Uvalles
Santa Clara County Superior Court #CC121250
Court of Appeal #H024674
**RULE 35(e) LETTER**

Dear Appeals Clerk:

Under Rule 35(e) of the California Rules of Court, appellate counsel requests that the following item be legibly reproduced and made a part of the record on appeal. The item is such that it should have been a part of the normal record on appeal:

**1. The transcript of appellant's taped statement to police. (RT 4-5.)**

Under California Rules of Court, rule 33(a)(1)(k) the normal record on appeal shall include any transcript of an electronic sound recording that was tendered to the court under rule 203.5.

The original of the requested item should be sent to the Sixth District Court of Appeal, Michael J. Yerly, Clerk, 333 West Santa Clara, San Jose, CA 95113. Copies should be sent to the parties: Attorney General's Office, 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102; and to **Lori A. Quick, Staff Attorney, Sixth District Appellate Program, 100 N. Winchester Blvd., Suite 310, Santa Clara, CA 95050.**

C-1    F

Should you need to discuss this matter, please do not hesitate to contact me.

Sincerely,

Lori A. Quick
Staff Attorney

cc:    Sixth District Court of Appeal
       Attorney General

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA 94102-3664
    Telephone: (415) 703-5969
8   Fax: (415) 703-1234
    Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13
   **RAUL UVALLES,**                          C 05-2779 MJJ (PR)
14
                                  Petitioner,
15
            **v.**
16
   **D.L. RUNNELS, Warden,**
17
                                  Respondent.
18

19        **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT C-2

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| **THE PEOPLE** | **SANTA CLARA COUNTY NO.  CC121250** |
| **VS** | |
| **RAUL UVALLES** | **CLERK'S CERTIFICATE** |

I, _____M. MALLABO_____ , DEPUTY COUNTY CLERK OF THE COUNTY OF SANTA

CLARA, STATE OF CALIFORNIA, DO CERTIFY THE FOLLOWING:

THAT AFTER DUE DILIGENCE AND SEARCH, I WAS UNABLE TO LOCATE APPELLANT'S
REQUEST FOR: "TRANSCRIPT OF APPELLANT'S TAPED STATEMENT TO POLICE."

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND THE SEAL OF
SAID SUPERIOR COURT, THIS  __SEPTEMBER 13, 2002__ .

DATE



**KIRI TORRE,**
CHIEF EXECUTIVE OFFICER/CLERK

BY: _____M. MALLABO_____
DEPUTY CLERK

C-2

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA

PLAINTIFF,

- VERSUS -

RAUL UVALLES

DEFENDANT.

DOCKETED
SAN FRANCISCO

SEP 1 7 2002

By L. CARAMANZANA

No. SF2022DA0867

CASE NUMBER:    CC121250

# PROOF OF SERVICE BY MAIL OF:

☒ CLERK'S CERTIFICATE

☐ OTHERS: _____

## CLERK'S CERTIFICATE OF MAILING:

I CERTIFY THAT I AM NOT A PARTY TO THIS CAUSE AND
THAT A TRUE COPY OF THIS DOCUMENT WAS MAILED
FIRST CLASS POSTAGE PREPAID IN A SEALED ENVELOPE
ADDRESSED AS SHOWN BELOW AND THE DOCUMENT
WAS MAILED AT:

**KIRI TORRE**

CHIEF EXECUTIVE OFFICER/CLERK

BY: _____

SAN JOSE, CALIFORNIA ON    9/13/02

M. MALLABO                    DEPUTY

Attorney General
455 Golden Gate Avenue
Room 11000
San Francisco, CA 94102

COURT OF APPEAL
SIXTH APPELLATE DISTRICT
333 W. SANTA CLARA ST. STE. 1060
SAN JOSE, CA 95113

LORI QUICK, ESQ.
100 N. WINCHESTER BOULEVARD
SUITE 310
SANTA CLARA, CA 95050

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

**RAUL UVALLES,**                          C 05-2779 MJJ (PR)

14
                                Petitioner,
15

        **v.**
16

17  **D.L. RUNNELS, Warden,**

                                Respondent.
18

19        **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT C-3



2/19/2003

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA,   ]
                                      ]  NO.  H024674
            Plaintiff and Respondent, ]
                                      ]  (SANTA CLARA CO.
    vs.                               ]  SUPERIOR COURT
                                      ]  NO. CC121250)
RAUL UVALLES,                         ]
                                      ]
            Defendant and Appellant.  ]
_____]

APPELLANT'S OPENING BRIEF

494 pgs

DOCKETED
SAN FRANCISCO

FEB 2 0 2003

By  F. MONTOYA
No. SF2002DA0867

7/26/02

SIXTH DISTRICT APPELLATE PROGRAM

LORI A. QUICK
Staff Attorney
State Bar #148692
100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050
(408) 241 -6171

Attorneys for Appellant,
RAUL UVALLES

C-3

# TABLE OF CONTENTS

STATEMENT OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    The Prosecution Case . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          1.    Events Leading Up To The Discovery of the Homicide. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          2.    The Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . 7

               a.    The Crime Scene . . . . . . . . . . . . . . . . . . . . . . 7

               b.    The Search of Appellant's Residence . . . . . . . 9

               c.    The Arrest of Appellant . . . . . . . . . . . . . . . . 9

               d.    The Investigation of Mancera's Bank Account Activity . . . . . . . . . . . . . . . . . . . . . . 10

          3.    The Autopsy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          4.    Other Forensic Evidence . . . . . . . . . . . . . . . . . . . . 15

      B.    The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.    THE CONCURRENT THREE YEAR SENTENCE FOR THE ROBBERY CHARGED IN COUNT II VIOLATED PENAL CODE SECTION 654 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

///

///

i

## TABLE OF CONTENTS (continued)

II.    THE CONCURRENT THREE YEAR SENTENCE FOR THE
ROBBERY CHARGED IN COUNT II VIOLATED THE
DOUBLE JEOPARDY CLAUSE OF THE FIFTH
AMENDMENT OF THE UNITED STATES
CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

## CASES

Jones v. Thomas (1989)
        491 U.S. 376 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Miranda v. Arizona (1966)
        284 U.S. 436 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Neal v. State of California (1960)
        55 Cal.2d 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,17

North Carolina v. Pearce (1969)
        395 U.S. 711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

People v. Avalos (1996)
        47 Cal.App.4th 1569 . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

People v. Brown (1991)
        234 Cal.App.3d 918 . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

People v. Diaz (2002)
        95 Cal.App.4th 695 . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

People v. Evers (1992)
        10 Cal.App.4th 588 . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

People v. Harrison (1989)
        48 Cal.3d 321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

People v. Holt (1997)
        15 Cal.4th 619 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

People v. Latimer (1993)
        5 Cal.4th 1203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,17

People v. Marsden (1970)
        2 Cal.3d 118 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**TABLE OF AUTHORITIES (continued)**

**CASES**

People v. Mulqueen (1970)
    9 Cal.App.3d 532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

People v. Mustafaa (1994)
    22 Cal.App.4th 1305 . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

People v. Norrell (1996)
    13 Cal.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

People v. Osband (1996)
    13 Cal.4th 622 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

People v. Perez (1979)
    23 Cal.3d 545 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

People v. Wader (1993)
    5 Cal.4th 610 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18,19

**CONSTITUTIONS**

United States Constitution

    Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
    Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . .  18

**STATUTES**

Penal Code

    Section 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,3
    Section 211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,3
    Section 212.5, subdivision (c) . . . . . . . . . . . . . . . . . . . .  1,3
    Section 654 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16,17,19
    Section 1237, subdivision (a) . . . . . . . . . . . . . . . . . . . . . .  1

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ] | |
| ] NO. H024674 | |
| Plaintiff and Respondent, ] | |
| ] (SANTA CLARA CO. | |
| vs. ] SUPERIOR COURT | |
| ] NO. CC121250) | |
| RAUL UVALLES, ] | |
| ] | |
| Defendant and Appellant. ] | |

## STATEMENT OF APPEALABILITY

This appeal is from a final judgment and sentence which finally disposes of all issues between the parties. (Penal Code section 1237, subd. (a).)

## STATEMENT OF THE CASE

On January 11, 2002, an information was filed in Santa Clara County Superior Court charging appellant in Count 1 with murder in violation of Penal Code section 187, and in Count 2 with robbery in the second degree in violation of Penal Code sections 211 and 212.5, subdivision (c). (CT 61-62.)

1

On May 3, 2002, jury trial began with motions in limine. (CT 108-110.) It was stipulated that the victim, known as Maria Mancera, was in fact a man named John Mancera. (CT 108.)

On May 6, 2002, the trial court ruled that appellant's statements to police had been taken in violation of Miranda v. Arizona (1966) 284 U.S. 436 and could not be introduced in the prosecution's case in chief. (CT 117; RT 94.) The court also ruled, however, that because the statements did not appear to be involuntary, they could be used for impeachment in the event that appellant testified. (RT 94.)

On May 7, 2002, testimony began. (CT 121.) On May 8, 2002, the parties entered into four stipulations: that a blood sample was properly drawn from appellant and accurately analyzed by the Santa Clara County Crime Laboratory and was determined to be positive for "BE"; that a blood sample was properly drawn from the body of Mancera, accurately analyzed by the Santa Clara County Crime Laboratory, and was positive for both cocaine and alcohol, the blood alcohol level being measured at .22%; that Mancera's bank records were admissible; and that on August 20, 2001 at 12:48 a.m., Mancera's ATM card was used at an automatic teller machine at the Union Bank in San Jose, and at 12:55 a.m. at the Bank of America - Hester Branch in San Jose, that the video tapes taken during each transaction accurately

2

reflected the transaction, and that photographs were accurately made from the video taken during the transaction. (CT 124.)

The jury began deliberations on the afternoon of May 13, 2002 and concluded on the afternoon of May 14, 2002 at which time it found appellant guilty of murder in the first degree in violation of Penal Code section 187, and second degree robbery in violation of Penal Code sections 211-212.5, subdivision (c). (CT 191-195.)

On June 13, 2002, a hearing was held pursuant to People v. Marsden (1970) 2 Cal.3d 118. (CT 200.)

On June 14, 2002, the Marsden motion was denied. Appellant was then sentenced to serve 25 years to life for Count 1, and three years for Count 2, to be served concurrently, for a total prison commitment of 25 years to life. (CT 235-237.)

Notice of appeal was timely filed on June 14, 2002. (CT 238.)

## STATEMENT OF FACTS

A. The Prosecution Case

1. Events Leading Up To The Discovery Of The Homicide

At approximately 11:15 p.m. on August 19, 2001, San Jose Police Officer Joaquin Barreto was on foot patrol in the area of the Alameda and Hedding Street. (RT 129-130.) He and his partner, Officer Keith Neumer,

3

were standing on the Alameda at Sunol Street when they saw appellant and Maria Mancera[1] walking on the Alameda. (RT 132, 150.) They seemed to be "ambling along" with no specific direction. (RT 132.)

Barreto approached the pair and asked them what they were doing. (RT 133.) Mancera replied that they were looking for an ATM machine, and pulled an ATM card out of the purse she was carrying. (RT 133.) Barreto observed that the card was emblazoned with the name "Maria Mancera." (RT 134.) It was obvious to Barreto that Mancera was a man presenting himself as a woman. (RT 13`5-136, 144-145.) She did not have any injuries, and appeared to have all of her front teeth. (RT 138, 145.) Her hands were dirty. (RT 146.) Mancera and appellant appeared to be friendly with each other. (RT 136.)

While speaking to them, Barreto believed they were both under the influence of alcohol. (RT 134, 144.) He based this upon the fact that there was an odor of alcohol on them, their eyes were watery and bloodshot, and they were somewhat unsteady on their feet. (RT 135.) Neumer also smelled alcohol, and recalled that they admitted they had been drinking. (RT 154.) They also had dilated pupils, which Barreto knew was a symptom of stimulant

---

1.    Because the victim was referred to throughout the trial as "Maria Mancera" and because feminine pronouns were consistently used to describe Mancera, the same will be done in this brief to avoid confusion, even though Mancera was in fact a man named John Mancera and remained anatomically a man at the time of his death.

use. (RT 144.) Barreto did not see anything that he immediately recognized as symptoms of cocaine use, but it was possible that they were under the influence of cocaine as well. (RT 148.) Barreto thought they were both at about the same level of intoxication. (RT 135.) They did not have trouble communicating with him, and their level of intoxication was not severe enough to warrant booking them for being drunk in public or booking them into a non-custodial detention facility to sober up. (RT 135.)

Barreto conducted records checks on both Mancera and appellant to confirm their identities. (RT 134.) He also filled out a field identification card for appellant. (RT 139.) These cards are used to conduct field interviews when police believe there may be some criminal activity occurring, and contains such information as name, date of birth, address, whether the subject is on parole or probation, and a general clothing description. (RT 139.) During the course of this procedure, appellant told Neumer that he lived on Cleaves Street. (RT 150.) At the conclusion of the encounter, Barreto directed them to the Arena Hotel to find an ATM. (RT 136.) Within a few minutes, the two emerged from the Arena Hotel parking lot, and told Barreto that there was no ATM machine there. (RT 137.) Barreto then told them that there was a Bank of America down the street, and directed them to the Bank of America near Hester Street. (RT 137.) They thanked Barreto and headed in that

5

direction. (RT 138.) Barreto and Neumer continued with their regular duties.
(RT 139.)

At approximately 6:30 a.m. on Monday, August 20, 2001, as Barreto
was preparing to end his shift, he heard a radio broadcast that there had been
a report of a beaten person near Bellarmine High School. (RT 140.) Because
this area was in the district covered by Barreto, he felt he needed to investigate
since it had happened while he was on duty. (RT 140.) When he arrived at
Bellarmine High School, he saw the body of Maria Mancera lying beside the
high school running track. (RT 141.) Barreto immediately recognized her as
the person he had spoken to the previous night. (RT 142.) She was still
wearing the same clothing, but her pockets were turned inside out. (RT 147,
249-250.) The body was in full rigor mortis, meaning death had occurred
approximately six to eight hours earlier. (RT 212-213.) He notified his
supervisor and passed on to the investigating detectives the information he had
gathered during his encounter with Mancera and appellant, including the field
identification card. (RT 142-143.)

Neumer also went to Bellarmine High School when news of Mancera's
death reached him. (RT 150.) He then went to the Bank of America near
Hester to see whether there was a videotape of appellant and Mancera at the
ATM. (RT 150-151.) Upon viewing the videotape, Neumer saw Mancera and

appellant approaching the ATM. (RT 151, 153-154.) In the video, appellant wore a hat which had a number on it. (RT 153-154.) A withdrawal of $41.50 had been made via that ATM at 11:35 p.m. on August 19, 2001. The bank videotape, from which still photos were made, accurately reflected that transaction. (RT 152.)

### 2. The Investigation

#### a. The Crime Scene

Mario Lejes worked for a painting company on Hedding Street. (RT 258.) When he arrived at work at about 6:30 a.m. on August 20, he saw someone lying on the running track of Bellarmine High School. (RT 259.) Lejes and a co-worker approached the body and saw that there was blood around the mouth and the back of the head. (RT 260.) Lejes touched the right kneecap and noticed that it was cold. (RT 260-261.) Lejes did not move or take anything at the scene, nor did he move the body. (RT 261-263.)

When police initially arrived on the scene, photographs were taken of Mancera's body and all items found around it. (RT 157-158.) Officer Bruce Wiley arrived at the site where the body was found, which was below the Hedding Street overpass that crosses over the athletic fields of Bellarmine High School. (RT 158.) The overpass is a pedestrian walkway which rises some 31 feet above the ground. (RT 189-190.) It has a railing which is

7

approximately 29 inches high. (RT 168.) Near the body were found a black leather belt (RT 163), a California identification card in the name of Michael George Photopoulas[2] (RT 164, 167), a fragment of a tooth (RT 164), a red plastic disposable lighter (RT 164), and a white metal digital wristwatch with a black leather band. (RT 164.) There were bloodstains on the running track approximately five and one-half to six feet from Mancera's right foot. (RT 165.) All of these items were within approximately two feet of each other. (RT 166.)

In a sandy area beneath the overpass approximately 60 feet from Mancera's body was found her purse with its contents spilled out. (RT 169, 190, 225.) These included makeup and personal hygiene products, miscellaneous papers, notes, business cards, photographs, some costume jewelry, and address book, a checkbook, a California identification card in Mancera's name, and four dollars and six cents in coins. (RT 170.) The purse and its contents were not visible from the overpass. (RT 171.)

Some shoe prints were located near Mancera's body. (RT 172.) Wiley photographed them and also made a cast of one of the shoe prints which was actually closer to the purse. (RT 174-176, 189.)

---

2.    There was a stipulation that Photopoulas was known to Mancera, was in custody at the time of Mancera's death, and that Mancera was in possession of the identification card at the time of her death.

### b. The Search Of Appellant's Residence

The next day, Wiley went to appellant's home at 152 Cleaves Avenue in San Jose. (RT 178.) According to appellant's landlord, appellant had not arrived home until 4:37 or 4:38 on the morning of August 20. (RT 231.) In appellant's bedroom Wiley found a pair of gray pants which had what appeared to be traces of blood on them. (RT 178-180.) Also collected was a pair of white Thom McAn tennis shoes (RT 181-182, 184), a pair of boots (RT 185), a black baseball cap with a maroon brim across the front of which was the logo "Carpenters Local" and "Santa Clara and San Benito Counties", with the number 405 in the middle. (RT 182-184), and a t-shirt with the logo "MAX AIR" across the front. (RT 183.)

Also searched was a municipal trash can at the northwest corner of Hester Street and the Alameda. (RT 187.) Inside was located an ATM card in the name of Maria R. Mancera. (RT 187-188.) The trash can was approximately 20 yards from the ATM at the Bank of America near Hester. (RT 188.)

### c. The Arrest Of Appellant

Appellant was taken to the preprocessing unit at 6:53 p.m. (RT 264.) While photos were being taken of him, he asked Sergeant Vallecilla "So what do you think, is this going to be a life sentence or what?" (RT 267.) Vallecilla

9

replied that he did not know, at which point appellant said "I'm 39 years old. I'm really screwed this time. I'll be here for life. Shit like this follows me all the time." (RT 267-269.) A blood sample was drawn from appellant. (RT 270.) A test indicated the presence of cocaine metabolite, meaning he had most likely ingested cocaine more than six hours earlier. (RT 270, 276-277.)

### d. The Investigation Of Mancera's Bank Account Activity

San Jose Police Sergeant Gilbert Vizzusi was the detective assigned to investigate Mancera's death. (RT 247.) Vizzusi noticed that Mancera's pockets were turned inside out, and there was an ATM receipt on or near the body. (RT 249-250.) He ascertained that the ATM card was not on or near Mancera, though her checkbook was. (RT 250-251.) Using the account number from the checkbook Vizzusi investigated whether there had been any activity on the account. (RT 251.) Vizzusi also viewed videotapes taken by security cameras at the bank, which revealed that appellant had used the ATM machine at 12:46 a.m. on August 20. (RT 254.) Mancera's ATM card had been used at the same time. (RT 255.) Bank records indicated that $40.00 had been successfully withdrawn from Mancera's checking account through an ATM at the Hester Branch of the Bank of America at 11:45 p.m. (RT 291-

10

292.)[3] They further indicated that at 12:48 a.m., 12:49:07 a.m., and 12:49:21 a..m. on August 20, 2001, three attempts were made at the ATM at Union Bank to withdraw $300.00 from Mancera's account. The attempts were unsuccessful because the user had entered an incorrect personal identification number, or "PIN". (RT 293.) A fourth attempt at the same ATM at 12:49:41 resulted in a rejection of the card by the ATM. (RT 294.) At 12:55:37, an attempt was made to withdraw $100.00 from the Hester Street Bank of America, resulting in a message by the ATM that the number of PIN tries had been exceeded. (RT 295.) Two more unsuccessful attempts were made at 12:56:09 a.m. and 12:56:50 a.m. (RT 296.)

### 3. The Autopsy

Gregory Schmunk is the Chief Medical Examiner and Coroner for Santa Clara County who is an expert in the area of forensic pathology and wound recognition. (RT 196-198.) He performed an autopsy on Mancera's body, during which he discovered that Mancera was in fact a man. (RT 198-199.) Mancera's blood alcohol level had been determined to be .22. (RT 280-281.) The blood alcohol level of .22% indicated to Schmunk that Mancera had consumed approximately 10 drinks within a few hours. (RT 219.) Such a

---

3.      The date on which this occurred was never stated for the record.

blood alcohol level would result in signs of gross intoxication, such as slurred speech and loss of balance with difficulty standing and walking. (RT 273-274, 282-283.) He noted that between 11:10 a.m. and 12:20 p.m. on August 20, Mancera's body was in full rigor mortis, meaning that she had died approximately six to eight hours earlier. (RT 213.) The level of lividity[4] present at the same time was not fixed, as would be expected eight to 12 hours after death. (CT 215-216.)

With respect to external injuries, Schmunk observed that the upper jaw was fractured, and there were abrasions or scrapes, and bruises of the skin. (RT 201.) There were abrasions on the neck and upper shoulders, the right back, the left lower back, the right side and front of the chest. There was bruising around the left eye and an abrasion at the left side of the jaw. (RT 201.) Bruises or areas of bleeding were inside the white of the left eye, and there was bruising and tearing on the inside of the mouth, especially on the left side of the cheek, which was consistent with a blow to that area, and inconsistent with a fall. (RT 201, 220.) Other abrasions were present on the front and left side of the chest and arms and legs. (RT 201-202.) The left upper arm was broken, the pelvis was fractured, and there were rib fractures

---

4.    Lividity is the settling of the blood that occurs in the body due to gravity. (RT 214-215.)

12

on both sides of the chest. (RT 202.) An internal examination revealed the pelvic and rib fractures, bruising to the brain with blood on the surface of the brain, and a basilar skull fracture. (RT 203.) The liver was lacerated and there was a small amount of blood in the body. (RT 203.)

Additionally, Schmunk noted that Mancera's teeth were in very poor repair. Mainly only the front teeth were present and they were badly rotted. Most of the back teeth were missing and those that were present were decaying. (RT 210.) There were lacerations and bruising around the left eye and some redness in the area of the right eye. (RT 210.) There were a few abrasions and some bruising over the forehead and right cheek. (RT 210.)

Many of the injuries were consistent with a fall of 27 to 31 feet. (RT 204.) One exception was the injury to the inside of the mouth. (RT 204.) According to Schmunk, while it was possible to suffer injuries to the inside of the mouth in a fall, one would also expect to see an injury to the skin surface due to impact on the ground. (RT 204.) Because Mancera did not have such an injury, Schmunk thought it could reasonably be concluded that another, softer impact, such as a punch, had caused this injury prior to the fall. (RT 204-205, 220.) Schmunk could not exclude the possibility that the injury happened within a few minutes after the fall, but believed it more logical to conclude that it happened before the fall. (RT 205, 220-221.) Schmunk felt

13

that at most, this injury had occurred within a maximum of a few hours of death, but he could not exclude the possibility that it had occurred within an hour or slightly more than an hour before death. (RT 223-224.)

Schmunk opined that Mancera was alive at the time of the fall based on the large amount of blood both on the track and inside the body. (RT 205.) In addition, the arm fracture had some soft-tissue swelling which would not have occurred without blood pressure. (RT 205-206.) Other factors which led Schmunk to believe that Mancera was alive before hitting the ground were bleeding on the surface of the brain, in the deep chest, at the rib fractures, and in the abdominal cavity. (RT 206.)

A study of the bloodstains on the track indicated to Schmunk that the body had lain in one position on the track, bleeding, for some period of time, and was then moved to the location where it was found. (RT 206-207.) Contributing to this opinion was the presence of "pattern injuries" on Mancera's abdomen. (RT 208.) Schmunk also observed in the photograph of the body what appeared to be drag marks below the impression of one of the arms. (RT 209-210.) He did not believe that Mancera would have been able to move herself. (RT 225.)

Schmunk was of the opinion that Mancera's back, back pelvic region, and left arm had hit the ground first, based on the injuries he observed. (RT

14

211.) If in fact she was alive when she fell, Schmunk believed that she would have been unconscious from the moment of impact, though her heart and respiration would not have stopped for several minutes. (RT 212.) Schmunk concluded that the manner of death was homicide. (RT 226.)

### 4. Other Forensic Evidence

Santa Clara County Criminalist John Bourke, an expert in the area of shoeprint analysis and comparison, compared three pairs of shoes submitted by the detectives in the Mancera case against an impression taken of shoeprints at the scene. (RT 235-236.) Based on this comparison, Bourke included the right shoe of the pair of Thom McAn tennis shoes taken from appellant's residence as a possible source of the shoeprints. (RT 243-246.)

Nancy Marte, a Criminalist at Santa Clara County Crime Laboratory conducted a DNA analysis on blood samples collected from a pair of gray pants and from fingernail swabbings. (RT 299-300.) Her conclusion was that Mancera was the source of three bloodstains on the pants. (RT 302.) Appellant was the source of one. (RT 302.) Mancera was also the source of the blood sample obtained from the fingernail swabbing, which had been taken from Mancera's hand. (RT 302.)

### B. The Defense Case

Andrew Marr worked at a concrete company on the other side of the

railroad tracks by Bellarmine High School. (RT 312.) At about 6:30 a.m. on

August 20, 2001, he noticed a Hispanic male clearing the fence. Once he hit

the ground, he ran off at a high rate of speed. (RT 313.) Marr described the

man as having a long black braided ponytail and wearing a white t-shirt and

faded blue jeans. (RT 313.) About 30 to 45 minutes later, Marr noticed the

police activity. (RT 315.) He walked over to see what was happening, and

told police about the man he had seen. (RT 315, 318.)

## ARGUMENT

### I.

### THE CONCURRENT THREE YEAR SENTENCE FOR THE ROBBERY CHARGED IN COUNT II VIOLATED PENAL CODE SECTION 654

Penal Code section 654 states in pertinent part that "[a]n act or

omission which is made punishable in different ways by different provisions

of this code may be punished under either of such provisions, but in no case

can it be punished under more than one . . . " The California Supreme Court

has repeatedly interpreted this section to mean that if multiple offenses

committed by a defendant were incident to one objective, the defendant may

be punished for any one of such offenses but not for more than one. (People

v. Norrell (1996) 13 Cal.4th 1, 6; People v. Latimer (1993) 5 Cal.4th 1203,

1208; Neal v. State of California (1960) 55 Cal.2d 11, 19.) Defense counsel's

failure to object to a sentence violative of the section 654 proscription against

16

multiple punishment does not waive the issue for appeal. (People v. Perez (1979) 23 Cal.3d 545, 550, fn. 3; People v. Mustafaa (1994) 22 Cal.App.4th 1305, 1311.)

In applying section 654, it must be determined whether the defendant acted pursuant to a single intent and objective. (Latimer, supra, 5 Cal.4th at p. 1216; Perez, supra, at pp. 551-552; People v. Avalos (1996) 47 Cal.App.4th 1569, 1583.) If all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, the defendant may be found to have harbored a single intent and therefore may be punished only once. (People v. Harrison (1989) 48 Cal.3d 321, 335; Neal, supra, 55 Cal.2d at p. 19; People v. Evers (1992) 10 Cal.App.4th 588, 602.)

In the present case, concurrent sentences were imposed for first degree murder and for robbery. The prosecutor argued alternative theories of first degree murder, stating that it had either been a result of premeditation and deliberation with the motive being robbery (RT 347, 350-351), or felony murder in that the homicide occurred during the course of a robbery which is an inherently dangerous felony. (RT 352-354.) Regardless of which theory the jury based its verdict on, it is clear that the robbery and the killing were incident to one objective, thus making the crime one indivisible transaction subject only to one punishment under section 654. (People v. Brown (1991)

17

234 Cal.App.3d 918, 933.)  Appellant was given separate but concurrent sentences for both the murder and the robbery during which the murder occurred.  It is clear from the record that there was only one act and that the act of robbery was the act which made the homicide first degree murder.  (See People v. Mulqueen (1970) 9 Cal.App.3d 532, 547; *accord* People v. Diaz (2002) 95 Cal.App.4th 695, 708.)  Consequently, the sentence for Count II should have been stayed.

## II.

### THE CONCURRENT THREE YEAR SENTENCE FOR THE ROBBERY CHARGED IN COUNT II VIOLATED THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION

The Fifth Amendment guarantee against double jeopardy, which is enforceable against the States through the Fourteenth Amendment, protects against multiple punishments for the same offense.  (North Carolina v. Pearce (1969) 395 U.S. 711, 717; People v. Wader (1993) 5 Cal.4th 610, 670.)  The United States Supreme Court has held that a "sentence for both felony murder and the underlying felony violate[s] the . . . double Jeopardy Clause, the protection against 'multiple punishments for the same offense' imposed in a single proceeding."  (Jones v. Thomas (1989) 491 U.S. 376, 381.)  The Court in Jones v. Thomas stated that the "conviction of both felony murder and attempted robbery gave rise to a double jeopardy claim only because the

18

Missouri legislature did not intend to allow conviction and punishment for *both* felony murder and the underlying felony." (<u>Jones v. Thomas, supra,</u> 491 U.S. at p. 381, italics in original.)   As explained above, the California legislature also did not intend to allow punishment for both felony murder and the underlying felony, as is evidenced by Penal Code section 654.

The trial court did not stay the sentence for Count II.   Thus, it is necessary for this court to consider appellant's claim that the punishment for both felony murder and the underlying felony violated the double jeopardy clause.   (See <u>People v. Holt</u> (1997) 15 Cal.4th 619, 692; <u>People v. Osband</u> (1996) 13 Cal.4th 622, 730-731; <u>Wader, supra,</u> 5 Cal.4th 610, 670.)

CONCLUSION

For the foregoing reasons, appellant respectfully asks this court to reverse the judgment.

Dated: February *19*, 2003

Respectfully Submitted,

LORI A. QUICK
Attorney for Appellant
Raul Uvalles

19

## PROOF OF SERVICE

I declare that I am over the age of 18, not a party to this action and my business address is 100 N. Winchester Blvd., Suite 310, Santa Clara, California 95050. On the date shown below, I served the within APPELLANT'S OPENING BRIEF to the following parties hereinafter named by:

X    Placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Santa Clara, California, addressed as follows:

Attorney General's Office
455 Golden Gate Avenue
Suite 11,000
San Francisco, CA 94102-7004
[Attorney for Respondent]

Raul Uvalles
T-59954
High Desert State Prison
P. O. Box 3030
Susanville, CA 96127-3030

District Attorney's Office
70 W. Hedding St.
San Jose, CA 95110

Clerk of the Superior Court
Criminal Division
190 W. Hedding St.
San Jose, CA 95110

I declare under penalty of perjury the foregoing is true and correct. Executed this _17th_ day of February, 2003, at Santa Clara, California.

Sue Yarbrough

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
5   MARK S. HOWELL
    Deputy Attorney General
6   State Bar No. 95125
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
      Telephone: (415) 703-5969
8     Fax: (415) 703-1234
      Email: mark.howell@doj.ca.gov
9   Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13
    **RAUL UVALLES,**                          C 05-2779 MJJ (PR)
14
                              Petitioner,
15
                 **v.**
16
    **D.L. RUNNELS, Warden,**
17
                              Respondent.
18

19          **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

                                    **EXHIBIT C-4**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

RAUL UVALLES,

Defendant and Appellant.

H024674    BIB F. 2/19/03

DOCKETED
SAN FRANCISCO

JUL 1 8 2003

By _____ J. TUCAY
No. SF 2002 DA 0867

Santa Clara County Superior Court No. CC121250
The Honorable Thomas C. Hastings, Judge

**RESPONDENT'S BRIEF**

FILED

JUL 1 6 2003

Court of Appeal – Sixth App. Dist.
By _____
DEPUTY

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

CATHERINE A. RIVLIN
Supervising Deputy Attorney General

MARK S. HOWELL
Deputy Attorney General
State Bar No. 95125

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5969
Fax: (415) 703-1234

Attorneys for Respondent

C-4

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE                                      1

STATEMENT OF FACTS                                        2

APPELLANT'S CONTENTIONS                                  11

RESPONDENT'S ARGUMENT                                    11

ARGUMENT                                                 12

    **THE CONCURRENT THREE YEAR SENTENCE FOR ROBBERY AS CHARGED IN COUNT TWO VIOLATES PENAL CODE SECTION 654**    12

CONCLUSION                                               14

i

# TABLE OF AUTHORITIES

Page

**Cases**

*Jones v. Thomas*
(1989) 491 U.S. 376 ............................................................... 13

*Miranda v. Arizona*
(1966) 284 U.S. 436 ............................................................... 1

*People v. Boyd*
(1990) 222 Cal.App.3d 541 ...................................................... 12

*People v. Bracamonte*
(2003) 106 Cal.App.4th 704 .................................................... 12

*People v. Harrison*
(1989) 48 Cal.3d 321 .............................................................. 13

*People v. Latimer*
(1993) 5 Cal.4th 1203 ............................................................. 12

*People v. Marsden*
(1970) 2 Cal.3d 118 ................................................................ 2

*People v. Mulqueen*
(1970) 9 Cal.App.3d 532 ......................................................... 12, 13

*People v. Mustafaa*
(1994) 22 Cal.App.4th 1305 .................................................... 13

*People v. Perez*
(1979) 23 Cal.3d 545 .............................................................. 13

*People v. Scott*
(1994) 9 Cal.4th 331 ............................................................... 13

**TABLE OF AUTHORITIES** (continued)

                                                                          Page

**Constitutional Provisions**

United States Constitution
     Fifth Amendment                             11

**Statutes**

Penal Code
    § 187                                           1, 2
    § 211                                           1, 2
    § 212.5 subd. (c)                               1, 2
    § 654                                          11, 12

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

**RAUL UVALLES,**

Defendant and Appellant.

H024674

## STATEMENT OF THE CASE

In an information filed in Santa Clara County Superior Court on January 11, 2002, the district attorney charged appellant as follows: count 1 alleged that on or about August 20, 2001, appellant murdered Maria Mancera, in violation of Penal Code section 187; count 2 alleged that on or about August 20, 2001, appellant committed robbery in the second degree, in violation of Penal Code sections 211 and 212.5 subdivision (c), by taking personal property, an ATM card, and money from Maria Mancera. (CT 60-62.)

On May 3, 2002, the jury trial began with the arguments in support of motions in limine. (CT 108-110.) The court found that appellant's pretrial statements were inadmissible as he had not been given his *Miranda* warnings.[1] However, the court did state that his statements could be used for impeachment purposes if appellant testified. (RT 94.)

On May 7, 2002, testimony began. The trial court submitted the case to the jury on the afternoon of May 13, 2002. (CT 190.) The jury concluded deliberations on the afternoon of May 14, 2002, finding appellant guilty of

---

1. *Miranda v. Arizona* (1966) 284 U.S. 436.

murder in the first degree, a violation of Penal Code section 187, and guilty of robbery in the second degree, a violation of Penal Code sections 211 and 212.5, subdivision (c). (CT 191-194.)

On June 13, 2002 a hearing was held pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. (CT 200.) On June 14, 2002, the trial court denied the *Marsden* motion and sentenced appellant to 25 years to life for count 1, the murder conviction, and to a concurrent sentence of three years, the middle term, for count 2, the robbery conviction. (CT 235-237; RT 495-496.)

Appellant filed a timely notice of appeal on June 14, 2002. (CT 238.)

## STATEMENT OF FACTS

### A. The Prosecution's Case

#### 1. Events Leading up to Maria Mancera's Murder

On Sunday, August 19, 2001, at 11:15 p.m., Officer Joaquin Barreto was on foot patrol with his partner, Keith Neumer, on the west side of San Jose, near the Alameda and Hedding Street. (RT 130-131.) Officers Barreto and Neumer encountered appellant and Maria Mancera at the intersection of the Alameda and Sunol Street. (131-132.) When Officer Barreto first observed them, they were ambling along the Alameda with "no specific direction or intent on what they were doing." (RT 132.)

Officers Barreto and Neumer approached appellant and Ms. Mancera and asked what they were doing. Ms. Mancera replied that they were looking for an ATM machine. (RT 133.) Officer Barreto asked if she was really looking for an ATM machine and inquired if she had an ATM card with her. (*Ibid.*) Ms. Mancera reached into her purse and produced an ATM card with the name Maria Mancera on it. (RT 134.) Officer Barreto testified that it seemed obvious to him that Maria Mancera was transgender. (RT 135-136.)

In observing appellant and Maria Mancera, Officer Barreto noticed

2

that they both appeared to be under the influence of alcohol. (*Ibid.*) Both had eyes that seemed watery and bloodshot, and they looked a bit unsteady on their feet. (RT 135.) Officer Neumer also felt that the two presented signs of intoxication. (RT 154-155.) Officer Barreto felt that they were still able to care for themselves and did not require booking for being drunk in public. (RT 135.) Officer Barreto noted that at that time Maria Mancera appeared to have no injuries to her face and that all of her front teeth appeared to be present. (RT 138.) Appellant and Ms. Mancera appeared to be friendly with each other, and Officer Barreto saw nothing that indicated Ms. Mancera felt any distress. (RT 136, 138.)

Officer Barreto conducted record checks on both appellant and Ms. Mancera to confirm their identities. (RT 134.) Officer Barreto also filled out a field identification card for appellant. Field identification cards consist of general information, such as name, address date of birth, general clothing description, and parole or probation status. (RT 139.) Upon completion of the field identification procedure, Officer Barreto pointed appellant and Ms. Mancera in the general direction of the Arena Hotel, where he believed there was an ATM machine. (RT 134.)

After a few minutes, Officer Barreto observed the pair exiting the hotel parking lot. (RT 137.) They told him that there was no ATM machine in the Arena Hotel. In response, Officer Barreto pointed them toward the Bank of America ATM near Hester Street. (*Ibid.*) They thanked him and proceeded in that direction. (RT 138.)

## 2. Discovery of the Body

Mario Lejes arrived for work at R. Brothers painting on Hedding Street on Monday, August 20, 2001, at approximately 6:30 a.m. (RT 258-259.) Upon arrival, Mr. Lejes and his coworkers observed a body lying on the track of Bellarmine High School, right next to R. Brothers. (RT 259.) Mr. Lejes went

3

to the body and attempted to rouse the person. (RT 260.) After noting the lack of response and blood around the mouth and back of the head of the body, Mr. Lejes touched the right kneecap and discovered it was cold. (RT 260-261.) Mr. Lejes did not touch anything else or move the body. (RT 261-263.)

At approximately 6:30 a.m. on Monday, August 20, 2001, Officer Barreto received a call concerning a person who had been beaten near Bellarmine High School. (RT 140.) Officer Barreto felt he needed to investigate what the circumstances of the beating were, as it had occurred in his district. (*Ibid.*) Upon arrival at Bellarmine High School, Officer Barreto observed that the body was located beside the high school's track. (RT 141.) Upon seeing the body, Officer Barreto immediately recognized the person as Maria Mancera, the same person with whom he had spoken the previous night. (RT 142.) He also noted that Ms. Mancera was wearing the same outfit that she had been wearing the previous night. (RT 147.) Officer Barreto relayed this information to his supervisors and to the investigators, including the field identification card with appellant's information on it. (RT 143-144.)

Officer Neumer also responded to the crime scene. Then, he went to the Bank of America near Hester to retrieve videotape from the ATM of the previous night's activities. (RT 150-151.) Reviewing the videotape, Officer Neumer found tape of Maria Mancera and appellant approaching the ATM machine at approximately 11:35 p.m. on August 19, 2001. (RT 151-152.)

Investigators arrived on the scene, made sure it was properly secured, and took pictures of the body and surrounding area. (RT 158-159.) Sergeant Bruce Marten Wiley, of the San Jose Police Department, arrived on the scene at approximately 7:45 a.m. on Monday, August 20, 2001. (RT 159.) Sergeant Wiley testified that the body was found below the Hedding Street overpass that crosses over the athletic fields of Bellarmine High School. (RT 158, 160.) The victim's pockets were turned out, with an ATM receipt laying by her side. (RT

4

249-250.)  Officer Wiley noted that several objects were found in the general vicinity of the body, (RT 163-171,) specifically, a black leather belt, a California Identification card,[2] a fragment of a tooth, a red plastic disposable lighter, and a white metal digital wristwatch with a black leather band.  (RT 163-164.) Sergeant Wiley also testified that the victim's purse had been found, approximately 60 feet from the victim's body, its contents dumped out.  (RT 169, 190.)  The purse was a black handbag.  Some of its contents had been strewn about it, and some of its contents remained inside.  Sergeant Wiley testified that the contents included makeup, personal hygiene and care products, miscellaneous papers, notes, business cards, photographs, some costume jewelry, an address book, a checkbook, California Identification and Social Security cards in Maria Mancera's name, and four dollars and six cents in coins. (RT 170.)  There was no ATM card found near the body.  (RT 250-251.)

Sergeant Wiley testified that the height of the Hedding Street overpass is 31 feet from the top of the railing to the ground.  (RT 189.)  From the top of the railing to the walkway surface was 29 inches.  (RT 168.)

A shoe print was also found near the victim's body.  (RT 172.)  The shoe print was photographed, and a cast was made.  (RT 173-174.)

### 3.   Investigation of Appellant's Home and Subsequent Arrest of Appellant

Later that day, August 20, 2001, Sergeant Wiley went to appellant's home at 152 Cleaves Avenue in San Jose.  (RT 178.)  A search of the bedroom produced a pair of gray pants with traces of what appeared to be blood on them, concentrated on the right front pocket.  (RT 179.)  Police inspectors collected a pair of white Thom McAn shoes from appellant's home that appeared to

---

2.   The identification belonged to a George Photopoulas.  It was stipulated that Mr. Photopoulas was in custody at the time of Ms. Mancera's death, that he was to known to Ms. Mancera, and that she was in possession of his identification with his permission.  (RT 167.)

match the impressions left at the crime scene. (RT 181-182, 184.) Police also found a black baseball cap with a maroon brim with "Carpenters Local 405 Santa Clara and San Benito Counties" stitched on it, a gray teeshirt with "MAX AIR" emblazoned across the front, and a pair of boots. (RT 182-186.)

From a municipal trash can located at the northwest corner of Hester and Alameda Streets, police also recovered an ATM check card with Maria Mancera's name on it. (RT 187-188.) This trash can was located approximately 20 yards east and across the street from the Bank of America near Hester. (RT 188.)

Criminalist John Bourke of the Santa Clara County crime laboratory, an expert in the area of shoeprint analysis and comparison (RT 234-236,) testified that he examined the casts taken of the shoeprints from the crime scene as well as photographs of the impressions taken at the scene. (RT 237.) He compared these to the shoes taken from appellant's home and he determined that the right Thom McAn shoe could have been a possible source for the impression left at the crime scene. (RT 243.) He concluded that a shoe of the same brand, same size, same sole pattern, and same amount of wear as appellant's shoe had made the impression at the crime scene. (RT 245.)

Appellant's roommate, testified that he heard appellant come home at approximately 4:37 or 4:38 a.m. on the morning of August 20, 2001. (RT 231.) Appellant's roommate was sure of the time because appellant's entry into the house woke him up. (RT 231.)

San Jose Police Detective Gilbert Vizzusi called the victim's bank and requested records of the activity of the previous evening, August 19, 2001, and he asked to have the account flagged for any future use. (RT 250-251.) In addition, Detective Vizzusi sent Officer Neumer to recover bank videotapes from the night of August 19, 2001 at the Bank of America near Hester, when Officer Neumer and Barreto observed appellant and the victim together. (RT

251-252.)  The ATM videos from Union Bank and Bank of America showed appellant attempting to withdraw money with Maria Mancera's card early on August 20, 2001.  (RT  254.)  The ATM video of appellant at the Bank of America was recorded at about 12:56 a.m.  (Rt 254-255.)

Fraud investigator Jesus Gaona for the Greater BA Bank Corporation reviewed Maria Mancera's bank records.  (RT 288-289.)  He noted that Maria Mancera had successfully withdrawn forty dollars from the Bank of America near Hester at 11:45 p.m. on August 19, 2001.  (RT 290-293.)  Mr. Gaona also noted that approximately one hour later, beginning at 12:48 a.m., Maria Mancera's account had a flurry of activity, consisting of unsuccessful attempts to obtain money.  (RT 293-296.)  At 12:48 and 54 seconds, a.m., at 12:49 and 7 seconds, a.m., and at 12:49 and 21 seconds, a.m., a user attempted to access Ms. Mancera's account with an incorrect pin from the Union Bank at Alameda and Taylor in San Jose.  (RT 293-294.)  The first two tries involved requests of three hundred dollars[3] and a third try involved a request for one hundred dollars. (RT 293-294.)  The fourth attempt at the Union Bank, at 12:49 and 41 seconds, a.m., for one hundred dollars, resulted in a rejection of the card, due to an excessive number of invalid pin entries.  (RT 295.)  The user then moved to the Bank of America Hester branch and attempted three more withdrawals at 12:55 and 37 seconds, a.m., at 12:56 and 9 seconds, a.m., and at 12:56 and 50 seconds, a.m., all culminating in the same "pin tries exceeded" error message.  (RT 295-296.)

San Jose police took appellant to the preprocessing unit at approximately 6:53 p.m. on August 20, 2001, and photographed him.  (RT 264, 267.)  At this time appellant looked at Officer Ernesto Vallecilla and said, "So what do you think, is this going to be a life sentence or what?"  (RT 267.)

---

3.  Mr. Goana testified that the balance in Ms. Mancera's account on August 20, 2001, was $344.90.  (RT 290.)

Officer Vallecilla replied that he did not know and inquired how old appellant was. Appellant replied, "I'm 39 years old. I'm really screwed this time. I'll be here for life. Shit like this follows me all the time." (RT 267-268.)

### 4. The Autopsy of Maria Mancera

Dr. Gregory Schmunk, the chief medical examiner and coroner for the county of Santa Clara and an expert in forensic pathology and wound recognition, performed the autopsy on Maria Mancera. (RT 196-198.) Dr. Schmunk noted that Maria Mancera was a man but had been living as a woman. (RT 198.)

Dr. Schmunk observed several external injuries on the victim's body. (RT 200.) He found a fractured upper jaw, abrasions to the skin on her neck, shoulders, her right back, her left lower back, the right side of her chest, the front of her chest and her jaw, and bruising around the victim's left eye. Additionally, he noted bleeding inside the white of her left eye and tearing of the skin on the inside of her mouth, especially inside the left cheek. The injury to the inside of the victim's mouth was consistent with a blow to the face. Ms. Mancera also had two lacerations due to blunt force injury on the side of her upper left eyelid, and other abrasions on her arms. (RT 201.) Dr. Schmunk also noted a broken left upper arm, a broken pelvis, and rib fractures on both sides of the chest. (RT 202.)

Dr. Schmunk then examined Ms. Mancera's internal injuries. This examination revealed the rib and pelvic fractures as well as bruising to the brain. There was blood on the surface of the brain. (RT 202-203.) Ms. Mancera also suffered a basilar skull fracture. She had a liver laceration, and she had a small amount of blood inside her body. (RT 203.) He remarked that her teeth were in very poor repair. Most of her front teeth were missing, and those that she did have were decaying. (RT 210.) A toxicology report was performed and Ms. Mancera's blood alcohol level was determined to be .22%. There was also

cocaine and a cocaine metabolite present in the victims blood. (RT 218-220, 280-281.) Dr. Schmunk testified that most of the external and internal injuries were consistent with a fall of about 27 to 31 feet. (RT 204.)

Dr Schmunk opined that the bruising to the inner left cheek was more consistent with a punch or some other impact prior to the fall than with an injury caused by the fall itself. He did concede that the laceration to the inner cheek could have occurred just after the fall, although that was not as likely. (RT 204-205.)

Dr. Schmunk testified that Maria was alive prior to the fall, as evidenced by the swelling surrounding her left arm fracture and by the internal bleeding surrounding some of her injuries. (RT 205-206.) After observing the bloodstains at the crime scene, Dr. Schmunk also noted that the body had most likely been in one position, with the head bleeding for a period of time, and then it was moved to the position in which it was discovered. (RT 206.) In addition to the bloodstains, Dr. Schmunk deduced that "pattern injuries" on Ms. Mancera's lower chest and left abdomen were indicative of the body having been moved. (RT 208.) He also took note of some drag marks near the body in certain photographs taken at the scene. (RT 208.)

The body was in full rigor mortis when the coroner's investigator examined the body at the scene. (RT 213.) Full rigor mortis develops approximately six to eight hours after death, and the coroner's investigator observed the body at the scene between 11:10 a.m. and 12:20 p.m. on August 20, 2001. However, Mr. Lejes, who discovered the body at about 6:30 a.m., had noted when he discovered the body that it was cold and stiff. (RT 260-261.) The body had partial lividity, but it was not fixed.[4] Given that lividity was not

_____

4. Lividity is the settling of the blood in the body. Thus if a victim was lying on her back, the blood would be pulled toward her back. Fixed lividity means that the body has been in a position long enough that the blood will no longer move if the body is moved. (RT 214-215.)

fixed when the coroner's investigator examined it between 11:10 a.m. and 12:20 p.m., the doctor estimated it was less than twelve hours since Ms. Mancera's death when the coroner's investigator made her assessment. (RT 213, 215.)

Dr. Schmunk testified that although Maria almost certainly would have been unconscious as soon as she hit the ground, she probably did not die immediately. It would have taken several minutes for her heart and respiration to stop. (RT 212.) Based on her injuries, it is most likely that Ms. Mancera's back, left arm and pelvic region struck the ground first. (RT 211.) Dr. Schmunk opined that the manner of death was homicide. (RT 256.)

### 5. DNA Evidence

Criminalist Nancy Marte, of the Santa Clara County crime laboratory testified as an expert in criminalistics with a speciality in DNA. (RT 299.) Ms. Marte did DNA analysis on the bloodstains found on appellant's pants. She determined that three bloodstains on the pants came from Ms. Mancera. One bloodstain on the pants matched appellant's own blood. (RT 302.) A blood sample taken from Ms. Mancera's right fingernail also produced a match with Ms. Mancera's blood. (RT 302, 305.)

### B. The Defense Case

The defense called Andrew Marr as its only witness. Mr. Marr worked for a concrete company located next to Bellarmine High School. (RT 312.) He was working at approximately 6:30 a.m. on the morning of August 20, 2001, when he observed a Hispanic male jumping the fence and running at a high rate of speed away from the track. (RT 313.) The man had a ponytail, was six feet tall, weighed approximately 180 pounds, and was wearing faded blue jeans and a white teeshirt. (RT 313.) Mr. Marr saw the police arrive in the area about 45 minutes later, and he told them about the man he observed. (RT 315.)

## APPELLANT'S CONTENTIONS

      1.   The concurrent three year sentence for the robbery charged in count II violated Penal Code section 654.

      2.   The concurrent three year sentence for the robbery charged in count II violated the double jeopardy clause of the Fifth Amendment of the United States Constitution.

## RESPONDENT'S ARGUMENT

      The concurrent three year sentence for robbery as charged in count two violates Penal Code section 654.

# ARGUMENT

## THE CONCURRENT THREE YEAR SENTENCE FOR ROBBERY AS CHARGED IN COUNT TWO VIOLATES PENAL CODE SECTION 654

Appellant contends that "the robbery and the killing were incident to one objective, thus making the crime one indivisible transaction subject to only one punishment under section 654." (AOB 17.) We agree.

Penal Code section 654, subdivision (a) states, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

California courts, applying section 654, have stated that the operative determination is dependent on the intent and objective of the actor. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Ibid.*) Specifically, courts have found that felony-murder cases violate section 654 if both the underlying felony and the murder are separately punished. (*People v. Bracamonte* (2003) 106 Cal.App.4th 704, 708-709; *People v. Boyd* (1990) 222 Cal.App.3d 541, 576; *People v. Mulqueen* (1970) 9 Cal.App.3d 532, 547.)

Here, the court imposed concurrent sentences for the robbery and the murder without any explanation of its reasoning in support of separate sentence terms. (RT 495-496.) The probation department had not recommended separate, concurrent terms. (CT 206-207.) Trial counsel did not object to, or

argue against, the imposition of separate sentence terms.[5] The prosecution, at sentencing, neither requested, nor objected to, the imposition of separate sentence terms.

In fact, during trial, the prosecutor, in her closing argument, had suggested that the killing and the robbery were parts of a single criminal objective. She told the jurors that they could find first degree murder one of two ways. (RT 347.) She argued, first, that the murder was premeditated, with the motive being robbery. (RT 347-351.) Alternatively, she argued felony-murder with robbery as the underlying felony. (RT 351-354.)

Consistent with these prosecution theories, the jury instructions permitted the jury to find appellant guilty of first degree murder on either a theory of willful, deliberate, and premeditated murder (RT 409-411) or on a theory of robbery-murder. (RT 411, 415-416.) Regardless of which theory the jurors adopted in finding appellant guilty of first degree murder, it is clear that the commission of the robbery played a key role in the jury's finding that the homicide was a first degree murder. (See *People v. Mulqueen, supra,* 9 Cal.App.3d at 547.) Appellant either killed Ms. Mancera during the commission of an inherently dangerous felony, i.e., robbery, or he killed her in order to facilitate a robbery. Thus, the murder was "merely incidental to," or was "the means of accomplishing or facilitating," a singular objective – the robbery. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) As a result, appellant's concurrent sentence of three years for the robbery should be stayed.[6]

---

5. Error under Penal Code Section 654 is not waived by failure to object. (*People v. Scott* (1994) 9 Cal.4th 331, 354 & fn. 17; *People v. Perez* (1979) 23 Cal.3d 545, 550, fn.3; *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1312, fn. 2.

6. A stay of the sentence term for the robbery conviction renders appellant's double jeopardy claim moot. (AOB 18-19.) Under *Jones v. Thomas* (1989) 491 U.S. 376, 382, a stay is the appropriate remedy for multiple

## CONCLUSION

Accordingly, respondent respectfully requests that the judgment be affirmed.

Dated:  July 16, 2003

Respectfully submitted,[7]

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

CATHERINE A. RIVLIN
Supervising Deputy Attorney General

MARK S. HOWELL
Deputy Attorney General

Attorneys for Respondent

---

sentence terms that would otherwise violate double jeopardy principles. Continued confinement under the single unstayed sentence for murder would not constitute double jeopardy.  (*Ibid.*)

7. The Attorney General wishes to thank and acknowledge Law Student Intern John Dasher for his significant contribution to this respondent's brief.

14

## DECLARATION OF SERVICE BY MAIL

Case Name:  *People* v.  *Raul Uvalles*
Case No. **H024674**

I am employed in the Office of the Attorney General, which is the office of a member of the Bar of this Court at which member's direction this service is made.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>July 16, 2003,</u> I served the attached

### RESPONDENT'S BRIEF

in the internal mail collection system at the Office of the Attorney General,455 Golden Gate Avenue, Suite 11000, San Francisco, California 94102, for deposit in the United States Postal Service that same day in the ordinary course of business in a sealed envelope, postage fully prepaid, addressed as follows:

Lori Quick
Sixth District Appellate Program
100 No. Winchester Blvd.
Suite 310
Santa Clara, CA 95050

Honorable George Kennedy
District Attorney
County of Santa Clara
70 West Hedding Street, West Wing
San Jose, CA 95110

Clerk, Santa Clara County Superior Court
Hall of Justice
190 West Hedding Street
San Jose, CA 95110

I declare under penalty of perjury the foregoing is true and correct and that this declaration was executed on July 16, 2003, at San Francisco, California.

Denise Neves

*Denise Neves*
Signature

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
5   MARK S. HOWELL
    Deputy Attorney General
6   State Bar No. 95125
       455 Golden Gate Avenue, Suite 11000
7      San Francisco, CA 94102-3664
       Telephone: (415) 703-5969
8      Fax: (415) 703-1234
       Email: mark.howell@doj.ca.gov
9   Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

**RAUL UVALLES,**                          C 05-2779 MJJ (PR)

14                              Petitioner,

15

                 **v.**

16

**D.L. RUNNELS, Warden,**

17
                               Respondent.

18

19     **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT C-5

**COPY**

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

**FILED**

SIXTH APPELLATE DISTRICT

OCT 2 8 2003

Court of Appeal · Sixth App. Dist.
MICHAEL J. YERLY, Clerk

BY _____
DEPUTY

| | |
|---|---|
| THE PEOPLE, | H024674 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC121250) |
| v. | |
| RAUL UVALLES, | |
| Defendant and Appellant. | |

FILED
SAN FRANCISCO

OCT 2 3 2003

By L. CARAMANZANA
No. ST 20023A0867

A jury found appellant guilty of first degree murder in violation of Penal Code section 187 and second degree robbery in violation of Penal Code section 211-212.5, subdivision (c). The trial court sentenced appellant to state prison for 25 years to life for the murder charged in count one. The trial court imposed a concurrent sentence of three years for the robbery charged in count two. Appellant contends that the sentence on the robbery count violates both the double jeopardy clause of the Fifth Amendment of the United States Constitution and Penal Code section 654. Respondent concedes the sentence violates Penal Code section 654. We stay the sentence on count two.

The evidence presented at trial showed that appellant spent time on the night of August 19, 2001, with a person whose dead body was found the next morning with the pockets turned out. Other evidence, including ATM records and surveillance tapes, blood stain analysis of appellant's clothing, shoe print impressions, and appellant's

F

C-5

statements at the time of his booking all linked appellant to the murder. At trial, the prosecutor argued alternative theories of first-degree murder, stating that it had either been a result of premeditation and deliberation with the motive being robbery or felony murder in that the homicide occurred during the course of a robbery.

Penal Code section 654 provides that multiple sentences for the "same act or omission" are prohibited. "[B]ecause the statute is intended to ensure that defendant is punished 'commensurate with his culpability' [citation], its protection has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335, citing *People v. Perez* (1979) 23 Cal.3d 545, 551 and *People v. Beamon* (1973) 8 Cal.3d 625, 639.) Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the actor. If all the offenses are incidental to one objective, the defendant may be punished for any one of them, but not for more than one. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) Here, as respondent concedes, the robbery and the killing were incident to one objective, thus making the crime one indivisible transaction subject to only one punishment under section 654. Accordingly, the sentence for count two must be stayed. This stay renders appellant's double jeopardy claim moot. (*Jones v. Thomas* (1989) 491 U.S. 376, 382.)

The judgment is modified to stay the three-year sentence for count two. The superior court is ordered to amend the abstract of judgment accordingly and to send a certified copy of the amended abstract of judgment to the Department of Corrections. As modified, the judgment is affirmed.

2

_____

Elia, J.

WE CONCUR:

_____

Rushing, P. J.

_____

Premo, J.

*People v. Uvalles*

H024674

1 EDMUND G. BROWN JR.
  Attorney General of the State of California
2 DANE R. GILLETTE
  Chief Assistant Attorney General
3 GERALD A. ENGLER
  Senior Assistant Attorney General
4 PEGGY S. RUFFRA
  Supervising Deputy Attorney General
5 MARK S. HOWELL
  Deputy Attorney General
6 State Bar No. 95125
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA 94102-3664
    Telephone: (415) 703-5969
8   Fax: (415) 703-1234
    Email: mark.howell@doj.ca.gov
9 Attorneys for Respondent

10          IN THE UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

**RAUL UVALLES,**                                C 05-2779 MJJ (PR)

14                                    Petitioner,

15

16        **v.**

17 **D.L. RUNNELS, Warden,**

                                      Respondent.

18

19     **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT C-6

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SIXTH APPELLATE DISTRICT

**COPY** 

Mark S. Howell
Office Of The Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102

```
DOCKETED
SAN FRANCISCO

DEC 3 1 2003

By L. CARAMANZANA
No._____
```

RE:   THE PEOPLE,
            Plaintiff and Respondent,
      v.
      RAUL UVALLES,
            Defendant and Appellant.

H024674
Santa Clara County No. CC121250

\* \* REMITTITUR \* \*

I, MICHAEL J. YERLY, Clerk of the Court of Appeal of the State of California, for the Sixth Appellate District, do hereby certify that the opinion or decision entered in the above-entitled cause on October 28, 2003, has now become final.

Costs are not awarded in this proceeding

Witness my hand and the seal of the Court affixed at my office on   **DEC 3 0 2003**

MICHAEL J. YERLY, Clerk

By:            **BETH MILLER**

                     Deputy

(SEAL)

C-6

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | MARK S. HOWELL
Deputy Attorney General
6 | State Bar No. 95125
  455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-3664
  Telephone: (415) 703-5969
8 | Fax: (415) 703-1234
  Email: mark.howell@doj.ca.gov
9 | Attorneys for Respondent

10 | IN THE UNITED STATES DISTRICT COURT

11 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 | SAN FRANCISCO DIVISION

13

14 | **RAUL UVALLES,** | C 05-2779 MJJ (PR)

Petitioner,

15

16 | v.

**D.L. RUNNELS, Warden,**

17

Respondent.

18

19 | **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT D-1

MC-275

**COPY**

Name  Raul Uvalles

Address  High Desert State Prison

P.O. Box 3030

Susanville, CA 96630

CDC or ID Number  T-59954

COPY

**FILED**

JUN 7 - 2004

Court of Appeal – Sixth App. Dist.
BY _____
                              DEPUTY

California Court of Appeal

Sixth Appellate District

*(Court)*

| | |
|---|---|
| Raul Uvalles<br>Petitioner<br><br>vs.<br><br>D.L. Runnels (warden)<br>Respondent | **PETITION FOR WRIT OF HABEAS CORPUS**<br><br>No. ████████<br>*(To be supplied by the Clerk of the Court)*<br><br>**H027526** |

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California

PETITION FOR WRIT OF HABEAS CORPUS     WEST GROUP

Page one of six

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

(1)

D-1

This petition concerns:

☒ A conviction     ☐ Parole

☒ A sentence     ☐ Credits

☐ Jail or prison conditions     ☐ Prison discipline

☐ Other (specify): _____

1. Your name: Raul Uvalle

2. Where are you incarcerated? High Desert State Prison

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Murder, Robbery In The Second Degree and Taking Personal Property

b. Penal or other code sections: 187, 211 and 215.5 Subdivices

c. Name and location of sentencing or committing court: Santa Clara County Superior Court

d. Case number: CC171750

e. Date convicted or committed: June 14, 2002

f. Date sentenced: June 14, 2002

g. Length of sentence: 35 years to life

h. When do you expect to be released? _____

i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:

Charlie Gillian #144161 120 West Mission Street

San Jose, CA 95110

4. What was the LAST plea you entered? (check one)

☒ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

(2)

GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement.". *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Please See Exhibit "B"

a. **Supporting facts:**
   Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time *(when)* or place *(where).* *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Please See Exhibit "B"

**Supporting cases, rules, or other authority (optional):**
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

Please See Exhibit "B"

7. Ground 2 or Ground _____ *(if applicable)*

Please See Exhibit "B"

a. Supporting facts:

Please See Exhibit "B"

b. Supporting cases, rules, or other authority:

Please See Exhibit "B"

Did you appeal from the conviction, sentence, or commitment?  ☒ Yes.  ☐ No.   If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

Court of Appeals, Six Appellate District

b. Result: Modified the three year sentence  c. Date of decision: Oct 24, 2003

d. Case number or citation of opinion, if known: —

e. Issues raised: (1) The concurrent three year sentence for the robbery charged in Count II violated Penal Code 654.

(2) The concurrent three year sentence for the robbery charged in Count II violated the double jeopardy clause of the Fifth Amendment of the

(3) United States constitution.

f. Were you represented by counsel on appeal?  ☒ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

Lori A. Quick # 148467, 100 N. Winchester Blvd, Suite 310 Santa Clara, CA (95050)

Did you seek review in the California Supreme Court?  ☐ Yes.  ☒ No.   If yes, give the following information:

a. Result: N/A                                     b. Date of decision: N/A

c. Case number or citation of opinion, if known: N/A

d. Issues raised: (1) N/A

(2) N/A

(3) N/A

If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

Appeals Attorney failed to sweep the issues which petitioner is now presenting to the court

**Administrative Review:**

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

N/A

Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than the direct appeal, have you previously filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☒ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _Santa Clara Superior Court_

(2) Nature of proceeding (for example, "habeas corpus petition"): _Habeas Corpus_

(3) Issues raised: (a) _Ineffective Assistance of Counsel_

(b) _Insufficient Evidence, (c) Prosecutorial Misconduct, (D) Trial Judge Misconduct, (E) cumulative Errors._

(4) Result (Attach order or explain why unavailable): _See Exhibit "A" (Forward June EXP)_

(5) Date of decision: _5-21-04_

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
_N/A_

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
_Prison Lockdowns, Petitioner is a layman at law and had to seek assistance to prepare this instant writ_

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
_The Santa Clara County Court Failed to address my petition and this Court has the Power to grant Petitions writ (Griggs v superior court (1976) 16 Cal. 3d 341)_

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: _June 3rd 2004_          ▶ _[signature]_
                                                (SIGNATURE OF PETITIONER)

(6)

California Court of Appeal

Sixth Appellate District

Raul Uvalles,

   Petitioner,

   V.

D.L. Runnels (Warden)

   Respondent.

Santa Clara County
Super. ct. No. CC121250
Sixth Appellate District
Court Case No. H024674

Petition For Writ Of Habeas Corpus

TO: The Honorable Justices Of the California Court Of Appeals.

Petitioner, Raul Uvalles, hereby petitions this Honorable Court For a Writ Of Habeas Corpus directed to, David L. Runnels, warden of High Desert State Prison, at Susanville, California, ordering petitioner's release From custody to the extent that his continued incarceration is in violation of the constitution and laws of the State of California and also violation of the

(7)

Constitution and laws of the united States.

By verified petition it is alleged as follows:

I.

Please see exhibit "B" (Petition for writ of habeas Corpus). Petitioner alleges and believes that the judgement of conviction and Sentence is invalid as in violation of the state and Federal constitutional rights to effective assistance by trial and appellate lawyers, prosecutorial misconduct and trial judge misconduct, and more specifically stated in petitioner's memorandum of points and authorities, exhibits and my declaration Fully set Forth herein. Petitioner sent Said petition to the Santa Clara County Superior court on 5-17-2004 and it was rejected on 5-21-2004 see exhibit "A".

II.

Habeas Corpus is the appropriate remedy for petitioner's unlawful incarceration. Petitioner alleges that his incarceration violates fundamental due process as fundamental Constitutional defects amounting to denial of due process "do not become irremediable when a judgement of conviction becomes final, even after affirmation on appeal." (In re Coughlin (1976) 16 cal. 3d 52, 55; see also, In re Foss (1974) 10 cal. 3d 910, 916-917) Therefore, petitioner seeks remedial action to cure the continued violation of fundamental Constitutional due process violations.

In the ordinary case, the habeas corpus petition is initially brought before the Superior court

People v. Munoz (1984) 157 Cal. App. 999, 1017. California law requires that a habeas petition state a "prima facie case" for relief. In re Bower (1985) 38 Cal. 3d 865, 872; People v. McCarthy (1986) 176 Cal. App. 3d 593, 597.

The defendant convicted is required to "allege with particularity the facts upon which he would have a final judgement overturned... The procedural requirement... simply demands of him a measure of frankness in disclosing his factual situation. In re Swain, (1949) 34 Cal. 2d 300, 304) The appropriate procedure is to file a petition which contains "factual allegations" that are in such form that perjury may be assigned upon the allegations if they are false. Id., at p. 597, quoting from In re Walpole (1890) 84 Cal. 584; People v. Madaris (1981) 122 Cal. App. 3d 234, 242.

In a habeas proceeding, the reviewing court is not... necessary confined under all circumstances to that which appears on the face of the record. In re McVickers (1946) 29 Cal. 2d 264, 274. Insufficient support from the record is not a basis for denial of the writ. See, People v. Pope (1979) 23 Cal. 3d 412, 426. The prima facie case for relief may be established through a combination of the record in the case, the affidavits or sworn declarations accompanying the petition and the evidence adduced at the hearing pursuant to the return of the writ.

See, In re Hochberg (1970) 2 Cal. 3d 870, 875 Fn. 4;
In re Moss, 174 Cal. App. 3d *** , 923; People v. McCarthy,
supra, 176 Cal. App. 3d at P. 547, People v. Mudrie, supra,
122 Cal. App. 3d at p. 242; diss. opn. of Grodin, J. at pp.
243-244.

    " Section 1484 of the Penal Code provides that on
such proceedings the petitioner may allege any
Fact to show that his imprisonment or detention
is unlawful, or that he is entitled to his disc-
harge. The court or judge may then proceed in
summary way to hear such proof as may be prod-
uced against such imprisonment or detention, or
in favor of the same and to dispose of such
party as justly of the case may require..." (In
re McDickers, supra, 29 Cal. 2d at P. 274 Cal. 2d at P274.

    " A petitioner seeking habeus corpus ... is not confin-
ed to the face of the record in attempting to sustain
the burden of proving that his conviction was in
violation of his constitutional right... [T]he remedy
of habeus corpus permits an examination not
only of the actual evidence introduced at peti-
ioner's trial but of any evidence inaddition which
bearing upon the infringement of petitioner's con-
stitutional right." In re McDickers, supra, 29 cal. 2d at
P. 275.

III.

Petitioner has no plain, speedy, and adequate remedy
at law to obtain his release

WHEREFORE, Petitioner respectfully prays that this court:

A. Take judicial notice of the record of appeal in People
v. Ruul Ovalles, sixth Appellate District court of Appeals case
No. H024674, and People v. Ruul Ovalles, Santa Clara county
superior court case No. CC121260, which are referred
to herein to clarify and amplify various allegations;

B. Issue a writ of Habeas corpus or odr to show
cause to the warden of High Desert state Prison
to inquire into the lawfulness of petitioner's conviction;

C. If needed, order that an Evidentiary Hearing

(10)

to be convened;

D. After full consideration of the matter, set aside the conviction of petitioner, and order a new trial, or otherwise the appropriate relief.

E. Grant petitioner whatever further relief which the court may deem appropriate in the interest of justice.

Dated: June 3rd _____ (2004)

Respectfully submitted

Raul Ovalles
Petitioner In Pro Per

(11)

Verification

I, Raul Uvalles, States:

I am the Petitioner in this action, I have read the Foregoing Petition for a writ of habeas Corpus and the Facts Stated therein are true of my Knowledge, except as to matters that are herein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the Foregoing is true and correct under the laws of the State of California, and that this declaration was executed on the 3rd day of June (2004) at High Desert State Prison, in Susanville California.

Respectfully submitted

Raul Uvalles
Petitioner In Pro Per

# EXHIBIT  A



LEGAL MAIL

LEGAL MAIL

RETURN TO SENDER

SANTEO 9551102222-1403 5S 05/21/04
HOWARD TIME EXP RTN 5S
SANTA CLARA COUNTY SUPERIOR COURT
191 N 1ST ST
SAN JOSE CA 95113-1001

HIGH DESERT
STATE PRISON

PRIORITY
MAIL

=3.95=
U.S. POSTAGE

# EXHIBIT B

## PROOF OF SERVICE BY PERSON IN STATE CUSTODY

STATE OF CALIFORNIA

CASE NO. _____

COUNTY OF Lassen

ADDITIONAL NO. _____

   I, the undersigned, do certify, declare and verify that I am over the age of (18) eighteen years old, that I am incarcerated at HDSP , prison in Susanville , California 96130 , that I am a party to the above-entitled cause, and that on the day of 16th , in the month of May , the year 2004 I served a true and complete copy of the following:

( Petition For Writ of Habeas Corpus  )
(  )
(  )
(  )
(  )
(_____)

[ ]  by depositing it in a prison mailbox in a sealed envelope, or . . . .
[X]  by handing it to institutional staff in a sealed envelope, along with any of the following.
[X]  a Trust Account Withdrawal Order attached to it authorizing that the required postage be prepaid in full.
[X]  the required amount of actual U.S. Postage afford there to.
[ ]  the above mentioned envelope was to be deposited in the United States Mail pursuant to California Code of Regulations Section &3142 and &3165 to the following: (Please List the names and addresses of the persons served).

( Santa Clara County  )
( Superior Court  )
( Office of The Clerk  )
( 190 w. Hedding st.  )
( San Jose, CA 95110  )
(  )
(  )
(_____)

   The intended place of mailing is: the U.S. Postal Office at: California.
   I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON May 16th _____ , the year 2004 , in California.

Rasul Qualls                    R.1 Ch.1              5-16-04
Typed or print name (here)      ~~Signature of person (here)~~       Date

MC-275

Name  Raul Uvalles

Address  High Desert State Prison

P.O. Box 3030

Susanville, Ca 96130

CDC or ID Number  T-59954

Santa Clara County

Superior Court
*(Court)*

---

Raul Uvalles
**Petitioner**

vs.

D.L. Runnels (warden)
**Respondent**

**PETITION FOR WRIT OF HABEAS CORPUS**

No. _____
*(To be supplied by the Clerk of the Court)*

---

## INSTRUCTIONS — READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

---

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

**PETITION FOR WRIT OF HABEAS CORPUS**

WEST GROUP

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

1

**This petition concerns:**

☒ A conviction                    ☐ Parole

☒ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other *(specify)*: _____

1. Your name: Raul Uvalles

2. Where are you incarcerated? High Desert State Prison

3. Why are you in custody?    ☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Murder, Robbery In The Second Degree and Taking Personal Property

   b. Penal or other code sections: 187, 211 and 212.5 Subdivision (c)

   c. Name and location of sentencing or committing court: Santa Clara County Superior Court

   d. Case number: CC121250

   e. Date convicted or committed: June 14, 2002

   f. Date sentenced: June 14, 2002

   g. Length of sentence: 25 years to life

   h. When do you expect to be released? _____

   i. Were you represented by counsel in the trial court?    ☒ Yes.    ☐ No. If yes, state the attorney's name and address:

   Charlie Gillian #14416, 120 West Mission Street

   San Jose, CA 95110

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty    ☐ Guilty    ☐ Nolo Contendere    ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury    ☐ Judge without a jury    ☐ Submitted on transcript    ☐ Awaiting trial

---

MC-275 [Rev. January 1, 1999]

**PETITION FOR WRIT OF HABEAS CORPUS**

Page two of six

6.  GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

*— See Attached Petition —*

a.  **Supporting facts:**

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

*— See Attached Petition —*

b.  **Supporting cases, rules, or other authority (optional):**
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

*— See Attached Petition —*

7. **Ground 2 or Ground _____** *(if applicable):*

_— See Attached Petition —_

a. **Supporting facts:**

_— See Attached Petition —_

b. **Supporting cases, rules, or other authority:**

_— See Attached Petition —_

8. Did you appeal from the conviction, sentence, or commitment? ☒ Yes. ☐ No.    If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

     Court of Appeals, Sixth Appellate District

   b. Result: Modified the three year sentence   c. Date of decision: Oct 29, 2003

   d. Case number or citation of opinion, if known: H024674

   e. Issues raised: (1) The Concurrent Three Year Sentence For The Robbery
     Charged In Count II Violated Penal Code Section 654.

    (2) The Concurrent Three Year Sentence For The Robbery Charged In Count
     II Violated The Double Jeopardy Clause of the Fifth Amendment of the

    (3) United States Constitution.

   f. Were you represented by counsel on appeal? ☒ Yes. ☐ No.  If yes, state the attorney's name and address, if known:

     Lori A. Quick #148692, 100 N. Winchester Blvd., Suite 310, Santa Clara, CA
     45050

9. Did you seek review in the California Supreme Court? ☐ Yes. ☒ No.   If yes, give the following information:

   a. Result: ___ N/A ___     b. Date of decision: N/A

   c. Case number or citation of opinion, if known: N/A

   d. Issues raised: (1) N/A

     (2) N/A

     (3) N/A

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   Appeals Attorney Would Not Raise The Claims I'm Now Present-
   ing

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

     N/A

   b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No. N/A
     *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?   ☐ Yes. If yes, continue with number 13.   ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

Limited Access To The Law Library To Research And Prepare

Writ; Incomplete Transcripts And Records

16. Are you presently represented by counsel?   ☐ Yes.   ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?   ☐ Yes.   ☒ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

This Court Has Jurisdiction

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 5-13-2004     ▶ _____

Raul Uvalles
T54954 B4-243
P.O. Box 3030
Susanville, CA 96130

In Pro Per

In The Superior Court Of The
County Of Santa Clara

Raul Uvalles,

  Petitioner,

On Habeas Corpus

Case No. _____

( Santa Clara County
  Super. Ct. No. CC121250 )

## Petition For Writ Of Habeas Corpus

TO: The Honorable Presiding Judge Of The Superior Court For
The County Of Santa Clara:

  Comes Now, Raul Uvalles, hereinafter referred to as
petitioner, complains of the respondent, D.L. Runnels, Warden
at High Desert State Prison, as above designated, and
for legal cause of action.

I.

  Petitioner is unlawfully in the custody of the
California Department of corrections by D.L. Runnels,
Warden, at High Desert State Prison pursuant to a
Judgement pronounced by the Santa Clara Superior Court

7

In People v. Raul Uvalles, Case No. CC121250 Appeal in the matter was held in the Sixth Appellate District, No. H024674.

## II.

Petitioner request that this Court take Judicial notice of the record on appeal in the Court of appeal No. H024674. (Evidence Code Sections 452(a)(1), 453 and 459.)

## III.

Petitioner is illegally restrained because he was deprived of his state and Federal constitutional rights to effective assistance by trial and appellant lawyers, prosecutorial misconduct, trial Judge misconduct, and more specifically stated in petitioner's accompanying memorandum of points and authorities, exhibits and declaration fully set forth herein.

Petitioner's Conviction is in violation of Due Process as guaranteed by the 14th Amendment of the United States constitution. More specifically states in petitioner's accompanying memorandum of points and authorities, exhibits and declaration fully set forth herein.

## IV.

Petitioner has no other plain, speedy or adequate remedy at law.

///

///

///

8

## V.

No prior petition has been filed by Petitioner or on Petitioner's behalf.

## VI.

Petitioner request for an evidentiary hearing as to the disputed material factual allegations, pursuant to the written opinion as outlined in the case of In re Johnson (1992) 1 Cal. 4th 689 [4 Cal. Rptr. 2d 170.]

Petitioner also request that the court enter an order requiring trial and appellate lawyers to file declarations to explain their conduct which lead to the unlawful conviction of Petitioner. It is the factual contention of petitioner that this hearing is crucial to present evidence supporting my factual claims. At said hearing, witnesses and documents may be subpoenaed, Penal Code § 1484; California Rules of Court, rule 260 (c). The factual basis to support the allegations more specifically will be stated in petitioner's memorandum of points and authorities, exhibits and declaration fully set forth herein.

## VII.

By this reference the accompanying memorandum of points and authorities and exhibits are made a part of this petition as fully set forth herein. Petitioner's claims under this petition will be based on the petition, the accompanying points and authorities, the exhibits, attached hereto and all records, documents, and

Pleadings on file with this court in People v. Raul Ovalles NO. CC121250 and any further material to be developed at any future hearing which may be ordered.

Petitioner is without remedy save by writ of habeas Corpus.

WHEREFORE, Petitioner prays the court:

1. Order respondent to show cause why Petitioner is not entitled to relief sought.

2. Grant an evidentiary hearing to examine the conduct of the prosecuting attorney, trial and appellate lawyers, and for declarations of each, explaining their conduct and strategy, if any; and also to grant the above II written request;

3. After full consideration of the issues raised in the petition, grant the petition, vacate the judgement and sentence imposed upon petitioner in santa clara county superior court, NO. CC121250, and direct to the California Department of Corrections, commanding it to have the body of Raul Ovalles, together with the authority for his confinement before this court at a specific time;

/ / /

/ / /

/ / /

4. Grant any other and further relief the court deems proper in the interest of Justice

Dated: ___13 May_____, (2004)

Respectfully submitted

Raul Uvalles
In Pro Per

<u>Verification</u>

I, Raul Ovalles, states:

I am the Petitioner in this action, I have read the foregoing Petition for a writ of habeas corpus and the Facts stated therein are true of my knowledge, except as to matters that are therein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the State of California, and that this declaration was executed on the 13TH day of May_____ (2004) at High Desert State Prison, in Susanville California.

Respectfully submitted

_____
Raul Ovalles
In Pro Per

Memorandum of Points and
Authorities In Support of
Habeas Corpus

I.

## STATEMENT OF THE CASE

On January 11, 2002, an information was filed in Santa Clara County Superior Court charging appellant in Count 1 with murder in violation of Penal Code section 187, and in Count 2 with robbery in the second degree in violation of Penal Code sections 211 and 212.5, subdivision (c). (CT 61-62.)

On May 3, 2002, jury trial began with motions in limine. (CT 108-110.) It was stipulated that the victim, known as Maria Mancera, was in fact a man named John Mancera. (CT 108.)

On May 6, 2002, the trial court ruled that appellant's statements to police had been taken in violation of Miranda v. Arizona (1966) 284 U.S. 436 and could not be introduced in the prosecution's case in chief. (CT 117; RT 94.) The court also ruled, however, that because the statements did not appear to be involuntary, they could be used for impeachment in the event that appellant testified. (RT 94.)

On May 7, 2002, testimony began. (CT 121.) On May 8, 2002, the parties entered into four stipulations: that a blood sample was properly drawn from appellant and accurately analyzed by the Santa Clara County Crime Laboratory and was determined to be positive for "BE"; that a blood sample was properly drawn from the body of Mancera, accurately analyzed by the Santa Clara County Crime Laboratory, and was positive for both cocaine and alcohol, the blood alcohol level being measured at .22%; that Mancera's bank records were admissible; and that on August 20, 2001 at 12:48 a.m., Mancera's ATM card was used at an automatic teller machine at the Union Bank in San Jose, and at 12:55 a.m. at the Bank of America - Hester Branch in San Jose, that the video tapes taken during each transaction accurately

2

reflected the transaction, and that photographs were accurately made from the video taken during the transaction. (CT 124.)

The jury began deliberations on the afternoon of May 13, 2002 and concluded on the afternoon of May 14, 2002 at which time it found appellant guilty of murder in the first degree in violation of Penal Code section 187, and second degree robbery in violation of Penal Code sections 211-212.5, subdivision (c). (CT 191-195.)

On June 13, 2002, a hearing was held pursuant to People v. Marsden (1970) 2 Cal.3d 118. (CT 200.)

On June 14, 2002, the Marsden motion was denied. Appellant was then sentenced to serve 25 years to life for Count 1, and three years for Count 2, to be served concurrently, for a total prison commitment of 25 years to life. (CT 235-237.)

Notice of appeal was timely filed on June 14, 2002. (CT 238.)

## STATEMENT OF FACTS

A. The Prosecution Case

1. Events Leading Up To The Discovery Of The Homicide

At approximately 11:15 p.m. on August 19, 2001, San Jose Police Officer Joaquin Barreto was on foot patrol in the area of the Alameda and Hedding Street. (RT 129-130.) He and his partner, Officer Keith Neumer,

were standing on the Alameda at Sunol Street when they saw appellant and Maria Mancera[1] walking on the Alameda. (RT 132, 150.) They seemed to be "ambling along" with no specific direction. (RT 132.)

Barreto approached the pair and asked them what they were doing. (RT 133.) Mancera replied that they were looking for an ATM machine, and pulled an ATM card out of the purse she was carrying. (RT 133.) Barreto observed that the card was emblazoned with the name "Maria Mancera." (RT 134.) It was obvious to Barreto that Mancera was a man presenting himself as a woman. (RT 13`5-136, 144-145.) She did not have any injuries, and appeared to have all of her front teeth. (RT 138, 145.) Her hands were dirty. (RT 146.) Mancera and appellant appeared to be friendly with each other. (RT 136.)

While speaking to them, Barreto believed they were both under the influence of alcohol. (RT 134, 144.) He based this upon the fact that there was an odor of alcohol on them, their eyes were watery and bloodshot, and they were somewhat unsteady on their feet. (RT 135.) Neumer also smelled alcohol, and recalled that they admitted they had been drinking. (RT 154.) They also had dilated pupils, which Barreto knew was a symptom of stimulant

---

1.     Because the victim was referred to throughout the trial as "Maria Mancera" and because feminine pronouns were consistently used to describe Mancera, the same will be done in this brief to avoid confusion, even though Mancera was in fact a man named John Mancera and remained anatomically a man at the time of his death.

use. (RT 144.) Barreto did not see anything that he immediately recognized as symptoms of cocaine use, but it was possible that they were under the influence of cocaine as well. (RT 148.) Barreto thought they were both at about the same level of intoxication. (RT 135.) They did not have trouble communicating with him, and their level of intoxication was not severe enough to warrant booking them for being drunk in public or booking them into a non-custodial detention facility to sober up. (RT 135.)

Barreto conducted records checks on both Mancera and appellant to confirm their identities. (RT 134.) He also filled out a field identification card for appellant. (RT. 139.) These cards are used to conduct field interviews when police believe there may be some criminal activity occurring, and contains such information as name, date of birth, address, whether the subject is on parole or probation, and a general clothing description. (RT 139.) During the course of this procedure, appellant told Neumer that he lived on Cleaves Street. (RT 150.) At the conclusion of the encounter, Barreto directed them to the Arena Hotel to find an ATM. (RT 136.) Within a few minutes, the two emerged from the Arena Hotel parking lot, and told Barreto that there was no ATM machine there. (RT 137.) Barreto then told them that there was a Bank of America down the street, and directed them to the Bank of America near Hester Street. (RT 137.) They thanked Barreto and headed in that

direction. (RT 138.) Barreto and Neumer continued with their regular duties.
(RT 139.)

At approximately 6:30 a.m. on Monday, August 20, 2001, as Barreto
was preparing to end his shift, he heard a radio broadcast that there had been
a report of a beaten person near Bellarmine High School. (RT 140.) Because
this area was in the district covered by Barreto, he felt he needed to investigate
since it had happened while he was on duty. (RT 140.) When he arrived at
Bellarmine High School, he saw the body of Maria Mancera lying beside the
high school running track. (RT 141.) Barreto immediately recognized her as
the person he had spoken to the previous night. (RT 142.) She was still
wearing the same clothing, but her pockets were turned inside out. (RT 147,
249-250.) The body was in full rigor mortis, meaning death had occurred
approximately six to eight hours earlier. (RT 212-213.) He notified his
supervisor and passed on to the investigating detectives the information he had
gathered during his encounter with Mancera and appellant, including the field
identification card. (RT 142-143.)

Neumer also went to Bellarmine High School when news of Mancera's
death reached him. (RT 150.) He then went to the Bank of America near
Hester to see whether there was a videotape of appellant and Mancera at the
ATM. (RT 150-151.) Upon viewing the videotape, Neumer saw Mancera and

appellant approaching the ATM. (RT 151, 153-154.) In the video, appellant wore a hat which had a number on it. (RT 153-154.) A withdrawal of $41.50 had been made via that ATM at 11:35 p.m. on August 19, 2001. The bank videotape, from which still photos were made, accurately reflected that transaction. (RT 152.)

### 2. The Investigation

#### a. The Crime Scene

Mario Lejes worked for a painting company on Hedding Street. (RT 258.) When he arrived at work at about 6:30 a.m. on August 20, he saw someone lying on the running track of Bellarmine High School. (RT 259.) Lejes and a co-worker approached the body and saw that there was blood around the mouth and the back of the head. (RT 260.) Lejes touched the right kneecap and noticed that it was cold. (RT 260-261.) Lejes did not move or take anything at the scene, nor did he move the body. (RT 261-263.)

When police initially arrived on the scene, photographs were taken of Mancera's body and all items found around it. (RT 157-158.) Officer Bruce Wiley arrived at the site where the body was found, which was below the Hedding Street overpass that crosses over the athletic fields of Bellarmine High School. (RT 158.) The overpass is a pedestrian walkway which rises some 31 feet above the ground. (RT 189-190.) It has a railing which is

approximately 29 inches high. (RT 168.) Near the body were found a black leather belt (RT 163), a California identification card in the name of Michael George Photopoulas[2] (RT 164, 167), a fragment of a tooth (RT 164), a red plastic disposable lighter (RT 164), and a white metal digital wristwatch with a black leather band. (RT 164.) There were bloodstains on the running track approximately five and one-half to six feet from Mancera's right foot. (RT 165.) All of these items were within approximately two feet of each other. (RT 166.)

In a sandy area beneath the overpass approximately 60 feet from Mancera's body was found her purse with its contents spilled out. (RT 169, 190, 225.) These included makeup and personal hygiene products, miscellaneous papers, notes, business cards, photographs, some costume jewelry, and address book, a checkbook, a California identification card in Mancera's name, and four dollars and six cents in coins. (RT 170.) The purse and its contents were not visible from the overpass. (RT 171.)

Some shoe prints were located near Mancera's body. (RT 172.) Wiley photographed them and also made a cast of one of the shoe prints which was actually closer to the purse. (RT 174-176, 189.)

---

2.    There was a stipulation that Photopoulas was known to Mancera, was in custody at the time of Mancera's death, and that Mancera was in possession of the identification card at the time of her death.

### b. The Search Of Appellant's Residence

The next day, Wiley went to appellant's home at 152 Cleaves Avenue in San Jose. (RT 178.) According to appellant's landlord, appellant had not arrived home until 4:37 or 4:38 on the morning of August 20. (RT 231.) In appellant's bedroom Wiley found a pair of gray pants which had what appeared to be traces of blood on them. (RT 178-180.) Also collected was a pair of white Thom McAn tennis shoes (RT 181-182, 184), a pair of boots (RT 185), a black baseball cap with a maroon brim across the front of which was the logo "Carpenters Local" and "Santa Clara and San Benito Counties", with the number 405 in the middle. (RT 182-184), and a t-shirt with the logo "MAX AIR" across the front. (RT 183.)

Also searched was a municipal trash can at the northwest corner of Hester Street and the Alameda. (RT 187.) Inside was located an ATM card in the name of Maria R. Mancera. (RT 187-188.) The trash can was approximately 20 yards from the ATM at the Bank of America near Hester. (RT 188.)

### c. The Arrest Of Appellant

Appellant was taken to the preprocessing unit at 6:53 p.m. (RT 264.) While photos were being taken of him, he asked Sergeant Vallecilla "So what do you think, is this going to be a life sentence or what?" (RT 267.) Vallecilla

replied that he did not know, at which point appellant said "I'm 39 years old. I'm really screwed this time. I'll be here for life. Shit like this follows me all the time." (RT 267-269.) A blood sample was drawn from appellant. (RT 270.) A test indicated the presence of cocaine metabolite, meaning he had most likely ingested cocaine more than six hours earlier. (RT 270, 276-277.)

> d.    The Investigation Of
>        Mancera's    Bank
>        Account Activity

San Jose Police Sergeant Gilbert Vizzusi was the detective assigned to investigate Mancera's death. (RT 247.) Vizzusi noticed that Mancera's pockets were turned inside out, and there was an ATM receipt on or near the body. (RT 249-250.) He ascertained that the ATM card was not on or near Mancera, though her checkbook was. (RT 250-251.) Using the account number from the checkbook Vizzusi investigated whether there had been any activity on the account. (RT 251.) Vizzusi also viewed videotapes taken by security cameras at the bank, which revealed that appellant had used the ATM machine at 12:46 a.m. on August 20. (RT 254.) Mancera's ATM card had been used at the same time. (RT 255.)    Bank records indicated that $40.00 had been successfully withdrawn from Mancera's checking account through an ATM at the Hester Branch of the Bank of America at 11:45 p.m. (RT 291-

292.)[3] They further indicated that at 12:48 a.m., 12:49:07 a.m., and 12:49:21 a..m. on August 20, 2001, three attempts were made at the ATM at Union Bank to withdraw $300.00 from Mancera's account. The attempts were unsuccessful because the user had entered an incorrect personal identification number, or "PIN". (RT 293.) A fourth attempt at the same ATM at 12:49:41 resulted in a rejection of the card by the ATM. (RT 294.) At 12:55:37, an attempt was made to withdraw $100.00 from the Hester Street Bank of America, resulting in a message by the ATM that the number of PIN tries had been exceeded. (RT 295.) Two more unsuccessful attempts were made at 12:56:09 a.m. and 12:56:50 a.m. (RT 296.)

### 3. The Autopsy

Gregory Schmunk is the Chief Medical Examiner and Coroner for Santa Clara County who is an expert in the area of forensic pathology and wound recognition. (RT 196-198.) He performed an autopsy on Mancera's body, during which he discovered that Mancera was in fact a man. (RT 198-199.) Mancera's blood alcohol level had been determined to be .22. (RT 280-281.) The blood alcohol level of .22% indicated to Schmunk that Mancera had consumed approximately 10 drinks within a few hours. (RT 219.) Such a

---

3.    The date on which this occurred was never stated for the record.

1:

blood alcohol level would result in signs of gross intoxication, such as slurred

speech and loss of balance with difficulty standing and walking. (RT 273-274,

282-283.) He noted that between 11:10 a.m. and 12:20 p.m. on August 20,

Mancera's body was in full rigor mortis, meaning that she had died

approximately six to eight hours earlier. (RT 213.) The level of lividity[4]

present at the same time was not fixed, as would be expected eight to 12 hours

after death. (CT 215-216.)

With respect to external injuries, Schmunk observed that the upper jaw

was fractured, and there were abrasions or scrapes, and bruises of the skin.

(RT 201.) There were abrasions on the neck and upper shoulders, the right

back, the left lower back, the right side and front of the chest. There was

bruising around the left eye and an abrasion at the left side of the jaw. (RT

201.) Bruises or areas of bleeding were inside the white of the left eye, and

there was bruising and tearing on the inside of the mouth, especially on the left

side of the cheek, which was consistent with a blow to that area, and

inconsistent with a fall. (RT 201, 220.) Other abrasions were present on the

front and left side of the chest and arms and legs. (RT 201-202.) The left

upper arm was broken, the pelvis was fractured, and there were rib fractures

---

4.    Lividity is the settling of the blood that occurs in the body due
to gravity. (RT 214-215.)

on both sides of the chest. (RT 202.) An internal examination revealed the pelvic and rib fractures, bruising to the brain with blood on the surface of the brain, and a basilar skull fracture. (RT 203.) The liver was lacerated and there was a small amount of blood in the body. (RT 203.)

Additionally, Schmunk noted that Mancera's teeth were in very poor repair. Mainly only the front teeth were present and they were badly rotted. Most of the back teeth were missing and those that were present were decaying. (RT 210.) There were lacerations and bruising around the left eye and some redness in the area of the right eye. (RT 210.) There were a few abrasions and some bruising over the forehead and right cheek. (RT 210.)

Many of the injuries were consistent with a fall of 27 to 31 feet. (RT 204.) One exception was the injury to the inside of the mouth. (RT 204.) According to Schmunk, while it was possible to suffer injuries to the inside of the mouth in a fall, one would also expect to see an injury to the skin surface due to impact on the ground. (RT 204.) Because Mancera did not have such an injury, Schmunk thought it could reasonably be concluded that another, softer impact, such as a punch, had caused this injury prior to the fall. (RT 204-205, 220.) Schmunk could not exclude the possibility that the injury happened within a few minutes after the fall, but believed it more logical to conclude that it happened before the fall. (RT 205, 220-221.) Schmunk felt

that at most, this injury had occurred within a maximum of a few hours of death, but he could not exclude the possibility that it had occurred within an hour or slightly more than an hour before death. (RT 223-224.)

Schmunk opined that Mancera was alive at the time of the fall based on the large amount of blood both on the track and inside the body. (RT 205.) In addition, the arm fracture had some soft-tissue swelling which would not have occurred without blood pressure. (RT 205-206.) Other factors which led Schmunk to believe that Mancera was alive before hitting the ground were bleeding on the surface of the brain, in the deep chest, at the rib fractures, and in the abdominal cavity. (RT 206.)

A study of the bloodstains on the track indicated to Schmunk that the body had lain in one position on the track, bleeding, for some period of time, and was then moved to the location where it was found. (RT 206-207.) Contributing to this opinion was the presence of "pattern injuries" on Mancera's abdomen. (RT 208.) Schmunk also observed in the photograph of the body what appeared to be drag marks below the impression of one of the arms. (RT 209-210.) He did not believe that Mancera would have been able to move herself. (RT 225.)

Schmunk was of the opinion that Mancera's back, back pelvic region, and left arm had hit the ground first, based on the injuries he observed. (RT

211.) If in fact she was alive when she fell, Schmunk believed that she would have been unconscious from the moment of impact, though her heart and respiration would not have stopped for several minutes. (RT 212.) Schmunk concluded that the manner of death was homicide. (RT 226.)

### 4. Other Forensic Evidence

Santa Clara County Criminalist John Bourke, an expert in the area of shoeprint analysis and comparison, compared three pairs of shoes submitted by the detectives in the Mancera case against an impression taken of shoeprints at the scene. (RT 235-236.) Based on this comparison, Bourke included the right shoe of the pair of Thom McAn tennis shoes taken from appellant's residence as a possible source of the shoeprints. (RT 243-246.)

Nancy Marte, a Criminalist at Santa Clara County Crime Laboratory conducted a DNA analysis on blood samples collected from a pair of gray pants and from fingernail swabbings. (RT 299-300.) Her conclusion was that Mancera was the source of three bloodstains on the pants. (RT 302.) Appellant was the source of one. (RT 302.) Mancera was also the source of the blood sample obtained from the fingernail swabbing, which had been taken from Mancera's hand. (RT 302.)

### B. The Defense Case

Andrew Marr worked at a concrete company on the other side of the

railroad tracks by Bellarmine High School. (RT 312.) At about 6:30 a.m. on August 20, 2001, he noticed a Hispanic male clearing the fence. Once he hit the ground, he ran off at a high rate of speed. (RT 313.) Marr described the man as having a long black braided ponytail and wearing a white t-shirt and faded blue jeans. (RT 313.) About 30 to 45 minutes later, Marr noticed the police activity. (RT 315.) He walked over to see what was happening, and told police about the man he had seen. (RT 315, 318.)

II.

Argument

A.

Petitioner's Conviction Is Unconstitutional Because
He Did Not Receive Effective Assistance Of Counsel
Both On Appeal And At Trial
As Guaranteed By The Sixth Amendment

Petitioner's conviction cannot stand because he did
not receive effective assistance of counsel as
guaranteed by the 6th Amendment. A defendant is
entitled to effective assistance of counsel under
both the sixth Amendment to the United States
Constitution and article I, section 15, of the California
Constitution, ( Strickland v. Washington (1984) 466 U.S. 668,
People v. Pope (1979) 23 C. 3d 412, 422.)

Habeas Corpus is a proper vehicle for the presen-
tation of petitioner's claim the claims presented in
this petition is that petitioner was deprived of his
constitutional rights to effective assistance of counsel.
This constitutional claim could not be presented as
effectively on appeal as it is herein because its
factual basis rests in part on evidence not
contained in the record on appeal. ( In re Hochberg
(1970) 2 Cal. 3d 870, 875; See also, People v. Jackson
(1973) 10 cal. 3d 265, 268.)

29

Although habeas corpus cannot serve as a second appeal denial of the right to effective assistance of counsel is cognizable on habeas corpus whether or not it was raised on appeal. (Ibid.)

In People v. Pope (1979) 23 C.3d 412, 426, Fn. 17 the California Supreme Court stated:

Where the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus. In habeas corpus proceedings there is an opportunity in an evidentiary hearing to have trial counsel fully describe his or her reasons for acting or failing in the manner complained of. (Citations omitted.) For example, counsel may explain why certain defenses were or were not presented having offered the attorney an opportunity to explain courts are in the position to intelligently evaluate whether counsel's acts or omissions were in range of reasonable competence. (People v. Pope, supra, 23 Cal. 3d at p. 426, Fn. Omitted.)

///
///
///
///
///
///

A defendant in a criminal case has the right to the assistance of Counsel, in order, to ensure that his trial is both fair in its Conduct and reliable in its result. The right is not some bare or minimal assistance, but rather to effective assistance, to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate. ( United States Constitution, sixth Amendment and California Constitution, article 1, Section 15; People v. Ledesma (1987) 43 Cal. 3d 171, 216, 218.)

It is fundamental to this concept that defense counsel is expected to make rational and informed decisions decisions on strategy and tactics founded upon adequate investigation and preparation. More specifically, he or she is expected to make rational and informed decisions after a careful factual and legal investigation and inquiry with a view to develope matters of defense, in order, that he or she makes informed decisions on Client's behalf... ( People v. Shells (1971) 4 Cal. 3d 626, 630.)

If as a result of the attorney's failure to undertake careful inquiry and investigation of a crucial defense is withdrawn from the case the defendant has not had the assistance of Counsel to which he is entitled. ( People v. Ibarra (1963

60 Cal. 2d 460, 464, disapproved on other grounds in, Pope at pp. 421-423.) In addition, an attorney "has a duty to bring to bear such skills and knowledge as will render the trial reliable adversarial testing process." Strickland, at p. 669.

In a habeas corpus proceeding as in a direct appeal, the court's review of counsel's performance is a deferential one. (In re Cordero (1988) 46 Cal. 3d 161, 180.) The courts have found, "It is all too tempting for a defendant to second-guess counsel assistance after conviction or adverse sentence, and it is all too easy for a court examining counsel's defense, after it has proven to be unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. (citation omitted.)

A fair assessment of an attorney's performance requires that every effort be made to eliminate the distorting effects of hindsight to reconstruct the circumstances of the attorney's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that it is the defendant who must overcome the presumption that under the circumstances the

32

challenged action might be considered sound trial strategy. <u>Strickland</u>, at p. 689.

"However, deferential scrutiny of counsel's performance is limited in extent, and, indeed, in certain cases may be altogether unjustified. Deference, is not abdication. It must never be used to insulate counsel's performance from meaningful scrutiny and, thereby, automatically validate challenged acts or omissions." ( <u>In re Cordero</u>, supra, 46 Cal. 3d at p. 180, quoting, <u>People v. Ledesma</u>, supra, 43 Cal. 3d at p. 217.) "Otherwise the constitutional right to effective assistance of counsel would be reduced to form without substance." (Id. at p. 217.)

In addition, albeit deference is paid to counsel's tactical decisions. "The reasonableness of a tactical decision at trial invites scrutiny as to whether that decision was an informed one, that is, whether the decision was preceded by adequate investigation and preparation." ( <u>In re Jones</u> (1996) 13 Cal. 4th 552, 561-562, quoting ( <u>People v. Ledesma</u>, supra, 43 Cal. 3d at p. 217.)

With this in mind, "It is not sufficient for petitioner to allege merely that his trial counsel's tactical decisions were poor or that the case might have been handled more effectively..."

Rather petitioner "must demonstrate that the omissions of his defense counsel involved a critical issue and that the omission cannot be . . explained on the basis of any kind of knowledgeable choice of tactics." (Citations; see, People v. Lanphear (1980) 26 Cal. 3d 814, 828-829.)

Generally, both Federal and State Constitutions require counsel's diligence and active participation in the full and effective preparation of his or her client's case. Therefore, countless authorities have stressed that factual investigation is crucial to competent representation.

Accordingly, inadequate factual investigation by defense attorneys has lead to a number of reversals of criminal convictions or modification of sentences. For example: (People v. Ledesma, supra, 43 Cal. 3d at p. 207-208, 227 (trial counsel failed to make use of evidence and leads contained in material she obtained pre-trial from defendant's prior counsel); In re Cordero, supra, 46 Cal. 3d at p. 173 (trial counsel "failed egregiously to pursue leads and evidence made available to him"); In re Hall (1981) 30 Cal. 3d 408, 417, 421 (trial counsel failed to pursue numerous substantial leads which would have lead to an available witness for the defense); In re Marquez (1992) 1 Cal. 4th 584, 599-609 (counsel failed to interview possible

34

alibi witness or to present mitigating evidence which a competent investigation would have uncovered); In re Jones, supra, 13 Cal. 4th at 566-567, 583-584 (trial counsel made no attempt to locate a witness who according to police report furnished to counsel had made statements tending to exculpate the defendant.)

However, proof that an attorney's assistance was so deficient as to require reversal of a conviction involves two components. First, petitioner must show his attorney's performance was deficient. (In re Marquez, supra, 1 Cal. 4th at p. 602, citing, Strickland v. Washington, supra, 466 U.S. 668 at p. 687, and People v. Pope, supra, 23 Cal. 3d at pp. 423-425. Second, petitioner must show prejudice resulting from the counsel's deficiencies. In re Marquez, supra, 1 Cal. 4th at p. 603.)

Under the Federal standard of prejudice, petitioner must show there is a "reasonable probability that but for counsel's unprofessional errors the results of the proceedings would have been much different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Strickland v. Washington, supra, 466 U.S. at pp. 693-694; In re Fields (1990) 51 Cal. 3d 1063, 1070. Such a probability does not require a showing that "counsel's conduct more likely than not altered the outcome in the case."

(In re Cordero, Supra, 46 Cal. 3d at P. 160.)

Under the California standard of Prejudice, Petitioner must show that Counsel's acts or omissions deprived him of an adjudication of a crucial or potentially meritorious defense (People v. Shaw, (1984) 35 Cal. 3d 535, 541.) A crucial defense is not necessarily one which presented would result inexorably in a defendant's acquittal. (Id., Citing, People v. Pope, Supra, 23 Cal 3d at p. 425, Fn. 15.)

In Lockhart v. Fretwell (1993) 113 S.ct. 838, The Court explained the same analysis and concepts pertaining to defense trial counsel are applicable to appellate counsel, (In re Banks (1971) 4 Cal. 3d 337, 343; In re Smith (1970) 3 Cal. 3d 192, 202 (inexcusable failure of appellate counsel to raise crucial assignment of error that arguably could have resulted in reversal deprived defendant of effective assistance of appellate counsel).

Petitioner was denied effective assistance of Counsel by both trial and appellant Counsel. Counsels' deficient performance render the result of the of the trial and the appeal unreliable and fundamentally unfair, Lockhart v. Fretwell, Supra.

///
///
///
///

36

Petitioner's defense attorneys were defficial for the following reasons:

(1) Petitioner contends he received ineffective assistance of trial counsel in that trial counsel failed and or refused to present as requested by petitioner my defense of "self-defense." It was a valid defense to the criminal charges petitioner was facing and there was evidence to support the claim.

(2) Petitioner contends that trial counsel was ineffective for failing and or refusing to call any expert witnesses to refute or give an independent analysis who testified for the people from the coroner's office and the crime laboratory.

(3) Petitioner contends that trial counsel was ineffective for failing and or refusing to request involuntary manslaughter instructions.

(4) Petitioner contends that during the selection of the jury the prosecutor was using her peramptory challenges to exclude minorities from the jury. Trial counsel was ineffective for failing to present the court with a whaller motion for these race-based challenges.

(5) Petitioner contends that trial counsel was ineffective for failing to make a motion to have suppressed the property taken from my apartment as a result of an unlawful search and seizure.

///

///

///

37

(6) Petitioner contends that trial counsel was ineffective for failing to move for a speedy trial as requested by petitioner.

(7) Petitioner contends that trial counsel was ineffective concerning discovery. Petitioner questioned trial counsel about the discovery of the prosecution. Petitioner was informed one would automatically be provided, and that there was no need to worry because there was no shoe casting.

(8) Petitioner contends that trial counsel was ineffective for failing to file a motion and argue that petitioners statement was involuntary which resulted from an unlawful detention, arrest and miranda violation.

(9) Petitioner contends that trial counsel was ineffective for failing to investigate the victims criminal background to establish if there was any violent or criminal acts committed by the victim.

(10) Petitioner contends that trial counsel was ineffective when he witfully misled petitioner regarding his right to testify.

Whether a defendant received ineffective assistance of counsel is reviewed de novo. United States v. Swan Son, 943 F.2d 1070, 1072 (9th Cir. 1991).

A defendant in a criminal case has the right to the assistance of counsel, in order, to insure that his trial is both fair in its conduct and reliable in its result. The right is not to some bare or minimal assistance, but rather to effective assistance, to the reason

38

ably competent assistance of an attorney acting as his diligent and conscientious advocate (United States Constitution, Sixth Amendment and California Constitution, article 1, Section 15; People v. Ledesma (1987) 43 Cal. 3d 171, 216, 218.)

It is fundamental to this concept that defense counsel is expected to make rational and informed decisions on strategy and tactics founded upon adequate investigation and preparation. More specifically, he or she is expected to make rational and informed decisions, that is, he or she is expected to "Conduct careful factual and legal investigations and inquiries with a view to develope matters of defense(s) in order that he or she make informed decisions on the client's behalf... (People v. Shelles (1971) 4 Cal. 3d 626, 630.)

If as a result of the attorney's failure to undertake careful inquiry and investigation a crucial defense is withdrawn from the case - the defendant has not had the assistance of counsel to which he is entitled (People v. Ibarra) (1963) 60 Cal. 2d 460, 464, disapproved on other grounds in People v. Pope (1979) 23 Cal. 3d 412, 421, 423.)

An attorney has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." (Strickland v. Washington (1984) 466 U.S. 668, 688.)

///

///

39

In a habeas corpus proceeding, as in direct appeal the court's review of counsel's performance is a deferential one. (In re Cordero (1988) 46 Cal. 3d 161, 180.)

In the present case at bar, defense counsel completely acted in a manner in which constituted to be that of a prosecutor instead of acting in a manner to be expected of a reasonably competent criminal attorney, in violation of the sixth Amendment to the United States constitution. People v. Rodriguez (1977) 73 Cal. App. 3d 1023.)

(11) Appellate counsel was ineffective because she failed to contend on appeal that: (1) the evidence was insufficient to convict petitioner, (2) that trial counsel was ineffective for the following reasons as listed above in (1) thru (10) of my contentions made, (3) the prosecution committed misconduct during closing argument, (4) the trial court committed misconduct by denying petitioner's marsden motion.

III.

B.

Petitioner's Conviction Violates
Due Process of Law Because The
Evidence Is Insufficient To Support The Verdict

Petitioner contends that evidence which "merely" creates a strong suspicion of the guilt of the accused does not shift the burden of proof and impose upon the accused the duty of overcoming the suspicion (People v. Alikow (1930) 97 Cal. App. 2d 797, 802.)

///

Mere Conjecture, surmise or suspicion is not equivalent
of reasonable inference and does not constitute proof,
and proof of mere opportunity to so act is no proof
that the act was in fact done. See, People v. Terry, 57 Cal.
2d 538.) More is required to constitute substantial evidence
of guilt than when all of the evidence against an accused
is considered, it gives rise at most to suspicion that
he was connected with the criminal activity at issue
(People v. Ortiz (1962) 210 Cal. App. 2d 489.) The petitioner
recognizes that before the judgement of the trial
court can be set aside for insufficiency of the evidence
to support the verdict of the jury, it must clearly appear
that upon no hypothesis what ever is there sufficient
substantial evidence to support it. (People v. Daugherty, 40
Cal. 2d 876, 885, 256 P. 2d 911.)

But it is clearly the law that evidence which merely
raises a strong suspicion of the defendant's guilt
is not sufficient to support a conviction. Suspicion is
not evidence; it merely raises a possibility, and this is
not a sufficient basis for an inference of fact. (People v.
Bowie, 255 Cal. App. 2d 497, 500-501, 63 C.R. 111; People v. Tahoe,
219 Cal. App. 2d 430, 435-436, 33 C.R. 323; People v. Ruscon, 128
Cal. App. 2d 118, 122, 274 P. 2d 899.)

The prosecution's burden is a heavy one: To justify
a criminal conviction, the trier of fact must be reason-
ably persuaded to a near certainty (People v. Bassett,
69 A.C. 121, 70 Cal. Rptr. 193, 443 P. 2d 777) In People v. Red
mond, 71 Cal. 2d 745, 79 Cal. Rptr. 529 and in People v. Flores

58 Cal. App. 2d 764, our Courts have reversed convictions where the convictions where the identification was not conclusive. Further, in the _Flores_ case, _supra_, the court observed: "we are not unmindful of the claimed pro-fligate character of appellant, who admitted a prior convic-tion of a felony, but we are now concerned with the guilt or innocence of appellant, further than to say the evidence presented at his trial was insufficient to make out a case of grand theft as charged against him As was said by the court in _People v. Brown_, 31 Cal. App. 2d 593 (88 p. 2d 728), at page 603, "though unfair means may happen to result in doing justice to the prisoner in the particular case, yet justice so attained is unjust and dangerous to the whole commonly (_Hurd v. People_, 25 Mich. 405... The acquittal of a guilty person is truly a miscarriage of justice, but the conviction of an innocent person through relaxation of those fundamental legal principles such as the one with which we are here concerned would be a tragedy;

Here, there was no substantial evidence that petitioner committed a murder or a robbery, Please see exhibit "A" statement of Facts of the prosecutor's case.

The Due Process clause of the united states const-itution mandates that "no person shall... suffer the onus of a criminal conviction except upon sufficient proof... to convince a trier of fact beyond a reason-able doubt of the existence of every element of the offense; _Jackson v. Virginia_ (1979) 443 US. 307, 316.

42

In determining whether the evidence is sufficient to sustain a conviction, this Court must: (1) review the whole record in the light most favorable to the judgement to determine whether it contains substantial evidence -- i.e., evidence that is credible and of solid value -- from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt, and (2) Judge whether the evidence of each of the essential elements is substantial; It is not enough for the respondent to simply point to some evidence supporting the finding, for not every surface conflict of evidence remains substantial in the light of other facts, ( People v. Green (1980) 27 Cal. 3d 1, __. See also Jackson v. Virginia (1979) 443 U.S. 307, 319.)

Penal code 190.2 (a) (17) (1) provides that a special circumstance exist when a murder was committed while the defendant was engaged in the commission of or attempted commission of a robbery.

CalJIC 8.21 instruction Killing of a human being, whether intentionally, unintentional or accidental, which occurs during the commission or attempted commission of the crime as a direct causal result of robbery is murder of the first degree when the perpetrator had the "specific intent" to commit that crime.

"The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."

///

43

The law of Felony murder is clear. A person must have the intent to rob murder for the Felony murder rule to apply. In the case now before the court and by reviewing the evidence, no evidence shows petitioner had an intent to rob the victim. The evidence in this case only consist of a strong suspicion of guilt of the defendant and that is not enough (People v. Rascon 128 Cal. App. 2d 118, 122 (274 p. 2d 899).

Petitioner was not found guilty beyond a reasonable doubt and was not found guilty with evidence beyond a reasonable doubt, which violated petitioner's Federal and State constitutional rights. And for the foregoing reasons, petitioner urges this court to reverse the judgement of conviction.

III.

C.

<u>Prosecutorial Misconduct During closing</u>
<u>Arguments Denied Petitioner His Rights</u>
<u>under the sixth And Fourteenth Amend-</u>
<u>ent of The United States constitution</u>

To establish prosecutorial misconduct, petitioner need not show that the prosecutor acted in bad faith; it is sufficient to show that his rights to a fair trial was prejudiced. (People v. Bolton (1979) 23 c.3d 208, 213, 214.) The focus is not on the prosecutor's good or bad faith but on the prosecutor's conduct as judged by an objective standard. (People v. Alvarez (1997) 14 c.4th 155, 213.)

///

During closing arguments the following statements were made by the prosecution:

The crime scene evidence also shows that maria was a victim of robbery. The pulled-out pockets were found. (R.T. 333: 24-25).

That I.D. alone tells us an important thing: That the murderer, that the defendant, staged the crime scene. (RT 335: 17-18).

If maria's blood had a voice, this blood would be saying: This is the guy that did it. The bloodstains were on the defendant's pocket and in the lining of the pants, because he put what he took into his pant's pockets. or he touched his pant's pockets with maria's blood. (R.T. 343: 5-9).

And this is the statement of a guilty person: "I'm 39 and I'm really screwed this time. I'll be here for life. shit like this follow me all the time." Are those the words of an innocent person (R.T. 344: 12-15)

There is no way that maria mancera got to the level of drunkenness that counsel suggesting in between the time that she saw officers and she was killed. (R.T. 391: 26-28, 392:1).

So, at the very least, He was drinking with maria mancera. (R.T. 392: 26:27).

Could Counsel, could the defendant have called some other witness to talk about the cocaine nose-bleed? Sure. (R.T. 394: 6-7)

45

The Courts have recognized that Juries accord great weight to arguments of prosecutors since "prosecuting attorneys are governmental officials and [are] clothed with dignity and prestige of their office. It is their duty to see to it that those accused of crimes are afforded a Fair trial..." (People v. Turner (1983) 145 Cal.App. 3d 548, 578.)

In the present case at bar, the prosecutor injected personal belief about the evidence, mischaracterized evidence and referred to facts not in evidence, argued as true-false and misleading evidence with the intentions to obtain a conviction and given the fact this was done knowingly deprived Petitioner of his constitutional rights under the sixth and Fourteenth amendments. The prosecutor's remarks were not harmless and the cumulative effect of the misconduct argued herein so infected the trial with unfairness as to making the resulting conviction a denial of due process. (Darden v. Wainright (1986) 477 U.S. 168, 181, quoting Donnelly v. DeChristoforo (1974) 461 U.S. 63.)

This misconduct cannot be found harmless beyond a reasonable doubt and reversal is required. (Chapman v. California, supra, 386 U.S. at 24.)

///
///
///
///
///
///

46

IX.

D.

<u>The Trial Court Abused Its Discretion</u>
<u>In Denying Petitioner's Madsen Motion</u>
<u>The Ruling Was Opinionated And Biased</u>
<u>And Violates Due Process</u>

A state law error that renders a trial fundamentally unfair violates the Due Process clause. ( <u>Estelle v.</u> <u>McGuire</u> (1991) 502 U.S. 62, 70.)

On June 14, 2002 the Honorable Judge Thomas C. Hasting presided over the madsen hearing. (CT. 235) The hearing can be found in the R.T. Pages 455-492 which were sealed.

The Court:

No. That covers the issues raised by Mr Valles. I've resolved the first issue, and I've resolved the second issue, which was the discussion of the sidebar concerning the wheeler motion which was not made and possible explanation why it wasn't. (R.T. 491: 21-25.)

The issues resolved by the trial court were done in a manner that was opinionated and biased and amounted to a due process violation and of a fair trial. The due process clause of the state and Federal Constitution entitle an accused to a fair trial. ( <u>Estes v. Texas</u> (1965) 381 U.S. 532, 540; <u>People v. Lyons</u> (1956) 47 Cal. 2d 311, 319.) Based upon the foregoing reversal is required or at a minimum, for petitioner to be given a new trial.

VI.

E.

## The Cumulative Effect of the Errors Discussed Above Deprived Petitioner of Due Process of Law And A Fair Trial And Requires Reversal of Petitioners Conviction

The Court of this state recognize their obligation to assess the cumulative effect of errors on a criminal Conviction. ( People v. Purvis (1985) 164 Cal. App. 3d 1075, 1087; People v. Williams (1971) 22 Cal. App. 3d 34, 40, 58.) Moreover, the cumulative effect of errors may operate to deprive a defendant of due process and a fair trial, requiring reversal irrespective of any lack of objection on the past of defendant. ( Taylor v. Kentucky (1978) 436 U.S. 478, 486-490; Durden v. McNeil, 5th Cir. 1992, 978 F. 2d 1453, 1456; People v. Mills (1978) 81 Cal. App. 3d 171, 176.)

In the present case, these errors, taken individually are sufficient to warrant reversal of petitioner's conviction. In the event that the court finds anyone of these errors harmless, however, their cumulative effect on the jurys deliberation cannot be ignored. the court's and the prosecution's errors, combined with defense counsel's eroded petitioner's right to a fundamentally fair trial. Looking cumulatively at the errors of defense counsel the court must find that counsel's performance in petitioner's case was clearly below the level

48

of professional skills customary for competent counsel similarly situated. See (Pitchau, 741 F. supp at 797). In Pitchau, the petitioner cited numerous errors that the court considered when it found that petitioner had been denied effective assistance of counsel. (Id) Likewise, petitioner has been prejudiced by the cumulative effect of his counsel's errors and omissions. In petitioner's case, as in Walker, the cumulative effect of various counsel's errors along with that of the trial judge and prosecutor prejudiced petitioner to such an extent that he was denied a fundamentally fair trial.

(United States v. Wallace (9th Cir. 1988) 848 F.2d 1464, 1475 (court determined that it did not need to look at whether each individual error in itself was harmless where cumulatively three errors affected fundamental fairness of trial.)

(Cooper v. Fitthumser (9th Cir. 1979), 586 F.2d 1325 (Prejudice is clearly established from cumulative impact.)

The following deprived petitioner of a fundamentally fair trial, requiring reversal of the judgment or, at a minimum a new trial.



**A. The Prosecution's Case**

**1. Events Leading up to Maria Mancera's Murder**

On Sunday, August 19, 2001, at 11:15 p.m., Officer Joaquin Barreto was on foot patrol with his partner, Keith Neumer, on the west side of San Jose, near the Alameda and Hedding Street. (RT 130-131.) Officers Barreto and Neumer encountered appellant and Maria Mancera at the intersection of the Alameda and Sunol Street. (131-132.) When Officer Barreto first observed them, they were ambling along the Alameda with "no specific direction or intent on what they were doing." (RT 132.)

Officers Barreto and Neumer approached appellant and Ms. Mancera and asked what they were doing. Ms. Mancera replied that they were looking for an ATM machine. (RT 133.) Officer Barreto asked if she was really looking for an ATM machine and inquired if she had an ATM card with her. (*Ibid.*) Ms. Mancera reached into her purse and produced an ATM card with the name Maria Mancera on it. (RT 134.) Officer Barreto testified that it seemed obvious to him that Maria Mancera was transgender. (RT 135-136.)

In observing appellant and Maria Mancera, Officer Barreto noticed

2

that they both appeared to be under the influence of alcohol. (*Ibid.*) Both had eyes that seemed watery and bloodshot, and they looked a bit unsteady on their feet. (RT 135.) Officer Neumer also felt that the two presented signs of intoxication. (RT 154-155.) Officer Barreto felt that they were still able to care for themselves and did not require booking for being drunk in public. (RT 135.) Officer Barreto noted that at that time Maria Mancera appeared to have no injuries to her face and that all of her front teeth appeared to be present. (RT 138.) Appellant and Ms. Mancera appeared to be friendly with each other, and Officer Barreto saw nothing that indicated Ms. Mancera felt any distress. (RT 136, 138.)

Officer Barreto conducted record checks on both appellant and Ms. Mancera to confirm their identities. (RT 134.) Officer Barreto also filled out a field identification card for appellant. Field identification cards consist of general information, such as name, address date of birth, general clothing description, and parole or probation status. (RT 139.) Upon completion of the field identification procedure, Officer Barreto pointed appellant and Ms. Mancera in the general direction of the Arena Hotel, where he believed there was an ATM machine. (RT 134.)

After a few minutes, Officer Barreto observed the pair exiting the hotel parking lot. (RT 137.) They told him that there was no ATM machine in the Arena Hotel. In response, Officer Barreto pointed them toward the Bank of America ATM near Hester Street. (*Ibid.*) They thanked him and proceeded in that direction. (RT 138.)

### 2. Discovery of the Body

Mario Lejes arrived for work at R. Brothers painting on Hedding Street on Monday, August 20, 2001, at approximately 6:30 a.m. (RT 258-259.) Upon arrival, Mr. Lejes and his coworkers observed a body lying on the track of Bellarmine High School, right next to R. Brothers. (RT 259.) Mr. Lejes went

3

to the body and attempted to rouse the person. (RT 260.) After noting the lack of response and blood around the mouth and back of the head of the body, Mr. Lejes touched the right kneecap and discovered it was cold. (RT 260-261.) Mr. Lejes did not touch anything else or move the body. (RT 261-263.)

At approximately 6:30 a.m. on Monday, August 20, 2001, Officer Barreto received a call concerning a person who had been beaten near Bellarmine High School. (RT 140.) Officer Barreto felt he needed to investigate what the circumstances of the beating were, as it had occurred in his district. (*Ibid.*) Upon arrival at Bellarmine High School, Officer Barreto observed that the body was located beside the high school's track. (RT 141.) Upon seeing the body, Officer Barreto immediately recognized the person as Maria Mancera, the same person with whom he had spoken the previous night. (RT 142.) He also noted that Ms. Mancera was wearing the same outfit that she had been wearing the previous night. (RT 147.) Officer Barreto relayed this information to his supervisors and to the investigators, including the field identification card with appellant's information on it. (RT 143-144.)

Officer Neumer also responded to the crime scene. Then, he went to the Bank of America near Hester to retrieve videotape from the ATM of the previous night's activities. (RT 150-151.) Reviewing the videotape, Officer Neumer found tape of Maria Mancera and appellant approaching the ATM machine at approximately 11:35 p.m. on August 19, 2001. (RT 151-152.)

Investigators arrived on the scene, made sure it was properly secured, and took pictures of the body and surrounding area. (RT 158-159.) Sergeant Bruce Marten Wiley, of the San Jose Police Department, arrived on the scene at approximately 7:45 a.m. on Monday, August 20, 2001. (RT 159.) Sergeant Wiley testified that the body was found below the Hedding Street overpass that crosses over the athletic fields of Bellarmine High School. (RT 158, 160.) The victim's pockets were turned out, with an ATM receipt laying by her side. (RT

4

249-250.)  Officer Wiley noted that several objects were found in the general vicinity of the body, (RT 163-171,) specifically, a black leather belt, a California Identification card,[2/] a fragment of a tooth, a red plastic disposable lighter, and a white metal digital wristwatch with a black leather band.  (RT 163-164.) Sergeant Wiley also testified that the victim's purse had been found, approximately 60 feet from the victim's body, its contents dumped out.  (RT 169, 190.)  The purse was a black handbag.  Some of its contents had been strewn about it, and some of its contents remained inside.  Sergeant Wiley testified that the contents included makeup, personal hygiene and care products, miscellaneous papers, notes, business cards, photographs, some costume jewelry, an address book, a checkbook, California Identification and Social Security cards in Maria Mancera's name, and four dollars and six cents in coins. (RT 170.)  There was no ATM card found near the body.  (RT 250-251.)

Sergeant Wiley testified that the height of the Hedding Street overpass is 31 feet from the top of the railing to the ground.  (RT 189.)  From the top of the railing to the walkway surface was 29 inches.  (RT 168.)

A shoe print was also found near the victim's body.  (RT 172.)  The shoe print was photographed, and a cast was made.  (RT 173-174.)

### 3.  Investigation of Appellant's Home and Subsequent Arrest of Appellant

Later that day, August 20, 2001, Sergeant Wiley went to appellant's home at 152 Cleaves Avenue in San Jose.  (RT 178.)  A search of the bedroom produced a pair of gray pants with traces of what appeared to be blood on them, concentrated on the right front pocket.  (RT 179.)  Police inspectors collected a pair of white Thom McAn shoes from appellant's home that appeared to

---

2.  The identification belonged to a George Photopoulas.  It was stipulated that Mr. Photopoulas was in custody at the time of Ms. Mancera's death, that he was to known to Ms. Mancera, and that she was in possession of his identification with his permission.  (RT 167.)

match the impressions left at the crime scene. (RT 181-182, 184.) Police also found a black baseball cap with a maroon brim with "Carpenters Local 405 Santa Clara and San Benito Counties" stitched on it, a gray teeshirt with "MAX AIR" emblazoned across the front, and a pair of boots. (RT 182-186.)

From a municipal trash can located at the northwest corner of Hester and Alameda Streets, police also recovered an ATM check card with Maria Mancera's name on it. (RT 187-188.) This trash can was located approximately 20 yards east and across the street from the Bank of America near Hester. (RT 188.)

Criminalist John Bourke of the Santa Clara County crime laboratory, an expert in the area of shoeprint analysis and comparison (RT 234-236,) testified that he examined the casts taken of the shoeprints from the crime scene as well as photographs of the impressions taken at the scene. (RT 237.) He compared these to the shoes taken from appellant's home and he determined that the right Thom McAn shoe could have been a possible source for the impression left at the crime scene. (RT 243.) He concluded that a shoe of the same brand, same size, same sole pattern, and same amount of wear as appellant's shoe had made the impression at the crime scene. (RT 245.)

Appellant's roommate, testified that he heard appellant come home at approximately 4:37 or 4:38 a.m. on the morning of August 20, 2001. (RT 231.) Appellant's roommate was sure of the time because appellant's entry into the house woke him up. (RT 231.)

San Jose Police Detective Gilbert Vizzusi called the victim's bank and requested records of the activity of the previous evening, August 19, 2001, and he asked to have the account flagged for any future use. (RT 250-251.) In addition, Detective Vizzusi sent Officer Neumer to recover bank videotapes from the night of August 19, 2001 at the Bank of America near Hester, when Officer Neumer and Barreto observed appellant and the victim together. (RT

251-252.) The ATM videos from Union Bank and Bank of America showed appellant attempting to withdraw money with Maria Mancera's card early on August 20, 2001. (RT 254.) The ATM video of appellant at the Bank of America was recorded at about 12:56 a.m. (Rt 254-255.)

Fraud investigator Jesus Gaona for the Greater BA Bank Corporation reviewed Maria Mancera's bank records. (RT 288-289.) He noted that Maria Mancera had successfully withdrawn forty dollars from the Bank of America near Hester at 11:45 p.m. on August 19, 2001. (RT 290-293.) Mr. Gaona also noted that approximately one hour later, beginning at 12:48 a.m., Maria Mancera's account had a flurry of activity, consisting of unsuccessful attempts to obtain money. (RT 293-296.) At 12:48 and 54 seconds, a.m., at 12:49 and 7 seconds, a.m., and at 12:49 and 21 seconds, a.m., a user attempted to access Ms. Mancera's account with an incorrect pin from the Union Bank at Alameda and Taylor in San Jose. (RT 293-294.) The first two tries involved requests of three hundred dollars[3] and a third try involved a request for one hundred dollars. (RT 293-294.) The fourth attempt at the Union Bank, at 12:49 and 41 seconds, a.m., for one hundred dollars, resulted in a rejection of the card, due to an excessive number of invalid pin entries. (RT 295.) The user then moved to the Bank of America Hester branch and attempted three more withdrawals at 12:55 and 37 seconds, a.m., at 12:56 and 9 seconds, a.m., and at 12:56 and 50 seconds, a.m., all culminating in the same "pin tries exceeded" error message. (RT 295-296.)

San Jose police took appellant to the preprocessing unit at approximately 6:53 p.m. on August 20, 2001, and photographed him. (RT 264, 267.) At this time appellant looked at Officer Ernesto Vallecilla and said, "So what do you think, is this going to be a life sentence or what?" (RT 267.)

---

3. Mr. Goana testified that the balance in Ms. Mancera's account on August 20, 2001, was $344.90. (RT 290.)

7

Officer Vallecilla replied that he did not know and inquired how old appellant was. Appellant replied, "I'm 39 years old. I'm really screwed this time. I'll be here for life. Shit like this follows me all the time." (RT 267-268.)

### 4. The Autopsy of Maria Mancera

Dr. Gregory Schmunk, the chief medical examiner and coroner for the county of Santa Clara and an expert in forensic pathology and wound recognition, performed the autopsy on Maria Mancera. (RT 196-198.) Dr. Schmunk noted that Maria Mancera was a man but had been living as a woman. (RT 198.)

Dr. Schmunk observed several external injuries on the victim's body. (RT 200.) He found a fractured upper jaw, abrasions to the skin on her neck, shoulders, her right back, her left lower back, the right side of her chest, the front of her chest and her jaw, and bruising around the victim's left eye. Additionally, he noted bleeding inside the white of her left eye and tearing of the skin on the inside of her mouth, especially inside the left cheek. The injury to the inside of the victim's mouth was consistent with a blow to the face. Ms. Mancera also had two lacerations due to blunt force injury on the side of her upper left eyelid, and other abrasions on her arms. (RT 201.) Dr. Schmunk also noted a broken left upper arm, a broken pelvis, and rib fractures on both sides of the chest. (RT 202.)

Dr. Schmunk then examined Ms. Mancera's internal injuries. This examination revealed the rib and pelvic fractures as well as bruising to the brain. There was blood on the surface of the brain. (RT 202-203.) Ms. Mancera also suffered a basilar skull fracture. She had a liver laceration, and she had a small amount of blood inside her body. (RT 203.) He remarked that her teeth were in very poor repair. Most of her front teeth were missing, and those that she did have were decaying. (RT 210.) A toxicology report was performed and Ms. Mancera's blood alcohol level was determined to be .22%. There was also

8

cocaine and a cocaine metabolite present in the victims blood. (RT 218-220, 280-281.) Dr. Schmunk testified that most of the external and internal injuries were consistent with a fall of about 27 to 31 feet. (RT 204.)

Dr Schmunk opined that the bruising to the inner left cheek was more consistent with a punch or some other impact prior to the fall than with an injury caused by the fall itself. He did concede that the laceration to the inner cheek could have occurred just after the fall, although that was not as likely. (RT 204-205.)

Dr. Schmunk testified that Maria was alive prior to the fall, as evidenced by the swelling surrounding her left arm fracture and by the internal bleeding surrounding some of her injuries. (RT 205-206.) After observing the bloodstains at the crime scene, Dr. Schmunk also noted that the body had most likely been in one position, with the head bleeding for a period of time, and then it was moved to the position in which it was discovered. (RT 206.) In addition to the bloodstains, Dr. Schmunk deduced that "pattern injuries" on Ms. Mancera's lower chest and left abdomen were indicative of the body having been moved. (RT 208.) He also took note of some drag marks near the body in certain photographs taken at the scene. (RT 208.)

The body was in full rigor mortis when the coroner's investigator examined the body at the scene. (RT 213.) Full rigor mortis develops approximately six to eight hours after death, and the coroner's investigator observed the body at the scene between 11:10 a.m. and 12:20 p.m. on August 20, 2001. However, Mr. Lejes, who discovered the body at about 6:30 a.m., had noted when he discovered the body that it was cold and stiff. (RT 260-261.) The body had partial lividity, but it was not fixed.[4] Given that lividity was not

---

4. Lividity is the settling of the blood in the body. Thus if a victim was lying on her back, the blood would be pulled toward her back. Fixed lividity means that the body has been in a position long enough that the blood will no longer move if the body is moved. (RT 214-215.)

fixed when the coroner's investigator examined it between 11:10 a.m. and 12:20 p.m., the doctor estimated it was less than twelve hours since Ms. Mancera's death when the coroner's investigator made her assessment. (RT 213, 215.)

Dr. Schmunk testified that although Maria almost certainly would have been unconscious as soon as she hit the ground, she probably did not die immediately. It would have taken several minutes for her heart and respiration to stop. (RT 212.) Based on her injuries, it is most likely that Ms. Mancera's back, left arm and pelvic region struck the ground first. (RT 211.)    Dr. Schmunk opined that the manner of death was homicide. (RT 256.)

### 5. DNA Evidence

Criminalist Nancy Marte, of the Santa Clara County crime laboratory testified as an expert in criminalistics with a speciality in DNA. (RT 299.) Ms. Marte did DNA analysis on the bloodstains found on appellant's pants. She determined that three bloodstains on the pants came from Ms. Mancera. One bloodstain on the pants matched appellant's own blood. (RT 302.) A blood sample taken from Ms. Mancera's right fingernail also produced a match with Ms. Mancera's blood. (RT 302, 305.)

### B. The Defense Case

The defense called Andrew Marr as its only witness. Mr. Marr worked for a concrete company located next to Bellarmine High School. (RT 312.) He was working at approximately 6:30 a.m. on the morning of August 20, 2001, when he observed a Hispanic male jumping the fence and running at a high rate of speed away from the track. (RT 313.) The man had a ponytail, was six feet tall, weighed approximately 180 pounds, and was wearing faded blue jeans and a white teeshirt. (RT 313.) Mr. Marr saw the police arrive in the area about 45 minutes later, and he told them about the man he observed. (RT 315.)

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | MARK S. HOWELL
Deputy Attorney General
6 | State Bar No. 95125
455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-3664
Telephone: (415) 703-5969
8 | Fax: (415) 703-1234
Email: mark.howell@doj.ca.gov
9 | Attorneys for Respondent

10                    IN THE UNITED STATES DISTRICT COURT

11                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                          SAN FRANCISCO DIVISION

13

**RAUL UVALLES,**                                    C 05-2779 MJJ (PR)

14
                                       Petitioner,
15

16      v.

     **D.L. RUNNELS, Warden,**
17
                                       Respondent.
18

19          **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT D-2

**ORIGINAL**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

**FILED**

JUN 1 4 2004

Court of ~~~~~ Sixth App. Dist.
BY~~~~~
DEPUTY

In re RAUL UVALLES,

    on Habeas Corpus.

H027526
(Santa Clara County
 Super. Ct. No. CC121250)

BY THE COURT:

    The petition for writ of habeas corpus is denied.

    (Premo, Acting P.J., Elia, J., and Walsh, J.,* participated in this decision.)

Dated    JUN 1 4 2004                   _Premo_    Acting P.J.

    *Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

D-2

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

   **RAUL UVALLES,**                         C 05-2779 MJJ (PR)
14
                                Petitioner,
15

                 **v.**
16

   **D.L. RUNNELS, Warden,**
17
                               Respondent.
18

19        **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT E-1

ORIGINAL

MC-275

Name Raul Uvalles

Address High Desert State Prison

PO Box 3030

Susanville, CA 96130

CDC or ID Number T-59954

SUPREME COURT
**FILED**

JUN 2 8 2004

Frederick K. Ohlrich Clerk

DEPUTY

Supreme Court of The State

of California
*(Court)*

In re

Raul Uvalles

~~Petitioner~~

vs.

~~Respondent~~

on Habeas Corpus.

**PETITION FOR WRIT OF HABEAS CORPUS**

No. **S125870**

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS — READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
dicial Council of California
?75 [Rev. January 1, 1999]

**PETITION FOR WRIT OF HABEAS CORPUS**
(1)

WEST GROUP

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

E-1

This petition concerns:

☒ A conviction                    ☐ Parole

☒ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other *(specify)*: _____

1. Your name: Raul Muller

2. Where are you incarcerated? High Desert State Prison

3. Why are you in custody? ☒ Criminal Conviction  ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Murder, Robbery In The Second Degree and Taking Personal Property.

   b. Penal or other code sections: 187, 211 and 215.5 Subdivisions

   c. Name and location of sentencing or committing court: Santa Clara County Superior Court

   d. Case number: CC171250

   e. Date convicted or committed: June 14, 2002

   f. Date sentenced: June 14, 2002

   g. Length of sentence: 25 years to life

   h. When do you expect to be released? _____

   i. Were you represented by counsel in the trial court? ☒ Yes.  ☐ No.  If yes, state the attorney's name and addre

   Charlie Gillian #144161 120 West Mission Street San Jose, CA 95110

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

i. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement.". *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Please See Exhibit "C"

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Please See Exhibit "C"

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

Please See Exhibit "C"

7. **Ground 2 or Ground _____** ( .plicable):

_Please See Exhibit "C"_

---
---
---
---

a. **Supporting facts:**

_Please See Exhibit "C"_

---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---

b. **Supporting cases, rules, or other authority:**

_Please See Exhibit "C"_

---
---
---
---

8. Did you appeal from the conviction, sentence, or commitment?  ☒ Yes.  ☐ No.    If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

Court of Appeals, Sixth Appellate District

b. Result: Modified the three year Sentence    c. Date of decision: Oct 28, 2002

d. Case number or citation of opinion, if known:  No. H024674

e. Issues raised:  (1) The concurrent three year Sentence for the robbery charge in Count II violated Penal code 654.

(2) The concurrent three year Sentence for the charged robbery in Count II violated the double Jeopardy clause of the Fifth Amendment of

(3) the United States Constitution.

f. Were you represented by counsel on appeal?  ☒ Yes.  ☐ No.   If yes, state the attorney's name and address, if known:

Lori A. Quick #148692  100 N. Winchester Blvd. Suite 310 Santa Clara, CA
95050

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☒ No.    If yes, give the following information:

a. Result:  N/A    b. Date of decision:  N/A

c. Case number or citation of opinion, if known:  N/A

d. Issues raised:  (1)  N/A

(2)  N/A

(3)  N/A

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

Petitioner is presenting this court with new claims of which my appellant attorney either failed or refused when they were brought to her attention.

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

N/A

b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have yo __ d any other petitions, applications, or motions __ . respect to this conviction,
commitment, or issue in any court?  ☒ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _Santa Clara Superior Court_

(2) Nature of proceeding (for example, "habeas corpus petition"): _Habeas Corpus Petition_

(3) Issues raised: (a) _Ineffective Assistance of Trial and Appellant Counsel,_

(b) _Insufficient Evidence, (c) Prosecutorial Misconduct, (D) Trial Judge Misconduct and (e) Cumulative errors._

(4) Result (Attach order or explain why unavailable): _See Exhibit "A" (Forwest Time Exp)_

(5) Date of decision: _5-21-04_

b. (1) Name of court: _Court of Appeals, Sixth Appellate District_

(2) Nature of proceeding: _Habeas Corpus Petition_

(3) Issues raised: (a) _The same new issues I present to the superior Court which are listed in (13) section._

(b) _____

(4) Result (Attach order or explain why unavailable): _See Exhibit "B" (Denied)_

(5) Date of decision: _June 14, 2004_

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
_Petitioner requested for an evidentiary hearing in both courts, however, they weren't held._

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
_Prison lockdowns, Petitioner is a layman at law and he to seek the assistance of other inmates. (I.A.C. Appellant Counsel)_

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
_Pursuant to Preiser v. Rodriguez (1973) 411 U.S. 475 and Bogovich v. Sandoval (9th Cir. 1999) 189 F.3d 999 this writ is properly before the court._

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 6-24-2004

▶ _[signature]_
(SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]    **PETITION FOR WRIT OF HABEAS CORPUS**    Page six of six

Supreme Court of The State
of California

Raul Vualles,
  Petitioner,

v.

D.L. Runnels (Warden)
  Respondent.

Case No.

Santa Clara County Superior
Court No. CC121230
Sixth Appellate District Court
No. H024674

Petition For Writ of Habeas
                    Corpus

### Petition For Writ of Habeas Corpus

To: The Honorable Presiding Chief Justice and Associate
Justices of the California Supreme Court:

Comes Now, Raul Vualles, hereinafter referred to as
Petitioner, Complains of the Respondent, David L. Runnels,
Warden, as above designated, and for legal cause of
action.

(a) That petitioner is confined, detained, imprisoned
and restrained of his liberty by D.L. Runnels, warden
of the State Prison Known as High Desert in Susanville
California; that such confinement and restraint are
illegal, and that the illegality thereof will consist in
the basic Constitutional violations which will hereinafter

be set forth

(b) This Honorable Court has Jurisdiction herein pursuant to the essential provisions of 1473 of the California Penal Code; including the 6th, 8th and 14th Amendments of the United States Constitution.

By verified Petition it is alleged as follows:

## I.

Please see exhibit "C" (Petition For Writ of Habeus Corpus). Petitioner alleges and believes that the Judgement of Conviction and Sentence is invalid as in violation of the State and Federal Constitutional rights to effective assistance by trial and appellate lawyers, prosecutorial misconduct and trial Judge misconduct, and more specifically stated in petition-er's memorandum of points and authorities which are contained in exhibit "C". The record should clearly reflect that petitioner presented the new claims to the Superior Court and the Court of appeals.

## II.

Petitioner has no other Plan, speedy or adequate remedy at law.

## III.

Petitioner request for an evidentiary hearing as to the disputed material factual allegations, pursuant to the written opinion as outlined in the case of In re Johnson (1992) 1 Cal. 4th 689 [4 Cal. Rprt. 2d 170]. Petitioner also request that the court enter an

order requiring trial and appellant lawyers to file declarations to explain their conduct which lead to the unlawful conviction of petitioner. Its the fervent contention of petitioner that this hearing is crucial to present evidence supporting my factual claims. At said hearing, witnesses and documents may be subpoenaed, Penal Code § 1484; California Rules of Court, rule 260 (c). The factual basis to support the allegations more specifically is stated in petitioner's memorandum of points and authorities, exhibits and declaration fully set forth herein.

## IV.

Habeas corpus is the appropriate remedy for petitioner's unlawful incarceration. Petitioner alleges that his incarceration violates fundamental due process as fundamental constitutional defects amounting to denial of due process do not become irremediable when a judgement of conviction becomes final, even when after affirmation on appeal. In re Coughlin (1976) 16 Cal. 3d 52, 55; see also, In re Foss (1974) 10 Cal. 3d 910, 916-917. Therefore, petitioner seeks remedial action to cure the continued violation of fundamental constitutional due process violations.

///

///

///

///

WHEREFORE, Petitioner respectfully requests that this Court:

1. Take Judicial notice of the record of appeal in People v. Raul Ualles, Sixth Appellate District court of Appeals case No. H026674, and People v. Raul Ualles, Santa Clara County Superior Court Case No. CC121230.

2. Petitioner request that this court Issue a writ of Habeas Corpus Ad Testificandum or an order to show cause to the Respondent (David L. Runnels), warden of High Desert State Prison, to inquire into the legality of petitioner's incarceration.

3. Petitioner believes the record in this case is sufficient to entitle him to a reversal of the Judgement of Conviction of the Superior court, but if it is not, Petitioner has no other plain, speedy, or adequate remedy at law.

4. Issue an order requiring immediate reversal of the Judgement of Conviction; and,

5. Grant petitioner such further relief as is appropriate in the interest of Justice. This petition is being presented in the First instance to this court, under Its original habeas corpus Jurisdiction, and accordingly Petitioner urges this court to grant the petition without delay.

Dated: 6-24-2004 _____ (2004)

Respectfully submitted

Isl _____

(10)

<u>Verification</u>

I, Raul Uvalles, states:

I am the Petitioner in this action, I have read the foregoing petition for a writ of habeas corpus and the facts stated herein are true to my knowledge, except as to matters that are herein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the state of California, and that this declaration was executed on this 24th day of June (2004) at High Desert State Prison, in Susanville California.

Respectfully submitted

_____

"EXHIBIT"
A

LEGAL MAIL

LEGAL MAIL

SANT190  5511022251403  55N 05/21/04
FORWARD TIME EXP
1SANTA CLARA COUNTY SUPERIOR COURT
191  N 1ST ST
SAN JOSE CA 95113-1001

RETURN TO SENDER

PRIORITY
MAIL

HIGH DESERT
STATE PRISON

PRIORITY
MAIL

==3.95==
U.S. POSTAGE





IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

**FILED**

JUN 14 2004

Court of Appeal - Sixth App. Dist.

BY_____

DEPUTY

In re RAUL UVALLES,

     on Habeas Corpus.

H027526

(Santa Clara County

 Super. Ct. No. CC121250)

BY THE COURT:

    The petition for writ of habeas corpus is denied.

    (Premo, Acting P.J., Elia, J., and Walsh, J.,* participated in this decision.)

Dated       **JUN 14 2004**           **PREMO, J.**              Acting P.J.

    *Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

"EXHIBIT"
C

Name _Raul Uvalles_

Address _High Desert State Prison_

_P.O. Box 3030_

_Susanville, CA 96130_

COPY

CDC or ID Number _T-59954_

_California Court of Appeal_

_Sixth Appellate District_
(Court)

_Raul Uvalles_
Petitioner

vs.

_D.L. Runnels (Warden)_
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____
(To be supplied by the Clerk of the Court)

## INSTRUCTIONS — READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

  **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

Read the entire form *before* answering any questions.

This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

If you are filing this petition in the Court of Appeal, file the original and four copies.

If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

Notify the Clerk of the Court in writing if you change your address after filing your petition.

In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished Supreme Court and Court of Appeal.



This petition concerns:

☒ A conviction      ☐ Parole

☒ A sentence      ☐ Credits

☐ Jail or prison conditions      ☐ Prison discipline

☐ Other (specify): _____

1. Your name: Raoul Wallace

2. Where are you incarcerated? High Desert State Prison

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Murder, Robbery In The Second Degree and Taking Personal Property

b. Penal or other code sections: 187, 211 and 215.5 subdivisions

c. Name and location of sentencing or committing court: Santa Clara County Superior Court

d. Case number: CC171750

e. Date convicted or committed: June 14, 2002

f. Date sentenced: June 14, 2002

g. Length of sentence: 35 years to life

h. When do you expect to be released? _____

i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:

Charlie Gillian #144161 120 West Mission Street
San Jose, CA 95110

4. What was the LAST plea you entered? *(check one)*

☒ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement.". *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Please See Exhibit "B"

a.  Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time *(when)* or place *(where).* *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Please See Exhibit "B"

Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

Please See Exhibit "B"

ev. January 1, 1999]    PETITION FOR WRIT OF HABEAS CORPUS    Page three of six

(3)

7. Ground 2 or Ground _____ (if applicable):

Please see Exhibit "B"

a. Supporting facts:

Please See Exhibit "B"

b. Supporting cases, rules, or other authority:

Please see Exhibit "B"

Did you appeal from the conviction, sentence, or commitment?   ☒ Yes.   ☐ No.   If yes, give the following information:

a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

Court of Appeals, Six Appellate Disdrict

b.  Result: Modified the three year sentence   c.  Date of decision: Oct 26, 2003

d.  Case number or citation of opinion, if known:   –

e.  Issues raised:  (1) The Concurrent three year Sentence For the robbery
charged in Count II violated Penal Code 654.

(2) The Concurrent three year Sentence For the robbery charged in Count
II violated the double Jeopardy clause of the Fifth Amendment of the

(3) United States constitution

f.  Were you represented by counsel on appeal?   ☒ Yes.   ☐ No.   If yes, state the attorney's name and address, if known:

Lori A. Quick # 148632 100 N. Winchester Blvd, Suite 310 Santa Clara, CA
(95050)

Did you seek review in the California Supreme Court?   ☐ Yes.   ☒ No.   If yes, give the following information:

a.  Result:  N/A                              b.  Date of decision:  N/A

c.  Case number or citation of opinion, if known:   N/A

d.  Issues raised:  (1)  N/A

(2)  N/A

(3)  N/A

f your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal,
explain why the claim was not made on appeal:

Appeals Attorney Failed to Insert the issues which petitioner
is now presenting to the Court

Administrative Review:

· If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust
administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975)
52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such
review:

N/A

Did you seek the highest level of administrative review available?   ☐ Yes.   ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions in respect to this conviction, commitment, or issue in any court? ☒ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _Santa Clara Superior Court_

(2) Nature of proceeding (for example, "habeas corpus petition"): _Habeas Corpus_

(3) Issues raised: (a) _Ineffective Assistance of Counsel_

(b) _Insufficient Evidence, (C) Prosecutorial Misconduct, (D) Trial Judge Misconduct, (E) Cumulative Errors._

(4) Result (Attach order or explain why unavailable): _See Exhibit "A" (Forward June Exp)_

(5) Date of decision: _5-21-04_

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
_N/A_

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
_Prison Lockdowns, Petitioner is a layman at law and had to seek assistance to prepare this instant writ._

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
_This Santa Clara County Court Failed to address my Petition and this Court has the Power to grant Petitions writ (Griggs v Superior Court (1976) 16 Cal. 3d 341)_

, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: _June 3rd, 2004_

▶ _[signature]_
(SIGNATURE OF PETITIONER)

California Court of Appeal

Sixth Appellate District

Raul Uvalles,

   Petitioner,

   v.

D. L. Runnels (Warden)

   Respondent.

Santa Clara County
Super. Ct. No. CC121260
Sixth Appellate District
Court Case No. H024674

### Petition For Writ Of Habeas Corpus

TO: The Honorable Justices of the California Court of Appeals.

   Petitioner, Raul Uvalles, hereby petitions this Honorable Court for a Writ of Habeas Corpus directed to David L. Runnels, warden of High Desert State Prison, at Susanville, California, ordering petitioner's release from custody to the extent that his continued incarceration is in violation of the Constitution and laws of the State of California and also violation of the

(7)

Constitution and laws of the United States.

By verified petition it is alleged as follows:

## I.

Please see exhibit "B" (Petition for writ of habeas Corpus). Petitioner alleges and believes that the judgement of conviction and sentence is invalid as in violation of the State and Federal constitutional rights to effective assistance by trial and appellate lawyers, prosecutorial misconduct and trial judge misconduct, and more specifically stated in petitioner's memorandum of points and authorities, exhibits and my declaration fully set forth herein. Petitioner sent said petition to the Santa Clara County superior court on 5-17-2004 and it was rejected on 5-21-2004 see exhibit "A".

## II.

Habeas Corpus is the appropriate remedy for petitioner's unlawful incarceration. Petitioner alleges that his incarceration violates fundamental due process as fundamental Constitutional defects amounting to denial of due process "do not become irremediable when a judgement of conviction becomes final, even after affirmation on appeal." (In re Coughlin (1976) 16 Cal. 3d 52, 55; see also, In re Foss (1974) 10 Cal. 3d 910, 916-917) Therefore, petitioner seeks remedial action to cure the continued violation of fundamental Constitutional due process violations.

In the ordinary case, the habeas corpus petition is initially brought before the superior court

People v. Munoz (1984) 157 Cal. App. 999, 1017. California law requires that a habeas petition state a "prima facie case" for relief. In re Bower (1985) 38 Cal. 3d 865, 872; People v. McCarthy (1986) 176 Cal. App. 3d 593, 597.

The defendant convicted is required to "allege with particularity the facts upon which he would have a final judgement overturned... The procedural requirement... simply demands of him a measure of frankness in disclosing his factual situation. In re Swain, (1949) 34 Cal. 2d 300, 304) The appropriate procedure is to file a petition which contains "factual allegations" that are in such form that perjury may be assigned upon the allegations if they are false. Id., at p. 597, quoting from In re Walpole (1890) 84 Cal. 584; People v. Madaris (1981) 122 Cal. App. 3d 234, 242.

In a habeas proceeding, the reviewing court is not... necessary confined under all circumstances to that which appears on the face of the record. In re McVickers (1946) 29 Cal. 2d 264, 274. Insufficient support from the record is not a basis for denial of the writ. See People v. Pope (1979) 23 Cal. 3d 412, 426. The prima facie case for relief may be established through a combination of the record in the case, the affidavits or sworn declarations accompanying the petition and the evidence adduced at the hearing pursuant to the return of the writ.

See, In re Hochberg (1970) 2 Cal. 3d 870, 875 Fn. 4;
In re Moss, 174 Cal. App. 3d *** 923; People v. McCarthy,
Supra, 176 Cal. App. 3d at P. 547, People v. Madris, Supra,
122 Cal. App. 3d at po 242; diss opn. of Grodin, J. at pp
243-244.

"Section 1484 of the Penal Code provides that on
such proceedings the petitioner may allege any
fact to show that his imprisonment or detention
is unlawful, or that he is entitled to his dis-
charge. The court or judge must then proceed in
summary way to hear such proof as may be prod-
uced against such imprisonment or detention, or
in favor of the same and to dispose of such
party as justy of the case may require..." In
re Mulkeres, Supra, 29 Cal. 2d at P. 274 Cal 2d at P274.

"A petitioner seeking habeas corpus ... is not confin-
ed to the face of the record in attempting to sustain
the burden of proving that his conviction was in
violation of his constitutional right... [T]he remedy
of habeas corpus permits an examination not
only of the actual evidence introduced at petit-
ioner's trial but of any evidence in addition which
bearing upon the infringement of petitioner's con-
stitutional right." In re Mulkeres, Supra, 29 Cal. 2d at
P. 275.

III.

Petitioner has no plain, speedy, and adequate remedy
at law to obtain his release.

WHEREFORE, Petitioner respectfully prays that this Court:

A. Take judicial notice of the record of appeal in People
v. Raul Valles, Sixth Appellate District Court of Appeals case
NO. H024674, and People v. Raul Valles, Santa Clara County
Superior Court case NO. CC121260, which are referred
to herein to clarify and amplify various allegations;

B. Issue a writ of Habeas Corpus or obet to show
cause to the warden of High Desert State Prison
to inquire into the lawfulness of petitioner's conviction;

C. If needed, order that an Evidentiary Hearing

(10)

to be covered;

D. After full consideration of the matter, set aside the conviction of petitioner, and order a new trial, or otherwise the appropriate relief.

E. Grant petitioner whatever further relief which the court may deem appropriate in the interest of justice.

Dated: June 3rd _____ (2004)

Respectfully submitted

Raul Wallace
Petitioner In Pro Per

Verification

I, Raul Ovallee, States:

I am the Petitioner in this action, I have read the foregoing petition for a writ of habeas corpus and the facts stated therein are true of my knowledge, except as to matters that are herein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the State of California, and that this declaration was executed on the 3rd day of June (2004) at High Desert State Prison, in Susanville California.

Respectfully submitted

_____

Raul Ovallee
Petitioner In Pro Per

(12)

# EXHIBIT A

# EXHIBIT B

## PROOF OF SERVICE BY PERSON IN STATE CUSTODY

STATE OF CALIFORNIA

CASE NO. _____

COUNTY OF Lassen

ADDITIONAL NO. _____

     I, the undersigned, do certify, declare and verify that I am over the age of (18) eighteen years old, that I am incarcerated at HDSP , prison in Susanville , California 96130 , that I am a party to the above-entitled cause, and that on the day of 16th , in the month of May , the year 2004 I served a true and complete copy of the following:

```
( Petition For Writ of Habeas Corpus      )
(                                          )
(                                          )
(                                          )
(                                          )
(_____ )
```

[ ]  by depositing it in a prison mailbox in a sealed envelope, or . . . .

[X]  by handing it to institutional staff in a sealed envelope, along with any of the following.

[X]  a Trust Account Withdrawal Order attached to it authorizing that the required postage be prepaid in full.

[X]  the required amount of actual U.S. Postage afford there to.

[ ]  the above mentioned envelope was to be deposited in the United States Mail pursuant to California Code of Regulations Section &3142 and &3165 to the following: (Please List the names and addresses of the persons served).

```
(                                          )
(  Santa Clara County                      )
(    Superior Court                        )
(   office of The clerk                    )
(  190 w. Hedding St.                      )
(  San Jose, CA 95110                      )
(                                          )
(                                          )
(                                          )
(_____ )
```

    The intended place of mailing is: the U.S. Postal Office at: California.

    I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON May 16th _____, the year 2004, in California.

Raul Valles _____     R-1 CWM _____     5-16-04 _____
Typed or print name (here)       ~~Signature of person (here)~~        Date

MC-275

Name Raul Walles

Address High Desert State Prison

P.O. Box 3030

Susanville, Ca 96130

CDC or ID Number  T-59954

Santa Clara County

Superior Court
_____(Court)_____

Raul Walles
Petitioner

vs.

D.L. Runnels (Warden)
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS — READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

PETITION FOR WRIT OF HABEAS CORPUS

WEST GROUP

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

1

This petition concerns:

☒ A conviction                    ☐ Parole

☒ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other *(specify)*: _____

1. Your name: Raul Uvalles

2. Where are you incarcerated? High Desert State Prison

3. Why are you in custody?    ☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Murder, Robbery In The Second Degree and Taking Personal Property

   b. Penal or other code sections: 187, 211 and 212.5 Subdivision (c).

   c. Name and location of sentencing or committing court: Santa Clara County Superior Court

   _____

   d. Case number: CC121250

   e. Date convicted or committed: June 14, 2002

   f. Date sentenced: June 14, 2002

   g. Length of sentence: 25 years to life

   h. When do you expect to be released? _____

   i. Were you represented by counsel in the trial court?   ☒ Yes.   ☐ No.  If yes, state the attorney's name and address:

   Charlie Gillian #14416, 120 West Mission Street

   San Jose, CA 95110

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6.  GROUNDS FOR RELIEF
    **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

*— See Attached Petition —*

a.  Supporting facts:
    Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

*— See Attached Petition —*

b.  Supporting cases, rules, or other authority (optional):
    *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

*— See Attached Petition —*

7. **Ground 2 or Ground _____** *(if applicable):*

_- See Attached Petition -_

a. **Supporting facts:**

_- See Attached Petition -_

b. **Supporting cases, rules, or other authority:**

_- See Attached Petition -_

8. Did you appeal from the conviction, sentence, or commitment?    ☒ Yes.    ☐ No.    If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): Court of Appeals, Sixth Appellate District

   b. Result: Modified the Three Year Sentence    c. Date of decision: Oct 23, 2003

   d. Case number or citation of opinion, if known: H024674

   e. Issues raised: (1) The Concurrent Three Year Sentence For The Robbery Charged In Count II Violated Penal Code Section 654

      (2) The Concurrent Three Year Sentence For The Robbery Charged In Count II Violated The Duble Jeopardy Clause of the Fifth Amendment of the

      (3) United States Constitution.

   f. Were you represented by counsel on appeal?    ☒ Yes.    ☐ No.    If yes, state the attorney's name and address, if known:

      Lori A. Quick # 148692, 100 N. Winchester Blvd., Suite 310, Santa Clara, CA 95050

9. Did you seek review in the California Supreme Court?    ☐ Yes.    ☒ No.    If yes, give the following information:

   a. Result: N/A    b. Date of decision: N/A

   c. Case number or citation of opinion, if known: N/A

   d. Issues raised: (1) N/A

      (2) N/A

      (3) N/A

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    Appeals Attorney Would Not Raise The Claims I'm Now Presenting.

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

       N/A

    b. Did you seek the highest level of administrative review available?    ☐ Yes.    ☐ No. N/A
       *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13.    ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

Limited Access To The Law Library To Research And Prepare Writ; Incomplete Transcripts And Records

16. Are you presently represented by counsel? ☐ Yes.    ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes.    ☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

This Court Has Jurisdiction

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 5-13-2004

▶ _____

Raul Uvalles
T 54954 D4-243
P.O. Box 3030
Susanville, CA 96130

In Pro Per

In The Superior Court of The
County of Santa Clara

Raul Uvalles,                    Case No. _____

    Petitioner,                  ( Santa Clara County
                                    Super. ct. No.CC121250 )
On Habeas Corpus

## Petition For writ of Habeas Corpus

TO: The Honorable Presiding Judge of The Superior court For
The County of Santa Clara:

Comes Now, Raul Uvalles, hereinafter referred to as
petitioner, complains of the respondent, D.L. Runnels, warden
at High Desert state Prison, as above designated, and
For legal cause of action

                              I.

Petitioner is unlawfully in the custody of the
California Department of corrections by D.L. Runnels.
warden, at High Desert state Prison pursuant to a
Judgement pronounced by the Santa Clara Superior court

In People v. Raul Uvalles, Case No. CC121250 Appeal in the matter was held in the Sixth Appellate District, No. H024674.

## II.

Petitioner request that this Court take Judicial notice of the record on appeal in the Court of appeal No. H024674. (Evidence Code Sections 452 (d) (1), 453 and 459.)

## III.

Petitioner is illegally restrained because he was deprived of his state and Federal constitutional rights to effective assistance by trial and appellant lawyers, prosecutorial misconduct, trial Judge misconduct, and more specifically stated in petitioner's accompanying memorandum of points and authorities, exhibits and declaration fully set forth herein.

Petitioner's conviction is in violation of Due Process as guaranteed by the 14th Amendment of the United States constitution. More specifically states in petitioner's accompanying memorandum of points and authorities, exhibits and declaration fully set forth herein.

## IV.

Petitioner has no other plain, speedy or adequate remedy at law.

///

///

///

## V.

No prior petition has been filed by Petitioner or on Petitioner's behalf.

## VI.

Petitioner request for an evidentiary hearing as to the disputed material factual allegations, pursuant to the written opinion as outlined in the case of In re Johnson (1992) 1 Cal. 4th 689 [4 Cal. Rptr. 2d 170.]

Petitioner also request that the court enter an order requiring trial and appellate lawyers to file declarations to explain their conduct which lend to the unjust conviction of petitioner. Its the factual contention of petitioner that this hearing is crucial to present evidence supporting my factual claims. At said hearing, witnesses and documents may be subpoenaed, Penal Code § 1484; California Rules of Court, rule 260 (c). The factual basis to support the allegations more specifically will be stated in Petitioner's memorandum of points and authorities, exhibits and declaration fully set forth herein.

## VII.

By this reference the accompanying memorandum of points and authorities and exhibits are made apart of this petition as fully set forth herein. Petitioner's claims under this petition will be based on the petition, the accompanying points and authorities, the exhibits, attached hereto and all records, documents, and

9

Pleadings on file with this Court in People v. Raul Ovalles NO. CC121250 and any further material to be developed at any future hearing which may be ordered.

Petitioner is without remedy save by writ of habeas corpus.

WHEREFORE, Petitioner prays the Court:

1. Order respondent to show cause why petitioner is not entitled to relief sought.

2. Grant an evidentiary hearing to examine the conduct of the prosecuting attorney, trial and appellate lawyers, and for declarations of each, explaining their conduct and strategy, if any; and also to grant the above II written request;

3. After full consideration of the issues raised in the petition, grant the petition, vacate the judgement and sentence imposed upon petitioner in Santa Clara County Superior Court, NO. CC121250, and direct to the California Department of Corrections, commanding it to have the body of Raul Ovalles, together with the authority for his confinement before this Court at a specific time;

///

///

///

10

4. Grant any other and Further relief the court deems
proper in the interest of Justice

Dated: ___13 May_____, (2004)

Respectfully submitted.

Raul Uvalles
In Pro Per

Verification

I, Raul Uvalles, states:

I am the Petitioner in this action, I have read the foregoing Petition for a Writ of habeas corpus and the facts stated therein are true of my knowledge, except as to matters that are therein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the State of California, and that this declaration was executed on the 13TH day of May _____ (2004) at High Desert State Prison, in Susanville California.

Respectfully Submitted

Raul Uvalles
In Pro Per

12

Memorandum of Points and
Authorities In Support of
Habeas Corpus

I.

## STATEMENT OF THE CASE

On January 11, 2002, an information was filed in Santa Clara County

Superior Court charging appellant in Count 1 with murder in violation of Penal

Code section 187, and in Count 2 with robbery in the second degree in

violation of Penal Code sections 211 and 212.5, subdivision (c).  (CT 61-62.)

On May 3, 2002, jury trial began with motions in limine. (CT 108-110.) It was stipulated that the victim, known as Maria Mancera, was in fact a man named John Mancera. (CT 108.)

On May 6, 2002, the trial court ruled that appellant's statements to police had been taken in violation of Miranda v. Arizona (1966) 284 U.S. 436 and could not be introduced in the prosecution's case in chief. (CT 117; RT 94.) The court also ruled, however, that because the statements did not appear to be involuntary, they could be used for impeachment in the event that appellant testified. (RT 94.)

On May 7, 2002, testimony began. (CT 121.) On May 8, 2002, the parties entered into four stipulations: that a blood sample was properly drawn from appellant and accurately analyzed by the Santa Clara County Crime Laboratory and was determined to be positive for "BE"; that a blood sample was properly drawn from the body of Mancera, accurately analyzed by the Santa Clara County Crime Laboratory, and was positive for both cocaine and alcohol, the blood alcohol level being measured at .22%; that Mancera's bank records were admissible; and that on August 20, 2001 at 12:48 a.m., Mancera's ATM card was used at an automatic teller machine at the Union Bank in San Jose, and at 12:55 a.m. at the Bank of America - Hester Branch in San Jose, that the video tapes taken during each transaction accurately

reflected the transaction, and that photographs were accurately made from the video taken during the transaction. (CT 124.)

The jury began deliberations on the afternoon of May 13, 2002 and concluded on the afternoon of May 14, 2002 at which time it found appellant guilty of murder in the first degree in violation of Penal Code section 187, and second degree robbery in violation of Penal Code sections 211-212.5, subdivision (c). (CT 191-195.)

On June 13, 2002, a hearing was held pursuant to People v. Marsden (1970) 2 Cal.3d 118. (CT 200.)

On June 14, 2002, the Marsden motion was denied. Appellant was then sentenced to serve 25 years to life for Count 1, and three years for Count 2, to be served concurrently, for a total prison commitment of 25 years to life. (CT 235-237.)

Notice of appeal was timely filed on June 14, 2002. (CT 238.)

STATEMENT OF FACTS

A. The Prosecution Case

    1. Events Leading Up To The Discovery Of The Homicide

At approximately 11:15 p.m. on August 19, 2001, San Jose Police Officer Joaquin Barreto was on foot patrol in the area of the Alameda and Hedding Street. (RT 129-130.) He and his partner, Officer Keith Neumer,

were standing on the Alameda at Sunol Street when they saw appellant and Maria Mancera[1] walking on the Alameda. (RT 132, 150.) They seemed to be "ambling along" with no specific direction. (RT 132.)

Barreto approached the pair and asked them what they were doing. (RT 133.) Mancera replied that they were looking for an ATM machine, and pulled an ATM card out of the purse she was carrying. (RT 133.) Barreto observed that the card was emblazoned with the name "Maria Mancera." (RT 134.) It was obvious to Barreto that Mancera was a man presenting himself as a woman. (RT 13`5-136, 144-145.) She did not have any injuries, and appeared to have all of her front teeth. (RT 138, 145.) Her hands were dirty. (RT 146.) Mancera and appellant appeared to be friendly with each other. (RT 136.)

While speaking to them, Barreto believed they were both under the influence of alcohol. (RT 134, 144.) He based this upon the fact that there was an odor of alcohol on them, their eyes were watery and bloodshot, and they were somewhat unsteady on their feet. (RT 135.) Neumer also smelled alcohol, and recalled that they admitted they had been drinking. (RT 154.) They also had dilated pupils, which Barreto knew was a symptom of stimulant

---

1.    Because the victim was referred to throughout the trial as "Maria Mancera" and because feminine pronouns were consistently used to describe Mancera, the same will be done in this brief to avoid confusion, even though Mancera was in fact a man named John Mancera and remained anatomically a man at the time of his death.

use. (RT 144.) Barreto did not see anything that he immediately recognized as symptoms of cocaine use, but it was possible that they were under the influence of cocaine as well. (RT 148.) Barreto thought they were both at about the same level of intoxication. (RT 135.) They did not have trouble communicating with him, and their level of intoxication was not severe enough to warrant booking them for being drunk in public or booking them into a non-custodial detention facility to sober up. (RT 135.)

Barreto conducted records checks on both Mancera and appellant to confirm their identities. (RT 134.) He also filled out a field identification card for appellant. (RT. 139.) These cards are used to conduct field interviews when police believe there may be some criminal activity occurring, and contains such information as name, date of birth, address, whether the subject is on parole or probation, and a general clothing description. (RT 139.) During the course of this procedure, appellant told Neumer that he lived on Cleaves Street. (RT 150.) At the conclusion of the encounter, Barreto directed them to the Arena Hotel to find an ATM. (RT 136.) Within a few minutes, the two emerged from the Arena Hotel parking lot, and told Barreto that there was no ATM machine there. (RT 137.) Barreto then told them that there was a Bank of America down the street, and directed them to the Bank of America near Hester Street. (RT 137.) They thanked Barreto and headed in that

direction. (RT 138.) Barreto and Neumer continued with their regular duties. (RT 139.)

At approximately 6:30 a.m. on Monday, August 20, 2001, as Barreto was preparing to end his shift, he heard a radio broadcast that there had been a report of a beaten person near Bellarmine High School. (RT 140.) Because this area was in the district covered by Barreto, he felt he needed to investigate since it had happened while he was on duty. (RT 140.) When he arrived at Bellarmine High School, he saw the body of Maria Mancera lying beside the high school running track. (RT 141.) Barreto immediately recognized her as the person he had spoken to the previous night. (RT 142.) She was still wearing the same clothing, but her pockets were turned inside out. (RT 147, 249-250.) The body was in full rigor mortis, meaning death had occurred approximately six to eight hours earlier. (RT 212-213.) He notified his supervisor and passed on to the investigating detectives the information he had gathered during his encounter with Mancera and appellant, including the field identification card. (RT 142-143.)

Neumer also went to Bellarmine High School when news of Mancera's death reached him. (RT 150.) He then went to the Bank of America near Hester to see whether there was a videotape of appellant and Mancera at the ATM. (RT 150-151.) Upon viewing the videotape, Neumer saw Mancera and

appellant approaching the ATM. (RT 151, 153-154.) In the video, appellant wore a hat which had a number on it. (RT 153-154.) A withdrawal of $41.50 had been made via that ATM at 11:35 p.m. on August 19, 2001. The bank videotape, from which still photos were made, accurately reflected that transaction. (RT 152.)

### 2. The Investigation

#### a. The Crime Scene

Mario Lejes worked for a painting company on Hedding Street. (RT 258.) When he arrived at work at about 6:30 a.m. on August 20, he saw someone lying on the running track of Bellarmine High School. (RT 259.) Lejes and a co-worker approached the body and saw that there was blood around the mouth and the back of the head. (RT 260.) Lejes touched the right kneecap and noticed that it was cold. (RT 260-261.) Lejes did not move or take anything at the scene, nor did he move the body. (RT 261-263.)

When police initially arrived on the scene, photographs were taken of Mancera's body and all items found around it. (RT 157-158.) Officer Bruce Wiley arrived at the site where the body was found, which was below the Hedding Street overpass that crosses over the athletic fields of Bellarmine High School. (RT 158.) The overpass is a pedestrian walkway which rises some 31 feet above the ground. (RT 189-190.) It has a railing which is

approximately 29 inches high. (RT 168.) Near the body were found a black leather belt (RT 163), a California identification card in the name of Michael George Photopoulas[2] (RT 164, 167), a fragment of a tooth (RT 164), a red plastic disposable lighter (RT 164), and a white metal digital wristwatch with a black leather band. (RT 164.) There were bloodstains on the running track approximately five and one-half to six feet from Mancera's right foot. (RT 165.) All of these items were within approximately two feet of each other. (RT 166.)

In a sandy area beneath the overpass approximately 60 feet from Mancera's body was found her purse with its contents spilled out. (RT 169, 190, 225.) These included makeup and personal hygiene products, miscellaneous papers, notes, business cards, photographs, some costume jewelry, and address book, a checkbook, a California identification card in Mancera's name, and four dollars and six cents in coins. (RT 170.) The purse and its contents were not visible from the overpass. (RT 171.)

Some shoe prints were located near Mancera's body. (RT 172.) Wiley photographed them and also made a cast of one of the shoe prints which was actually closer to the purse. (RT 174-176, 189.)

---

2.    There was a stipulation that Photopoulas was known to Mancera, was in custody at the time of Mancera's death, and that Mancera was in possession of the identification card at the time of her death.

### b. The Search Of Appellant's Residence

The next day, Wiley went to appellant's home at 152 Cleaves Avenue in San Jose. (RT 178.) According to appellant's landlord, appellant had not arrived home until 4:37 or 4:38 on the morning of August 20. (RT 231.) In appellant's bedroom Wiley found a pair of gray pants which had what appeared to be traces of blood on them. (RT 178-180.) Also collected was a pair of white Thom McAn tennis shoes (RT 181-182, 184), a pair of boots (RT 185), a black baseball cap with a maroon brim across the front of which was the logo "Carpenters Local" and "Santa Clara and San Benito Counties", with the number 405 in the middle. (RT 182-184), and a t-shirt with the logo "MAX AIR" across the front. (RT 183.)

Also searched was a municipal trash can at the northwest corner of Hester Street and the Alameda. (RT 187.) Inside was located an ATM card in the name of Maria R. Mancera. (RT 187-188.) The trash can was approximately 20 yards from the ATM at the Bank of America near Hester. (RT 188.)

### c. The Arrest Of Appellant

Appellant was taken to the preprocessing unit at 6:53 p.m. (RT 264.) While photos were being taken of him, he asked Sergeant Vallecilla "So what do you think, is this going to be a life sentence or what?" (RT 267.) Vallecilla

replied that he did not know, at which point appellant said "I'm 39 years old. I'm really screwed this time. I'll be here for life. Shit like this follows me all the time." (RT 267-269.) A blood sample was drawn from appellant. (RT 270.) A test indicated the presence of cocaine metabolite, meaning he had most likely ingested cocaine more than six hours earlier. (RT 270, 276-277.)

d.  The Investigation Of
Mancera's Bank
Account Activity

San Jose Police Sergeant Gilbert Vizzusi was the detective assigned to investigate Mancera's death. (RT 247.) Vizzusi noticed that Mancera's pockets were turned inside out, and there was an ATM receipt on or near the body. (RT 249-250.) He ascertained that the ATM card was not on or near Mancera, though her checkbook was. (RT 250-251.) Using the account number from the checkbook Vizzusi investigated whether there had been any activity on the account. (RT 251.) Vizzusi also viewed videotapes taken by security cameras at the bank, which revealed that appellant had used the ATM machine at 12:46 a.m. on August 20. (RT 254.) Mancera's ATM card had been used at the same time. (RT 255.)   Bank records indicated that $40.00 had been successfully withdrawn from Mancera's checking account through an ATM at the Hester Branch of the Bank of America at 11:45 p.m. (RT 291-

292.)[3] They further indicated that at 12:48 a.m., 12:49:07 a.m., and 12:49:21 a..m. on August 20, 2001, three attempts were made at the ATM at Union Bank to withdraw $300.00 from Mancera's account. The attempts were unsuccessful because the user had entered an incorrect personal identification number, or "PIN". (RT 293.) A fourth attempt at the same ATM at 12:49:41 resulted in a rejection of the card by the ATM. (RT 294.) At 12:55:37, an attempt was made to withdraw $100.00 from the Hester Street Bank of America, resulting in a message by the ATM that the number of PIN tries had been exceeded. (RT 295.) Two more unsuccessful attempts were made at 12:56:09 a.m. and 12:56:50 a.m. (RT 296.)

### 3. The Autopsy

Gregory Schmunk is the Chief Medical Examiner and Coroner for Santa Clara County who is an expert in the area of forensic pathology and wound recognition. (RT 196-198.) He performed an autopsy on Mancera's body, during which he discovered that Mancera was in fact a man. (RT 198-199.) Mancera's blood alcohol level had been determined to be .22. (RT 280-281.) The blood alcohol level of .22% indicated to Schmunk that Mancera had consumed approximately 10 drinks within a few hours. (RT 219.) Such a

---

3.    The date on which this occurred was never stated for the record.

blood alcohol level would result in signs of gross intoxication, such as slurred speech and loss of balance with difficulty standing and walking. (RT 273-274, 282-283.) He noted that between 11:10 a.m. and 12:20 p.m. on August 20, Mancera's body was in full rigor mortis, meaning that she had died approximately six to eight hours earlier. (RT 213.) The level of lividity[4] present at the same time was not fixed, as would be expected eight to 12 hours after death. (CT 215-216.)

With respect to external injuries, Schmunk observed that the upper jaw was fractured, and there were abrasions or scrapes, and bruises of the skin. (RT 201.) There were abrasions on the neck and upper shoulders, the right back, the left lower back, the right side and front of the chest. There was bruising around the left eye and an abrasion at the left side of the jaw. (RT 201.) Bruises or areas of bleeding were inside the white of the left eye, and there was bruising and tearing on the inside of the mouth, especially on the left side of the cheek, which was consistent with a blow to that area, and inconsistent with a fall. (RT 201, 220.) Other abrasions were present on the front and left side of the chest and arms and legs. (RT 201-202.) The left upper arm was broken, the pelvis was fractured, and there were rib fractures

---

4.    Lividity is the settling of the blood that occurs in the body due to gravity. (RT 214-215.)

on both sides of the chest. (RT 202.) An internal examination revealed the pelvic and rib fractures, bruising to the brain with blood on the surface of the brain, and a basilar skull fracture. (RT 203.) The liver was lacerated and there was a small amount of blood in the body. (RT 203.)

Additionally, Schmunk noted that Mancera's teeth were in very poor repair. Mainly only the front teeth were present and they were badly rotted. Most of the back teeth were missing and those that were present were decaying. (RT 210.) There were lacerations and bruising around the left eye and some redness in the area of the right eye. (RT 210.) There were a few abrasions and some bruising over the forehead and right cheek. (RT 210.)

Many of the injuries were consistent with a fall of 27 to 31 feet. (RT 204.) One exception was the injury to the inside of the mouth. (RT 204.) According to Schmunk, while it was possible to suffer injuries to the inside of the mouth in a fall, one would also expect to see an injury to the skin surface due to impact on the ground. (RT 204.) Because Mancera did not have such an injury, Schmunk thought it could reasonably be concluded that another, softer impact, such as a punch, had caused this injury prior to the fall. (RT 204-205, 220.) Schmunk could not exclude the possibility that the injury happened within a few minutes after the fall, but believed it more logical to conclude that it happened before the fall. (RT 205, 220-221.) Schmunk felt

that at most, this injury had occurred within a maximum of a few hours of death, but he could not exclude the possibility that it had occurred within an hour or slightly more than an hour before death. (RT 223-224.)

Schmunk opined that Mancera was alive at the time of the fall based on the large amount of blood both on the track and inside the body. (RT 205.) In addition, the arm fracture had some soft-tissue swelling which would not have occurred without blood pressure. (RT 205-206.) Other factors which led Schmunk to believe that Mancera was alive before hitting the ground were bleeding on the surface of the brain, in the deep chest, at the rib fractures, and in the abdominal cavity. (RT 206.)

A study of the bloodstains on the track indicated to Schmunk that the body had lain in one position on the track, bleeding, for some period of time, and was then moved to the location where it was found. (RT 206-207.) Contributing to this opinion was the presence of "pattern injuries" on Mancera's abdomen. (RT 208.) Schmunk also observed in the photograph of the body what appeared to be drag marks below the impression of one of the arms. (RT 209-210.) He did not believe that Mancera would have been able to move herself. (RT 225.)

Schmunk was of the opinion that Mancera's back, back pelvic region, and left arm had hit the ground first, based on the injuries he observed. (RT

211.) If in fact she was alive when she fell, Schmunk believed that she would have been unconscious from the moment of impact, though her heart and respiration would not have stopped for several minutes. (RT 212.) Schmunk concluded that the manner of death was homicide. (RT 226.)

### 4. Other Forensic Evidence

Santa Clara County Criminalist John Bourke, an expert in the area of shoeprint analysis and comparison, compared three pairs of shoes submitted by the detectives in the Mancera case against an impression taken of shoeprints at the scene. (RT 235-236.) Based on this comparison, Bourke included the right shoe of the pair of Thom McAn tennis shoes taken from appellant's residence as a possible source of the shoeprints. (RT 243-246.)

Nancy Marte, a Criminalist at Santa Clara County Crime Laboratory conducted a DNA analysis on blood samples collected from a pair of gray pants and from fingernail swabbings. (RT 299-300.) Her conclusion was that Mancera was the source of three bloodstains on the pants. (RT 302.) Appellant was the source of one. (RT 302.) Mancera was also the source of the blood sample obtained from the fingernail swabbing, which had been taken from Mancera's hand. (RT 302.)

### B. The Defense Case

Andrew Marr worked at a concrete company on the other side of the

railroad tracks by Bellarmine High School. (RT 312.) At about 6:30 a.m. on August 20, 2001, he noticed a Hispanic male clearing the fence. Once he hit the ground, he ran off at a high rate of speed. (RT 313.) Marr described the man as having a long black braided ponytail and wearing a white t-shirt and faded blue jeans. (RT 313.) About 30 to 45 minutes later, Marr noticed the police activity. (RT 315.) He walked over to see what was happening, and told police about the man he had seen. (RT 315, 318.)

II.

Argument

A.

Petitioner's Conviction Is Unconstitutional Because
He Did Not Receive Effective Assistance Of Counsel
Both On Appeal And At Trial
As Guaranteed By The Sixth Amendment

Petitioner's conviction cannot stand because he did
not receive effective assistance of counsel as
guaranteed by the 6th Amendment. A defendant is
entitled to effective assistance of counsel under
both the sixth Amendment to the United States
Constitution and article I, Section 15, of the California
Constitution. ( Strickland v. Washington (1984) 466 U.S. 668,
People v. Pope (1979) 23 C. 3d 412, 422.)

Habeas Corpus is a proper vehicle for the presen-
tation of petitioner's claim. The claims presented in
this petition is that petitioner was deprived of his
constitutional rights to effective assistance of counsel.
This constitutional claim could not be presented as
effectively on appeal as it is herein because its
factual basis rests in part on evidence not
contained in the record on appeal. ( In re Hochberg
(1970) 2. Cal 3d 870, 875; See also, People v. Jackson
(1973) 10 Cal. 3d 265, 268.)

29

Although habeas corpus cannot serve as a second appeal denial of the right to effective assistance of counsel is cognizable on habeas corpus whether or not it was raised on appeal. (Ibid.)

In People v. Pope (1979) 23 C. 3d 412, 426, Fn. 17 the California Supreme Court stated:

Where the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus. In habeas corpus proceedings there is an opportunity in an evidentiary hearing to have trial counsel fully describe his or her reasons for acting or failing in the manner complained of. (Citations omitted.) For example, counsel may explain why certain defenses were or were not presented having offered the attorney an opportunity to explain courts are in the position to intelligently evaluate whether counsel's acts or omissions were in range of reasonable competence. (People v. Pope, supra, 23 Cal. 3d at p. 426, Fn. Omitted.)

///
///
///
///
///
///

A defendant in a criminal case has the right to
the assistance of counsel, in order, to ensure that
his trial is both fair in its conduct and reliable in
its result. The right is not some bare or minimal
assistance, but rather to effective assistance, to the
reasonably competent assistance of an attorney
acting as his diligent and conscientious advocate.
( United States constitution, sixth Amendment and California
Constitution, article 1, section 15; People v. Ledesma (1987)
43 Cal. 3d 171, 216, 218.)


It is fundamental to this concept that defense counsel
is expected to make rational and informed decisions
decisions on strategy and tactics founded upon
adequate investigation and preparation. More specif-
ically, he or she is expected to make rational and
informed decisions after a careful factual and legal
investigation and inquiry with a view to develope
matters of defense, in order, that he or she makes
informed decisions on client's behalf...( People v.
Shells (1971) 4 Cal. 3d 626, 630.)


If as a result of the attorney's failure to
undertake careful inquiry and investigation of a
crucial defense is withdrawn from the case the
defendant has not had the assistance of counsel
to which he is entitled. ( People v. Ibarra (1963

31

60 cal. 2d 460, 464, disapproved on other grounds in, Pope at pp. 421-423.) In addition, an attorney "has a duty to bring to bear such skills and knowledge as will render the trial reliable adversarial testing process." Strickland, at p. 669.

In a habeas corpus proceeding as in a direct appeal, the Court's review of counsel's performance is a deferential one. (In re Cordero (1988) 46 cal. 3d 161, 180.) The courts have found, "It is all too tempting for a defendant to second-guess counsel assistance after conviction or adverse sentence, and it is all too easy for a court examining counsel's defense, after it has proven to be unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. (citation omitted.)

A fair assessment of an attorney's performance requires that every effort be made to eliminate the distorting effects of hindsight to reconstruct the circumstances of the attorney's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that it is the defendant who must overcome the presumption that under the circumstances the

challenged action might be considered sound trial strategy. Strickland, at p. 689.

"However, deferential scrutiny of Counsel's performance is limited in extent, and, indeed, in certain cases may be altogether unjustified. Deference, is not abdication It must never be used to insulate counsel's performance from meaningful scrutiny and, thereby, automatically validate challenged acts or omissions." ( In re Cordero, supra, 46 Cal. 3d at p. 180, quoting, People v. Ledesma, supra, 43 Cal. 3d at p. 217.) "Otherwise the constitutional right to effective assistance of Counsel would be reduced to form without substance." (Id. at p. 217.)

In addition, albeit deference is paid to Counsel's tactical decisions, "the reasonableness of a tactical decision at trial invites scrutiny as to whether that decision was an informed one, that is, whether the decision was preceded by adequate investigation and preparation." ( In re Jones (1996) 13 Cal. 4th 552, 561-562, quoting, (People v. Ledesma, supra, 43 Cal. 3d at p. 217.)

With this in mind, " It is not sufficient for petitioner to allege merely that his trial Counsel's tactical decisions were poor or that the case might have been handled more effectively..."

Rather petitioner "must demonstrate that the omissions of his defense Counsel involved a critical issue and that the omission cannot be . explained on the basis of any kind of knowledgeable choice of tactics." ( Citations; see, People v. Langhorn (1980) 26 Cal. 3d 814, 828-829.)

Generally, both Federal and State constitutions require Counsel's diligence and active Participation in the full and effective prepation of his or her client's Case. Therefore, countless authorities have stressed that Factual investigation is crucial to competent representation.

Accordingly, inadequate factual investigation by defense attorneys has lead to a number of reversals of criminal convictions or modification of sentences. For example: ( People v. Ledesma, supra, 43 Cal. 3d at p. 207-208, 227 (trial counsel failed to make use of evidence and leads contained in material she obtained pre-trial from defendant's prior counsel); In re Cordero, supra, 46 Cal. 3d at p. 173 (trial counsel failed egregiously to pursue leads and evidence made available to him"); In re Hall (1981) 30 Cal. 3d 408, 417, 421 (trial Counsel failed to pursue numerous substantial leads which would have lead to an available witness for the defense); In re Marquez (1992) 1 Cal. 4th 584, 599-609 ( Counsel failed to interview possible

alibi witness, or to present mitigating evidence which a competent investigation would have uncovered); In re Jones, supra, 13 Cal. 4th at 566-567, 583-584 (trial counsel made no attempt to locate a witness who according to police report furnished to counsel had made statements tending to exculpate the defendant.)

However, proof that an attorney's assistance was so deficient as to require reversal of a conviction involves two components. First, petitioner must show his attorney's performance was deficient. (In re Marquez, supra, 1 Cal. 4th at p. 602, citing, Strickland v. Washington, supra, 466 U.S. 668 at p. 687, and People v. Pope, supra, 23 Cal. 3d at pp. 423-425. Second, petitioner must show prejudice resulting from the counsel's deficiencies. In re Marquez, supra, 1 Cal. 4th at p. 603.)

Under the Federal standard of prejudice, petitioner must show there is a "reasonable probability that but for counsel's unprofessional errors the results of the proceedings would have been much different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Strickland v. Washington, supra, 466 U.S. at pp. 693-694; In re Fields (1990) 51 Cal. 3d 1063, 1070. Such a probability does not require a showing that "counsel's conduct more likely than not altered the outcome in the case."

(In re Cordero, supra, 46 Cal. 3d at P. 180.)

Under the California standard of Prejudice, Petitioner must show that Counsel's acts or omissions deprived him of an adjudication of a crucial or potentially meritorious defense (People v. Shaw, (1984) 35 Cal. 3d 535, 541.) A crucial defense is not necessarily one which presented would result inexorably in a defendant's acquittal. (Id., citing, People v. Pope, supra, 23 Cal. 3d at P. 425, Fn. 15.)

In Lockhart v. Fretwell (1993) 113 S.Ct. 838, The court explained the same analysis and concepts pertaining to defense trial counsel are applicable to appellate counsel, (In re Banks (1971) 4 Cal. 3d 337, 343; In re Smith (1970) 3 Cal. 3d 192, 202 (inexcusable failure of appellate counsel to raise crucial assignment of error that arguably could have resulted in reversal deprived defendant of effective assistance of appellate counsel).

Petitioner was denied effective assistance of counsel by both trial and appellant counsel. Counsels' deficient performance render the result of the of the trial and the appeal unreliable and fundamentally unfair, Lockhart v. Fretwell, supra.

///
///
///
///

36

Petitioner's defense attorneys were deficient for the following reasons:

(1) Petitioner contends he received ineffective assistance of trial counsel in that trial counsel failed and or refused to present as requested by Petitioner my defense of "self-defense." It was a valid defense to the criminal charges petitioner was facing and there was evidence to support the claim.

(2) Petitioner contends that trial counsel was ineffective for failing and or refusing to call any expert witnesses to refute or give an independent analysis who testified for the people from the coroner's office and the crime laboratory.

(3) Petitioner contends that trial counsel was ineffective for failing and or refusing to request involuntary manslaughter instructions.

(4) Petitioner contends that during the selection of the jury the prosecutor was using her peremptory challenges to exclude minorities from the jury. Trial counsel was ineffective for failing to present the court with a wheeler motion for these race-based challenges.

(5) Petitioner contends that trial counsel was ineffective for failing to make a motion to have suppressed the property taken from my apartment as a result of an unlawful search and seizure.

///

///

///

(6) Petitioner contends that trial counsel was ineffective for failing to move for a speedy trial as requested by petitioner.

(7) Petitioner contends that trial counsel was ineffective concerning discovery, petitioner questioned trial counsel about the discovery of the prosecution. Petitioner was informed one would automatically be provided, and that there was no need to worry because there was no shoe casting.

(8) Petitioner contends that trial counsel was ineffective for failing to file a motion and argue that petitioners statement was involuntary which resulted from an unlawful detention, arrest and miranda violation.

(9) Petitioner contends that trial counsel was ineffective for failing to investigate the victims criminal background to establish if there was any violent or criminal acts committed by the victim.

(10) Petitioner contends that trial counsel was ineffective when he wittally misled petitioner regarding his right to testify.

Whether a defendant received ineffective assistance of counsel is reviewed de novo. United States v. Swan 500, 943 F.2d 1070, 1072 (9th Cir. 1991).

A defendant in a criminal case has the right to the assistance of counsel, in order, to insure that his trial is both fair in its conduct and reliable in its result. The right is not to some bare or minimal assistance, but rather to effective assistance, to the reason

38

ably competent assistance of an attorney acting as his diligent and conscientious advocate (United States Constitution, Sixth Amendment and California Constitution, article 1, Section 15: People v. Ledesma (1987) 43 Cal. 3d 171, 216, 218.)

It is fundamental to this concept that defense counsel is expected to make rational and informed decisions on strategy and tactics founded upon adequate investigation and preparation. More specifically, he or she is expected to make rational and informed decisions, that is, he or she is expected to "conduct careful factual and legal investigations and inquiries with a view to develop matters of defense(s) in order that he or she make informed decisions on the client's behalf... ( People v. Shelles (1971) 4 Cal. 3d 626, 630.)

If as a result of the attorney's failure to undertake careful inquiry and investigation a crucial defense is withdrawn from the case - the defendant has not had the assistance of counsel to which he is entitled (People v. Ibarra) (1963) 60 Cal. 2d 460, 464, disapproved on other grounds in People v. Pope (1979) 23 Cal. 3d 412, 421, 423.)

An attorney has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." ( Strickland v. Washington (1984) 466 U.S. 668, 688.)

///

///

In a habeas corpus proceeding, as in direct appeal the court's review of counsel's performance is a deferential one. ( In Re Cordero (1988) 46 Cal. 3d 161, 180.)

In the present case at bar, defense counsel completely acted in a manner in which constituted to be that of a prosecutor instead of acting in a manner to be expected of a reasonably competent criminal attorney in violation of the sixth Amendment to the united states Constitution. People v. Rodriguez (1977) 73 Cal. App. 3d. 1023.)

(11) Appellate Counsel was ineffective because she failed to contend on appeal that: (1) the evidence was insufficient to convict petitioner, (2) that trial counsel was ineffective for the following reasons as listed above in (1) thru (10) of my contentions made, (3) the prosecutorn committed misconduct during closing argument, (4) the trial Court committed misconduct by denying Petitioner's marsden motion.

## III.

## B.

### Petitioner's Conviction Violates
### Due Process of Law, Because The
### Evidence Is Insufficient To Support The Verdict

Petitioner contends that evidence which "merely" creates a strong suspicion of the guilt of the accused does not shift the burden of proof and impose upon the accused the duty of overcoming the suspicion (People v. Allaw (1930) 97 Cal. App. 2d 797, 802.)

///

Mere conjecture, surmise or suspicion is not equivalent of reasonable inference and does not constitute proof, and proof of mere opportunity to so act is no proof that the act was in fact done. See, People v. Terry, 57 Cal. 2d 538.) More is required to constitute substantial evidence of guilt than when all of the evidence against an accused is considered, it gives rise at most to suspicion that he was connected with the criminal activity at issue (People v. Ortiz (1962) 210 Cal. App. 2d 489.) The petitioner recognizes that before the judgement of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what ever is there sufficient substantial evidence to support it. (People v. Daugherty 40 Cal. 2d 876, 885, 256 P. 2d 911.)

But it is clearly the law that evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact. (People v. Boyce, 288 Cal. App. 2d 497, 500-501, 63 C.R. 111; People v. Tutege, 219 Cal. App. 2d 430, 435-436, 33 C.R. 323; People v. Ruscon, 128 Cal. App. 2d 118, 122, 274 P. 2d 899.)

The prosecution's burden is a heavy one: To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty (People v. Bassett, 69 A.C. 121, 70 Cal. Rptr. 193, 443 P. 2d 777.) In People v. Redmond, 71 Cal. 2d 745, 79 Cal. Rptr. 529 and in People v. Flores

41

58 Cal. App. 2d 764, our Courts have reversed convictions where the convictions where the identification was not conclusive. Further, in the Flores case, supra, the court observed: "we are not unmindful of the claimed pro-Fligate character of appellant, who admitted a prior conviction of a felony, but we are now concerned with the guilt or innocence of appellant, further than to say the evidence presented at his trial was insufficient to make out a case of grand theft as charged against him As was said by the court in People v. Brown, 31 Cal. App. 2d 593 (88 p. 2d 728), at page 603." though unfair means may happen to result in doing Justice to the prisoner in the particular case, yet Justice so attained is unsafe and dangerous to the whole Commonly (Hurd v. People, 25 Mich. 405... The acquittal of a guilty person is truly a miscarriage of Justice, but the Conviction of an innocent person through relaxation of those fundamental legal principles such as the one with which we are here concerned would be a tragedy.

Here, there was no substantial evidence that petitioner committed a murder or a robbery, Please see exhibit "A" statement of facts of the prosecutor's case.

The Due Process clause of the United States constitution mandates that "no person shall... suffer the onus of a criminal conviction except upon sufficient proof... to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense;" Jackson v. Virginia (1979) 443 U.S. 307, 316.

In determining whether the evidence is sufficient to sustain a conviction, this Court must: (1) review the whole record in the light most favorable to the Judgement to determine whether it contains substantial evidence -- i.e., evidence that is credible and of solid value -- from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt, and (2) Judge whether the evidence of each of the essential elements is substantial; It is not enough for the respondent to simply point to some evidence supporting the finding, for not every surface conflict of evidence remains substantial in the light of other facts, ( People v. Green (1980) 27 Cal.3d 1, 55. See also Jackson v. Virginia (1979) 443 U.S. 307, 319.)

Penal Code 190.2 (a)(17)(1) provides that a special circumstance exist when a murder was committed while the defendant was engaged in the commission of or attempted commission of a robbery.

CalJic 8.21 instruction killing of a human being, whether intentionally, unintentional or accidental, which occurs during the commission or attempted commission of the crime as a direct causal result of robbery is murder of the first degree when the perpetrator had the "specific intent" to commit that crime."

"The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."

///

43

The law of Felony murder is clear. A person must have the intent to rob murder for the Felony murder rule to apply. In the case now before the court and by reviewing the evidence, no evidence shows petitioner had an intent to rob the victim. The evidence in this case only consist of a strong suspicion of guilt of the defendant and that is not enough (People v. Rascon 128 Cal. App. 2d 118, 122 (274 p. 2d 899).

Petitioner was not found guilty beyond a reasonable doubt and was not found guilty with evidence beyond a reasonable doubt, which violated petitioner's Federal and State constitutional rights. And for the foregoing reasons, petitioner urges this court to reverse the Judgement of conviction.

### IV.

### C.

### Prosecutorial Misconduct During Closing Arguments Denied Petitioner His Rights Under The Sixth And Fourteenth Amendment Of The United States Constitution

To establish prosecutorial misconduct, petitioner need not show that the prosecutor acted in bad faith; It is sufficient to show that his rights to a Fair trial was prejudiced.(People v. Bolton (1979) 23 c.3d 208, 213, 214.) The Focus is not on the prosecutor's good or bad faith but on the prosecutor's conduct as Judged by an objective standard.(People v. Alvarez (1997) 14 c4th 155, 213.)

///

During closing arguments the following statements were made by the prosecution:

The crime scene evidence also shows that maria was a victim of robbery. The pulled-out pockets were found. (R.T. 333: 24-25).

That I.D. alone tells us an important thing. That the murderer, that the defendant, staged the crime scene. (RT 335: 17-18).

If maria's blood had a voice, this blood would be saying: This is the guy that did it. The bloodstains were on the defendant's pocket and in the lining of the pants, because he put what he took into his pant's pockets. Or he touched his pant's pockets with maria's blood. (R.T. 343: 5-9).

And this is the statement of a guilty person: "I'm 39 and I'm really screwed this time. I'll be here for life. Shit like this follow me all the time." Are those the words of an innocent person (R.T. 344: 12-15)

There is no way that maria mancera got to the level of drunkenness that counsel suggesting in between the time that she saw officers and she was killed. (R.T. 391: 26-28, 392: 1).

So, at the very least, He was drinking with maria mancera. (R.T. 392: 26: 27).

Could Counsel, could the defendant have called some other witness to talk about the cocaine nose-bleed? Sure. (R.T. 394: 6-7)

45

The Courts have recognized that Juries accord great weight to arguments of prosecutors since "prosecuting attorneys are government officials and [are] clothed with dignity and prestige of their office. It is their duty to see to it that those accused of crimes are afforded a fair trial..." (People v. Turner (1983) 145 Cal.App.3d 548, 678.)

In the present case at bar, the prosecutor injected personal belief about the evidence, mischaracterized evidence and referred to facts not in evidence, argued as true-false and misleading evidence with the intentions to obtain a conviction and given the fact this was done knowingly deprived petitioner of his constitutional rights under the sixth and fourteenth amendments. The prosecutor's remarks were not harmless and the cumulative effect of the misconduct argued herein so infected the trial with unfairness as to making the resulting conviction a denial of due process. (Darden v. Wainright (1986) 477 U.S. 168, 181, quoting Donnelly v. Dechristoforo (1974) 461 U.S. 63.)

This misconduct cannot be found harmless beyond a reasonable doubt and reversal is required. (Chapman v. California, supra, 386 U.S. at 24.)

///
///
///
///
///
///

46

IX:

D.

## The Trial Court Abused Its Discretion In Denying Petitioner's Murdsen Motion The Ruling Was Opinionated And Biased And Violates Due Process

A state law error that renders a trial fundamentally unfair violates the Due Process clause. (Estelle v. McGuire (1991) 502 U.S. 62, 70.)

On June 14, 2002 the Honorable Judge Thomas C. Hasting presided over the murdsen hearing. (CT. 235.) The hearing can be found in the R.T. Pages 455-492 which were sealed.

The Court:

NO. That covers the issues raised by MR. Uvalles. I've resolved the first issue, and I've resolved the second issue, which was the discussion of the sidebar concerning the wheeler motion which was not made and possible explanation why it wasn't. (R.T. 491: 21-25.)

The issues resolved by the trial court were done in a manner that was opinionated and biased and amounted to a due process violation and of a fair trial. The due process clause of the state and Federal Constitution entitle an accused to a fair trial. (Estes v. Texas (1965) 381 U.S. 532, 540; People v. Lyons (1956) 47 Cal. 2d 311, 319.) Based upon the foregoing reversal is required or at a minimum, for petitioner to be given a new trial.

47

VI.

E.

<u>The Cumulative Effect of the Errors
Discussed Above Deprived Petitioner
Of Due Process Of Law And A Fair
Trial And Requires Reversal Of Pet-
itioners Conviction</u>

The Court of this state recognize their obligation to
assess the cumulative effect of errors on a criminal
conviction. (<u>People v. Purvis</u> (1985) 164 Cal. App. 3d 1075, 1087;
<u>People v. Williams</u> (1971) 22 Cal. App. 3d 34, 40, 58.) Moreover,
the cumulative effect of errors may operate to deprive
a defendant of due process and a fair trial, requiring
reversal irrespective of any lack of objection on the
part of defendant. (<u>Taylor v. Kentucky</u> (1978) 436 U.S. 478, 486-
490; <u>Durden v. McNeel</u>, 5th Cir. 1992, 978 F.2d 1453, 1456; <u>People
v. Mills</u> (1978) 81 Cal. App. 3d 171, 176.)

In the present case, these errors, taken individually
are sufficient to warrant reversal of petitioner's
conviction. In the event that the court finds anyone of
these errors harmless, however, their cumulative effect
on the jury's deliberation cannot be ignored. The court's
and the prosecutor's errors, combined with defense
counsel's eroded petitioner's right to a fundamentally
fair trial. Looking cumulatively at the errors of defense
counsel the court must find that counsel's performance
in petitioner's case was clearly below the level

48

of professional skills customary for competent counsel similarly situated. See (PitchH, 741 F. supp at 797). In Pitchett, the petitioner cited numerous errors that the court considered when it found that petitioner had been denied effective assistance of counsel (Id). Likewise, petitioner has been prejudiced by the cumulative effect of his counsel's errors and omissions. In petitioner's case, as in walker, the cumulative effect of various counsel's errors along with that of the trial judge and prosecutor prejudiced petitioner to such an extent that he was denied a fundamentally fair trial.

(United States v. Wallace (9th Cir. 1988) 848 F.2d 1464, 1473 (court determined that it did not need to look at whether each individual error in itself was harmless where cumulatively three errors affected fundamental fairness of trial.)

(Cooper v. Fitzharris (9th Cir. 1978), 586 F.2d 1325 (Prejudice is clearly established from cumulative impact.)

The following deprived petitioner of a fundamentally fair trial, requiring reversal of the judgement or, at a minimum a new trial.



A.  **The Prosecution's Case**

1. **Events Leading up to Maria Mancera's Murder**

On Sunday, August 19, 2001, at 11:15 p.m., Officer Joaquin Barreto was on foot patrol with his partner, Keith Neumer, on the west side of San Jose, near the Alameda and Hedding Street. (RT 130-131.) Officers Barreto and Neumer encountered appellant and Maria Mancera at the intersection of the Alameda and Sunol Street. (131-132.) When Officer Barreto first observed them, they were ambling along the Alameda with "no specific direction or intent on what they were doing." (RT 132.)

Officers Barreto and Neumer approached appellant and Ms. Mancera and asked what they were doing. Ms. Mancera replied that they were looking for an ATM machine. (RT 133.) Officer Barreto asked if she was really looking for an ATM machine and inquired if she had an ATM card with her. (*Ibid.*) Ms. Mancera reached into her purse and produced an ATM card with the name Maria Mancera on it. (RT 134.) Officer Barreto testified that it seemed obvious to him that Maria Mancera was transgender. (RT 135-136.)

In observing appellant and Maria Mancera, Officer Barreto noticed

2

that they both appeared to be under the influence of alcohol. (*Ibid.*) Both had eyes that seemed watery and bloodshot, and they looked a bit unsteady on their feet. (RT 135.) Officer Neumer also felt that the two presented signs of intoxication. (RT 154-155.) Officer Barreto felt that they were still able to care for themselves and did not require booking for being drunk in public. (RT 135.) Officer Barreto noted that at that time Maria Mancera appeared to have no injuries to her face and that all of her front teeth appeared to be present. (RT 138.) Appellant and Ms. Mancera appeared to be friendly with each other, and Officer Barreto saw nothing that indicated Ms. Mancera felt any distress. (RT 136, 138.)

Officer Barreto conducted record checks on both appellant and Ms. Mancera to confirm their identities. (RT 134.) Officer Barreto also filled out a field identification card for appellant. Field identification cards consist of general information, such as name, address date of birth, general clothing description, and parole or probation status. (RT 139.) Upon completion of the field identification procedure, Officer Barreto pointed appellant and Ms. Mancera in the general direction of the Arena Hotel, where he believed there was an ATM machine. (RT 134.)

After a few minutes, Officer Barreto observed the pair exiting the hotel parking lot. (RT 137.) They told him that there was no ATM machine in the Arena Hotel. In response, Officer Barreto pointed them toward the Bank of America ATM near Hester Street. (*Ibid.*) They thanked him and proceeded in that direction. (RT 138.)

### 2. Discovery of the Body

Mario Lejes arrived for work at R. Brothers painting on Hedding Street on Monday, August 20, 2001, at approximately 6:30 a.m. (RT 258-259.) Upon arrival, Mr. Lejes and his coworkers observed a body lying on the track of Bellarmine High School, right next to R. Brothers. (RT 259.) Mr. Lejes went

3

249-250.) Officer Wiley noted that several objects were found in the general vicinity of the body, (RT 163-171,) specifically, a black leather belt, a California Identification card,[2] a fragment of a tooth, a red plastic disposable lighter, and a white metal digital wristwatch with a black leather band. (RT 163-164.) Sergeant Wiley also testified that the victim's purse had been found, approximately 60 feet from the victim's body, its contents dumped out. (RT 169, 190.) The purse was a black handbag. Some of its contents had been strewn about it, and some of its contents remained inside. Sergeant Wiley testified that the contents included makeup, personal hygiene and care products, miscellaneous papers, notes, business cards, photographs, some costume jewelry, an address book, a checkbook, California Identification and Social Security cards in Maria Mancera's name, and four dollars and six cents in coins. (RT 170.) There was no ATM card found near the body. (RT 250-251.)

Sergeant Wiley testified that the height of the Hedding Street overpass is 31 feet from the top of the railing to the ground. (RT 189.) From the top of the railing to the walkway surface was 29 inches. (RT 168.)

A shoe print was also found near the victim's body. (RT 172.) The shoe print was photographed, and a cast was made. (RT 173-174.)

**3. Investigation of Appellant's Home and Subsequent Arrest of Appellant**

Later that day, August 20, 2001, Sergeant Wiley went to appellant's home at 152 Cleaves Avenue in San Jose. (RT 178.) A search of the bedroom produced a pair of gray pants with traces of what appeared to be blood on them, concentrated on the right front pocket. (RT 179.) Police inspectors collected a pair of white Thom McAn shoes from appellant's home that appeared to

---

2. The identification belonged to a George Photopoulas. It was stipulated that Mr. Photopoulas was in custody at the time of Ms. Mancera's death, that he was to known to Ms. Mancera, and that she was in possession of his identification with his permission. (RT 167.)

251-252.)  The ATM videos from Union Bank and Bank of America showed appellant attempting to withdraw money with Maria Mancera's card early on August 20, 2001.  (RT 254.)  The ATM video of appellant at the Bank of America was recorded at about 12:56 a.m.  (Rt 254-255.)

Fraud investigator Jesus Gaona for the Greater BA Bank Corporation reviewed Maria Mancera's bank records.  (RT 288-289.)  He noted that Maria Mancera had successfully withdrawn forty dollars from the Bank of America near Hester at 11:45 p.m. on August 19, 2001.  (RT 290-293.)  Mr. Gaona also noted that approximately one hour later, beginning at 12:48 a.m., Maria Mancera's account had a flurry of activity, consisting of unsuccessful attempts to obtain money.  (RT 293-296.)  At 12:48 and 54 seconds, a.m., at 12:49 and 7 seconds, a.m., and at 12:49 and 21 seconds, a.m., a user attempted to access Ms. Mancera's account with an incorrect pin from the Union Bank at Alameda and Taylor in San Jose.  (RT 293-294.)  The first two tries involved requests of three hundred dollars[3/] and a third try involved a request for one hundred dollars.  (RT 293-294.)  The fourth attempt at the Union Bank, at 12:49 and 41 seconds, a.m., for one hundred dollars, resulted in a rejection of the card, due to an excessive number of invalid pin entries.  (RT 295.)  The user then moved to the Bank of America Hester branch and attempted three more withdrawals at 12:55 and 37 seconds, a.m., at 12:56 and 9 seconds, a.m., and at 12:56 and 50 seconds, a.m., all culminating in the same "pin tries exceeded" error message.  (RT 295-296.)

San Jose police took appellant to the preprocessing unit at approximately 6:53 p.m. on August 20, 2001, and photographed him.  (RT 264, 267.)  At this time appellant looked at Officer Ernesto Vallecilla and said, "So what do you think, is this going to be a life sentence or what?"  (RT 267.)

---

3.  Mr. Goana testified that the balance in Ms. Mancera's account on August 20, 2001, was $344.90.  (RT 290.)

cocaine and a cocaine metabolite present in the victims blood. (RT 218-220, 280-281.) Dr. Schmunk testified that most of the external and internal injuries were consistent with a fall of about 27 to 31 feet. (RT 204.)

Dr Schmunk opined that the bruising to the inner left cheek was more consistent with a punch or some other impact prior to the fall than with an injury caused by the fall itself. He did concede that the laceration to the inner cheek could have occurred just after the fall, although that was not as likely. (RT 204-205.)

Dr. Schmunk testified that Maria was alive prior to the fall, as evidenced by the swelling surrounding her left arm fracture and by the internal bleeding surrounding some of her injuries. (RT 205-206.) After observing the bloodstains at the crime scene, Dr. Schmunk also noted that the body had most likely been in one position, with the head bleeding for a period of time, and then it was moved to the position in which it was discovered. (RT 206.) In addition to the bloodstains, Dr. Schmunk deduced that "pattern injuries" on Ms. Mancera's lower chest and left abdomen were indicative of the body having been moved. (RT 208.) He also took note of some drag marks near the body in certain photographs taken at the scene. (RT 208.)

The body was in full rigor mortis when the coroner's investigator examined the body at the scene. (RT 213.) Full rigor mortis develops approximately six to eight hours after death, and the coroner's investigator observed the body at the scene between 11:10 a.m. and 12:20 p.m. on August 20, 2001. However, Mr. Lejes, who discovered the body at about 6:30 a.m., had noted when he discovered the body that it was cold and stiff. (RT 260-261.) The body had partial lividity, but it was not fixed.[4] Given that lividity was not

---

4. Lividity is the settling of the blood in the body. Thus if a victim was lying on her back, the blood would be pulled toward her back. Fixed lividity means that the body has been in a position long enough that the blood will no longer move if the body is moved. (RT 214-215.)

## PROOF OF SERVICE BY PERSON IN STATE CUSTODY

STATE OF CALIFORNIA                    CASE NO. _____

COUNTY OF Lassen                       ADDITIONAL NO. _____

I, the undersigned, do certify, declare and verify that I am over the age of (18) eighteen years old, that I am incarcerated at HDSP , prison in Susanville, California 96130 , that I am a party to the above-entitled cause, and that on the day of 24th , in the month of June , the year 2004 I served a true and complete copy of the following:

( Petition for writ of Habeas Corpus                    )
(                                                        )
(                                                        )
(                                                        )
(                                                        )
(_____)

[ ] by depositing it in a prison mailbox in a sealed envelope, or . . . .
[X] by handing it to institutional staff in a sealed envelope, along with any of the following.
[X] a Trust Account Withdrawal Order attached to it authorizing that the required postage be prepaid in full.
[ ] the required amount of actual U.S. Postage afford there to.
[ ] the above mentioned envelope was to be deposited in the United States Mail pursuant to California Code of Regulations Section &3142 and &3165 to the following: (Please List the names and addresses of the persons served).

( Supreme Court of California                            )
( 350 McAllister St                                      )
( San Francisco, CA                                      )
(        94102                                           )
(                                                        )
(                                                        )
(                                                        )
(_____)

The intended place of mailing is: the U.S. Postal Office at: California.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON June 24th _____ , the year 20 04 , in California.

Terrance Mosed _____        _Terrell Mosel_          6-24-04
Typed or print name (here)     Signature of person (here)     Date

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | MARK S. HOWELL
Deputy Attorney General
6 | State Bar No. 95125
   455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-3664
   Telephone: (415) 703-5969
8 | Fax: (415) 703-1234
   Email: mark.howell@doj.ca.gov
9 | Attorneys for Respondent

10 |                IN THE UNITED STATES DISTRICT COURT

11 |              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 |                       SAN FRANCISCO DIVISION

13 |

| | |
|---|---|
| **RAUL UVALLES,** | C 05-2779 MJJ (PR) |
| Petitioner, | |
| v. | |
| **D.L. RUNNELS, Warden,** | |
| Respondent. | |

19 |

20 | **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# EXHIBIT E-2

S125870

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

In re RAUL UVALLES on Habeas Corpus

Petition for writ of habeas corpus is DENIED.

SUPREME COURT
F I L E D

MAY 1 8 2005

Frederick K. Ohlrich, Clerk

DEPUTY

Chief Justice

E-2

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | MARK S. HOWELL
Deputy Attorney General
6 | State Bar No. 95125
455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-3664
Telephone: (415) 703-5969
8 | Fax: (415) 703-1234
Email: mark.howell@doj.ca.gov
9 | Attorneys for Respondent

10 | IN THE UNITED STATES DISTRICT COURT

11 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 | SAN FRANCISCO DIVISION

13 |

14 | **RAUL UVALLES,**                              C 05-2779 MJJ (PR)

                                   Petitioner,

15 |

            v.

16 |

    **D.L. RUNNELS, Warden,**

17 |

                                   Respondent.

18 |

19 | **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# EXHIBIT F-1

## PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**FILED**

Name ___Uvalles_____Raul_____ JUL - 6 2005 (Initial)
        (Last)              (First)

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
Prison Number _T59954_    NORTHERN DISTRICT OF CALIFORNIA

Institutional Address _High Desert State Prison PO Box 3030_
                       _Susanville, CA 96127_

---

### UNITED STATES DISTRICT COURT   C 05 2779 MJJ

### NORTHERN DISTRICT OF CALIFORNIA

(PR)

___Raul Uvalles_____     Case No. _____
Full Name of Petitioner              (To be supplied by the Clerk,
                                      U.S. District Court)

    vs.

___D.L. Runnels (warden)_____     **PETITION FOR WRIT OF HABEAS CORPUS**
Name of Respondent
(Warden or jailor)

---

### Read Comments Carefully Before Filling In

### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo, and Sonoma.

If you file in the Northern District because you are now in a prison in this District but you were **not** convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court in which is located the State Court which convicted and sentenced you. The Federal District Courts in California prefer that a petition should be considered in the district of conviction and sentencing. The records can be more easily consulted and witnesses are available if a hearing is necessary.

DOCKETED
SAN FRANCISCO
AUG 1 5 2007
By_____ J. HOGG

1

F-1

## Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county, or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the State judgment against which you seek relief but may be subject to such custody in the future (e.g. detainers), you must name the person in whose custody you are now and the Attorney General of the State in which the judgment you seek to attack was entered.

## PART A - JURISDICTION

The federal district court can only consider your petition if you satisfy certain jurisdictional requirements. The information below will allow the court to determine whether those requirements are met.

1. For what crime were you sentenced? (If you seek habeas corpus based upon a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are seeking habeas corpus as to more than one sentence, a different petition should be filed for each sentence.)

1). First Degree Murder; P.C. 187

2). Second Degree Robbery; P.C. 211-212.5

2. The sentence from which you seek relief is as follows:

(a) Name and location of court which imposed sentence (for example; Alameda County Superior Court, Oakland):

Santa Clara County Superior Court        Santa Clara
                 Court                          Location

(b) Case number, if known  CC121250

(c) Date and terms of sentence  June 14, 2002  25 years to life

(d) Are you now in custody serving this term?   Yes ✓  No _____

(Custody means being in jail, on parole or probation. You are not in custody if you are released on bail, on your own recognizance or if there is a stay of execution of sentence.)

Where?  High Desert State Prison   PO Box 3030  Susanville, CA
            (Name of Institution)            (Address)     96127

2

3.  What post-conviction relief have you sought?

**APPEAL**

(a)  Did you take an appeal from your conviction?    Yes _✓_    No _____

(b)  To what court(s)?    Check

Court of Appeal         Yes _✓_    No _____    _____    _____
                                               (Give year)        (Result)

Supreme Court of        Yes _✓_    No _____    _____    _____
California                                     (Give year)        (Result)

Any other court         Yes _____  No _✓_      _____    _____
                                               (Give year)        (Result)

(c)  If you appealed, were the grounds the same as those which will be set forth in this petition?    Yes _✓_    No _____

(d)  Was any opinion rendered?    Yes _✓_    No _____

(e)  If you did not appeal, what were your reasons?

_____

_____

_____

(f)  Did you seek permission to file a late appeal under Rule 31(a)?
Yes _____    No _____

If you answered "Yes" give _N/A Petition To Timely_____
                            (Name of Court)

_____
                        (and result)

**OTHER POST-CONVICTION REVIEW**

(g)  Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes _✓_    No _____

(h)  If you answered "Yes" give the following information about each proceeding.

3

I.   Name of Court _Santa Clara County Superior Court_

Type of Proceeding _Petition For Writ Of Habeas Corpus_

Grounds raised (Be brief and specific):

a. _Ineffective Assistance of Consel._

b. _Due Process Insufficient Of Evidence To Support_
   _verdict._

c. _Prosecutorial Misconduct_

d. _Trial Court Abused Its Discretion Due Process_

e. _Cumulative Effect Of Errors Violates Due Process And_
   _Right To A Fair Trial_

Result _Denied_ _____ Date of Result _5-21-2004_

Citation of opinion, if any and known _____

II.  Name of Court  _Sixth Appellate District Court_

Grounds raised (Be brief and specific):

a. _- Same As Cited Above ( I )._

b. _____

c. _____

d. _____

e. _____

Result _Denied_ _____ Date of Result _6-14-2004_

Citation of opinion, if any and known _H027526_

III. Name of Court _Supreme Court Of California_

Grounds raised (Be brief and specific):

a. _- Same As Cited Above -_

b. _____

c. _____

d. _____

e. _____

4

Result _Denied_____    Date of Result _5-18-2005___

    Citation of opinion, if any and known _S125870_____
(Use back side of this page if you need more space.  Fill in the same
questions for each.)

(i)  If you answered "No" explain briefly why you have not sought any
post-conviction review?

_____N/A_____

_____

(j)  Is any petition or other post-conviction proceeding now pending in
any court?  Yes _____  No _✓___

_____
                    (Name and location of Court)

## PART B - TRIAL INFORMATION

4.  Check if any of the following were held in your case:

Arraignment:  Yes _✓_  No ___    Preliminary Hearing:  Yes _✓_  No ___

Motion to Suppress:  Yes ___  No _✓_

5.  Check whether a finding of guilty was made after a plea of

    Guilty ____        Not Guilty _✓_        Nolo Contendere ____

    Any other plea _____
                                    (Specify)
6.  Check kind of trial:

    Jury _✓_            Judge alone ____

    Judge alone on a transcript ____

7.  Did you testify at your trial?  Yes ____        No _✓_

## PART C - GROUNDS FOR RELIEF FROM CONVICTION

State briefly and concisely every ground which you believe supports your
claim that you are being held in unlawful confinement.  This means
telling the court the facts upon which you rely.  You should avoid legal
arguments with numerous case citations.  Thus, what legal right or
privilege were you deprived of in your case?  What happened to deprive
you of this right?  Who made the error of which you complain?  What did
he do wrong?  When did he do it?  If you lack space to state all your
grounds, use the back side of the page.

<u>NOTE WELL</u>:   You **must** present ALL of your claims in your first federal habeas petition.  Subsequent petitions are subject to dismissal without review on the merits for abuse of the writ.  <u>McCleskey v. Zant</u>, 111 S.Ct. 1454 (1991), 113 L.Ed. 2d 517, 59 U.S.L.W. 4288.

8.  Grounds for Relief <u>Petitioner's Conviction Is Unconstitutional</u>

   (a)  Ground One: <u>Because He Did Not Receive Effective Assis-</u>
<u>tance of Counsel Both On Appeal And At Trial As Guaranteed By the</u>
<u>Sixth Amendment.</u>
        Supporting Facts: <u>Petitioner's defense attorney was defic-</u>
<u>ent For the following reasons: Petitioner contends he received</u>
<u>ineffective assistance of trial counsel in that trial counsel</u>
<u>failed and or refused to present as requested by petitioner</u>
(See Attached Sheet)

   (b)  Ground Two: <u>Petitioner's Conviction Violates Due Process of</u>
<u>Law, Because the Evidence Is Insufficient to Support Verdict.</u>
        Supporting Facts: _____

<u>Petitioner's  Section IV (Statement Of Facts) are relied upon</u>
<u>to support the allegations that there was no substantial evide-</u>
<u>ence that petitioner committed a murder or robbery.</u>

   (c)  Ground Three: <u>Prosecutorial Misconduct During Closing Arguments</u>
<u>Denied Petitioner His Rights Under The Sixth And</u>
<u>Fourteenth Amendment Of The United States constitution.</u>
        Supporting Facts: <u>During closing arguments the following</u>
<u>statements were made by the prosecution: The crime scene</u>
<u>evidence also shows that maria was a victim of robbery. The</u>
<u>pulled-out pockets were found. (RT 353:24-25) See Attached Sheet</u>

9.  If any of the grounds listed were not previously presented to any other court, state briefly which grounds were not so presented and why:

<u>N/A  All Claims Have Been Properly Exhausted.</u>

_____

_____

_____

6

10.   Supporting cases, if any.   List by name and citation only, the cases which you think are close factually to yours so that it is an example of the error you believe occurred in your case.   Do not discuss the holding or reasoning of these cases:

People v. Lamphear (1980) 26 Cal. 3d 814; People v. Ledesma (1987) 43 Cal. 3d 171; People v. Ibarra (1963) 60 Cal. 2d 460; People v. Shaw (1984) 35 Cal. 3d 355; Lockhart v. Fretwell (1993) 113 S.Ct. 838; People v. Bassett 70 Cal.Rptr. 193; People v. Bolton (1979) 23 Cal. 3d 208; Taylor v. Kentucky (1978) 436 U.S. 478; U.S. v. Wallace 848 F.2d 1464
Jackson v. Virginia (1979) 443 U.S. 307;

**PART D - ATTORNEY INFORMATION**

11.   Give the name and address of each attorney who represented you in the following proceedings:

(a)   Arraignment  Charlie Gillian #144161 120 West Mission St

(b)   At preliminary hearing  San Jose, CA 95110

(c)   At time of plea  ___

(d)   At trial  Same As Above

(e)   At sentencing  Same As Above

(f)   On appeal  Lori A. Quick 100 N. Winchester Blvd. Ste 310
                                                Santa Clara, CA 95050

(g)   Other post-conviction proceeding _____

      In Pro Per

12.   Was the attorney hired by you or your family?  Yes ____    No ✓

      Appointed by the Court?   Yes ____    No ____

      Are you alleging as one ground for relief that your attorney gave you ineffective legal assistance?  If so, who and at what stage?

Charlie Gillian The Entire Trial / Lori Quick On Appeal

13.   If you did not have an attorney represent you, did you represent yourself?  Yes ____    No ____    N/A

      With consent of the Court?   Yes ____    No ____

14.   Are you represented by an attorney in this petition?
                                                Yes ____    No ✓

7

If you answered "Yes" give name and address of your attorney

N/A

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

Executed at High Desert State Prison          Dated: 6-30-2005

                                        _____
                                        Signature of Petitioner

## FORMA PAUPERIS AFFIDAVIT
### (See Instructions Attached to This Form)

I hereby apply for leave to proceed with this habeas corpus petition without prepayment of fees or costs or security therefor.  In support of my application, I state that the following facts are true:

(1)  I am the petitioner in said petition, and I believe I am entitled to redress.

(2)  I am unable to pay the costs of said action or give security because:

N/A

_____

_____

_____

                                        _____
                                        Signature of Petitioner
                                        (Sign here only if you seek to
                                        proceed without payment of fees)

STATE OF _____)

COUNTY OF _____)

I declare under penalty of perjury that the foregoing is true and correct.

Signed on _____
                    (Date)

                                        _____
                                        Signature of Petitioner

8

Raul Uvalles

T-59954 B1-

PO Box 3030

Susanville, CA 96127


Petitioner, In Pro Per


United States District Court

Northern District of California


Raul Uvalles,               Case No. _____

  Petitioner,             ( Santa Clara County Superior Court
                            # CC121250; Sixth Appellate District
v.                          Court of Appeals # H024674.)

D.L. Ronnels, (warden)      Petition For Writ Of Habeas Corpus

  Respondent.


TO: The Honorable Presiding Chief Judge And Magistrates Of The United States District Court, Northern District Of California.

   COMES NOW, Raul Uvalles, hereinafter referred to as Petitioner, complains of the respondent, David L. Ronnels, as above designated, and For legal cause of action.

(a) That petitioner is confined, detained and restrained of his liberty by D.L. Ronnels, warden of the state prison known as High Desert in Susanville, California; That such confinement and restraint are illegal, and that the illegality thereof will consist in the basic constitutional violations which will hereinafter be set Forth.

4

(b) This Honorable Court has Jurisdiction herein pursuant to the essential provisions of Title 28 U.S.C. Section 2254; including the 6th, 8th and 14th Amendments of The United States Constitution.

By Verified Petition It Is Alleged As Follows:

### I.

Petitioner alleges and believes that the Judgement and conviction and Sentence is invalid as in violation of the State and Federal constitutional rights to effective assistance by trial and appellate lawyers, prosecutorial misconduct and for misconduct by the trial Judge, and more specifically stated in petitioner's grounds for relief and supporting facts. It should be duly noted for the record that petitioner's new claims were properly exhausted in the California Supreme Court.

### II.

Petitioner has no other plan, speedy or adequate remedy at law.

### III.

Petitioner request for an evidentiary hearing as to the disputed material factual allegations of the acts and omissions of both my trial and appellant lawyers.

IV.

## STATEMENT OF THE CASE

On January 11, 2002, an information was filed in Santa Clara County

Superior Court charging appellant in Count 1 with murder in violation of Penal

Code section 187, and in Count 2 with robbery in the second degree in

violation of Penal Code sections 211 and 212.5, subdivision (c).  (CT 61-62.)

ll

On May 3, 2002, jury trial began with motions in limine. (CT 108-110.) It was stipulated that the victim, known as Maria Mancera, was in fact a man named John Mancera. (CT 108.)

On May 6, 2002, the trial court ruled that appellant's statements to police had been taken in violation of Miranda v. Arizona (1966) 284 U.S. 436 and could not be introduced in the prosecution's case in chief. (CT 117; RT 94.) The court also ruled, however, that because the statements did not appear to be involuntary, they could be used for impeachment in the event that appellant testified. (RT 94.)

On May 7, 2002, testimony began. (CT 121.) On May 8, 2002, the parties entered into four stipulations: that a blood sample was properly drawn from appellant and accurately analyzed by the Santa Clara County Crime Laboratory and was determined to be positive for "BE"; that a blood sample was properly drawn from the body of Mancera, accurately analyzed by the Santa Clara County Crime Laboratory, and was positive for both cocaine and alcohol, the blood alcohol level being measured at .22%; that Mancera's bank records were admissible; and that on August 20, 2001 at 12:48 a.m., Mancera's ATM card was used at an automatic teller machine at the Union Bank in San Jose, and at 12:55 a.m. at the Bank of America - Hester Branch in San Jose, that the video tapes taken during each transaction accurately

reflected the transaction, and that photographs were accurately made from the video taken during the transaction. (CT 124.)

The jury began deliberations on the afternoon of May 13, 2002 and concluded on the afternoon of May 14, 2002 at which time it found appellant guilty of murder in the first degree in violation of Penal Code section 187, and second degree robbery in violation of Penal Code sections 211-212.5, subdivision (c). (CT 191-195.)

On June 13, 2002, a hearing was held pursuant to People v. Marsden (1970) 2 Cal.3d 118. (CT 200.)

On June 14, 2002, the Marsden motion was denied. Appellant was then sentenced to serve 25 years to life for Count 1, and three years for Count 2, to be served concurrently, for a total prison commitment of 25 years to life. (CT 235-237.)

Notice of appeal was timely filed on June 14, 2002. (CT 238.)

## STATEMENT OF FACTS

A. The Prosecution Case

    1. Events Leading Up To The Discovery Of The Homicide

At approximately 11:15 p.m. on August 19, 2001, San Jose Police Officer Joaquin Barreto was on foot patrol in the area of the Alameda and Hedding Street. (RT 129-130.) He and his partner, Officer Keith Neumer,

were standing on the Alameda at Sunol Street when they saw appellant and Maria Mancera[1] walking on the Alameda. (RT 132, 150.) They seemed to be "ambling along" with no specific direction. (RT 132.)

Barreto approached the pair and asked them what they were doing. (RT 133.) Mancera replied that they were looking for an ATM machine, and pulled an ATM card out of the purse she was carrying. (RT 133.) Barreto observed that the card was emblazoned with the name "Maria Mancera." (RT 134.) It was obvious to Barreto that Mancera was a man presenting himself as a woman. (RT 13`5-136, 144-145.) She did not have any injuries, and appeared to have all of her front teeth. (RT 138, 145.) Her hands were dirty. (RT 146.) Mancera and appellant appeared to be friendly with each other. (RT 136.)

While speaking to them, Barreto believed they were both under the influence of alcohol. (RT 134, 144.) He based this upon the fact that there was an odor of alcohol on them, their eyes were watery and bloodshot, and they were somewhat unsteady on their feet. (RT 135.) Neumer also smelled alcohol, and recalled that they admitted they had been drinking. (RT 154.) They also had dilated pupils, which Barreto knew was a symptom of stimulant

---

1.    Because the victim was referred to throughout the trial as "Maria Mancera" and because feminine pronouns were consistently used to describe Mancera, the same will be done in this brief to avoid confusion, even though Mancera was in fact a man named John Mancera and remained anatomically a man at the time of his death.

use. (RT 144.) Barreto did not see anything that he immediately recognized as symptoms of cocaine use, but it was possible that they were under the influence of cocaine as well. (RT 148.) Barreto thought they were both at about the same level of intoxication. (RT 135.) They did not have trouble communicating with him, and their level of intoxication was not severe enough to warrant booking them for being drunk in public or booking them into a non-custodial detention facility to sober up. (RT 135.)

Barreto conducted records checks on both Mancera and appellant to confirm their identities. (RT 134.) He also filled out a field identification card for appellant. (RT 139.) These cards are used to conduct field interviews when police believe there may be some criminal activity occurring, and contains such information as name, date of birth, address, whether the subject is on parole or probation, and a general clothing description. (RT 139.) During the course of this procedure, appellant told Neumer that he lived on Cleaves Street. (RT 150.) At the conclusion of the encounter, Barreto directed them to the Arena Hotel to find an ATM. (RT 136.) Within a few minutes, the two emerged from the Arena Hotel parking lot, and told Barreto that there was no ATM machine there. (RT 137.) Barreto then told them that there was a Bank of America down the street, and directed them to the Bank of America near Hester Street. (RT 137.) They thanked Barreto and headed in that

direction. (RT 138.) Barreto and Neumer continued with their regular duties. (RT 139.)

At approximately 6:30 a.m. on Monday, August 20, 2001, as Barreto was preparing to end his shift, he heard a radio broadcast that there had been a report of a beaten person near Bellarmine High School. (RT 140.) Because this area was in the district covered by Barreto, he felt he needed to investigate since it had happened while he was on duty. (RT 140.) When he arrived at Bellarmine High School, he saw the body of Maria Mancera lying beside the high school running track. (RT 141.) Barreto immediately recognized her as the person he had spoken to the previous night. (RT 142.) She was still wearing the same clothing, but her pockets were turned inside out. (RT 147, 249-250.) The body was in full rigor mortis, meaning death had occurred approximately six to eight hours earlier. (RT 212-213.) He notified his supervisor and passed on to the investigating detectives the information he had gathered during his encounter with Mancera and appellant, including the field identification card. (RT 142-143.)

Neumer also went to Bellarmine High School when news of Mancera's death reached him. (RT 150.) He then went to the Bank of America near Hester to see whether there was a videotape of appellant and Mancera at the ATM. (RT 150-151.) Upon viewing the videotape, Neumer saw Mancera and

appellant approaching the ATM. (RT 151, 153-154.) In the video, appellant wore a hat which had a number on it. (RT 153-154.) A withdrawal of $41.50 had been made via that ATM at 11:35 p.m. on August 19, 2001. The bank videotape, from which still photos were made, accurately reflected that transaction. (RT 152.)

### 2. The Investigation

#### a. The Crime Scene

Mario Lejes worked for a painting company on Hedding Street. (RT 258.) When he arrived at work at about 6:30 a.m. on August 20, he saw someone lying on the running track of Bellarmine High School. (RT 259.) Lejes and a co-worker approached the body and saw that there was blood around the mouth and the back of the head. (RT 260.) Lejes touched the right kneecap and noticed that it was cold. (RT 260-261.) Lejes did not move or take anything at the scene, nor did he move the body. (RT 261-263.)

When police initially arrived on the scene, photographs were taken of Mancera's body and all items found around it. (RT 157-158.) Officer Bruce Wiley arrived at the site where the body was found, which was below the Hedding Street overpass that crosses over the athletic fields of Bellarmine High School. (RT 158.) The overpass is a pedestrian walkway which rises some 31 feet above the ground. (RT 189-190.) It has a railing which is

approximately 29 inches high. (RT 168.) Near the body were found a black leather belt (RT 163), a California identification card in the name of Michael George Photopoulas[2] (RT 164, 167), a fragment of a tooth (RT 164), a red plastic disposable lighter (RT 164), and a white metal digital wristwatch with a black leather band. (RT 164.) There were bloodstains on the running track approximately five and one-half to six feet from Mancera's right foot. (RT 165.) All of these items were within approximately two feet of each other. (RT 166.)

In a sandy area beneath the overpass approximately 60 feet from Mancera's body was found her purse with its contents spilled out. (RT 169, 190, 225.) These included makeup and personal hygiene products, miscellaneous papers, notes, business cards, photographs, some costume jewelry, and address book, a checkbook, a California identification card in Mancera's name, and four dollars and six cents in coins. (RT 170.) The purse and its contents were not visible from the overpass. (RT 171.)

Some shoe prints were located near Mancera's body. (RT 172.) Wiley photographed them and also made a cast of one of the shoe prints which was actually closer to the purse. (RT 174-176, 189.)

---

2. There was a stipulation that Photopoulas was known to Mancera, was in custody at the time of Mancera's death, and that Mancera was in possession of the identification card at the time of her death.

### b. The Search Of Appellant's Residence

The next day, Wiley went to appellant's home at 152 Cleaves Avenue in San Jose. (RT 178.) According to appellant's landlord, appellant had not arrived home until 4:37 or 4:38 on the morning of August 20. (RT 231.) In appellant's bedroom Wiley found a pair of gray pants which had what appeared to be traces of blood on them. (RT 178-180.) Also collected was a pair of white Thom McAn tennis shoes (RT 181-182, 184), a pair of boots (RT 185), a black baseball cap with a maroon brim across the front of which was the logo "Carpenters Local" and "Santa Clara and San Benito Counties", with the number 405 in the middle. (RT 182-184), and a t-shirt with the logo "MAX AIR" across the front. (RT 183.)

Also searched was a municipal trash can at the northwest corner of Hester Street and the Alameda. (RT 187.) Inside was located an ATM card in the name of Maria R. Mancera. (RT 187-188.) The trash can was approximately 20 yards from the ATM at the Bank of America near Hester. (RT 188.)

### c. The Arrest Of Appellant

Appellant was taken to the preprocessing unit at 6:53 p.m. (RT 264.) While photos were being taken of him, he asked Sergeant Vallecilla "So what do you think, is this going to be a life sentence or what?" (RT 267.) Vallecilla

replied that he did not know, at which point appellant said "I'm 39 years old. I'm really screwed this time. I'll be here for life. Shit like this follows me all the time." (RT 267-269.) A blood sample was drawn from appellant. (RT 270.) A test indicated the presence of cocaine metabolite, meaning he had most likely ingested cocaine more than six hours earlier. (RT 270, 276-277.)

d.    The <u>Investigation Of</u>
<u>Mancera's  Bank</u>
<u>Account Activity</u>

San Jose Police Sergeant Gilbert Vizzusi was the detective assigned to investigate Mancera's death. (RT 247.) Vizzusi noticed that Mancera's pockets were turned inside out, and there was an ATM receipt on or near the body. (RT 249-250.) He ascertained that the ATM card was not on or near Mancera, though her checkbook was. (RT 250-251.) Using the account number from the checkbook Vizzusi investigated whether there had been any activity on the account. (RT 251.) Vizzusi also viewed videotapes taken by security cameras at the bank, which revealed that appellant had used the ATM machine at 12:46 a.m. on August 20. (RT 254.) Mancera's ATM card had been used at the same time. (RT 255.)  Bank records indicated that $40.00 had been successfully withdrawn from Mancera's checking account through an ATM at the Hester Branch of the Bank of America at 11:45 p.m. (RT 291-

292.)[3] They further indicated that at 12:48 a.m., 12:49:07 a.m., and 12:49:21 a..m. on August 20, 2001, three attempts were made at the ATM at Union Bank to withdraw $300.00 from Mancera's account. The attempts were unsuccessful because the user had entered an incorrect personal identification number, or "PIN". (RT 293.) A fourth attempt at the same ATM at 12:49:41 resulted in a rejection of the card by the ATM. (RT 294.) At 12:55:37, an attempt was made to withdraw $100.00 from the Hester Street Bank of America, resulting in a message by the ATM that the number of PIN tries had been exceeded. (RT 295.) Two more unsuccessful attempts were made at 12:56:09 a.m. and 12:56:50 a.m. (RT 296.)

### 3. The Autopsy

Gregory Schmunk is the Chief Medical Examiner and Coroner for Santa Clara County who is an expert in the area of forensic pathology and wound recognition. (RT 196-198.) He performed an autopsy on Mancera's body, during which he discovered that Mancera was in fact a man. (RT 198-199.) Mancera's blood alcohol level had been determined to be .22. (RT 280-281.) The blood alcohol level of .22% indicated to Schmunk that Mancera had consumed approximately 10 drinks within a few hours. (RT 219.) Such a

---

3.      The date on which this occurred was never stated for the record.

blood alcohol level would result in signs of gross intoxication, such as slurred speech and loss of balance with difficulty standing and walking. (RT 273-274, 282-283.) He noted that between 11:10 a.m. and 12:20 p.m. on August 20, Mancera's body was in full rigor mortis, meaning that she had died approximately six to eight hours earlier. (RT 213.) The level of lividity[4] present at the same time was not fixed, as would be expected eight to 12 hours after death. (CT 215-216.)

With respect to external injuries, Schmunk observed that the upper jaw was fractured, and there were abrasions or scrapes, and bruises of the skin. (RT 201.) There were abrasions on the neck and upper shoulders, the right back, the left lower back, the right side and front of the chest. There was bruising around the left eye and an abrasion at the left side of the jaw. (RT 201.) Bruises or areas of bleeding were inside the white of the left eye, and there was bruising and tearing on the inside of the mouth, especially on the left side of the cheek, which was consistent with a blow to that area, and inconsistent with a fall. (RT 201, 220.) Other abrasions were present on the front and left side of the chest and arms and legs. (RT 201-202.) The left upper arm was broken, the pelvis was fractured, and there were rib fractures

---

4.    Lividity is the settling of the blood that occurs in the body due to gravity. (RT 214-215.)

22

on both sides of the chest. (RT 202.) An internal examination revealed the pelvic and rib fractures, bruising to the brain with blood on the surface of the brain, and a basilar skull fracture. (RT 203.) The liver was lacerated and there was a small amount of blood in the body. (RT 203.)

Additionally, Schmunk noted that Mancera's teeth were in very poor repair. Mainly only the front teeth were present and they were badly rotted. Most of the back teeth were missing and those that were present were decaying. (RT 210.) There were lacerations and bruising around the left eye and some redness in the area of the right eye. (RT 210.) There were a few abrasions and some bruising over the forehead and right cheek. (RT 210.)

Many of the injuries were consistent with a fall of 27 to 31 feet. (RT 204.) One exception was the injury to the inside of the mouth. (RT 204.) According to Schmunk, while it was possible to suffer injuries to the inside of the mouth in a fall, one would also expect to see an injury to the skin surface due to impact on the ground. (RT 204.) Because Mancera did not have such an injury, Schmunk thought it could reasonably be concluded that another, softer impact, such as a punch, had caused this injury prior to the fall. (RT 204-205, 220.) Schmunk could not exclude the possibility that the injury happened within a few minutes after the fall, but believed it more logical to conclude that it happened before the fall. (RT 205, 220-221.) Schmunk felt

that at most, this injury had occurred within a maximum of a few hours of death, but he could not exclude the possibility that it had occurred within an hour or slightly more than an hour before death. (RT 223-224.)

Schmunk opined that Mancera was alive at the time of the fall based on the large amount of blood both on the track and inside the body. (RT 205.) In addition, the arm fracture had some soft-tissue swelling which would not have occurred without blood pressure. (RT 205-206.) Other factors which led Schmunk to believe that Mancera was alive before hitting the ground were bleeding on the surface of the brain, in the deep chest, at the rib fractures, and in the abdominal cavity. (RT 206.)

A study of the bloodstains on the track indicated to Schmunk that the body had lain in one position on the track, bleeding, for some period of time, and was then moved to the location where it was found. (RT 206-207.) Contributing to this opinion was the presence of "pattern injuries" on Mancera's abdomen. (RT 208.) Schmunk also observed in the photograph of the body what appeared to be drag marks below the impression of one of the arms. (RT 209-210.) He did not believe that Mancera would have been able to move herself. (RT 225.)

Schmunk was of the opinion that Mancera's back, back pelvic region, and left arm had hit the ground first, based on the injuries he observed. (RT

211.) If in fact she was alive when she fell, Schmunk believed that she would have been unconscious from the moment of impact, though her heart and respiration would not have stopped for several minutes. (RT 212.) Schmunk concluded that the manner of death was homicide. (RT 226.)

### 4. Other Forensic Evidence

Santa Clara County Criminalist John Bourke, an expert in the area of shoeprint analysis and comparison, compared three pairs of shoes submitted by the detectives in the Mancera case against an impression taken of shoeprints at the scene. (RT 235-236.) Based on this comparison, Bourke included the right shoe of the pair of Thom McAn tennis shoes taken from appellant's residence as a possible source of the shoeprints. (RT 243-246.)

Nancy Marte, a Criminalist at Santa Clara County Crime Laboratory conducted a DNA analysis on blood samples collected from a pair of gray pants and from fingernail swabbings. (RT 299-300.) Her conclusion was that Mancera was the source of three bloodstains on the pants. (RT 302.) Appellant was the source of one. (RT 302.) Mancera was also the source of the blood sample obtained from the fingernail swabbing, which had been taken from Mancera's hand. (RT 302.)

### B. The Defense Case

Andrew Marr worked at a concrete company on the other side of the

railroad tracks by Bellarmine High School. (RT 312.) At about 6:30 a.m. on August 20, 2001, he noticed a Hispanic male clearing the fence. Once he hit the ground, he ran off at a high rate of speed. (RT 313.) Marr described the man as having a long black braided ponytail and wearing a white t-shirt and faded blue jeans. (RT 313.) About 30 to 45 minutes later, Marr noticed the police activity. (RT 315.) He walked over to see what was happening, and told police about the man he had seen. (RT 315, 318.)

WHEREFORE, Petitioner respectfully requests that this Court:

1. Take Judicial notice of the record in this case, and if the record is not before this court, it must obtain the record from the trial court or elsewhere, wherein, the court will find that the record proves each and every allegation alleged in this petition, and after the record clarify and amplify each and every allegation alleged herein, petitioner strongly urges this court to hold a hearing and grant petitioner sought.

2. Petitioner request that this Court issue a writ of Habeas Corpus or at lease an "Order to Show" cause to the Respondent (David L. Runnels) warden of High Desert State Prison, to inquire into the legality of petitioner's incarceration.

3. Petitioner believes the record in this case is sufficient to entitle him to reversal of conviction and release to his liberty, but if not, petitioner has no other plain, speedy, or adequate remedy at law.

4. Issue an order requiring petitioner's immediate release from custody because of the numerous violations of his state and Federal Constitutional rights; and,

5. Grant petitioner such further relief as is appropriate in the interest of Justice.


Dated: June 30th, 2005

                    Respectfully submitted

27

## Verification

I, Raul Uvalles, states:

I am the petitioner in this action, I have read the foregoing petition for a writ of habeas corpus and the facts stated herein are true to my knowledge, except as to matters that are herein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the state of California, and that this declaration was executed on this 30th day of June (2008) at High Desert State Prison in Susanville California.

Respectfully submitted

Grounds For Relief continues;

Ground one supporting Facts con'ts; my defense of "self
-defense." It was a valid defense to the criminal
charges petitioner was facing and there was evidence
to support the claim.

(2) Petitioner contends that the trial counsel was ineff-
ective for failing and or refusing to call any expert
witness to refute or give an independent analysis
who testified for the people from the coroner's
office and the crime laboratory.

(3) Petitioner contends that trial counsel was ineffective
for failing and or refusing to request involuntary
manslaughter instructions.

(4) Petitioner contends that during the selection of the
Jury the prosecutor was using her peremptory
challenges to exclude minorities from the Jury.
Trial counsel was effective for failing to present
the court with a whellor motion for these race based
challenges.

(5) Petitioner contends that trial counsel was ineffect-
ive for failing to make a motion to have suppress-
ed the property taken from my apartment as a result
of an unlawful search and seizure.

(6) Petitioner contends that trial counsel was ineffect-
ive for failing to move for a speedy trial as req-
uested by petitioner.

///

///

(7) Petitioner contends that trial counsel was ineffective concerning discovery; petitioner questioned trial counsel about the discovery of the prosecution. Petitioner was informed one would automatically be provided, and that there was no reason to worry because there was no shoe casting.

(8) Petitioner contends that trial counsel was ineffective for failing to file a motion and argue that petitioners statement was involuntary which resulted from an unlawful detention, arrest and miranda violation.

(9) Petitioner contends that trial counsel was ineffective for failing to investigate the victims criminal background to establish if there was any violent or criminal acts committed by the victim.

(10) Petitioner contends that trial counsel was ineffective when he willfully misled petitioner regarding his right to testify.

(11) Appellate counsel was ineffective because she failed to contend on appeal that: (1) the evidence was insufficient to convict petitioner, (2) that trial counsel was ineffective for the following reasons as listed above (1) thru (10) of my contentions made, (3) the prosecutorial misconduct during closing arguments, (4) the trial court committed misconduct by denying petitioner's murder motion.

///

///

///

30

Grounds For Relief continues;

Ground Three supporting Facts continues; That F.O. alone tells us an important thing. That the murderer, that the defendant, staged the crime scene. (R.T. 335: 17-18).

If maria's blood had a voice, this blood would be saying: This is the guy that did it. The bloodstains were on the defendant's pocket and in the lining of the pants, because he put what he took into his pant's pockets. Or he touched his pant's pockets with maria's blood. (R.T. 343: 5-9.)

And this is the statement of a guilty person: "I'm 39 and I'm really screwed this time. I'll be here for life. shit like this follows me all the time." Are those the words of an innocent person (R.T. 344: 12-15.)

There is no way that maria mancera got to the level of drunkenness that counsel suggesting in between the time that she saw officers and she was killed. (R.T. 391: 26-28; 392: 1).

So at the very least, He was drinking with maria mancera. (R.T. 392: 26-27).

Could counsel, could defendant have called some other witness to talk about the cocaine nose bleed? Sure (R.T. 394: 6-7).

The prosecutor injected personal belief about the evidence, mischaracterized evidence and referred to facts not in evidence, argued as true-false and misleading evidence with the intent to obtain a conviction.

///

31

Grounds For Relief continues;

(d) Ground Four: The Trial Judge abused Its discretion In denying Petitioner's Murder Motion The Ruling was opinionated And Biased And Violates Due Process

Supporting Facts: On June 14, 2002 the Honorable Judge Thomas c. Hastring presided over the murder hearing. (C.T. 235.) The hearing can be Found in the R.T. pages 455-492 which were sealed.

The Court:

NO, That covers the issues raised by MR. UValles I've resolved the First issue, and I've resolved the second issue, which was the discussion of the side-bar concerning the wheeler motion which was not made and possible explanation why it wasn't. (R.T. 491 21-25.) The issues resolved by the trial Court were done in a manner that was opinionated and biased and amounted to a due process violation and of a Fair trial.

(e) Ground Five: The cumulative effect of the errors discussed above deprived petitioner of due process of law and a Fair trial and requires reversal of petitioners conviction.

In the present case, these errors, taken individually are sufficient to warrant reversal of petitioner's conviction. However, if the Court Find the errors harmless their cumulative effect on the Jury's deliberation cannot be Ignored. The errors of the court, the prosecution and defense counsel denied petitioner a Fair trial.

## Conclusion

IF there is anything we as a society value more than life, it is liberty. The words of Patrick Henry are etched in the memories of every american schoolchild.

Life and liberty are mentioned with equal prominence in the Declaration of Independence, as well as Article I § 1, of the California Constitution. To Americans, liberty is the essence of life. Yet, Petitioner has been improperly, unlawfully and illegally deprived of his liberty: wherefore, Petitioner prays upon the mercy of this Court to grant the relief requested in the interest of Justice and for the sake of liberty.

Dated: 6-30-2005

Respectfully submitted

33

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | MARK S. HOWELL
Deputy Attorney General
6 | State Bar No. 95125
  455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-3664
Telephone: (415) 703-5969
8 | Fax: (415) 703-1234
Email: mark.howell@doj.ca.gov
9 | Attorneys for Respondent

10 |              IN THE UNITED STATES DISTRICT COURT

11 |          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 |                   SAN FRANCISCO DIVISION

13 |

**RAUL UVALLES,**                                    C 05-2779 MJJ (PR)

14 |
                                    Petitioner,
15 |
              v.
16 |
**D.L. RUNNELS, Warden,**
17 |
                                    Respondent.
18 |

19 |

20 |       **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# EXHIBIT F-2

FILED

OCT 1 9 2005

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAUL VALLES,                          )    No. C 05-2779 MJJ (PR)
                                      )
              Petitioner,             )    **ORDER TO SHOW CAUSE**
                                      )
    vs.                               )
                                      )
D.L. RUNNELS,                         )
                                      )
              Respondent.             )
_____)



Petitioner, a California prisoner, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254. He has paid the filing fee.

### BACKGROUND

In 2002, petitioner was sentenced to twenty-five years to life in state prison after a jury convicted him for first degree murder and robbery in Santa Clara County Superior Court. The California Court of Appeal affirmed, the Supreme Court of California denied review, and all three levels of the California courts denied habeas petitions filed by petitioner.

### DISCUSSION

A.    Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). A district court shall "award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto." 28 U.S.C. § 2243.

United States District Court
For the Northern District of California

F-2

B.    Legal Claims

Petitioner claims that: (1) he received ineffective assistance of trial and appellate counsel, in violation of his Sixth and Fourteenth Amendment rights; (2) there was insufficient evidence to support his conviction, and this violates his right to due process; and (3) prosecutorial misconduct during closing argument violated petitioner's right to due process. The errors alleged are, liberally construed, cognizable bases for federal habeas relief.

## CONCLUSION

For the foregoing reasons,

1.    The Clerk of the Court shall serve by certified mail a copy of this order, petition, and all attachments thereto, upon respondent and respondent's attorney, the Attorney General for the State of California. The Clerk shall also serve a copy of this order on petitioner.

2.    Respondent shall file with the Court and serve on petitioner, within 60 days of the date this order is filed, an answer conforming in all respects to Rule 5 of the Rules Governing Section 2254 Cases, showing cause why a writ of habeas corpus should not be granted on petitioner's four cognizable claims. Respondent shall file with the answer and serve on petitioner a copy of all portions of the state trial record that have been transcribed previously and that are relevant to a determination of the issues presented by the petition.

If petitioner wishes to respond to the answer, he shall do so by filing a traverse with the Court and serving it on respondent within 30 days of his receipt of the answer.

3.    Respondent may file a motion to dismiss on procedural grounds in lieu of an answer, as set forth in the Advisory Committee Notes to Rule 4 of the Rules Governing Section 2254 Cases. If respondent files such a motion, petitioner shall file with the Court and serve on respondent an opposition or statement of non-opposition within 30 days of receipt of the motion, and respondent shall file with the Court and serve on petitioner a reply within 15 days of receipt of any opposition.

4.    Petitioner is reminded that all communications with the Court must be

2

1    served on respondent by mailing a true copy of the document to respondent's counsel.

2        5.      It is petitioner's responsibility to prosecute this case.  Petitioner must keep

3    the Court and respondent informed of any change of address and must comply with the

4    Court's orders in a timely fashion.  Failure to do so may result in the dismissal of this

5    action for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b).

6        6.      Upon a showing of good cause, requests for a reasonable extension of time

7    will be granted as long as they are filed on or before the deadline which they seek to

8    extend.

9        IT IS SO ORDERED.

10   DATED: 10/18/2008

11

12   MARTIN J. JENKINS
     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

Uvalles,

    Plaintiff,

 v.

Runnels et al,

    Defendant.

             /

Case Number: CV05-02779 MJJ

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 20, 2005, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Raul Uvalles
High Desert State Prison
Prisoner Id T59954
P.O. Box 3030
Susanville, CA 96127

Dated: October 20, 2005

Richard W. Wieking, Clerk
By: Monica Tutson, Deputy Clerk

1    EDMUND G. BROWN JR.
     Attorney General of the State of California
2    DANE R. GILLETTE
     Chief Assistant Attorney General
3    GERALD A. ENGLER
     Senior Assistant Attorney General
4    PEGGY S. RUFFRA
     Supervising Deputy Attorney General
5    MARK S. HOWELL
     Deputy Attorney General
6    State Bar No. 95125
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
      Telephone: (415) 703-5969
8     Fax: (415) 703-1234
      Email: mark.howell@doj.ca.gov
9    Attorneys for Respondent

10           IN THE UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12             SAN FRANCISCO DIVISION

13

14    **RAUL UVALLES,**                   C 05-2779 MJJ (PR)

15                 Petitioner,

16          **v.**

17    **D.L. RUNNELS, Warden,**

18                 Respondent.

19

20      **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

21

22

23

24

25

26

27

28

# EXHIBIT F-3

ATTORNEY GENERAL OFFICE COPY

1 │ BILL LOCKYER
   │ Attorney General of the State of California
2 │ ROBERT R. ANDERSON
   │ Chief Assistant Attorney General
3 │ GERALD A. ENGLER
   │ Senior Assistant Attorney General
4 │ PEGGY S. RUFFRA
   │ Supervising Deputy Attorney General
5 │ MARK S. HOWELL
   │ Deputy Attorney General
6 │ State Bar No. 95125
   │   455 Golden Gate Avenue, Suite 11000
7 │   San Francisco, CA 94102-7004
   │   Telephone: (415) 703-5969
8 │   Fax: (415) 703-1234
   │   Email: mark.howell@doj.ca.gov
9 │ Attorneys for Respondents

ORIGINAL
FILED

FEB 24 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10 │              IN THE UNITED STATES DISTRICT COURT

11 │            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 │                   SAN FRANCISCO DIVISION

13 │
   │  RAUL UVALLES,                          C-05-2779-MJJ (PR)
14 │
   │                           Petitioner,
15 │
   │         v.
16 │
   │  D.L. RUNNELS, Warden,
17 │
   │                           Respondent.
18 │

19 │
20 │              MOTION TO DISMISS PETITION FOR
   │ LACK OF PARTICULARITY AND FOR FAILURE TO EXHAUST CLAIM II, AND
   │    ALTERNATE MOTION TO RETURN PETITION TO PETITIONER TO
21 │              MAKE PETITION MORE CERTAIN

22 │
23 │
24 │
25 │
26 │
27 │
28 │

F-3

1 **TABLE OF CONTENTS**

2                                                                                    **Page**

3
MEMORANDUM OF POINTS AND AUTHORITIES                                    2
4
STATEMENT OF THE CASE                                                   2
5
THE LEGAL PRINCIPLES GOVERNING THE SPECIALIZED
6  PLEADING REQUIREMENTS ON HABEAS CORPUS                                  3

7  CONCLUSION                                                            29

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2                                                                              **Page**

3 **Cases**

4 *Adams v. Armontrout*
  897 F.2d 332 (8ᵗʰ Cir. 1990)                              4, 6, 10, 19, 23, 26, 27
5
  *Allen v. Perini*
6 424 F.2d 134 (6ᵗʰ Cir. 1970)                                               5

7 *Anderson v. Harless*
  459 U.S. 4 (1982)                                                         22
8
  *Aubut v. Maine*
9 431 F.2d 688 (1ˢᵗ Cir. 1970)                              4-6, 10, 23, 25, 27

10 *Baldwin v. Reese*
   541 U.S. 27 (2004)                                                       22
11
   *Barnard v. Collins*
12 958 F.2d 634 (5ᵗʰ Cir. 1992)                                             18

13 *Batson v. Kentucy*
   476 U.S. 79 (1986)                                                       11
14
   *Bernier v. Moore*
15 441 F.2d 395 (1ˢᵗ Cir. 1971)                                              5

16 *Blackledge v. Allison*
   431 U.S. 63 (1977)                                        4, 6, 10, 23, 27
17
   *Bland v. Dept. of Corrections*
18 20 F.3d 1469 (9ᵗʰ Cir. 1994), overruled on other grounds
   in *Schell v. Witek*, 218 F.3d 1017 (9ᵗʰ Cir. 2000)                       9
19
   *Browder v. Director, Ill. Dept. of Corrections*
20 434 U.S. 257 (1978)                                                       5

21 *Brown v. Allen*
   344 U.S. 443 (1953)                                                       5
22
   *Carriger v. Lewis*
23 971 F.2d 329 (9ᵗʰ Cir. 1992)                                             22

24 *Conley v. Gibson*
   355 U.S. 41 (1957)                                                       20
25
   *Gatlin v. Madding*
26 189 F.3d 882 (9ᵗʰ Cir. 1999)                                             23

27 *Grisby v. Blodgett*
   130 F.3d 365 (9ᵗʰ Cir. 1997)                                            10
28

## TABLE OF AUTHORITIES  (continued)

1

Page

2

3

*Gutierrez v. Griggs*
695 F.2d 1195 (9th Cir. 1983)

6

4

*Hasan v. Galaza*
254 F.3d 1150 (9th Cir. 2001)

9

5

6

*Hishon v. King & Spalding*
467 U.S. 69 (1984)

20

7

*Iaea v. Sunn*
800 F.2d 861 (9th Cir. 1986)

9

8

9

*James v. Borg*
24 F.3d 20 (9th Cir. 1994)

8, 10, 17

10

*Jones v. Gomez*
66 F.3d 199 (9th Cir. 1995)

9, 11, 17

11

12

*Keeney v. Tamayo-Reyes*
504 U.S. 1 (1992)

23

13

*Kelly v. Small*
315 F.3d 1063 (9th Cir. 2003)

21, 22

14

15

*Mayle v. Felix*
125 S.Ct. 2562 (2005)

4

16

*Miranda v. Arizona*
384 U.S. 436 (1966)

15

17

18

*Moorman v. Schriro*
426 F.3d 1044 (9th Cir. 2005)

22

19

*Nelson v. Hargett*
989 F.2d 847 (5th Cir. 1993)

17

20

21

*O'Bremski v. Maass*
915 F.2d 418 (9th Cir. 1990)

4, 5

22

*Palmer v. Roosevelt Lake Log Owner's Assn.*
651 F.2d 1289 (9th Cir. 1981)

20

23

24

*People v. Cash*
28 Cal.4th 703 (2002)

16

25

*People v. Marsden*
2 Cal.3d 118 (1970)

2, 18, 25, 27

26

*People v. Wheeler*
22 Cal.3d 258 (1978)

11, 26

27

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

iii

TABLE OF AUTHORITIES  (continued)

Page

*Rhines v. Weber*
544 U.S. 269 (2005)                                                24

*Rhode Island v. Innes*
446 U.S. 291 (1980)                                                15

*Rock v. Arkansas*
483 U.S. 44 (1987)                                                 18

*Rose v. Lundy*
455 U.S. 509 (1982)                                          1, 3, 21-23

*Siripongs v. Calderon*
133 F.3d 732 (9th Cir. 1998)                                        9

*Small v. Endicott*
998 F.2d 411 (7th Cir. 1993)                                        5

*Strickland v. Washington*
466 U.S. 668 (1984)                            7, 9, 10, 12-15, 17, 18

*Turner v. Calderon*
281 F.3d 851 (9th Cir. 2002)                                        9

*United States v. Berry*
814 F.2d 1406 (9th Cir. 1989)                                   10, 17

*United States v. Edwards*
897 F.2d 445 (9th Cir. 1990)                                       18

*United States v. Popoola*
881 F.2d 811 (9th Cir. 1987)                                       17

*United States v. Taylor*
802 F.2d 1108 (9th Cir. 1986)                                   9, 10

*Wacht v. Cardwell*
604 F.2d 1245 (9th Cir. 1979)                        4, 6, 10, 19, 23, 27

*White v. Lewis*
874 F.2d 599 (9th Cir. 1989)                                      2, 6

*Williams v. Kullman*
722 F.2d 1048 (2d Cir. 1983)                                    4, 6, 20

**Constitutional Provisions**

United States Constitution

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

TABLE OF AUTHORITIES  (continued)

|  | Page |
|---|---|
| Sixth Amendment | 7, 24 |
| Fourteenth Amendment | 24 |

**Statutes**

| Evidence Code | |
| §§ 785-788 | 16 |

| Penal Code | |
| § 187 | 2 |
| § 211 | 2 |
| § 212.5, subd. (c) | 2 |
| § 654 | 2 |
| § 1103(a) | 16 |
| § 1387 | 13 |

| Rules following 28 USC § 2254 | |
| Rule 2(c) | 1, 3, 4, 6, 10, 23, 26, 28 |
| Rule 4 | 1, 3, 5, 6, 10, 20, 21, 23 |

| Rules following 28 USC § 2254 with Advisory Committee Noteso | |
| Rule 2 | 1, 10, 28 |
| Rule 4 | 1, 3, 6, 10, 20, 23, 25, 28 |

| 28 United States Code | |
| § 2254(b) | 1 |

**Court Rules**

| Federal Rules of Civil Procedure | |
| Rule 8(a) | 3 |
| Rule 8(e) | 3 |
| Rule 12(b)(6) | 5, 20 |
| Rule 12(e) | 6, 25 |

**Other Authorities**

| CALJIC | |
| No. 8.21 | 21 |

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

v

1  BILL LOCKYER
   Attorney General of the State of California
2  ROBERT R. ANDERSON
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-7004
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondents

10                IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  **RAUL UVALLES,**                          C-05-2779-MJJ (PR)

                            Petitioner,
15                                             **MOTION TO DISMISS PETITION
                                               FOR LACK OF PARTICULARITY
16          v.                                 AND FOR FAILURE TO EXHAUST
                                               CLAIM II, AND ALTERNATE
                                               MOTION TO RETURN PETITION TO
17  **D.L. RUNNELS, Warden,**                  PETITIONER TO MAKE PETITION
                                               MORE CERTAIN**
                            Respondent.
18

19

20          Respondent hereby moves, pursuant to Rules 2(c) and 4 of the Rules following 28 U.S.C.

21  § 2254, which govern habeas corpus cases, to dismiss the petition for writ of habeas corpus filed in

22  the above-entitled case. Respondent also moves to dismiss the petition for failure to exhaust Claim

23  II. 28 U.S.C. § 2254(b); *Rose v. Lundy*, 455 U.S. 509, 520-22 (1982). Alternatively, respondent

24  moves to have the petition returned to petitioner for a more certain statement of petitioner's claims.

25  Rules foll. 28 U.S.C. § 2254, Rules 2(c) and 4, and Advisory Committee Notes to Rules 2 and 4.

26          No hearing date is noticed pursuant to Habeas L.R. 2254-8, because petitioner is an

27  incarcerated state prisoner who is representing himself in this case.

28          A motion in lieu of an answer is appropriate where the petition is procedurally defective

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

                                              1

1  on its face. *See White v. Lewis,* 874 F.2d 599, 602-603 (9th Cir. 1989.)

3  **MEMORANDUM OF POINTS AND AUTHORITIES**

5  **STATEMENT OF THE CASE**

7  In an information filed in Santa Clara County Superior Court on January 11, 2002, the

8  district attorney charged petitioner as follows:  count one - murder, Cal. Pen. Code § 187[1/]; count

9  two - robbery in the second degree, Pen. Code §§ 211, 212.5(c).  CT 60-62.  Trial began with in

10  limine motions on May 3, 2002.  CT 108.  On May 14, 2002, the jury found petition guilty of both

11  counts.  CT 191-94.

12  On June 13, 2002, after the verdicts,  a hearing was held upon petitioner's request that his

13  appointed counsel be discharged and that new counsel be appointed for him, pursuant to *People v.*

14  *Marsden,* 2 Cal.3d 118 (1970).  CT 200.  On June 14, 2002, the trial court denied the *Marsden*

15  motion and sentenced petitioner to 25 years to life for the murder (count one) and to a concurrent

16  middle term of three years for the robbery (count two).  CT 235-37; RT 495-96.

17  Petitioner filed a timely notice of appeal on June 14, 2002.  CT 238.  On October 28, 2003,

18  the California Court of Appeal, on direct appeal, modified the sentence, pursuant to Penal Code

19  section 654, by staying the three-year term for the robbery (count two).[2/]  Otherwise, the judgment

20  was affirmed, Exh. C-5, and a remittitur issued  on December 30, 2003.  Exh. C-6.[3/]

21  Apparently, petitioner submitted a petition for writ of habeas corpus to the Superior Court

---

23  1. All subsequent references to the Penal Code are to the California Penal Code.

24  2. None of the issues on direct appeal are raised in the instant habeas petition. Consequently,
25  respondent never had occasion to brief the issues raised in the instant federal habeas petition.
    Petitioner's subsequent requests for state collateral relief were summarily decided also without any
26  input by respondent.

27  3. Contrary to the suggestion in the petition now before this Court, Ptn. at p. 3, item 3(b),
28  petitioner did not seek direct review in the California Supreme Court.

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1    of State of California, County of Santa Clara, on or about March 18, 2004. *See* Exh. B attached to

2    Resp's. Exh. D-1; Exh. B attached to Exh. C of Resp's. Exh. E-1. In the instant petition, petitioner

3    recites that his petition to the superior court was denied on May 21, 2004, Ptn. at p. 4, but in

4    actuality, it appears that the petition which he sent to the superior court was never decided. Instead,

5    it was apparently returned to petitioner by the post office on May 21, 2004, because it had been

6    misaddressed, and the forwarding time had expired. *See* Exh. A attached to Resp's. Exh. D-1; Exh.

7    A attached to Resp's. Exh. E-1.

8            On June 7, 2004, petitioner filed a petition for writ of habeas corpus in the California

9    Count of Appeal. Exh. D-1. Without issuing any Order To Show Cause, the Court of Appeal filed

10   an order on June 14, 2004, summarily denying the writ.

11           On June 28, 2004, petitioner filed a petition for writ of habeas corpus in the California

12   Supreme Court. Exh. E-1. Without issuing any Order To Show Cause, the California Supreme

13   Court filed an order on May 18, 2005, summarily denying the writ.

14           On July 6, 2005, petitioner filed the instant petition for writ of habeas corpus in this Court.

15   Docket No. 1. On October 19, 2005, this Court issued an Order To Show Cause why the petition

16   should not be granted. Respondent hereby moves to dismiss the petition for failure to state with

17   particularity the facts in support of his claims and for failure to exhaust Claim II. Rules foll. 28

18   U.S.C. § 2254, Rules 2(c) and 4; *Lundy*, 455 U.S. at 520-22. Alternatively, respondent requests that

19   the petition be returned to petitioner with directions to make the petition more certain. Rules foll.

20   28 U.S.C. § 2254, Rule 4 and its Advisory Committee Note (describing procedure whereby habeas

21   petition may be returned to petitioner for amendments that would "make the petition more certain").

22   **THE LEGAL PRINCIPLES GOVERNING THE SPECIALIZED PLEADING
     REQUIREMENTS ON HABEAS CORPUS**

23

24           In most civil cases brought in the federal courts Rule 8(a) of the Federal Rules of Civil

25   Procedure requires only a short and plain statement of the claim, and Rule 8(e) merely requires that

26   each averment be "simple, concise, and direct." However, the pleading requirements for habeas

27   corpus petitions are "more demanding" than the rules set forth in Rule 8 for civil pleadings in

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

3

1  general. *See Mayle v. Felix*, 125 S.Ct. 2562, 2569-2570 (2005).

2      A habeas petition must, among other things, "specify all the grounds for relief available

3  to the petitioner," must "state the facts supporting each ground," and must "state the relief

4  requested." Rules foll. 28 U.S.C. § 2254, Rule 2(c).

5      The courts do not accept notice pleading in habeas corpus proceedings. Generalizations

6  and conclusions will not suffice. *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970). "Conclusory

7  allegations unsupported by specifics" are "subject to summary dismissal." *Blackledge v. Allison*,

8  431 U.S. 63, 74 (1977). "'"Notice' pleading is not sufficient, for the petition is expected to state

9  facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. [at]

10  75 n. 7 . . . (quoting Advisory Committee Note to Rule 4, Rules Governing Habeas Corpus Cases,

11  28 U.S.C. § 2254 foll. (1976) (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (lst Cir. 1970))."

12  *O'Bremski v. Maass*, 915 F.2d 418, 420 (9th Cir. 1990); *accord Wacht v. Cardwell*, 604 F.2d 1245,

13  1246-47 (9th Cir. 1979).

14      In *Aubut*, 431 F.2d at 689, the First Circuit stated:

15      The petition should set out substantive facts that will enable the court to see a real
        possibility of constitutional error.  Habeas corpus is not a general form of relief for those
16      who seek to explore their case in search of its existence.

17  *Id.*

18      As explained by the Eighth Circuit in *Adams v. Armontrout*, 897 F.2d 332, 334 (8th Cir.

19  1990),

20      [T]o substantially comply with [28 U.S.C.] Section 2254 Rule 2(c), a petitioner must state
        specific, particularized facts which entitle him or her to habeas corpus relief for each
21      ground specified.  These facts must consist of sufficient detail to enable the court to
        determine, from the fact of the petition alone, whether the petition merits further habeas
22      corpus review.

23  *Id.*

24      Neither 28 U.S.C. § 2254, nor the Rules following Section 2254, compels the federal

25  courts to review the entire state court record to determine whether facts exist which support habeas

26  relief. *Id.* at 333. Federal courts have repeatedly expressed an unwillingness to sift the record in

27  order to divine the grounds or facts which allegedly warrant habeas relief. *Id.*; *see also Williams v.*

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

4

1    *Kullman*, 722 F.2d 1048, 1051 (2d Cir. 1983) ("it would be unwise to saddle district judges with the

2    burden of reading through voluminous records and transcripts in every case"; "'habeas corpus is a

3    special proceeding to right wrongs, not a routine procedure to search for them. . . .' *Bernier v.*

4    *Moore*, 441 F.2d 395, 396 (1st Cir. 1971) (per curiam). *See Aubut v. Maine*, 431 F.2d 688, 689 (1st

5    Cir. 1970)").

6         In *Williams*, the Second Circuit also relied upon Justice Jackson's concurring opinion in

7    *Brown v. Allen*, 344 U.S. 443 (1953), wherein he stated that "he who must search a haystack for a

8    needle is likely to end up with the attitude that the needle is not worth the search." *Williams*, 722

9    F.2d at 1051 (quoting *Brown*, 344 U.S. at 537 (Jackson J., conc. opn.).

10        Although pro se petitions are liberally construed, judges are not obliged to construct a

11   party's legal arguments for him. Where a petitioner's legal claim is unclear, it is for the petitioner

12   to elaborate and make sure that his arguments are sufficiently set forth so that the court does not have

13   to attempt to divine the point that petitioner is trying to make. *Small v. Endicott*, 998 F.2d 411, 417-

14   18 (7th Cir. 1993). Furthermore, ". . . under [28 U.S.C.] § 2243, it is the duty of the court to screen

15   out frivolous applications and eliminate the burden that would be placed on respondent by ordering

16   an unnecessary answer. *Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970)." Rules foll. 28 U.S.C.

17   § 2254, Rule 4.

18        Under ordinary pleading practice, a respondent may raise certain defenses by motion rather

19   than by filing an answer in response to the opening pleading. One defense which may be raised by

20   way of a motion is a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

21   12(b)(6). The Supreme Court has stated the view that a Rule 12(b)(6) motion is not an appropriate

22   motion in a habeas corpus proceeding. *O'Bremski*, 915 F.2d at 420 (quoting from *Browder v.*

23   *Director, Ill. Dept. of Corrections*, 434 U.S. 257, 269 n. 14. . . (1978)).[4/]

24

---

25      4. *Browder* explained that the procedure for responding to a habeas corpus petition is
26   controlled by the habeas corpus statutes, which take precedence over the Federal Rules of Civil
     Procedure. The Federal Rules apply to habeas proceedings only to the extent that the practice on
27   habeas corpus is not specifically set forth in the statutes governing habeas corpus. *Browder*, 434
     U.S. at 269 (citing Fed. R. Civ. P. 81(a)(2)).
28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

5

1  . . . [R]ule 4 of the Rules Governing Section 2254 in the United States District Courts
   "explicitly allows a district court to dismiss summarily the petition on the merits when no
2  claim for relief is stated." *Gutierrez v. Griggs*, 695 F.2d 1195, 1198 (9th Cir. 1983); *see
   also White v. Lewis*, 874 F.2d 602-03 (9th Cir. 1989) (meritorious motions to dismiss are
3  permitted by Rule 4.)

4  *O'Bremski*, 915 F.2d at 420.

5          In the instant case, the Order To Show Cause authorized respondent to proceed by way of

6  a motion, in lieu of an answer.  Clearly, a motion to dismiss is an authorized means of bringing to

7  the Court's attention the inadequacy of the petition for failure "to state facts that point to a real

8  possibility of constitutional error."  A motion to dismiss is also an appropriate means by which to

9  demonstrate "that petitioner has failed to exhaust state remedies" (*see* Claim III, below).  Finally,

10 in order to "avoid burdening the respondent with the necessity of filing an answer on the substantive

11 merits of the petition," a respondent may use a motion to request that a petition be returned to the

12 petitioner with directions "to make the petition more certain."[5/] Rules foll. 28 U.S.C. § 2254, Rule

13 4, Advisory Committee Notes; *see White*, 874 F.2d at 603 (responding to a habeas petition with a

14 motion to dismiss is common practice).

15         The instant petition is fatally defective in its lack of specificity as to each of the five

16 enumerated claims.  Because they fail to provide the particularized pleading required of a habeas

17 corpus application, the petition and each of the claims therein should be dismissed, for the reasons

18 stated more particularly below.  Rules foll. 28 U.S.C. § 2254, Rules 2(c), 4; *Allison*, 431 U.S. at 74-

19 75; *Wacht*, 604 F.2d at 1246; *see Adams*, 897 F.2d at 334; *Aubut*, 431 F.2d at 689.

20         Furthermore, to the extent that the Court deems any of petitioner's claims to state facts that

21 point to a real possibility of constitutional error, but still finds a need for petitioner to make the

22 _____

23         5.  Although the Advisory Committee Note following Rule 4 expressly discusses the utility
   of a motion to make the petition more certain, former Rule 2(e), now repealed, expressly provided
24 for the return of an insufficient habeas petition to the petitioner, along with a statement of the reason
   for its return.  *See Adams*, 897 F.2d at 334 and n. 3; *Williams*, 722 F.2d at 1051.  Rule 12(e) of the
25 Federal Rules of Civil Procedure similarly provides

26         If a pleading to which a responsive pleading is permitted is so vague or ambiguous
           that a party cannot reasonably be required to frame a responsive pleading, the party
27         may move for a more definite statement before interposing a responsive pleading.
           The motion shall point out the defects complained of and the details desired.

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

6

1  petition more certain, we would request that the Court order the petition to be returned to petitioner,

2  with directions that set forth the shortcomings in the petition described herein, Rules foll. 28 U.S.C.

3  § 2254, Rule 4, and, if petitioner refiles the petition, that respondent once again be provided with

4  time and an opportunity to file either an answer or a motion in response to the refiled petition.

5  **Claim I - Ineffective Assistance Of Counsel**

6      Petitioner alleges in Claim I that both his trial counsel and his counsel on direct appeal

7  rendered ineffective assistance, in violation of the Sixth Amendment, and therefore, petitioner is

8  entitled to habeas relief. Petitioner itemizes ten different ways in which trial counsel allegedly

9  rendered ineffective assistance and four different ways in which appellate counsel rendered

10  ineffective assistance.

11      A convicted defendant's claim that counsel's assistance was so defective as to require
    reversal of a conviction or death sentence has two components. First, the defendant must
12  show that counsel's performance was deficient. This requires showing that counsel made
    errors so serious that counsel was not functioning as the "counsel" guaranteed the
13  defendant by the Sixth Amendment. Second, the defendant must show that the deficient
    performance prejudiced the defense. This requires showing that counsel's errors were so
14  serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless
    a defendant makes both showings, it cannot be said that the conviction or death sentence
15  resulted from a breakdown in the adversary process that renders the result unreliable.

16  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

17      The correct constitutional standard for attorney performance is that of "reasonably

18  effective assistance." *Id.* To state a claim of ineffective assistance, a defendant "must show that

19  counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88.

20      A fair assessment of attorney performance requires that every effort be made to
    eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's
21  challenged conduct, and to evaluate the conduct from counsel's perspective at the time.
    Because of the difficulties inherent in making the evaluation, a court must indulge a strong
22  presumption that counsel's conduct falls within the wide range of reasonable professional
    assistance; that is, the defendant must overcome the presumption that, under the
23  circumstances, the challenged action "might be considered sound trial strategy."
    (Citation.) There are countless ways to provide effective assistance in any given case.
24  Even the best criminal defense attorneys would not defend a particular client in the same
    way. (Citation.)

25  *Id.* at 689.

26      A court deciding an ineffectiveness claim must judge the reasonableness of counsel's

27  challenged conduct on the facts as of viewed as the time of counsel's conduct. *Id.* at 690. ". . .

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

7

1    [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant

2    decisions in the exercise of reasonable professional judgment." *Id.*

3    ". . . [A]ny deficiencies in counsel's performance must be prejudicial to the defense in

4    order to constitute ineffective assistance under the Constitution." *Id.* at 692. Generally, a defendant

5    must affirmatively prove prejudice, *id.* at 693, i.e., that the particular errors of counsel were not only

6    unreasonable, but also that they "actually had an adverse effect on the defense." *Id.* "It is not

7    enough for the defendant to show that the errors had some conceivable effect on the outcome of the

8    proceeding," *id.*, but instead, "[t]he defendant must show that there is a reasonable probability that,

9    but for counsel's unprofessional errors, the result of the proceeding would have been different. A

10   reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at

11   694.

12   Petitioner's allegations repeatedly fail to establish any factual basis in support of his

13   conclusory claims of ineffective assistance. His allegations give no substantiating facts that would

14   enable anyone reading the allegations to conclude that there is a real possibility of constitutional

15   error, nor do petitioner's allegations of ineffectiveness provide the reader with any meaningful

16   allegation that there exists a reasonable probability that petitioner was prejudiced as a result of the

17   alleged shortcomings in his counsel's performance.

18   To illustrate these points, respondent addresses each of petitioner's allegations of

19   ineffectiveness:

20   (1) Petitioner alleges that trial counsel failed or refused to present petitioner's requested

21   defense of self-defense. Without marshaling any of the evidence that might have supported such a

22   defense, petitioner alleges only that it was a "valid defense" to the charges against petitioner, and that

23   there was evidence to support such a defense.

24   A petitioner's claim that trial counsel was ineffective for failing to present a particular

25   defense should be rejected where petitioner fails to identify the evidence that trial counsel should

26   have presented in support of that defense. *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994). To the

27   extent that petitioner is arguing that trial counsel should have relied on evidence of record to argue

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

8

1   self-defense, petitioner must "point to errors or omissions in the record on appeal that establish that

2   he did not receive adequate representation," *United States v. Taylor*, 802 F.2d 1108, 1119 (9th Cir.

3   1986), and vague and speculative allegations that trial counsel lacked professional competence fail

4   to state a claim of constitutionally ineffective assistance for which relief may be granted. *Id.* Any

5   allegation suggesting that the record already contains evidence which trial counsel should have

6   exploited to advance a defense of self-defense must be accompanied by an exposition of the

7   evidence, with appropriate citations to the record, or else the allegation must be deemed conclusory

8   and insufficiently specific to survive a motion to dismiss for lack of particularity. *Cf.*, *Jones v.*

9   *Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995).

10        Furthermore, petitioner's attempt to second-guess trial counsel's presentation fails to allege

11   that trial counsel's conduct was not the result of a reasoned tactical choice. The Ninth Circuit has

12   stated that a defendant does not establish ineffective representation by simply adverting to evidence

13   which trial counsel *could have* presented. The proper focus is on whether the course that trial

14   counsel chose was an unreasonable one. *Turner v. Calderon*, 281 F.3d 851, 877 (9th Cir. 2002);

15   *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998); *see Strickland*, 466 U.S. at 690 ("[a]

16   convicted defendant making a claim of ineffective assistance must identify the acts or omissions of

17   counsel that are alleged not to have been the result of reasonable professional judgment").

18        Petitioner has not alleged any basis for casting aside the strong presumption that trial

19   counsel rendered constitutionally adequate assistance and made all significant strategic decisions in

20   the exercise of reasonable professional judgment. *Strickland* at 690.  Trial counsel did not have a

21   duty to pursue every factual line of defense if counsel reasonably believed that defendant's interests

22   would not be advanced by doing so, *see Iaea v. Sunn*, 800 F.2d 861, 865 n. 4 (9th Cir. 1986), and

23   presentation of inconsistent defenses may, itself, represent prejudicial incompetence. *Bland v. Dept.*

24   *of Corrections*, 20 F.3d 1469, 1479 (9th Cir. 1994), overruled on other grounds in *Schell v. Witek*,

25   218 F.3d 1017, 1025 (9th Cir. 2000).

26        Finally, petitioner fails to allege that, but for trial counsel's failure to present a defense of

27   self-defense, there was a reasonable probability that petitioner would have obtained a more favorable

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1   outcome at trial. *See Hasan v. Galaza*, 254 F.3d 1150, 1154 (9th Cir. 2001) (petitioner must plead

2   and prove both prongs of *Strickland* test). Consequently, petitioner's claim is vague, conclusory, and

3   devoid of factual support and legal reasoning; therefore, it fails to state facts that point to a real

4   possibility of constitutional error for which habeas relief may be granted. Accordingly, it should be

5   dismissed. Rules foll. 28 U.S.C. § 2254, Rules 2(c), 4, and Advisory Committee Notes to Rules 2

6   and 4; *Allison*, 431 U.S. at 74-75; *Wacht*, 604 F.2d at 1246; *see Adams*, 897 F.2d at 334; *Aubut*, 431

7   F.2d at 689.

8

9        (2) Petitioner next alleges that trial counsel was ineffective for failing and/or refusing to

10  call an expert witness to refute the conclusions of the coroner and the crime laboratory, or, at least,

11  to provide an independent analysis of the facts. Again, however, petitioner fails to provide any

12  indication of what an independent expert would have found, or would have testified to at trial. *See*

13  *Grigsby v. Blodgett,* 130 F.3d 365, 373 (9th Cir. 1997). Again, petitioner fails to allege any facts

14  which would override the presumption that trial counsel's decision to proceed without presenting

15  additional expert testimony at trial was the product of a well-reasoned tactical choice. Petitioner's

16  failure to identify what evidence counsel should have presented, and to what end, leaves his

17  contention incomplete as a matter of law. *James*, 24 F.3d at 26; *see United States v. Berry*, 814 F.2d

18  1406, 1409 (9th Cir. 1989). Considering the petition in a light most favorable to petitioner, he has

19  failed to plead any facts that would substantiate the two prerequisites set forth in *Strickland* for a

20  claim of ineffective assistance: (1) that his attorney's performance fell below an objectively

21  reasonable standard, and (2) that there is a reasonable probability that, but for trial counsel's alleged

22  omission, petitioner would have obtained a more favorable outcome at trial. Petitioner's conclusory

23  allegation must be dismissed.

24

25        (3) Next, petitioner contends that trial counsel was ineffective for failing or refusing to

26  request involuntary manslaughter instructions. However, petitioner fails to allege any evidentiary

27  support for such a theory, and even if we were to assume that the record contains such evidence,

28  petitioner has a duty to identify where such evidence appears in the record. *Taylor*, 802 F.2d at

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

10

1 1119; *cf., Jones*, 66 F.3d at 204-05. Additionally, petitioner fails to make the necessary averments

2 that trial counsel's failure or refusal was the product of objectively unreasonable attorney

3 performance and not the result of a valid tactical decision. Furthermore, the petition fails to allege

4 any reasonable probability of prejudice.

5

6      (4) Petitioner alleges that trial counsel was ineffective for failing to raise a *Wheeler*

7 motion. *People v. Wheeler*, 22 Cal.3d 258 (1978). Petitioner argues that such a motion should have

8 been brought due to the prosecutor's alleged use of "race based" peremptory challenges to exclude

9 minorities from the jury.

10      However, petitioner does not identify *any* prospective jurors against whom the prosecutor

11 executed a peremptory challenge, nor, aside from mentioning the word "race," does petitioner

12 identify any cognizable group against whom the prosecutor was allegedly discriminating. Petitioner

13 does not provide any *facts* in support of the contention that the prosecutor's use of peremptory

14 challenges was based on race. He does not identify any facts in support of a prima facie case of

15 invidious discrimination, he does not recite any facts as to whether the court required the prosecutor

16 to explain her reasons for excusing any particular prospective jurors, nor does petitioner recite what

17 the prosecutor may have said in response to any trial court inquiry into the reasons for the

18 prosecutor's peremptory challenges. In short, petitioner fails to make any particularized averments

19 that would support a finding that any of his constitutional rights, *see Batson v. Kentucy*, 476 U.S. 79

20 (1986), were infringed by counsel's inaction.

21      Furthermore, petitioner has failed to set forth any facts that would negate the presumption

22 that trial counsel's decision not to bring a *Wheeler* motion was a reasonable tactical choice. A

23 *Wheeler* motion might have resulted in adverse consequences for the defense, such as the dismissal

24 of a panel or dismissal of a venire which contained prospective jurors considered highly favorable

25 by the defense, or a *Wheeler* motion, if sustained, could delay the trial, could affect the parties'

26 ability to present certain evidence, or could result in the case being tried by another judge.

27      Finally, petitioner fails to set forth any facts by which trial counsel's decision not to make

28 a *Wheeler* motion may be assessed for prejudice. An assessment of the strength of such a motion

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1  is essential to the determination—not only of whether the omission was the result of deficient

2  attorney performance—but also whether there was a reasonable probability that, but for the alleged

3  failure on the part of counsel to raise a *Wheeler* motion, petitioner would have obtained a more

4  favorable outcome.

5

6  (5) Petitioner next alleges that trial counsel was ineffective for failing to move to suppress

7  property which had been taken from petitioner's apartment as a result of an unlawful search and

8  seizure. Petitioner's conclusory allegation omits any mention of what property was seized, what

9  property should have been suppressed, who took it, whether or not it was taken pursuant to a warrant,

10 and what, in petitioner's view, was unlawful about the search and/or seizure.

11 Without any indication of what it is that petitioner would have sought to suppress, and its

12 value as prosecution evidence, any assessment of whether the failure to move for suppression was

13 the product of attorney incompetence is impossible. Likewise, the inability to determine whether

14 the proposed motion would likely have succeeded affects the analysis under both *Strickland* prongs,

15 i.e., it is impossible to determine whether counsel's omission was objectively unreasonable, and it

16 is impossible to determine whether, but for the omission, there is a reasonable probability that

17 petitioner would have obtained a more favorable outcome.

18 Also, since the claim here is so sketchy, petitioner's trial counsel may have omitted to raise

19 a motion to suppress because of some valid tactical reason, e.g., the evidence had some tendency to

20 benefit petitioner's case, or counsel may have omitted such a motion because evidence of the seizure

21 might tend to create doubt about the circumstances of the seizure, about petitioner's relationship to

22 the seized items, about the chain of custody, or about a police animus that might raise a doubt as to

23 guilt. Additionally, petitioner's failure to identify the items which allegedly should have been

24 suppressed precludes any assessment of whether their admission was harmless. In short, petitioner

25 has failed to set forth substantiating facts that demonstrate any real possibility of constitutional error.

26

27 (6) Petitioner alleges, without more, that "trial counsel was ineffective for failing to move

28 for a speedy trial as requested by petitioner." This vague and conclusory allegation does not identify

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1   whether the proposed speedy trial motion should have been based on statutory or constitutional

2   grounds, or whether it related to pre-complaint or post-complaint delay.  No particular dates are

3   identified.  There is no discussion in the petition as to the length of the delay, the reasons for the

4   delay, any assertion of the right to speedy trial, or whether any prejudice arose from the delay.  Nor

5   is there any mention of whether petitioner waived any part of the asserted delay, or whether the delay

6   was attributable to the defense or the government.  Petitioner also omits any description of the

7   circumstances surrounding his alleged request for trial counsel to bring a speedy trial motion.

8          The likely merit of the proposed motion cannot be evaluated, given the conclusory nature

9   of the pleading.   Consequently, petitioner fails to provide any factual support for the twin

10  propositions he must establish under *Strickland*: (1) that his trial counsel's omission was the result

11  of attorney performance which fell below an objectively reasonable standard, and (2) that, but for

12  counsel's failure to bring a speedy trial motion, petitioner would have obtained a more favorable

13  result at trial.

14         Petitioner's pleading also fails to negate the prospect of some tactical basis for forgoing

15  a speedy trial motion.  For example, if the motion were based exclusively on a statutory violation,

16  the prosecution might simply be able to file another pleading and commence a new proceeding, *see*

17  Pen. Code § 1387, and meanwhile, the intervening litigation delay might have had an adverse impact

18  on the defense.  In sum, petitioner has failed to assert either a speedy trial claim or a constitutional

19  claim of ineffective assistance with the degree of particularization required on habeas corpus.

20

21         (7)  In petitioner's next allegation of ineffective assistance, he states that when he asked

22  trial counsel about discovery, trial counsel told him that it would be automatically provided, and

23  there was no reason to worry because there was no shoe casting.[6/]  Based only this sketchy allegation,

24  petitioner contends that trial counsel rendered ineffective assistance regarding discovery.

25

---

26         6.  A shoe print found near the victim's body was photographed, and a shoe casting was

27  made.  RT 172-74.  Shoeprint comparison revealed that the shoeprints at the crime scene matched
   a pair of shoes found shortly after the homicide at petitioner's home.  RT 178, 181-84, 234-37, 243-

28  45.  Counsel did not object that he was surprised by this evidence when it was introduced at trial.

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1  Petitioner does not provide the context for his discussion with trial counsel, nor does he

2 provide a date for when that discussion took place. It would appear that the discussion, if it in fact

3 took place as petitioner claims, occurred before the prosecution had turned over any discovery to trial

4 counsel.

5  In any event, the allegation does not negate the likelihood that evidence of the shoe casting

6 was turned over to the defense, or, at least, it was made available to the defense for inspection and

7 further analysis by a defense expert. The allegation here fails to set forth that trial counsel's

8 representation fell below an objective standard of reasonableness by not demanding discovery, by

9 not reviewing discovery, or by not making appropriate motions to obtain discovery. Petitioner does

10 not allege that trial counsel *never* received discovery prior to introduction of the evidence.

11 Accordingly, there is no factual support for the proposition that trial counsel's performance with

12 regard to discovery was in any respect deficient.

13  Even if we were to assume that trial counsel said there was no shoe casting, and even if

14 we were further to assume that such statement was untrue, we cannot attribute to counsel a knowing

15 falsehood, nor can we ascribe to counsel any constitutional dereliction with regard to discovery.

16 Furthermore, petitioner's allegations fail to substantiate any attorney incompetence for not presenting

17 a motion or for failing to object to discovery procedures, nor does petitioner make the necessary

18 factual averments to support his burden of establishing that trial counsel's alleged ineffectiveness

19 was prejudicial under the *Strickland* standard.

20  (8) Petitioner's eighth allegation of attorney incompetence is that trial counsel failed to

21 file a motion, and to argue, that a pretrial statement which petitioner made, presumably to the police,

22 was "involuntary" and "resulted from an unlawful detention, arrest and *Miranda* violation."

23 Petitioner does not identify the particular statement at issue in his allegation of ineffective

24 assistance,[7/] nor does he provide any factual support for the conclusory allegation that his challenged

25

---

26  7. We can only infer that petitioner's claim refers to one or both of the statements which he
made to San Jose Police Officer Ernesto Vallecillo, and which were later introduced at trial. The
27 record shows that San Jose police took petitioner to the preprocessing unit at approximately 6:53
p.m. on August 20, 2001, and photographed him. RT 264, 267. At that time petitioner asked Officer
28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

14

1 | statement was involuntary. Petitioner also omits any factual allegations that would establish the

2 | prerequisites for *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966); *see also Rhode*

3 | *Island v. Innes*, 446 U.S. 291, 300 (1980) (*Miranda* does not come into play absent "custody" and

4 | "interrogation"). Petitioner does not explain how his detention and/or arrest was unlawful, nor does

5 | he adequately allege that any challenged statement was the product of an allegedly unlawful

6 | detention or arrest.

7 | Petitioner fails to allege facts from which it could reasonably be inferred that a motion

8 | based upon the asserted grounds had any reasonable likelihood of being granted. Consequently, the

9 | petition fails to set forth with particularity any facts to show that trial counsel proceeded

10 | unreasonably by failing to move for suppression or other relief on the grounds asserted here.

11 | Likewise, petitioner fails to provide any factual averments in support of his obligation to

12 | establish a reasonable probability that, but for counsel's alleged incompetence, petitioner would have

13 | obtained a more favorable outcome. The petition fails to provide any factual support for the

14 | proposition that the proposed motion would likely have been meritorious, and it also fails to provide

15 | any factual support for the proposition that the introduction of petitioner's statements at trial was

16 | prejudicial in light of the other evidence presented. Accordingly, petitioner's allegations are simply

17 | too conclusory to show that he would have prevailed on a motion brought under the Fourth

18 | Amendment, the Fifth Amendment, or *Miranda*, or that he can establish a violation of his right to

19 | counsel under *Strickland*. In sum, petitioner has not set out substantive facts which would enable

20 | the court (or respondent) to see a real possibility of constitutional error.

21 | (9) Next, petitioner alleges that trial counsel was ineffective for "failing to investigate the

22 | victim's criminal background to establish if there was any violent or criminal acts committed by the

23 | victim." Petitioner does not allege how such information might have benefitted him at trial. Even

24 | if the victim's background included evidence of violence or criminal activity, it is not reasonable to

25 |

26 | Vallecilla, "So what do you think, is this going to be a life sentence or what?" RT 267. Officer
Vallecilla replied that he did not know and inquired how old petitioner was. Petitioner replied, "I'm

27 | 39 years old. I'm really screwed this time. I'll be here for life. Shit like this follows me all the

28 | time." RT 267-68.

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1   expect that such information would have been admissible at trial under the state's rules of evidence.

2         The victim was deceased and did not testify at trial, so if she had a prior criminal history,

3   it could not have been used to impeach her testimony. Cal. Evid. Code §§ 785-788. Furthermore,

4   petitioner's contention suggests that, even at the time of trial, petitioner was unaware whether the

5   victim had a character, or trait of character, for violence or criminal conduct. Under state law,

6   petitioner's ignorance of such a character, or trait of character, would have precluded its introduction

7   into evidence to prove that, at the time of the charged offenses, the victim acted in a threatening

8   manner, or to show that petitioner harbored a reasonable, good faith belief in the need to use deadly

9   force to defend himself. Pen. Code § 1103(a); *People v. Cash*, 28 Cal.4th 703, 726 (2002).

10         Since any information about the victim's character for violence or for criminal activity

11   would have been inadmissible, the allegation here, on its face, thus fails to state a claim of

12   ineffectiveness of trial counsel. The claim fails to set forth any factual basis for concluding that trial

13   counsel had a duty to investigate the victim's criminal history or to investigate whether she had

14   previously committed acts of violence. Counsel's duty is to make reasonable investigations or to

15   make a reasonable decision that makes particular investigations unnecessary. *Strickland*, 466 U.S.

16   at 691. The petition fails to allege facts that would demonstrate that counsel failed to meet this

17   standard.

18         In fact, aside from petitioner's conclusory allegation, there is no information to support

19   the claim that trial counsel did not investigate the victim's background for evidence of violence or

20   criminality. Perhaps he did, but even if one assumes that counsel did not research the victim's

21   history for evidence of violence or crime, trial counsel's decision not to investigate "must be directly

22   assessed for reasonableness in all the circumstances, applying a hearing measure of deference to

23   counsel's judgments." *Id.* Counsel's actions may properly be based upon informed strategic choices

24   made by the defendant and on information supplied by the defendant. Whether particular

25   investigative decisions are reasonable depends critically on such information. *Id.* If counsel knew

26   that the facts which would support a claim of self-defense did not exist, due to something that

27   petitioner had told counsel, then "the need for further investigation [of such a defense] may be

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

16

1    considerably diminished or eliminated altogether.  And when a defendant has given counsel reason

2    to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure

3    to pursue those investigations  may not later be challenged as unreasonable." *Id.*  Here, there is no

4    factual allegation by petitioner which overcomes the presumption that trial counsel actually did

5    pursue an investigation of the victim's background, or that counsel had a reasonable basis for

6    foregoing such an investigation.

7           Petitioner also fails to allege what information counsel would have discovered about the

8    victim's background if counsel had conducted the investigation that petitioner now alleges to have

9    been required.  Petitioner's failure to supply that information on habeas corpus precludes him from

10   establishing, under the two *Strickland* prongs, that trial counsel's performance was deficient and that

11   counsel's alleged shortcomings were prejudicial.    Conclusory allegations unsupported by a

12   supporting statement of specific facts do not warrant habeas relief. *James*, 24 F.3d at 26; *United*

13   *States v. Popoola*, 881 F.2d 811, 813-14 (9th Cir. 1987); *United States v. Berry*, 814 F.2d at 1409;

14   *see Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993) (bare allegations do not suffice; a claim of

15   ineffectiveness based on a failure to investigate requires the petitioner to allege "with specificity

16   what the investigation would have revealed and how it would have altered the outcome of the trial.");

17   *cf. Jones v. Gomez*, 66 F.3d at 204-05 & n. 1.  Petitioner's failure to supply facts in support of his

18   allegation render this claim of ineffectiveness conclusory and insufficient to enable the court to see

19   a real possibility of constitutional error.

20

21           (10)  Petitioner's last claim of ineffectiveness by trial counsel is that counsel "willfully

22   misled petitioner regarding his right to testify."  Petitioner provides no further explanation of what

23   counsel did or said that misled him, nor does he provide any averments as to whether petitioner's

24   decision not to testify was at all affected by trial counsel's acts and/or statements, and if so, how.

25           The decision whether or not to testify was a personal one for petitioner to make. *Rock v.*

26   *Arkansas*, 483 U.S. 44, 51-53 (1987); *United States v. Edwards*, 897 F.2d 445, 446-47 (9th Cir.

27   1990). Petitioner does not provide any information regarding why he decided not to testify.  He does

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

17

1   not mention how he would have testified, nor how his testimony would have altered the outcome at
2   trial.

3       Petitioner has failed to allege any specific facts which would overcome the strong
4   presumption that trial counsel weighed the possible harm to petitioner from potentially incriminating
5   testimony if he were to testify against the countervailing utility of petitioner testifying in his own
6   defense. *See Barnard v. Collins*, 958 F.2d 634, 642 (5th Cir. 1992). Petitioner does not allege any
7   specific facts which would defeat either the presumption that trial counsel fulfilled his responsibility
8   to advise petitioner adequately and correctly regarding his right to testify. *See generally, Strickland*,
9   466 U.S. at 689 (strong presumption that counsel has acted within the wide range of reasonable
10  professional assistance). Petitioner does not allege any particularized facts which would replace the
11  presumption that petitioner waived his right to testify when he declined to testify and failed to notify
12  the court of his desire to do so. *Edwards*, 897 F.2d at 446. Again, based upon the vague conclusory
13  nature of petitioner's claim, petitioner has failed to set forth a real possibility of constitutional error.

14

15      (11) Petitioner alleges in subclaim (11) that his counsel on appeal was ineffective because
16  she failed to contend on appeal that:

17      (1) the evidence was insufficient to convict petitioner;

18      (2) that trial counsel was ineffective for the reasons stated in subclaims (1) through (10)
        above;
19
        (3) the prosecutor committed misconduct during her closing arguments; and
20
        (4) the trial court "committed misconduct" by denying petitioner's *Marsden* motion.
21      *Marsden*, 2 Cal.3d 118.

22      Petitioner omits any explication of specific facts in support of his burdens under *Strickland*
23  to establish deficient performance on the part of appellate counsel and to establish prejudice.
24  Moreover, as respondent has just demonstrated above, see Claim I, subclaims (1) through (10)
25  (ineffective assistance of trial counsel), and will demonstrate below in Claim II (sufficiency of the
26  evidence), Claim III (prosecutorial misconduct), and Claim IV (denial of the *Marsden* motion), the
27  underlying substantive claims are insufficiently pleaded to warrant consideration on habeas corpus,

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1  and so those allegations fail to add anything of significance to the insufficient factual allegations

2  regarding ineffectiveness of appellate counsel, as set forth here in Claim I, Subclaim (11).

3      No information from outside the record, e.g., declaration of trial counsel or appellate

4  counsel, is presented to suggest that the failure of appellate counsel to present these claims on direct

5  appeal was objectively unreasonable.    As the claims of ineffectiveness on the part of appellate

6  counsel are pleaded here, there is no factual basis upon which one might reasonably conclude that

7  there was a reasonable possibility for any of these appellate claims to have succeeded.    Here, on

8  habeas corpus, petitioner could rely on facts outside the record, but even so, he has failed to allege

9  with sufficient particularity any viable habeas claim related to the quality of his representation by

10  counsel on appeal.    On direct appeal, where his claims were limited to the four corners of the record,

11  there was no reasonable probability that appellate counsel would have been more successful had she

12  raised these half-baked claims on direct appeal.

13  **Claim II - Insufficient Evidence To Support The Convictions For Murder Or Robbery**

14      In petitioner's second claim, he asserts that his right to due process has been violated

15  because the evidence is insufficient to support either of his convictions for murder and robbery. Ptn.

16  at 6. Petitioner's generalized conclusory allegations are not accompanied by specific, particularized

17  allegations sufficient to enable respondent, or the Court, to determine from the face of the petition

18  alone, whether this claim merits federal habeas review. *Wacht*, 604 F.2d at 1247; *Adams*, 897 F.2d

19  at 333-34.  Petitioner omits any allegation that specifies what evidence was lacking in support of

20  either the robbery or murder convictions.    One is left to speculate how, in petitioner's view, the

21  evidence fails to support his convictions.

22      For all we know, petitioner may be alleging that the evidence was insufficient to negate

23  some defense as to which he had the burden of production and possibly the burden of persuasion.

24  Perhaps he is of the view that the People had a burden to supply substantial evidence to support some

25  fact which was not essential to conviction, or perhaps he has a fundamental misunderstanding of the

26  standard *on review* for claims attacking the sufficiency of evidence to support a criminal conviction.

27      Respondent recognizes that, under ordinary pleading practice, a motion to dismiss for

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

19

1   failure to state a claim, Fed. R. Civ. P. 12(b)(6), should not be granted unless it appears beyond doubt

2   that plaintiff can prove no set of facts in support of the claim that would entitle him to relief. *Hishon*

3   *v. King & Spalding*, 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957);

4   *Palmer v. Roosevelt Lake Log Owner's Assn.*, 651 F.2d 1289, 1294 (9th Cir. 1981.)  However, even

5   if the Court here were to find that petitioner's Claim II reasonably could be interpreted as setting forth

6   a set of facts entitling him to habeas relief, this Court should, at a minimum, order that the petition

7   be returned to petitioner for amendments that would "make the petition more certain," Rules foll. 28

8   U.S.C. § 2254, Rule 4, Advisory Committee Notes; *see* former Rule 2(e); *Williams*, 722 F.2d at 1051-

9   52.

10      To file an answer, respondent here must cull the record and point to *all* the pages in the trial

11   transcript which support *every* element of both of petitioner's convictions, acknowledging that there

12   could have been multiple legal and factual theories by which the jury could have convicted petitioner.

13   Respondent should not be saddled with having to guess what petitioner is alleging.  Rules foll. 28

14   U.S.C. § 2254, Rule 4, Advisory Committee Note (citing *Allen*, 424 F.2d at 141).

15      In *Williams*, 722 F.2d 1048, the issue was whether the record contained sufficient evidence

16   of the defendant's specific intent to commit larceny and robbery.  In such circumstances, where the

17   issue presented had been narrowed to challenge the sufficiency of proof of a particular element of the

18   charged offense, the Second Circuit observed that

19      [p]erhaps, in the instant case, the district court's best option would have been to require the
        State to file an answer in accordance with Rule 5.  If the court had done so, it would have
20      been a relatively simple matter for the State to point to those pages in the trial transcript
        that contained evidence on the issue of Williams' specific intent to commit larceny and
21      robbery.  With this salient information before him, the judge would then have been able to
        make an informed decision on the merits, without having to search the trial transcript
22      himself.

23   *Id.* at 1051-21.

24      However, in our case, unlike *Williams*, Claim II does not focus on an alleged lack of

25   evidence as to any particular element or elements of the two offenses of which petitioner was

26   convicted.  Furthermore, in *Williams*, the Second Circuit did not hold that the district court would

27   have been incorrect to return the petition to the petitioner as insufficient.  It merely held that, on the

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

20

1  facts of that case, the petition should not have been summarily dismissed under Rule 4. *Id.* at 1050-

2  51.

3          Additionally, there is another reason why the petition here *must* either be returned to

4  petitioner for a more definite statement of his claim, or else dismissed outright. Claim II, in its

5  current form, is partially unexhausted. A petition which contains an unexhausted claim must be

6  dismissed. *Lundy*, 455 U.S. at 520-22; *Kelly v. Small* (9th Cir. 2003) 315 F.3d 1063, 1065.

7          The petition which petition presented to the California Supreme Court, like the petition

8  here, Ptn. at 6, contained a claim that ". . . there was no substantial evidence that petitioner committed

9  a murder or a robbery." Exh. B (petition offered for filing in superior court) at 42, which is attached

10  to, and incorporated by, Exh. C (petition filed and denied by the state appeals court) at 4, which is,

11  in turn attached to and incorporated by Resp's Exh. E-1 (petition filed and denied by the state appeals

12  court) at 3. However, in state court, petitioner's claim of insufficient evidence was not the same all-

13  encompassing claim that he makes here in federal court. His state claim was much more limited. It

14  focused only upon the evidence of specific intent, as follows:

15          CALJIC 8.21 instruction killing of a human being, whether intentionally, unintentional
           or accidental, which occurs during the commission or attempted commission of the crime
16          as a direct causal result of robbery is murder of the first degree when the perpetrator had
           the specific intent to commit that crime.

17

18          The specific intent to commit robbery and the commission or attempted commission
           of such crime must be proved beyond a reasonable doubt. The law of felony murder is
19          clear. A person must have the intent to rob in order for the felony murder rule to apply.
           In the case now before the court and by reviewing the evidence, no evidence shows
           petitioner had an intent to rob the victim. The evidence in this case only consist[s] of a
20          strong suspicion of guilt of the defendant and that is not enough. (*People v. Rascon*, 128
           Cal.App.2d 118, 122 (274 p.2d 899).

21

22  Exh. B at 43-44 (internal quotation marks omitted) which is attached to Exh. C of Resp's. Exh. E-1

23  (the state habeas petition filed in the California Supreme Court) at 3.

24          Thus, petitioner's state claim was a narrow one, limited to the question whether the

25  evidence was sufficient to support an implicit jury finding that petitioner had the specific intent to rob.

26  If not, then the argument followed that petitioner could not properly have been convicted of robbery,

27  nor of murder on a robbery-murder theory. By omitting the above-quoted language, the sufficiency

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1  of the evidence argument which petitioner now presents to this Court is much broader. The current

2  claim includes a variety of legal issues regarding each of the elements of the offenses of which

3  petitioner was convicted. Except for the state court issue whether there was sufficient evidence to

4  establish that petitioner harbored a specific intent to rob, these other challenges to the sufficiency of

5  evidence were never presented in state courts. The state supreme court was never presented with the

6  operative facts and legal theories on which petitioner's current Claim II is broadly based, so,

7  therefore, the state court never had a fair opportunity to apply the controlling legal principles to the

8  facts bearing upon the petitioner's constitutional claim. *Kelly*, 315 F.3d at 1066 (citing *Anderson v.*

9  *Harless* (1982) 459 U.S. 4, 6; *cf., Lundy*, 455 U.S. at 511-13 (district court erred by considering the

10 subclaims of a prosecutorial misconduct claim where some subclaims had been presented in state

11 court and some had not); *id.* at 519 ("[r]equiring dismissal of petitions containing both exhausted and

12 unexhausted claims will relieve the district courts of the difficult if not impossible task of deciding

13 when claims are related, and will reduce the temptation to consider unexhausted claims"); *Moorman*

14 *v. Schriro* (9th Cir. 2005) 426 F.3d 1044, 1056 (a petitioner who presented an ineffective assistance

15 of counsel claim in state court cannot later add unrelated alleged instances of counsel's

16 ineffectiveness to his ineffective assistance claim on federal habeas review, citing *Carriger v. Lewis*

17 (9th Cir. 1992) 971 F.2d 329, 333); *Kelly*, 315 F.3d at 1068-70 (a thorough description of the operative

18 facts before the highest state court is a necessary prerequisite to satisfaction of a habeas petitioner's

19 duty to exhaust, and where petitioner has failed to exhaust certain subclaims of his federal claim of

20 prosecutorial misconduct, the federal petition is a mixed petition, and the district court must either

21 (1) dismiss the petition, or (2) allow the petitioner to amend to delete the unexhausted claims, then

22 stay the petition in order to permit petitioner to exhaust the unexhausted subclaims and, if the state

23 court denies relief, then petitioner can move to add the newly-exhausted subclaims by amendment

24 to his stayed federal petition); *see generally Baldwin v. Reese* (2004) 541 U.S. 27, 29 (to exhaust state

25 remedies and give the state court an opportunity to pass upon, and correct, alleged violations of a

26 prisoner's federal rights, the prisoner must fairly present his claim to the state court, "alerting that

27 court to the federal nature of the claim"); *Keeney v. Tamayo-Reyes* (1992) 504 U.S. 1, 8-9 (full factual

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

22

1   development in state court promotes the interests of finality, comity, and judicial economy, and

2   channels the resolution of claims into the most appropriate forum); *Gatlin v. Madding* (9th Cir. 1999)

3   189 F.3d 882, 887-88 (to exhaust, a petitioner must fairly present the substance of his claim to state

4   court, i.e., he must present the facts which entitle him to relief, and he must bring to the state court's

5   attention the constitutional claim inherent in those facts by referring to a specific federal constitutional

6   guarantee).

7          Thus, in sum, Claim II must be dismissed because it is too conclusory to establish a real

8   possibility of constitutional error. Rules foll. 28 U.S.C. § 2254, Rules 2(c), 4; *Allison*, 431 U.S. at

9   74; *Adams*, 897 F.2d at 334; *Wacht*, 604 F.2d at 1247; *Aubut*, 431 F.2d at 689. In fact, the entire

10  petition must be dismissed because, as currently pleaded, Claim II comprehends the possibility of so

11  many more potential grounds for relief that it is practically meaningless. It also expands the current

12  claim far beyond the particularized insufficiency claim that petitioner presented in the California

13  Supreme Court. Due to the breadth of Claim II, it is unexhausted as currently pleaded, and under

14  *Lundy*, 455 U.S. at 519, it must be dismissed as a mixed petition.

15         Rather than dismiss Claim II outright, with prejudice, for failing to state with particularity

16  the factual basis for that claim, this Court could dismiss Claim II, *without* prejudice and allow

17  petitioner a brief period of time to submit a more definite statement, setting forth with particularity

18  the factual basis for his due process claim that the evidence is insufficient to support either the

19  robbery or the murder convictions, by identifying what he contends to be the deficiency in the proof

20  as to each of those convictions. Rules foll. 28 U.S.C., Rule 4, Advisory Committee Notes.

21         Furthermore, rather than dismiss the mixed petition for lack of exhaustion, this Court could

22  allow petitioner to amend the current federal habeas petition to restrict Claim II so that it mirrors the

23  claim of insufficient evidence that petitioner presented to the California Supreme Court.

24  Alternatively, this Court could hold the petition in abeyance to allow petitioner to exhaust

25  unexhausted portion of Claim II. *Rhines v. Weber*, 544 U.S. 269 (2005).

26         However, if petitioner were to attempt to exhaust that portion of Claim II which was not

27  previously presented to the California Supreme Court and were to later present to this Court a claim

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1 of insufficient evidence that again fails to provide adequate specificity as to the facts in support of his

2 ground for relief (as if, for example, he were to present, once again, a claim of insufficient evidence

3 which simply restates the current Claim II, or which fails to identify the particular failure of proof

4 which is the basis of petitioner's claim), then respondent would reserve his right once again to move

5 for dismissal for lack of particularity under Rule 4 of the Rules following 28 U.S.C. § 2254.

6 **Claim III - Prosecutorial Misconduct**

7        In petitioner's third claim for habeas relief, he argues that the prosecutor committed

8 misconduct during closing arguments, and thereby violated his constitutional rights under the Sixth

9 and Fourteenth Amendments. Petitioner alleges in Claim III that the prosecutor acted improperly in

10 four distinct ways:

11     (1) she interjected into her argument her personal beliefs about the evidence;

12     (2) she mischaracterized evidence;

13     (3) she referred to facts not in evidence; and

14     (4) she argued false and misleading evidence as if it were true, with the intent to obtain
        a conviction.

15

16        Claim III also pinpoints four different passages from the prosecutor's initial closing

17 argument, RT 333:24-25, 335:17-18, 343:5-9, 344:12-15, and three passages from the prosecutor's

18 rebuttal argument, RT 391:26-392:1, 392:26-27, 394:6-7, which petitioner alleges to have constituted

19 misconduct.

20        However, nowhere does petitioner relate which of the four alleged forms of prosecutorial

21 misconduct infected which of the seven passages which petitioner cites. It is impossible to infer

22 which of the four alleged means of committing misconduct is attributable to the various passages

23 about which petitioner complains. Thus, petitioner has failed to relate the federal legal theory or

24 theories upon which he relies to the operative facts which allegedly entitle him to relief.

25        We do not believe that petitioner intended to suggest that each of the seven passages cited

26 violated his constitutional rights in four different ways. In other words we do not believe that the

27 petition warrants respondent or the Court sifting through 28 possible claims in search of a ground for

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1 | possible habeas relief. Rules foll. 28 U.S.C. § 2254, Rule 4, Advisory Committee Notes. As stated

2 | in *Aubut*, 431 F.2d at 688, "Habeas corpus is not a general form of relief for those who seek to

3 | explore their case in search of its existence."

4 |       Consequently, respondent requests that Claim III be dismissed. Claim III is vague and

5 | conclusory as to which legal theory or theories petitioner claims entitled him to habeas relief with

6 | request to each of the seven cited passages. By failing to plead this claim with adequate particularity,

7 | petitioner has failed to state facts which point to a real possibility of constitutional error. The claim

8 | must be dismissed. Rules foll. 28 U.S.C. § 2254, Rule 4, Advisory Committee Notes.

9 |       Even if this Court were to decide against dismissing this claim outright, it should, at a

10 | minimum, return the petition to petitioner with instructions to make Claim III more certain, by

11 | relating with particularity the legal theory or theories underlying each of petitioner's allegations of

12 | wrongdoing to the seven cited passages from the prosecutor's arguments, and by explaining why

13 | those theories apply with respect to each cited passage. Rules foll. 28 U.S.C. § 2254, Rule 4,

14 | Advisory Committee Notes; *see* Fed. R. Civ. P. 12(e); *see also* former Rule 2(e); Rules 2, Advisory

15 | Committee Notes, 1976 Adoption, Subdivision (c) (". . . it is the relationship of the facts to the claim

16 | asserted that is important. . . .").

### Claim IV - Denial Of The *Marsden* Motion

18 |       After the jury returned its guilty verdicts and immediately before sentencing, petitioner

19 | requested an in camera hearing to discuss trial counsel's alleged incompetence, RT 449:14-26,

20 | 451:24-452:11, 454:16-28, and presumably to have his appointed counsel discharged and new counsel

21 | appointed, pursuant to *Marsden*, 2 Cal.3d 118. Petitioner now alleges in Claim IV of his habeas

22 | petition that the trial court violated his rights to due process and to a fair trial when it denied

23 | petitioner's motion. RT 449, 451-452, 454, 455-492 (sealed).

24 |       Essentially, petitioner's entire claim consists of unexplained allegations that the trial court

25 | "abused its discretion," and "the ruling was opinionated and biased and violates due process."

26 | Petitioner also includes in Claim IV a recitation, presumably from a sealed portion of the record

27 |

28 |

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1  during the in camera *Marsden* hearing,[8/] as follows:

2          The Court: No. That covers the issues raised by Mr. Uvalles. I've resolved the first
3          issue and I've resolved the second issue, which was the discussion of the sidebar
           concerning the *Wheeler* motion which was not made [[9/]] and possible explanation why it
4          wasn't. (RT 491:21-25.)

5  Ptn., Grounds for Relief, Supplemental Page, Ground Four.

6          On the face of petitioner's pleading, one finds neither an exposition of the operative facts

7  nor a federal legal theory to support petitioner's conclusory claim that his rights to due process and

8  a fair trial were violated. General reference to a portion of the transcript does not comply with the

9  Rule 2(c) of the Rules following 28 U.S.C. § 2254, Rule 2(c) requires habeas petitioners to

10 summarize the facts supporting each alleged ground for relief. *Adams*, 897 F.2d at 333. Petitioner

11 fails to provide any insight into why he believes that the trial court committed constitutional error by

12 denying his *Marsden* motion. Contrary to petitioner's suggestion, the quoted passage from the

13

14

15 8. Respondent has never attempted to obtain access to the sealed transcript of the in camera *Marsden* hearing, *see* Rules of Court, Rule 31.2(a), because petitioner did not raise a *Marsden* issue on direct appeal, and the state courts summarily decided petitioner's habeas petitions without issuing
16 any Order to Show Cause. While California Rules of Court, Rule 31.2(a)(5) permits the State to move to obtain a copy of the sealed *Marsden* transcript, respondent herein still has not so moved
17 because, in respondent's view, Claim IV should be dismissed for inadequacies which are patent on
18 the face of the pleading. The petition fails to state a claim of error regarding the *Marsden* proceedings. If and when respondent is required to file an Answer that responds to petitioner's
19 *Marsden* claim, respondent will move in one or more state courts to obtain a copy of the reporter's transcript of the in camera *Marsden* hearing. RT 455-492 (sealed).
20

21 9. *Wheeler*, 22 Cal.3d 258, provides that where a party believes his opponent is using his peremptory challenges to strike jurors solely on the basis of group bias, and where the moving party
22 makes a prima facie case of group bias, the burden shifts to the non-movant to show that the peremptory challenges in question were not solely based on group bias. If the trial court finds that
23 the non-movant has failed to sustain the burden of justification as to any questioned peremptory challenge, then the presumption of their validity is rebutted. The trial court must then rule that the
24 jury does not comport with the representative cross-sectional requirement of the California Constitution, it must dismiss the jurors thus far selected, and it must quash any remaining venire.
25 Cal. Const., art I, § 16.
26         The record of here rial does not include any reporter's transcript of the voir dire proceedings, which began on May 6, 2002. CT 117, 121; RT 101, 105. The record of voir dire proceedings was
27 not transcribed. *See* CT 239. Until this Court decides the sufficiency of petitioner's pleading, it is
28 premature to request the transcription of the jury selection proceedings at petitioner's trial.

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And
Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

1 | *Marsden* ruling reveals no hint of judicial bias that might state a basis for habeas relief. From the face

2 | of the petition, one can only conclude that the trial court merely entered a ruling expressing its

3 | opinion on the *Marsden* request and upon the issues raised in support of what we presume was a

4 | challenge by petitioner to continue representation by his appointed counsel.

5 | Given the conclusory nature of petitioner's allegation regarding the trial court's ruling on

6 | the *Marsden* issue, given the failure of petitioner's conclusory allegation that the ruling was

7 | "opinionated" to state a ground for relief, given the failure of petitioner's pleading to provide any

8 | factual support for his allegations of either bias or constitutional error in the denial of the *Marsden*

9 | motion, and given petitioner's failure even to allege, let alone show, prejudice as a result of the

10 | alleged impropriety, this claim must be dismissed. Rules foll. 28 U.S.C. § 2254, Rules 2(c), 4;

11 | *Allison*, 431 U.S. at 74-75; *Wacht*, 604 F.2d at 1246; *see Adams*, 897 F.2d at 334; *Aubut*, 431 F.2d

12 | at 689.

13 |

14 | **Claim V - Cumulative Error And Cumulative Prejudice**

15 | In Claim V, petitioner alleges that the cumulative effect of the alleged errors in Claims I

16 | through IV violated his rights to due process and to a fair trial, and that, even if any of the errors in

17 | Claims I through IV was insufficient to warrant reversal, their cumulative effect was prejudicial to

18 | his right to a fair trial. In light of petitioner's failure to plead Claims I through IV with sufficient

19 | particularity, i.e., given his failure to set forth adequately the federal legal theories and the operative

20 | facts underlying each of Claims I through IV, and in light of the fact that Claim V incorporates, and

21 | relies for its vitality, upon the defective allegations in Claims I through IV, respondent moves for

22 | dismissal of Claim V for the same reasons set forth above with respect to respondent's requests for

23 | dismissal of Claims I through IV. Rule 4 of the Rules following 28 U.S.C. § 2254.

24 | Stated differently, since Claims I through IV are each too vague and conclusory to be

25 | considered on the merits, and must be dismissed, Claim V, which is a composite of Claims I through

26 | IV must likewise must be dismissed. Should any of Claims I through IV be returned to petitioner for

27 | a more definite statement, Claim V must also be returned to petitioner for possible reformulation and

28 |

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

27

1  resubmission in light of any changes to Claims I through IV. Rules foll. 28 U.S.C., Rules 2(c) and

2  4, and the Advisory Committee Notes to Rule 2 and 4.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

28

**CONCLUSION**

Accordingly, respondent respectfully requests that the petition for writ of habeas corpus be dismissed for lack of exhaustion (see analysis of Claim II), or alternatively, that the petition be dismissed, in whole or in party, for lack of particularity, or alternatively, that the petition be returned to petitioner with directions to make the petitioner more certain.


Dated:  February 24, 2006

                    Respectfully submitted,

                    BILL LOCKYER
                    Attorney General of the State of California

                    ROBERT R. ANDERSON
                    Chief Assistant Attorney General

                    GERALD A. ENGLER
                    Senior Assistant Attorney General

                    PEGGY S. RUFFRA
                    Supervising Deputy Attorney General

                    MARK S. HOWELL
                    Deputy Attorney General

                    Attorneys for Respondents

*Uvalles v. Runnels* - Motion To Dismiss Petition For Lack Of Particularity And For Failure To Exhaust Claim II, And Alternate Motion To Return Petition To Petitioner To Make Petition More Certain - C-05-2779-MJJ (PR)

29

## DECLARATION OF SERVICE BY MAIL

Case Name: ***Raul Uvalles v. D.L. Runnels, Warden***
Case No. **C-05-2779-MJJ(PR)**

I am employed in the Office of the Attorney General, which is the office of a member of the Bar of this Court at which member's direction this service is made. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>February 24, 2006,</u> I served the attached

**MOTION TO DISMISS PETITION FOR LACK OF PARTICULARITY AND FOR FAILURE TO EXHAUST CLAIM II, AND ALTERNATE MOTION TO RETURN PETITION TO PETITIONER TO MAKE PETITION MORE CERTAIN**

**NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF MOTION TO DISMISS**

in the internal mail collection system at the Office of the Attorney General,455 Golden Gate Avenue, Suite 11000, San Francisco, California 94102, for deposit in the United States Postal Service that same day in the ordinary course of business in a sealed envelope, postage fully prepaid, addressed as follows:

Raul Uvalles
T 59954
High Desert State Prison
P.O. Box 3030
Susanville, CA  96127

I declare under penalty of perjury the foregoing is true and correct and that this declaration was executed on February 24, 2006, at San Francisco, California.


_____Denise Neves_____                    _____
                                                              Signature

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8  Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10           IN THE UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13  ┌─────────────────────────────────┬──────────────────────
    │                                 │
14  │ **RAUL UVALLES,**               │  C 05-2779 MJJ (PR)
    │                                 │
15  │                    Petitioner,  │
    │                                 │
16  │          v.                     │
    │                                 │
17  │ **D.L. RUNNELS, Warden,**       │
    │                                 │
18  │                    Respondent.  │
    └─────────────────────────────────┘

19      **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28
                                        **EXHIBIT F-4**

*Howell, M*

1  Raul Uvalles T-59954
   H.D.S.P. B-3-116
2  P.O.Box 3030
   Susanville, CA 96127
3

4  Pro se

5

6

7



DOCKETED
SAN FRANCISCO

MAR 1 0 2006

By L. CARAMANZANA
No. SF-2005-40376

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11  RAUL UVALLES,                    C-05-2779-MJJ (PR)

12              Petitioner,          **PARTIAL OPPOSITION TO MOTION
                                     TO DISMISS PETITION**
13  v.

14  DAVID L. RUNNELS, Warden,

15              Respondent.

16  _____

17      Petitioner is making this partial opposition to motion to

18  dismiss petition because in some ways respondent is right in part.

19  The petition for writ of habeas corpus which petitioner presented

20  in the state courts and in this Court was improperly done.  The

21  inmate who helped petitioner with the petition for writ of habeas

22  corpus did not have a clue how to do a habeas petition, and due

23  to that, respondent now is claiming that this Court dismiss

24  petitioner's petition for writ of habeas corpus which he presented

25  in this court.  Petitioner is requesting this Court to follow the

26  advise of Respondent and to stay the present habeas petition for

27  over a year because petitioner needs to return to the state court

28  to properly raise the issues which petitioner presented in his

                              1

F-4

1  petition for writ of habeas corpus.  And also petitioner needs to
2  raise other issues that he might have in the records.  Petitioner
3  needs to return to the state courts and with an experienced Jail
4  House Lawyer which petitioner has now, he will be able to properly
5  raised the issues which petitioner raised before, and maybe new
6  issues that the experienced jail house lawyer might find in the
7  record after he combs it.

8      Respondent wanted that petitioner amends his federal petition
9  for writ of habeas corpus.  The simply amending the petition will
10 not work because after the amending, respondent might claim that
11 petitioner did not presented his issues properly in the state
12 court.  In short, if petitioner present an amended petition in the
13 future, the amended petition is going to be defective again
14 because the issues which petitioner presented in the state courts
15 were inadequate raised.

16     Petitioner is requesting this Court to stay his petition for
17 writ of habeas corpus for at least a year.  That way petitioner
18 can be able to file an amended petition in the future in this
19 court.  Respondent wanted that this court stays petitioner's
20 petition temporarily.  That proposition will not work because
21 petitioner needs that this court stay petitioner's petition for
22 writ of habeas corpus for at least a year.  That way he can
23 properly raised his issues in the state court.

24     Petitioner needs that this court stay his petition for writ
25 of habeas corpus at least for a year because the inmate who was
26 helping petitioner before, went to the  hole and took with him
27 all the transcripts of his case, petitioner needs time to retrieve
28 all his transcripts from this inmate.

STATEMENT OF THE CASE

In an information filed in Santa Clara County Superior Court on January 11, 2002, the district attorney charged petitioner as follows:  count one-murder, Cal. Pen.Code § 187; count two-robbery in the second degree, Pen. Code §§ 211, 211.5(c). CT 60-62. Trial began with in limine motion on May 3, 2002.  CT 108.  On May 14, 2002, the jury found petitioner guilty of both counts. CT 191-94.

On June 13, 2002, after the verdict, a hearing was held upon petitioner's request that his appointed counsel be discharged and the new counsel be appointed for him, the trial court denied the Marsden motion and sentenced petitioner to 25 years to life for the murder (count one) and to a concurrent middle term of three years for the robbery (count two).  CT 235-37; RT 495-96.

Petitioner filed a timely notice of appeal on June 14, 2002. CT 238.  On October 28, 2003, the California Court of Appeal, on direct appeal, modified the sentence, pursuant to Penal Code section 654, by staying the three years term for the robbery (count two).  Otherwise, the judgment was affirmed.  And a remittitur issued on December 30, 2003.

Apparently, petitioner submitted a petition for writ of habeas corpus to the Superior Court of state of California, County of Santa Clara, on or about March 18, 2004.  In the instant petition, petitioner recites that his petition to the superior court was denied on May 21, 2004, but in actuality, it appears that the petition which he sent to the superior court was never decided.  Instead, it was apparently returned to petitioner by the post office on May 21, 2004, because it

3

1 | had been misaddressed, and the forwarding time had expired.

2 |     On June 7, 2004, petitioner filed a petition for writ of

3 | habeas corpus in the California Court of Appeal. Without issuing

4 | any Order To Show Cause, the Court of Appeal filed an order on

5 | June 14, 2004, summarily denying the writ.

6 |     On June 28, 2004, petitioner filed a petition for writ of

7 | habeas corpus in the California Supreme Court. Without issuing

8 | any Order To Show Cause, the California Supreme Court filed an

9 | order on May 18, 2005, summarily demying the writ.

10 |     On July 6, 2005, petitioner filed the instant petition for

11 | writ of habeas corpus in this Court. On October 19, 2005, this

12 | Court issued an Order To Show Cause why the petition should not

13 | be granted. On February 24, 2006, Respondent moves to dismiss

14 | the petition for failure to state with particularity the facts

15 | in support of his claims and for failure to exhaust Claim II.

16 | Rules foll. 28 U.S.C.§ 2254, Rules 2 (c) and 4; Lundy, 455 U.S.

17 | at 520-22. Alternatively, Respondent requests that the petition

18 | be returned to petitioner with directions to make the petition

19 | more certain. Rules foll. 28 U.S.C. § 2254, Rule 4 and its

20 | Advisory Committee Note (describing procedure whereby habeas

21 | petition may be returned to petitioner for amendments that would

22 | "make the petition more certain").

23

24

25

26

27

28

I.

**THE PRESENT PETITION FOR WRIT OF
HABEAS CORPUS SHOULD BE STAYED
FOR AT LEAST A YEAR BECAUSE
PETITIONER NEEDS TU RETURN TO THE
STATE COURT TO MAKE HIS PETITION
MORE CERTAIN.**

In Carriger v. Lewis, (9th Cir. 1992) 971 F.2d 329, 333;
Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003), the United States
Court of Appeals for the Ninth Circuit indicated: (a thorough
description of the operative facts before the highest state
court is a necessary prerequisite to satisfaction of a habeas
petitioner's duty to exhaust, and where petitioner has failed
to exhaust certain subclaims of his federal claim of prosecuto-
rial misconduct, the federal petition is a mixed petition, and
the district court must either (1) dismiss the petition, or
(2) allow the petitioner to amend to delete the unexhausted
claims, then stay the petition in order to permit petitioner to ex-
haust the unexhausted subclaims  and, if the  state court denies
relief, then petitioner can move to add the newly-exhausted
subclaims by amendment to his stayed federal petition.  See
generally Baldwin v. Resee, (2004) 541 U.S. 27, 29 (to exhaust
state remedies and give the state court an opportunity to pass
upon, and correct, alleged violations of a prisoner's federal
rights, the prisoner must fairly present his claim to the state
court,  "alerting that court to the federal nature of the claim")
Keeney v. Tamayo-Reyes, (1992) 504 U.S. 1, 8-9 (full factual
development in state court promotes the interests of finality,
comity, and judicial economy, and channels the resolution of
claims into the most appropriate forum); Gatlin v. Madding,

5

1    (9th Cir. 1999) 189 F.3d 882, 887-88 (to exhaust, a petitioner
2    must fairly present the substance of his claim to state court,
3    i.e., he must present the facts which entitled him to relief,
4    and he must bring to the state court's attention the constitutional
5    claim inherent in those facts by referring to a specific federal
6    constitutional guarantee.)

7                              CONCLUSION

8        Petitioner has not following the above, because the inmate
9    who did the state petition for writ of habeas corpus did not have
10   any clues of what he was doing.  Now petitioner is requesting
11   to this Court to stay his petition for writ of habeas corpus
12   for at least a year.  That  way he can be able to present all
13   the facts of his issues in the state courts.  And then when the
14   state court rules on the futures issues, if affirmed, petitioner
15   will file an amended petition in this Court.
16   DATED: March 7, 2006

17                              Respectfully submitted,

18
19                              Raul Uvalles
20                              Pro se

21
22
23
     _____
24       This partial opposition to motion to dismiss petition is being
     done by Jail House Lawyer Renato Obando C-63369, H.D.S.P. B-1-224,
25   P.O.Box 3030, Susanville, CA 96127.  Petitioner is layman at law
     and indigent.  Inter alia, Mr. Obando is going to file a petition
26   for writ of habeas corpus in the state court if this Court stay
     the present petition for writ of habeas corpus for at least a
27   year.
28

## PROOF OF SERVICE BY PERSON IN STATE CUSTODY

I the undersigned, hereby declare that I am over the age of eighteen (18), and that I am incarcerated at High Desert State Prison in Susanville, California, that [x] I am [ ] am not a party to the cause shown below, and that on the _7_ day of March _____, 200 6 _, I served a true and complete copy of the following:

```
(                                                    )
(                                                    )
(        PARTIAL OPPOSITION TO MOTION                )
(        TO DISMISS PETITION                         )
(                                                    )
(                                                    )
(_____)
```

by handing it to institutional staff with First Class Postage prepaid in full for mailing to the following address(s):

```
(                                                    )
(  Mark S. Howell                                    )
(  Deputy Attorney General                           )
(  455 Golden Gate Avenue, Suite 11000               )
(  San Francisco, CA 94102-5969                      )
(                                                    )
(                                                    )
(                                                    )
(_____)
```

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON  March 7, 2006 _____, in Susanville, California, 96130.

Raul Uvalles _____        _____//_____        3/7/06 _____
(Print Name)                (Signature)                 (Date)

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10                IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13

| | |
|---|---|
| **RAUL UVALLES,** | C 05-2779 MJJ (PR) |
| Petitioner, | |
| **v.** | |
| **D.L. RUNNELS, Warden,** | |
| Respondent. | |

19      **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT F-5

1 | BILL LOCKYER
Attorney General of the State of California
2 | ROBERT R. ANDERSON
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | MARK S. HOWELL
Deputy Attorney General
6 | State Bar No. 95125
455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-7004
Telephone: (415) 703-5969
8 | Fax: (415) 703-1234
Email: mark.howell@doj.ca.gov
9 | Attorneys for Respondent

ATTORNEY GENERAL-
OFFICE COPY/5

DOCKETED
SAN FRANCISCO

MAR 2 0 2006

By L. CARAMANZANA
No. _____

10                IN THE UNITED STATES DISTRICT COURT

11             FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13

14 | RAUL UVALLES,                          C-05-2779-MJJ (PR)

                              Petitioner,

15                                          **REPLY TO PETITIONER'S**
        v.                                  **PARTIAL OPPOSITION TO**
16                                          **MOTION TO DISMISS**
   D.L. RUNNELS, Warden,                    **PETITION**
17
                              Respondent.
18

19

20          On July 6, 2005, petitioner filed a petition for writ of habeas corpus in the above-entitled

21 | case.  On October 19, 2005, this Court issued an Order to Show Cause.  On February 24, 2006,

22 | respondent filed a motion to dismiss the petition for lack of particularity and for failure to exhaust

23 | Claim II, and alternatively, to return the petition to petitioner to make the petition more certain.  On

24 | March 13, 2006, petitioner filed a "Partial Opposition To Motion To Dismiss Petition" wherein

25 | petitioner acknowledged that certain issues in his petition for writ of habeas corpus are unexhausted.

26 | Based upon this concession, and based upon his request that the petition be stayed pending

27 | exhaustion, a stay may be granted by the Court.  However, respondent would object to petitioner's

28 | request that the petition be stayed for a year or more. *Kelly v. Small*, 315 F.3d 1063, 1070 (9th Cir.

*Uvalles v. Runnels* -Reply to Petitioner's Partial Opposition To Motion To Dismiss Petition - C 05-2779-MJJ (PR)

1   2003) (district court may require petitioner to file his new state petition within 30 days after stay is

2   granted, and the stay may remain in effect until 30 days following entry of final judgment by the

3   California Supreme Court; if petitioner fails to act within the allotted time, the stay may be vacated

4   nunc pro tunc as of the date the district court entered the stay, and the petition may be dismissed

5   consistent with *Rose v. Lundy*, 455 U.S. 509 (1982)).

6           Upon any subsequent request by petitioner to file newly-exhausted claims by way of an

7   amended petition in this Court, respondent would request the opportunity then to file, as appropriate:

8           (1) an opposition to any request by petitioner for leave to amend the petition;

9           (2) a motion to dismiss, or a motion to deny leave to file, any amended petition;

10          (3) a motion to dismiss for failure to file within the period of the statute of

11          limitations;[1/]

12          (4) a motion to dismiss based on laches;

13          (5) a motion to dismiss for lack of exhaustion;

14          (6) a motion to dismiss for state procedural default;

15          (7) a motion to dismiss for lack of particularity;

16          (8) a motion to have any proposed amended petition that petitioner submits

17          returned to petitioner for him to make the petition more certain;

18          (9) and any other procedural motions that may be appropriate under the

19          circumstances.

---

25      1. Given that the current federal habeas petition was filed July 6, 2005, it is quite possible
26  that, upon any attempt by petitioner to exhaust and then file new federal claims, petitioner will have
    exceeded the period of limitations. In that event, respondent will move to dismiss for untimeliness
27  under 28 U.S.C. § 2244(d). That one-year statute of limitations applies to petitions for habeas relief.
    Belated claims that do not relate back to a timely-filed federal habeas claim are barred by section
28  2244(d). *Mayle v. Felix*, 125 S.Ct. 2562 (2005).

*Uvalles v. Runnels* -Reply to Petitioner's Partial Opposition To Motion To Dismiss Petition - C 05-2779-MJJ (PR)

1    Contingent upon the resolution of these potential procedural issues, respondent will answer

2 the merits of any claims presented in either the current petition, or in any amended petition offered

3 for filing, as directed by the Court.

4    Dated:  March 17, 2006

5

6                              Respectfully submitted,

7                              BILL LOCKYER
                              Attorney General of the State of California

8                              ROBERT R. ANDERSON
                              Chief Assistant Attorney General

9                              GERALD A. ENGLER
                              Senior Assistant Attorney General

10                             PEGGY S. RUFFRA
                              Supervising Deputy Attorney General

11

12                             *Mark S. Howell*

13                             MARK S. HOWELL
                              Deputy Attorney General

14                             Attorneys for Respondents

15

16   MSH:dmn
     SF2005401376
     40084136.wpd

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY MAIL

Case Name: *Raul Uvalles v. D.L. Runnels, Warden*

Case No. **C-05-2779-MJJ(PR)**

I am employed in the Office of the Attorney General, which is the office of a member of the Bar of this Court at which member's direction this service is made. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On March 17, 2006, I served the attached

### REPLY TO PETITIONER'S PARTIAL OPPOSITION TO
### MOTION TO DISMISS PETITION

in the internal mail collection system at the Office of the Attorney General,455 Golden Gate Avenue, Suite 11000, San Francisco, California 94102, for deposit in the United States Postal Service that same day in the ordinary course of business in a sealed envelope, postage fully prepaid, addressed as follows:

Raul Uvalles
T 59954
High Desert State Prison
P.O. Box 3030
Susanville, CA  96127

I declare under penalty of perjury the foregoing is true and correct and that this declaration was executed on March 17, 2006, at San Francisco, California.

_____               _____
        J. Wong                                    Signature

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13  |                                        |
    | **RAUL UVALLES,**                       | C 05-2779 MJJ (PR)
14  |                                        |
    |                          Petitioner,    |
15  |                                        |
    |        **v.**                           |
16  |                                        |
    | **D.L. RUNNELS, Warden,**               |
17  |                                        |
    |                         Respondent.     |
18  |                                        |

19       **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

**EXHIBIT F-6**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOCKETED
SAN FRANCISCO
MAR 2 9 2006
By___D. VELASCO
No. SF2005 401.376

**FILED**

MAR 2 3 2006

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAUL UVALLES,

      Petitioner,

vs.

D.L. RUNNELS,

      Respondent.

)
)
)
)
)
)
)
)
)
)
)

No. C 05-2779 MJJ (PR)

**ORDER GRANTING IN PART
MOTION TO DISMISS;
STAYING ACTION;
INSTRUCTIONS TO CLERK**

(Docket No. 11)

Petitioner, a California prisoner, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition should not be granted based on petitioner's three cognizable claims. Respondent has filed a motion to dismiss because the petition contains unexhausted claims, and because the claims set forth in the petition are not sufficiently clear or particular for respondent to be able to answer. Petitioner has filed a "partial" opposition in which he requests that the Court stay this matter while petitioner exhausts his unexhausted claims in state court. Respondent has filed a reply.

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are first required to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and

every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b),(c); Rose v. Lundy, 455 U.S. 509, 515-16 (1982); Duckworth v. Serrano, 454 U.S. 1, 3 (1981); McNeeley v. Arave, 842 F.2d 230, 231 (9th Cir. 1988). A federal district court must dismiss a federal habeas petition even if it contains only a single claim as to which state remedies have not been exhausted under 28 U.S.C. § 2254(b)-(c). See Rose, 455 U.S. at 522.

The parties do not dispute that the petition contains unexhausted claims. In lieu of dismissal, however, petitioner requests that this matter be stayed while he exhausts this claim by presenting it to he California Supreme Court. District courts have the authority to issue stays of mixed federal habeas petitions, and the AEDPA does not deprive them of that authority. Rhines v. Webber, 125 S. Ct. 1528, 1535 (2005). The use of a stay and abeyance is only appropriate, however, where the district court has first determined that there was good cause for the petitioner's failure to exhaust the claims in state court and that the claims are potentially meritorious. Id. Petitioner has sufficiently shown cause for his failure to exhaust under Rhines.

Good cause appearing, therefore, the Court orders as follows:

1.     Respondent's motion to dismiss is GRANTED in part. This action is hereby STAYED while petitioner exhausts in the state courts his jury instruction claim.

2.     **If petitioner wishes to have this Court consider his unexhausted claims, he must properly present that claim to the California Supreme Court within thirty days of the date this order is filed. Thereafter, he must file an amended petition in this Court, and serve it on respondent, within thirty days of the California Supreme Court's decision. Rhines, 125 S. Ct. at 1535 (where granting a stay, the district court must effectuate the timeliness concerns in AEDPA by placing "reasonable limits on a petitioner's trip to state court and back").**

3.     The amended petition must include the caption and civil case number used in this order (No. C-05-2779 MJJ (PR)) and the words FIRST AMENDED PETITION on the first page. Petitioner may not incorporate material from the prior petition by reference.

1    The amended petition must only include exhausted claims, and it must forth petitioner's

2    claims with sufficient clarity and particularity for respondent to prepare an answer.

3       4.      This stay will be lifted, and this matter will proceed, only upon the filing of

4    either the above-described amended petition.

5       The Clerk shall ADMINISTRATIVELY CLOSE the file pending the stay of this

6    action, and terminate docket number 11 from the docket.

7       IT IS SO ORDERED.

8    DATED: 3/24/2006

9

10                 MARTIN J. JENKINS
                   United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


UVALLES,

               Plaintiff,

    v.

RUNNELS et al,

               Defendant.

Case Number: CV05-02779 MJJ

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 24, 2006, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Mark S. Howell
Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004

Raul Uvalles
High Desert State Prison
Prisoner Id T59954
P.O. Box 3030
Susanville, CA 96127

Dated: March 24, 2006

Richard W. Wieking, Clerk
By: Monica Tutson, Deputy Clerk

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13
   **RAUL UVALLES,**                          C 05-2779 MJJ (PR)
14
                              Petitioner,
15
          **v.**
16
   **D.L. RUNNELS, Warden,**
17
                              Respondent.
18

19        **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT G-1

MC-275

| Name | Raul Uvalles |
|---|---|
| Address | H.D.S.P. B-1-202 |
| | P.O.Box 3030 |
| | Susanville, CA 96127 |
| CDC or ID Number | T-59954 |

ORIGINAL

Court of Appeal - Sixth App. Dist.

**FILED**

OCT 23 2006

MICHAEL J. YERLY, Clerk

By _____
DEPUTY

## CALIFORNIA COURT OF APPEAL
## SIXTH APPELLATE DISTRICT

(Court)

| |
|---|
| RAUL UVALLES |
| Petitioner |
| vs. |
| THOMAS FELKER, Warden, |
| Respondent |

**PETITION FOR WRIT OF HABEAS CORPUS**

No. H030758

*(To be supplied by the Clerk of the Court)*

X-REF

H024674   H027526

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

1

G-1

**This petition concerns:**

- [X] A conviction
- [ ] Parole
- [X] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [ ] Other (specify): _____

1. Your name: __ Raul Uvalles

2. Where are you incarcerated? High Desert State Prison

3. Why are you in custody? [X] Criminal Conviction [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Alleged first degree murder, alleged second degree robbery

   b. Penal or other code sections: 187, 211

   c. Name and location of sentencing or committing court: Superior Court of Santa Clara County
   190 W. Hedding Street San Jose, CA 95110

   d. Case number: CC121250

   e. Date convicted or committed: May 14, 2002

   f. Date sentenced: June 14, 2002

   g. Length of sentence: 25 years to life

   h. When do you expect to be released? unknown

   i. Were you represented by counsel in the trial court? [X] Yes. [ ] No. If yes, state the attorney's name and address:
   Charlie Gillan Public Defender 120 West Mission St. San Jose, CA
   95110

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty [ ] Guilty [ ] Nolo Contendere [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury [ ] Judge without a jury [ ] Submitted on transcript [ ] Awaiting trial

I.

## NO EVIDENCE PROVED THE CONVICTION AND SENTENCE OF FIRST DEGREE MURDER

Reasonable doubt is defined in California Penal Code § 1096 as follows:

"It is not a mere possible doubt; because everything relating to human affairs ... is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they ... cannot say they feel an abiding conviction ... of the truth of the charge."

In 1894. . . the court interpreted the predecessor of 28 U.S.C. § 2243 as vesting federal courts "with the largest power to control and direct the form of judgment to be entered in cases brought up before it on Habeas Corpus." Rogers v. Richmond, 365 U.S. 534, 549 (1951); Dowd v. United States ex rel Cook, 340 U.S. 206, 210 (1951); In re Bonner, 151 U.S. 242, 261-62 (1894).

The United States Court of Appeals for the Ninth Circuit and the United States Supreme Court of the United States indicated, our standards of review for addressing the sufficiency of the evidence to support a conviction is the same on habeas review as it is on direct appeal. See Mike v. Borg, 947 F.2d 353, 356 n. 5 (9th Cir. 1991); see also Jackson v. Virginia, 443 U.S. 307, 309, 99 S.CT. 2781, 2789 61 L.Ed.2d 560 (1979) (setting forth standard in a habeas corpus proceeding). Quoting Walter v. Maass, 45 F.3d 1355 (9th Cir. 1995).

3

1    In re  Winship, (1970) 90 S.CT. 1068, 1071, the requirement

2    that guilt of a criminal charge be established by proof  beyond

3    a reasonable doubt dates at least from our early years as a Nation.

4    The "demand for higher degree of persuasion in criminal cases was

5    recurrently expressed fron ancient times, [though] its crystalliza-

6    tion into the formula 'beyond a reasonable doubt' seems to have

7    occurred as late as 1798.  Its now accepted in common law

8    jurisdictions as the measure of persuasion by which the prosecution

9    must convince the trier of all the essential elements of guilt."

10    C. McCormick, Evidence section 321, pp. 681-682 (1954); See also

11    9 J. Wigmore, Evidence, section 2497 (3d ed. 1940).  Although

12    virtually unanimous adherence to the reasonable-doubt standard

13    in  common law jurisdictions may not conclusively establish it

14    as a requirement of due process, such adherence does "reflect a

15    profound judgment about the way in which law should be enforced

16    and justice administere."  Duncan v. Louisiana, 391 U.S. 145, 155,

17    88 S.CT. 1444, 1451, 20 L.Ed.2d 491 (1968).

18    Expressions in many opinions of the United States Supreme

19    Court indicate that it has long been assumed that proof of a

20    criminal charge be a reasonable doubt is constitutionally

21    required.  See, for example, Miles v. United States, 103 U.S. 304,

22    312, 26 L.Ed. 481 (1881); Davis v. United States, 160 U.S. 469,488,

23    16 S.CT. 353, 358, 40 L.Ed. 499 (1895); Holt v. United States,

24    218 U.S. 245, 253, 31 S.CT. 2, 6, 54 L.Ed. 1021 (1910); Wilson v.

25    United States, 232 U.S. 563, 569-570, 34 S.CT. 347, 349, 350, 58

26    L.Ed. 728 (1914); Brinegar v. United States, 338 U.S. 160, 174, 69

27    S.CT. 1302, 1310, 93 L.Ed. 1879 (1949); Leland v. Oregon, 343 U.S.

28    790, 795, 72 S.CT. 1002, 1005, 1006, 96 L.Ed. 1320 (1952);

4

1  reasonable doubt whether he was capable in law of committing

2  crime. * * *  No man should be deprived of his life under the

3  forms of law unless the jurors who try him are able, upon their

4  consciences, to say that the evidence before them * * * is

5  sufficient to show beyond a reasonable doubt the existence of

6  every fact necessary to constitute the crime charged." Id., at

7  484, 493, 16 S.CT., at 357, 360.  quoting, In re Winship, supra,

8  (90 S.CT., at 1071-1072.

9      Mr. Justice HARLAN, concurring.  I view the requirement of

10  proof beyond a reasonable doubt in a criminal case as bottomed on

11  a fundamental value determination of our society that it is far

12  worse to convict an innocent man than to let a guilty man go free.

13  It is only because the nearly complete and long-standing accep-

14  tance of the reasonable-doubt standard by the States in criminal

15  trials that the Court has not before today had to hold explicitly

16  that due process, as an expression of fundamental procedural

17  fairness, requires a more stringer standard for criminal trials

18  than for ordinary civil litigation.  In re Winship, supra, 90 S.CT.,

19  at 1077.

20      In Jackson v. Virginia, (1979) 443 U.S. 307, the United States

21  Supreme Court announced the constitutionally mandated standard

22  applicable to review of the sufficiency of the evidence to support

23  a conviction in a criminal case.  The Supreme Court held that the

24  Due Process Clause of the Fourteenth Amendment to the United States

25  Constitution protects a criminal defendant against conviction

26  "except upon proof- defined as evidence necessary to convince a

27  trier of fact beyond a reasonable doubt of the existence of every

28  element of the offense." (Id. at p. 315.)  Thus, the constitutiona-

5

1  Holland v. United States, 348 U.S. 121, 138, 75 S.CT. 127, 136, 137,
2  99 L.Ed. 150 (1954); Speiser v. Randall, 357 U.S. 513, 525-526,
3  78 S.CT. 1332, 1342, 2 L.Ed.2d 1460 (1958). Cf. Coffin v. United
4  States,  156 U.S. 432, 15 S.CT. 394, 39 L.Ed. 481 (1895).  Mr.
5  Justice Frankfurter stated that "[i]t is the duty of the government
6  to establish * * * guilt beyond a reasonable doubt.  This notion-
7  basic in our law and rightly one of the boasts of a free society-is
8  a requirement and a safeguard of due process of law in the historic,
9  procedural content of 'due process.'" Leland v. Oregon, supra,
10  343 U.S. at 802-803, 72 S.CT., at 1009 (dissenting opinion).  In
11  a similar vein, the Court said in Brinegar v. United States,  supra,
12  338 U.S., at 174, 69 S.CT., at 1310, that "[g]uilt in a criminal
13  case must be proved beyond a reasonable doubt and by evidence
14  confined to that which long experience in the common-law tradition,
15  to some extent embodied in the constitution, has crystallized
16  into rules of evidence consistent with that standard.  These rules
17  are historically grounded rights of our system, developed to
18  safeguard men from dubious and unjust convictions with resulting
19  forfeitures of life, liberty, and property." Davis v. United
20  States, supra, 160 U.S., at 488, 16 S.CT., at 358 stated  that the
21  requirement is implicit in "constitutions * * *  [wich] recognize
22  the fundamental principles that are deemed essential for the
23  protection of life and liberty."  In Davis a murder conviction was
24  reversed because the trial judge instructed the jury that it was
25  their duty to convict when the evidence was equally balanced
26  regarding the sanity of the accused.  The United States Supreme
27  Court said: "On the contrary, he is entitled to an acquittal of
28  the specific crime charged, if upon all the evidence, there is

6

1   lly required standard applicable to determining a claim of insuffi-
2   ciency of the evidence in a criminal case is "whether, after
3   viewing the evidence in the light most favorable to the prosecution,
4   any rational trier of fact could have found the essential elements
5   of the crime charged beyond a reasonable doubt." (Id. at p. 320.)
6   The opinion in Jackson represents a continuing, consistent, and
7   unequivocal line of U.S. Supreme Court decisions giving contour
8   to due process and Sixth Amendment imperatives from In re Winship,
9   to the present. (See, e.g., People v. Korbin (1995) 11 Cal.th
10  416, 422-423.) Thus, for a period spanning 30 years, the rule has
11  been the prosecution has the burden of proving every fact necessary
12  to constitute the crime charged beyond a reasonable doubt. (In re
13  Wiship, (1970) 397 U.S. 358, 364.)
14      California case law is substantially in accord with the standards
15  established by the United States Supreme Court. The test is whether,
16  reviewing the whole record in the light most favorable to the
17  judgment below, substantial evidence is disclosed such that a
18  reasonable trier of fact could find the essential elements of the
19  crime beyond a reasonable doubt. (People v. Johnson, (1980) 26
20  Cal. 3d 557, 578.) Substantial evidence is that which is "reasona-
21  ble, credible, and of solid value." (Ibid.) The focus of the
22  substantial evidence test is on the whole record of evidence
23  presented to the trier of fact, rather than on isolated bits of
24  evidence torn from the record. (People v. Cueveas, (1995) 12
25  Cal.4th 252, 261.) The reviewing court must "presume in support
26  of the judgment the existence of every fact the trier could
27  reasonably deduce from the evidence. (People v. Reilly, (1970)
28  3 Cal.3d 421, 425.) The reviewing court may not reweigh the

7

1   evidence.  (People v. Culver, (1973) 10 Cal.3d 542, 548), reappraise

2   the credibility of the witnesses (People v. Barnes, (1986) 42 Cal.

3   3d 284, 303-304), or resolve factual conflicts, since these are

4   functions reserved for the trier of fact (In re Federick G., (1979)

5   96 Cal.App.3d 353, 367).  Reversal is not warranted unless it

6   appears "'that upon no hypothesis whatsoever is there sufficient

7   substantial evidence to support [the conviction].'  [Citation.]

8   (People v. Bolin, (1998) 18 Cal.4th 297, 331.)

9       The evidence presented by the people is insufficient on the

10  following areas:

11      The prosecution and the police claimed that petitioner ran with

12  the victim's ATM card and that victim chased petitioner, then

13  a  struggling occurred.  Petitioner never ran with the ATM card.

14  The police and the prosecution invented this story.  The police and

15  the prosecution knew that if the victim chased petitioner to retrieve

16  the ATM card and then the victim died, that is evidence to convict

17  petitioner to first degree murder.  In short, the police and the

18  prosecution  falsely told the jury that the petitioner ran with

19  the victim's ATM card, and that constituted a robbey because the

20  victim was killed in the process of getting her ATM card, and  that

21  constituted a first degree murder even if the victim attacked

22  petition.

23      Is a fact that the victim withdrawed $40 from ATM card at the

24  Bank of America.  See Exhibit A at page 9.  Also this page shows that

25  petitioner put Mancera's ATM card in his pocket.  This petitioner

26  denied because he does not remember having putting the card in

27  his pocket.  Petitioner thinks that the putting of the card in his

28  pocket is another fabrication of the police and the prosecution.

8

1    In 2003, two men convicted of Santa Clara County murders were

2    set free amid judicial findings that police or prosecutor miscon-

3    duct helped convict people who were probably innonce. One involved

4    Glen "Buddy" Nickerson, who served 19 years before U.S. District

5    Judge Marilyn Hall Patel overturned his conviction. The second

6    was Quedellis Ricardo "Ricky" Walker, who spent nearly 12 years

7    in prison before top prosecutors acknowledged that improper deals

8    with unreliable witnesses had caused an injustice. Please see

9    Exhibit A at p. 3 paragraph 7.

10    Is the custom of the police and the prosecutor in Santa Clara

11    to work in concert to convict innocent people. Petitioner is

12    not the one saying this. The Mercuryd News said it. In the

13    present case the prosecution and the police fabricated the story

14    that petitioner ran with the victim's ATM card and then the

15    victim chased petitioner and then a struggling occurred and the

16    victim was killed in the struggling. The police and the prosecu-

17    tion knew that placing petitioner running with the victim's

18    ATM card constituted a robbery. And if the victim was killed

19    after a fight for the card did not constituted a manslaughter.

20    These people are very experienced, and they knew the importance

21    of placing petitioner running with the victim's ATM card and the

22    victim chasing petitioner to retrieve it. But the truth is that

23    petitioner never ran with the victim's ATM card. The victim

24    never chased petitioner to retrieve the ATM card. The struggling

25    and killing of the victim was in self-defense because for some

26    reason unknown to petitioner, they fought and the victim fell

27    and was killed. The prosecution claimed that petitioner tried to

28    used the ATM card of Mancera. That is not true. Like the Mercury

1  News said that the prosecution of Santa Clara County like to fabrica-
2  te evidence to convict people.    The prosecution has an obligation
3  to prove beyond a reasonable doubt that petitioner killed the
4  victim for the whole purpose to take the ATM card.  in this case
5  the prosecution had failed to prove the above.

6      Maria Mancera A.K.A John Mancera's blood alcohol level had
7  been determined to be. .22.  (RT 280-281.)  The blood alcohol
8  level of .22% indicated to Chief Medical Examiner Gregory Schmunk
9  that Mancera had consumed approximately 10 drinks within a few
10  hours of her death.  (RT 219.)  Such a blood alcohol level would
11  result in signs of gross intoxication, such as slurre speech and
12  loss of balance with difficulty standing and walking.  (RT 273-274,
13  282-283.)  Mr. Schmunk noted that between 11:10 a.m. and 12:20
14  p.m. on August 20, Mancera's body was in full rigor mortis,
15  meaning that she had died approximately six to eight hours earlier.
16  (RT 213.)  The level of lividity present at the same time was
17  not fixed, as would be expected eight to 12 hours after death.
18  (CT 215-216.)  Mr. Schmunk indicated that many of the injuries
19  were consistent with a fall of 27 to 31 feet.  (RT 204.) Mr.
20  Schmunk opined that Mancera was alive at the time of the fall
21  based on the large amount of blood on the track and inside the
22  body.  (RT 205.)  In addition, the arm fracture had some-tissue
23  swelling which would not have occurred without blood pressure.
24  (RT 205-206.)  Other factors which led Schmunk to believe that
25  Mancera was alive before hitting the ground were bleeding on the
26  surface of the brain, in the deep chest, at the rib fractures,
27  and in the abdominal cavity.  (RT 206.)

28      On May 7, 2002, testimony began.  (CT 121.)  On May 8, 2002,

1  the parties entered into four stipulations: that a blood sample
2  was properly drawn from petitioner and accurately analyzed by
3  the Santa Clara County Crime Laboratory and was determined to be
4  positive of "BE"; that a blood sample was properly drawn from
5  the body of Mancera, accurately analyzed by the Santa Clara County
6  Crime Laboratory, and was positive for both cocaine and alcohol,
7  the blood alcohol level being measured at .22%; that Mancera's
8  bank records were admissible; and that on August 20, 2001 at
9  12:48 a.m., Mancera's ATM card was used at an automatic teller
10 machine at the Union Bank in San Jose, and at 12:55 a.m. at the
11 Bank of America-Hester Branch in San Jose, that the video tapes
12 taken during each transaction accurately reflected the transaction,
13 and that photograph were accurately made from the video taken
14 during the transaction.  (CT 124.)

15    At approximately 11:15 p.m. on August 19, 2001, San Jose
16 Police Officer Joaquin Barreto was on foot patrol in the area
17 of the Alameda and Hedding Street.  (RT 129-130.)  He and his
18 partner, Officer Keith Neumer, were standing on the Alameda at
19 Sunol Street when they saw petitioner and Maria Mancera walking
20 on the Alameda.  (RT 132, 150.)  They seemed to be "ambling along"
21 with no specific direccion.  (RT 132.)

22    Barreto approached the pair and asked them what they were
23 doing.  (RT 133.)  Mancera replied that they were looking for
24 an ATM machine, and pulled an ATM card out of the purse she was
25 carrying.  (RT 133.)  Barreto observed that the card was
26 emblazoned with the name "Maria Mancera."  (RT 134.)  It was
27 obvious to Barreto that Mancera was a man presenting himself as
28 a woman.  (RT 135-136, 144-145.)  She did not have any injuries

11

1 and appeared to have all of her teeth. (RT 138, 145.) Her hands
2 were dirty. (RT 146.) Mancera and petitioner appeared to be
3 friendly with each other. (RT 136.)

4     While speaking to them, Barreto believed they were both under
5 the influence of alcohol. (RT 134-144.) He based this upon the
6 fact that there was an odor of alcohol on them, their eyes were
7 watery and bloodshot, and they were somewhat unsteady on their
8 feet. (RT 135.) Neumer also smelled alcohol, and recalled that
9 they admitted they had been drinking. (RT 154.) They also had
10 delated pupils, which Barreto knew was a sympton of stimulant use.
11 (RT 144.) Barreto did not see anything that he immediately
12 recognized as symptoms of cocaine use, but it was possible that
13 they were under the influence of cocaine as well. (RT 148.)
14 Barreto thought they were both at about the same level of intoxi-
15 cation. (RT 135.) They did not have trouble communication with
16 him, and their level of intoxication was not severe enough to
17 warrant booking them for being drunk in public or booking into
18 a non-custodial detention facility to sober up. (RT 135.)

19     Petitioner's conviction is one of manslaughter. The evidence
20 in this case only proves that two drunkers fought together for
21 not apparent reasons. To convict petitioner for first degree
22 murder is ludicrous because there is no evidence beyond a reaso-
23 nable doubt that petitioner killed Mancera intentionally, with
24 premeditation aforethought. In short the fall of Mancera was no
25 intentional. The evidence that petitioner ran with the ATM card
26 and Mancera chasing petitioner to retrieve the ATM card from
27 petitioner came from the police and the prosecution. The police
28 said that petitioner told them that he ran with the ATM card

1  and that Mancera chased petitioner for the purpose to retrieve

2  the ATM card.  That is ludicrous, because petitioner never told

3  the police the above.  Petitioner fought with Mancera because

4  Mancera attacked petitioner without a reason.  Mancera attacked

5  petitioner because Mancera was under the influence of cocaine and

6  alcohol as petitioner too was.  The police and the prosecution

7  claimed that petitioner took items from the purse of Mancera after

8  she fell to the track below.  The prosecution and the police claims

9  are not    true.        Petitioner is only guilty of accidentally

10  killing Mancera when Mancera jumped on petitioner back and

11  petitioner tried to take Mancera from his back and accidentally

12  Mancera fell to the track below.  See Exhibit A at page 9.

13     The police and the prosecution of the Santa Clara County had

14  a custom of working in concert to convict people said the Mercury

15  News.  See Exhibit A at page 3 paragraph 7.

16     The police said in this case that petitioner told them that

17  he fled the scene with the card still in his possession.  The

18  victim chased after the defendant and they began to wrestle.

19  The victim jumped on top of the defendant as she was trying to

20  get her card back, making the defendant hit the guardrail, causing

21  her to let go of the fefendant and fall to the track below.  The

22  defendant went down to check on the victim, panicked and left

23  the scene without calling 911.  Please see Exhibit A at page 9.

24  The last paragraph is a pure fabrication of the police and the

25  prosecution because petitioner never said what the last paragraph

26  said.  These people are very experienced and they knew that

27  petitioner can be convicted of first degree murder if the victim

28  died while she was trying to retrieve the ATM card even thought

1    the victim died during the struggling.

2        A review of the interrogation will show that the police and

3    the prosecution of the County of Santa Clara are lying just for

4    the purpose of convicting petitioner to first degree murder.  The

5    statement of petitioner to the police shall be reviewed very

6    closely to clarifying the fabrication of these people.  Petitioner

7    is REQUESTING AN EVIDENTIARY HEARING ON ISSUE ONE TO REVIEW THE

8    STATEMENT OF PETITIONER TO THE POLICE.  And after the evidentiary

9    hearing, petitioner is requesting a reversal of his conviction

10   and sentecing of first degree murder.  Petitioner is only guilty

11   of accidentally killing Mancera, while both of them were under

12   the influence of alcohol and cocaine.  Petitioner's right of

13   the Federal Due Process Clause of the Fourteenth Amendment had

14   been violated.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

## II.

### PETITIONER'S STATEMENT TO THE POLICE WAS USED
### INTO EVIDENCE IN VIOLATION OF MIRANDA V. ARIZONA

On May 6, 2002, the trial court ruled that petitioner's state-
ments to police had been taken in violation of Miranda v. Arizona,
284 U.S. 436 (1966) and could not be introduced in the prosecution's
case in chief.  (CT 117; RT 94.)

The trial court gave the order to the prosecution not to use
the statements of petitioner to the police.  But because is the
custom of the prosecution in the County of Santa Clara to ignoring
the orders of the judges, the prosecution in this case told the
jury that petitioner ran with the ATM card of Mancera, then
Mancera chased after petitioner to retrieve her card, and Mancera
fell to the truck killing herself.  But all because she was trying
to have possession of her card.  The prosecution's comments were
false and a refusal to obey the orders of the judge not to use
the statements of petitioner in his case in chief because it was
obtained in violation of Miranda.

When petitioner was interviewed by the police, he was under the
influence of alcohol and cocaine.  The waiver of petitioner's
Miranda rights were not voluntary, intelligent, and knowingly
made because of petitioner's condition when he was interviewed.
The police claimed that petitioner told them that he ran with the
ATM card of Mancera.  Petitioner does not remember saying that
to the police.  Is more likely that the police is fabricating the
running of petitioner with Mancera's card.  After all, the police
and the prosecution of Santa Clara County had the custom of working
together to convict people even if they are innocent.  See what

15

1   the Mercury News said in Exhibit A at page 3 paragraph 7.

2   Petitioner is not saying the above, the Mercury news says it.

3       When petitioner was interrogated, a blood sample was drawn

4   from him.  (RT 270.)  A test indicated the presence of cacaine

5   metabolite, meaning he had most likely ingested cocaine more than

6   six hours earlier.  (RT 270, 276-277.).  This is evidence that

7   petitioner was under the influence of cocaine and alcohol when

8   he was interviewed by the police.

9       The police and the prosecutoon kept saying that petitioner

10  told the police that he ran with the card of Mancera, then Mancera

11  chased after petitioner to retrieve the card, then both fought and

12  in the process, Mancera fell the track below and killed herself.

13  Well if petitioner told the police that he ran with the card of

14  Mancera, petitioner is requesting an examination of the Original

15  tape of the recorded statement to the police that petitioner made.

16  If what the police and the prosecution claimed is true, the

17  original tape of petitioner's statement to the police should

18  reflect this.  But petitioner is requesting an expert to examine

19  the tape recorded of the original tape of his statements to the

20  police.  The reason petitioner is requesting the service of an

21  expert to examine the original tape of his statements is because

22  the police and the prosecution are inventing that petitioner told

23  them that he ran with the card of Mancera and then Mancera chased

24  him.  That is false.  Petitioner does not remember saying that

25  to the police.

26      If an expert on cassette says that the original tape of

27  petitioner's statements to the police says that petitioner says

28  in the recorded statements that he ran with the card of Mancera

16

and Mancera chased after him to retrieve her card.  Then petitioner
will accept the expert findings.  But if not expert on cassettes
examine the original tape of the statements recorded of petitioner's
statements to the police, petitioner will not accept that he ran
with the card of Mancera and Mancera chased after him to retrieve
the card.  Petitioner fought with Mancera because both were drunk
or under the influence of cocaine and alcohol.  Petitioner never
ran with the card of Mancera.  The police and the prosecution are
inventing this story.

The reason petitioner is requesting the service of an expert
on cassette is because petitioner wants to challenge the authenti-
city of the original tape recorded of his statements to the police.
The Mercury News says that the Santa Clara County police and the
prosecution work in concert to convict people that are innocent.
Like indicated above, is the position of petitioner that he never
told the police that he ran with the card of Mancera.  The police
is not been candid.

If any part in the case in chief was used by the prosecution,
petitioner's conviction then should be reversed because the trial
court found that petitioner's statements violated his Miranda
rights.  Petitioner did not testify.  Then any part of his state-
ment that was used was a violation of his Fifth Amendment.

The people bear the burden of proving by a preponderance of
evidence that a defendant's custodial statement complied with
Miranda.  (<u>Colorado v. Connelly</u>, (1986) 479 U.S. 157, 168-169
[107 S.Ct. 515, 93 L.Ed.2d 473].

Criminal defendants undergoing custodial interrogations by
the police must be advised of their constitutional right to

17

1   remain silent, have an attorney present during the interrogation,

2   have an attorney appointed if the defendant is indigent, and of

3   the state's ability to use incriminating statements against them.

4   (Stansbury v. California, (1994) 511 U.S. 318, 321 [114 S.Ct. 1526,

5   128 L.Ed.2d 293]; Miranda v. Arizona, 384 U.S. 436, 444 (1966);

6   People v. Aguilera, (1996) 51 Cal.App.4th 1151, 1161.)  Unless

7   the defendant waives these constitutional rights, any statements

8.  obtained during a custodial interrogation are inadmissible to

9   establish a defendant's guilty.  (Michigan v. Tucker, (1974) 417

10  U.S. 433, 444, 446 [94 S.Ct. 2357, 41 L.Ed.2d 182]; Miranda v.

11  Arizona, supra, 384 U.S. at p. 444; People v. Aguilera supra,

12  51 Cal.4th at p. 1161; People v. Clair, (1992) 2 Cal.4th 629,

13  678.)

14      This case is being done without any aid from the trial

15  transcripts.  It been done just with the aid of Appellant's

16  Opening Brief that was sent by Appellate Counsel on 9/12/06   See

17  Exhibit A pages 15-16.

18      **PETITIONER REQUESTS AN EXPERT ON CASSETTE, AND AN EVIDENTIARY**

19  **HEARING ON ISSUE TWO.**  Petitioner also is requesting a reversal

20  of his conviction.  Petitioner's right under the Fifth Amendment

21  to the United States Constitution had been violated.

22

23

24

25

26

27

28

III.

## PETITIONER IS REQUESTING A COPY HIS TRIAL TRANSCRIPTS.

A Jailhouse Lawyer, whose name is not available right now, but will be provided in the future, was doing the case of petitioner. The Jailhouse Lawyer went to the hole (SHU). Petitioner did an appeal (602) requesting to the authorities to retrieve his trial transcripts from the Jailhouse Lawyer. The appeal (602) was responded and petitioner was told that he should have done the appeal (602) within 15 days from the day the Jailhouse Lawyer went to the hole.

This prison should not have refused to retrieve the trial transcripts from the Jailhouse Lawyer because they are very vital to petitioner. Now petitioner is doing this case without the trial transcripts. Petitioner received the Appellant's Opening Brief from his appellate counsel on September 12, 2006. Please see Exhibit A at page 16. On July 23, 2006 petitioner requested a copy of his trial transcripts to Ms. Lori A. Quick (Appellate Counsel) Please see Exhibit A at page 15. Like petitioner is saying in his letter that he needs a copy of the trial transcripts because a Jailhouse Lawyer have them and the Jailhouse Lawyer informed petitioner that the trial transcripts were taken from him and thrown away when he (Jailhouse Lawyer) went to the hole.

If petitioner does not have his trial transcripts is the fault of High Desert State Prison because it thrown them away. The High Desert State Prison's Warden, Thomas Felker is an arm or branch of the Government of the State of California. Therefore this Court should provide a copy of the trial transcripts to

19

petitioner.

In King v. Bell, 378 F.3d 550 (6th Cir. 2004) the United States Court of Appeals for the Sixth Circuit ordered an evidentiary hearing because the government delayed in providing petitioner with the trial transcripts. See also Keenan v. Bagley, 400 F.3d 421 (6th Cir. 2005)

In Holloway v. Roe, 31 Fed.Appx. 376, 377 (9th Cir. 2002) Holloway his Jailhouse Lawyer died, he did not prepare a timely petition because, his (Holloway') Jailhouse Lawyer had all the files and records. The United States Court of Appeals for the Ninth Circuit remand    for further development of the record and consideration of the equitable tolling claim in view of the record. See Whalem/Hunt v. Early, 233 F.3d 1146, 1148 (9th Cir. 2000) (en banc) (remand appropriate where there are "circumstances consistent with petitioner's petition and declaration under which he would be entitled to a finding of . . . . equitable tolling.")

Morrison contends that the district court erred by not granting him equitable tolling for the period during which he was incarce- rated outside of Montana and denied access to necessary materials. See Miles v. Prunty, 187 F.3d 1104, 1105, 1107 (9th Cir. 1999) (concluding that when external forces rather than the petitioner's lack of deligence, account for the failure to file a timely claim, equitable tolling may be appropriate). Because the district court did not have the benefit of our en banc decision in Whalem/Hunt v. Early, 233 F.3d 1146 (9th Cir. 2000) (en banc) (per curiam), and no evidentiary hearing was held, we reversed and remand to the district court for appropriate development of the record and factual findings. Id. at 1148. (determining that

1   where it cannot be said that there are no circumstance consistent
2   with petitioner's petition and declaration under which he would
3   be entitled to equitable tolling, reversal is proper).   Morrison
4   v. Mahoney, 31 Fed.Appx. 389, 390 (9th Cir. 2002).

5       If this Court fails to provide the trial transcripts to
6   petitioner, he will be entitled to submit another petition in the
7   future after petitioner gets the transcripts.   This Court should
8   provide the trial transcripts to petitioner now to prevent that
9   the tax payers resources be spent unnecessary in the future.
10  Petitioner has been raised the present issues without the trial
11  transcripts and due to that, the issues are not properly done.
12  **PETITIONER IS REQUESTING AN EVIDENTIARY HEARING ON THIS ISSUE**
13  **THREE.**   After it, petitioner is requesting a reversal of his
14  conviction because his Fourteenth Amendment right to transcript
15  had been violated by the Warden Thomas Felker when his subordinates
16  took and threw away the trial transcripts of petitioner that were
17  in possession of petitioner's Jailhouse Lawyer.

18
19
20
21
22
23
24
25
26
27
28

IV.

## PETITIONER WAS DENIED HIS
## PRESENCE DURING THE READBACK.

On May 14, 2002, 9:39 A.M. Not reported- The Jury informs the deputy that they have a question. The Court is notified. The Court instructs the deputy to enter the deliberation room and ask the jury to be more specific as to the question.

9:50 a.m. Not reported- the jury inform the deputy that they have specified the area requested. The court and counsel are notified.

10:23    not reported the jury informs the deputy that they have another question. The court and counsel are notified.

10:38 a.m. not reported, Cindy Mohr, enters the deliberation room to do the readback requested by the jury and to provide the written answer to the second question requested.

10:40 a.m. not reported the reporter leaves the deliberation room after completing the readback. The jury continue deliberating.

11:01 a.m. Court is in session with both counsel present. the Court reviews the first question received from the jury this morning. Defense Attorney Gillan is heard regarding his odjection. the People are heard briefly.

11:04 a.m. The court reads the second question received and reads the answer which was provided to the jury. **Defense counsel Gillan waives the defendant's presence.** Both counsel stipulate that the reporter may enter the deliberation room for readback. See (CT 193.)

Defendant has a constitutional right to be present at all

22

1  stages of the trial where his absence might frustrate the fairness
2  of the proceedings-<u>Cohen v. Senkowski</u>, 290 F.3d 485; see also
3  <u>Rushen v. Spain</u>, 464 U.S. 114 (1983) 2005 L.W. 1728, 6/7/05.

4      Petitioner did not waive his presence.  Therefore, his convic-
5  tion should be reversed.  **PETITIONER IS REQUESTING AN EVIDENTIARY**
6  **HEARING ON ISSUE SIX.**  Petitioner's right under the Sixth Amend-
7  ment has been violated.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

V.

## TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE
## BY FAILING TO PRESENT THE DEFENSE OF SELF-DEFENSE.

Maria Mancera A.K.A John Mancera's blood alcohol level had been determined to be .22%. (RT 280-281.)  The blood alcohol level of .22% indicated Chief Medical Examiner Gregory Schmunk that Mancera had consumed approximately 10 drinks within a few hours of her death.  (RT 219.)  Such a blood alcohol level would result of signs of gross intoxication, such as slurs speech and loss of balance with difficulty standing and walking.  (RT 273-274, 282-283.)

Officer Barreto on the day of the incident spoke with Mancera and petitioner.  Barreto believed that Mancera and petitioner were both under the influence of alcohol.  (RT 134-144.)  He based this upon the fact that there was an odor of alcohol on them, their eyes were watery and bloodshot,  and they were somewhat unsteady on their feet.  (RT 135.)  Officer Neumer also smelled alcahol, and recalled that they admitted they had been driking.  (RT 154.) They also had delated pupils, which Barreto knew was a sympton of stimulant use.  (RT 144.)  Barreto did not see anything that he immediately recognized as symptons of cocaine use, but it was possible that they were under the influence of cocaine as well. (RT 148.)  Barreto thought they were both at about the same level of intoxication.  (RT 135.)

Petitioner fought with Mancera after she jumped on petitioner for no apparent reasons.  Mancera fought with petitioner because she was under the influence of alcohol and cocaine.  At no time petitioner tried to run with the ATM card of Mancera as the

24

1    police and prosecution claimed. Was the position of the prosecu-
2    tion that Mancera was killed when she was trying to retrieve her
3    card from petitioner when petitioner was running with it. That
4    is a pure fabrication that Mancera was chasing after petitioner
5    for her card.

6        Petitioner told trial counsel that he fought with Mancera
7    for no apparent reasons. Petitioner told trial counsel that
8    during the struggling Mancera fell the track down and killed
9    herself during the fall. Trial counsel refused to argue that
10   petitioner had killed Mancera in the heat of passion, and that
11   the charged offense is a pure manslaughter. If trial counsel
12   would have used the defense of self-defense, the result of the
13   proceeding would have been different.

14       In In re Hall, 30 Cal.3d 408, 179 Cal.Rptr. 223. (Defendant
15   was denied competent counsel by failing to prepare case) Court
16   granted defendant's habeas corpus petition because of a combina-
17   tion of newly discovered evidence and trial counsel's failure to
18   adequately prepare the defense. Court went to considerable
19   length in detailings the failings of defense to properly prepare
20   and investigate the defense of the case.

21       Thelen has been granted a certificate of appealability by the
22   United States Court of Appeals for the Sixth Circuit to seek
23   review of the issue of whether his trial counsel rendered
24   ineffective assistance by failing to object to the use of a 1986
25   Oklahoma deferred sentence which occurred more than ten years
26   prior to the commencement of the instant offense as a predicate to
27   a career offender enhancement. Thelen v. United States, 131 Fed.
28   Appx. 61-63 (6th Cir. 2005).

1  Deferential standard of review applies to ineffective assis-

2  tance claims.  A defendant must show that counsel's representation

3  was so "thoroughly ineffective that defeat was 'snatched from

4  the jaws of victory.'"  West v. Seabold, 73 F.3d 81, 84 (6th Cir.

5  1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th

6  Cir. 1992) (en banc).

7  Inexperience and inattention can be enough to constitute

8  constitutional deficient performance.  Grevley v. Mills, 87 F.3d

9  779, 786 (6th Cir. 1996).

10  Petitioner's conviction should be reversed.  **PETITIONER IS**

11  **REQUESTING AN EVIDENTIARY HEARING ON ISSUE FIVE.**  Petitioner's

12  right under the Sixth Amendment had been violated.

## A.    Trial Counsel Prevented Petitioner From Testifying.

If petitioner would have been let to testifying, he would have told the jury that Mancera never chased after him to try to retrieve his ATM card.  Petitioner would have told the jury that because both were under the influence of cocaine and alcohol, they fought for no apparent reasons.  Petitioner would have told the jury that he never told the interrogation officers that he ran with the card of Mancera and that police invented the story that petitioner ran with the card of Mancera.  Petitioner would have told the jury that Mancera and him started the fight over the track and then accidentally, Mancera fell below the track.

Trial counsel told petitioner that he was no let him to testify because petitioner was going to be impeached with his priors if he testify.  Petitioner told trial counsel that he wanted to testify even though he could be impeached with his priors.

The constitutional right to testify is found in the Due Process Clause, the Fifth Amendment's guarantee against compelled testimony, and the Sixth Amendment.  Rock v. Arkansas, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2708-10, 97 L.Ed.2d 37 (1987).  Quoting United States v. Moreno, 102 F.3d 994, 998 (9th Cir. 1986); see also Nicholas v. Batler, (1990) 917 F.2d 518; United States v. Teague, 908 F.2d 488 (11th Cir. 1990).

Petitioner's conviction should be reversed.  **PETITIONER IS REQUESTING AN EVIDENTIARY HEARING ON ISSUE V(A).**    Petitioner has been denied his Fifth and Sixth Amendments of the United States Constitution.

27

B.    **Failure To Request Jury Instruction of the defense of Self-Defense.**

In U.S. v. Span, 75 F.3d 1383 (9th Cir. 1996) (Counsel's failure to request instructions on viable defense theory denies defendant right to effective counsel).  Defendants were charged and convicted of assaulting federal marshalls.  Although counsel had requested jury instructions covering the affirmative defense of self-defense and mistake of fact, and privilege to resist an unlawfull arrest, he neglected to see instructions on the theory that a person has a right to resist an officer who is using excessive force.  Court here found that counsel's failure to seek instructions on this theory which given the evidence, was defendants' only viable defense and one that had a strong likely of success, was ineffective assistance of counsel.

In the present case, trial counsel neglected to seek instructions on the theory that Mr. Uvalles has a right to resist the attack of Mancera who was using excessive force against petitioner.

Gregory Schmunk is the Chief Medical Examiner and Coroner for Santa Clara County who is an expert in the area of forensic pathology and wound recognition.  (RT 196-198.)  He performed an autopsy on Mancera's body during which he discovered that Mancera was in fact a man.  (RT 198-199.)  Mancera's blood alcohol level had been determined to be .22.  (RT 280-281.)  The blood alcohol level of .22% indicated to Schmunk that Mancera had consumed approximately 10 drinks within a few hours.  (RT 219.)  Such a blood alcohol level would result in signs of gross intoxication, such as slurred speech and loss of balance with difficulty

standing and walking.  (RT 273-274, 282-283.)  He noted that
between 11:10 a.m. and 12:20 p.m. on August 20, Mancera's body
was in full rigor mortis, meaning that she had died approximately
six to eight hours earlier.  (RT 213.)  The level of livility
present at the same time was not fixed, as would be expected
eight to 12 hours after death.  (RT 215-216.)

Mancera was a man, He must have been violent because for no
reason attacked petitioner.  Maybe Mancera was violent due to
the amount of alcohol and cocaine in his system.  Trial counsel
never investigated Mancera for any pattern of violence.  Mancera
was a violent person and due to that he attacked petitioner.  Or
like petitioner indicated above, maybe the alcohol and the cocaine
made Mancera to be violent.  The only thing petitioner can say
is that Mancera attacked him and he defended himself.  And trial
counsel would have requested the instruction that petitioner had
a right to defend the attack of Mancera.  Also trial counsel
would have requested the instruction of the defense of self-defen-
se.  Because he failed to do so.  He was ineffective.

Petitioner's conviction should be reversed.  **PETITIONER IS
REQUESTING AN EVIDENTIARY HEARING ON ISSUE FIVE(B).**  Petitioner's
rights under the Sixth Amendment to the United States Constitu-
tion had been violated.

## VI.

### APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE

If this Court finds any issue raised in this petition merito-
rious, them this Court will find that appellate counsel was
ineffective by failing to raise the meritorious issue that this
Court finds that have merits.

In evaluating a claim of ineffective assistance of appellate
counsel, we look to the analysis established by the United States
Supreme Court in Strickland v. Washington, 466 U.S. 668, 688 104
S.Ct. 2052, 80 L.Ed.2d 674 (1984).  See also Willis v. Smith,
351 F.3d 741, 745 (6th Cir. 2003).  The Strickland involves two
prongs: the "performance prong," where a petitioner is required
to show that her attorney's representation "fell below an objective
standard of reasonableness,"  Id, and the "prejudiced prong,"
which requires the petitioner to demonstrate that there exists
"a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different,"
id, (emphasis added).  Ballard v. United States, 400 F.3d 404,
407 (6th Cir. 2005).

The question presented here is whether an appellate counsel
prejudices a client where the attorney fails to raise on appeal
a [meritorious] claim.  We answer in the affirmative, because
but for the appellate counsel's ineffectiveness, there is a
reasonable probability that the result of the [] appeal may have
been different.  Cover v. Straub, 349 F.3d 340, 349-50 (6th Cir.
2003).  Quoting Ballard v. United States, supra, 400 F.3d 404,
409 (6th Cir. 2005).

30

1    A showing that a defendant received ineffective assistance of

2    counsel will establish cause excusing a procedural default.

3    Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 379

4    (1986) quoting Ellis v. Hargett, 303 F.3d 1183, 1186 (10th Cir.

5    2002).

6    Petitioner's conviction should be reversed. **PETITIONER IS**

7    **REQUESTING AN EVIDENTIARY HEARING ON ISSUE EIGHT.** Petitioner's

8    right under the Sixth and Fourteenth Amendments have been denied.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8. Did you appeal from the conviction, sentence, or commitment?    [X] Yes.    [ ] No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
   Court of Appeal Sixth Appellate District

b. Result  denied and remanded the enhancement  c. Date of decision: Oct. 28, 2003

d. Case number or citation of opinion, if known:  H024674

e. Issues raised: (1)  The enhancement violated 654 of the Penal Code.

   (2) _____

   (3) _____

f. Were you represented by counsel on appeal?  [X] Yes.  [ ] No. If yes, state the attorney's name and address, if known:

   Lori A. Quick 100 N. Winchester Blvd., Suite 310 Santa Clara, CA 95050.

9. Did you seek review in the California Supreme Court?  [ ] Yes  [X] No.  If yes, give the following information:

a. Result _____  b. Date of decision: _____

c. Case number or citation of opinion, if known: _____

d. Issues raised: (1) _____

   (2) _____

   (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    Appellate counsel was ineffective by no raising the present issues

    on direct appeal.

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    Not applicable

    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____

b. Did you seek the highest level of administrative review available?  [ ] Yes.  [ ] No.
   *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?   [X] Yes. If yes, continue with number 13.   [ ]  No. If no, skip to number 15.

13. a.  (1) Name of court: Superior Court of Santa Clara County

   (2) Nature of proceeding (for example, "habeas corpus petition"): Petition for writ of habeas corpus

   (3) Issues raised: (a) Prosecutor misconduct

   (b) Ineffective assistance of trial counsel

   (4) Result (Attach order or explain why unavailable): denied

   (5) Date of decision:

   b.  (1) Name of court: Court of Appeal Sixth Appellate District

   (2) Nature of proceeding: Petition for writ of habeas corpus

   (3) Issues raised: (a) Prosecutor misconduct

   (b) Ineffective assistance of trial counsel

   (4) Result (Attach order or explain why unavailable): denied

   (5) Date of decision:

   c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
   No hearing was held

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
   I just received the Appellant's Opening brief from my former appellate
   attorney. And I used it to prepare this writ because this prison threw
   away my transcript that was in possession of my Jailhouse Lawyer.

16. Are you presently represented by counsel?   [ ]  Yes.   [X] No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?   [ ]  Yes.   [X] No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
   I do not want to delay this proceeding and this Court has jurisdiction
   to review my issues

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: OCT 4 2006

▶ _(signature)_
(SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]          PETITION FOR WRIT OF HABEAS CORPUS          Page six of six

**EXHIBIT A**

Posted on Sun, Jan. 22, 2006

**FIRST OF FIVE PARTS**

# Review of more than 700 appeals finds problems throughout the justice system

**By Fredric N. Tulsky**
**Mercury News**

The Santa Clara County criminal justice system failed Miguel Sermeno.

Sermeno was arrested on felony hit-and-run charges after walking the half-block from his house to the scene of an accident. An overzealous deputy district attorney ignored evidence that pointed to a more likely suspect, instead winning a wrongful conviction.

The system failed Bobby Herrera.

Herrera pleaded guilty to assault for a shooting he did not commit, buckling to pressure from an incompetent lawyer who bled his family for thousands of dollars but never investigated the case. Even after the key witness admitted she falsely accused him, indifferent state appellate court justices let his five-year prison sentence stand without explanation.

The system failed Frederick Brown. Brown was sentenced to 26 years to life for possessing stolen property, after he hauled away a truck that had been stripped of parts as it sat idly near his home for a year. The trial judge refused to instruct the jury on a key point of law: Brown was not guilty if he believed the truck was abandoned.

The three cases are among hundreds examined in an unprecedented three-year Mercury News investigation of the Santa Clara County criminal justice system that shows a disturbing truth:

A dramatic number of cases were infected with errors by prosecutors, defense attorneys and judges, and those errors were routinely tolerated. In dozens of cases, the errors robbed defendants of their right to a fair trial. And in a small number of the very worst cases, they led people to be wrongly convicted.

The study reveals ``a basic truth about how the criminal justice system operates," said Laurie Levenson, a former federal prosecutor who teaches criminal law and ethics at Loyola Law School in Los Angeles. Levenson was one of seven experts in criminal procedures and ethics who reviewed the Mercury News findings. ``A lot of sausage gets pushed through that machine. Errors that help the prosecution are common. The uneven nature of criminal justice is a serious concern."

The Mercury News began its investigation in late 2002, as concerns emerged about the quality of justice in a series of high-profile cases. To test how the system worked more broadly, the newspaper reviewed the records of five years of criminal jury trial appeals decided by the California 6th District Court of Appeal -- 727 cases in all. In addition, the newspaper uncovered about 200 cases of questionable conduct that were not part of the study period, by reviewing files and interviewing lawyers.

The result is an unparalleled look at the extent, nature and impact of errors in a criminal justice system.

The review established that in 261 of the appellate cases reviewed -- more than one in every three of the total -- the criminal trial had been marred by questionable conduct that worked against the defendant. In only about one in 20 cases did the defendant win meaningful relief -- either a new trial or a significantly reduced sentence -- from higher courts.

The problems occurred at every phase of a trial, and in every part of the system.

• **Prosecutors.** In nearly 100 cases, the prosecution engaged in questionable conduct that bolstered its effort to win convictions, the examination revealed. Some Santa Clara County prosecutors withheld evidence that could have helped defendants, some defied judge's orders and some misled juries during closing arguments.

1

But they did not act in a vacuum. In an adversary system in which defense attorneys and judges are responsible for guarding against prosecutors' excesses, the newspaper study found, those checks on the system too often fall short.

• **Defense attorneys.** In 100 cases, defense attorneys acted in ways that harmed their clients. In nearly 50 cases, the attorneys failed to take the most basic of measures, from properly investigating their case to presenting the evidence they gathered. Defense attorneys failed in dozens more cases to object as prosecutors or judges engaged in questionable conduct, in effect excusing the mistakes.

• **Trial judges.** In more than 150 cases, judges made missteps or questionable rulings that favored the prosecution. Violating legal precedents, trial judges allowed evidence that unfairly tainted defendants and prohibited evidence that might have supported their defense. Repeatedly, judges failed to properly instruct jurors on legal principles, instead offering direction that made a guilty verdict more likely.

• **The appellate court.** The 6th District Court of Appeal, the primary court of review for Santa Clara County cases, upheld verdicts in more than 100 cases even as it acknowledged errors had occurred. The appellate court simply concluded those errors made no difference in the outcome of the case. Sometimes those conclusions were appropriate, but a review of the appellate record and consultations with experts established that in more than 50 cases the court misstated facts, twisted logic and devised questionable rationales to dismiss the error.

In nearly all the cases, the 6th District designates its opinions as ``not to be published'' -- a distinction that means they are not to be cited as legal authority in subsequent cases, and thus have little relevance beyond the parties to a case. The Mercury News found that higher courts are extremely unlikely to review unpublished opinions, making the 6th District the final word on most criminal trials in Santa Clara County.

The unpublished designation also has served to shield the cases from outside review. Past academic and journalistic studies of criminal justice, here and elsewhere, have examined published opinions, even though they represent a tiny proportion of court decisions. The Mercury News review is unprecedented in its comprehensive analysis of criminal decisions, published and unpublished alike.

State court statistics show the 6th District over time has published a smaller portion of its criminal cases -- 2 percent -- than any other appellate district in the state. The statewide average is 4 percent.

Taken together, the Mercury News findings offer a picture of a system that often turns on its head the presumption that defendants are innocent until proven guilty. Prosecutors, defense attorneys, judges and appellate justices often act in ways that cause defendants' rights to be violated.

The newspaper study points to a ``skewed system that disproportionately bends over backward to help the DA win,'' said Bennett Gershman, a former prosecutor and professor of criminal law at Pace University School of Law who has written on prosecutorial and judicial ethics. ``Admitting and excluding evidence unevenhandedly and overlooking serious errors is not a pretty state of affairs if one is concerned about fair trials. Nor if one is concerned about the appearance of justice.''

Another outside check on the system -- media attention -- also has largely failed. The few defendants with money or connections often can command attention for their complaints against the system. But the overwhelming number of cases in the Mercury News examination, even involving the most serious allegations of error or misconduct, have received scant publicity, if any.

To be sure, the review established that the system usually works. Most of the county's more than 300 criminal jury trials annually are marked by judicial rulings that correctly interpret and administer the law, and prosecutors who faithfully follow court rules and judges' rulings. In most appeals, the justices properly apply the law to the facts before them. And even in cases tainted by error, there is rarely reason to doubt the guilt of those convicted.

But Gershman and other experts say the problems exposed in the Mercury News examination are serious and reflect a nationwide trend in criminal justice. The expansion of the rights of the accused identified with U.S. Supreme Court decisions through the term of Chief Justice Earl Warren in the 1950s and '60s has waned in recent years. The public mood, worried about crime and clamoring for more safety, is reflected in tougher laws and court decisions. Prosecutors and judges who fail to lock up violent criminals do so at their own political peril.

## Defending conduct
### • DA reiterates concern for ethics

It was not possible to compare Santa Clara County directly to other areas, because of the lack of similar studies in any other jurisdiction. But this county has long been conservative on law-and-order issues and prides itself on a remarkably

low crime rate. The district attorney takes an aggressive approach to charging dangerous criminals, statistics show, and enjoys one of the highest conviction rates in the state. Judges in the county dismiss fewer cases than most of their counterparts elsewhere.

District Attorney George Kennedy and his assistants emphasize their concern for ethics and fairness, and say they have taken many steps to ensure that trial deputies care more about justice than about winning convictions at all costs. ``The tenor in the office, for fairness and ethics, is better than anywhere I know,'' Kennedy said.

His top assistant, Karyn Sinunu, reviewed with the Mercury News more than 100 cases in which concerns were raised about the prosecutor's behavior, and conceded that she was troubled by some of the conduct. But she said that in many instances, proper conduct was wrongly criticized, and that in other cases, the problems amounted to nothing more than honest mistakes.

But the Mercury News review uncovered a series of cases that raised more troubling questions about the conduct of prosecutors and whether the district attorney's office is doing enough to curb questionable behavior. While many errors were isolated incidents, others fell into patterns that suggested broader problems. And certain prosecutors engaged in questionable behavior in multiple cases, suggesting either sloppiness or a deliberate disregard for ethical rules. The Mercury News found repeated instances of troubling conduct in the career of one of the county's highest-profile prosecutors, Benjamin Field, including withholding evidence, making misleading arguments at trial and violating judicial orders.

Instances in which prosecutors, defense attorneys or judges err generally have little impact on the outcome of a case -- while any error raises, at least marginally, the likelihood of conviction, few cases go to trial without overwhelming evidence of guilt. But the Mercury News examination shows a number of cases in which the problems seemed to have greater impact.

``The system is built to tolerate errors,'' said Levenson, the former prosecutor. ``One problem is that errors increase the small risk that innocent people can be convicted. And no one can say for sure how often that happens.''

In 2003, two men convicted of Santa Clara County murders were set free amid judicial findings that police or prosecutor misconduct helped convict people who were probably innocent. One involved Glen ``Buddy'' Nickerson, who served 19 years before U.S. District Judge Marilyn Hall Patel overturned his conviction. The second was Quedellis Ricardo ``Ricky'' Walker, who spent nearly 12 years in prison before top prosecutors acknowledged that improper deals with unreliable witnesses had caused an injustice.

The newspaper probe identified several other cases in which doubts about guilt lingered after trials marred by questionable conduct. Some of those convictions were ultimately overturned in subsequent proceedings, although without the public notice the Walker and Nickerson cases drew. In two of those cases, the decision not to retry the defendant occurred as prosecutors reviewed concerns raised by the Mercury News.

After the Walker case, the district attorney's office took several significant steps, including mandatory training of assistants, to re-emphasize the need to be vigilant against wrongful prosecutions.

Kennedy said he has sought to guard against wrongful prosecutions since he took office in 1990. But, he said, the Walker case was a revelation to him. ``I thought before Ricky Walker that it was impossible'' for an innocent defendant to be convicted and lose a motion for a new trial. ``I thought it was impossible. Now I know that it isn't.''

## Worst nightmare
### • Mistakes lead to jail in hit-and-run case

The case against Miguel Sermeno is the system's worst nightmare: A series of misjudgments and mistakes led to the wrongful conviction of a man who was in the wrong place at the wrong time.

The yearlong ordeal began as Sermeno stood among a small crowd around the scene of an East San Jose hit-and-run in August 1995. A group of three bystanders thought he resembled the driver, and told police.

The investigating officer approached a frightened passenger who remained with the hit-and-run vehicle after the driver fled. He told her she could be locked up if she tried to cover up a crime, and asked whether Sermeno was the driver. She said yes, then quickly recanted.

Prosecutor Terence Tighe developed a theory that the passenger was lying to protect Sermeno because of their ``relationship,'' even though there was no indication the two knew each other. Tighe overlooked evidence suggesting the registered owner of the car was the driver who fled, and then withheld information that could have helped the

3

defense find the owner.

The assistant public defender chose not to present testimony from the children who also were in the car -- and who maintained all along that Sermeno was not the driver.

The trial judge refused to accept as evidence a photograph of the registered owner of the car, and rebuffed the public defender's complaints that he had no opportunity to show the picture to the witnesses and ask whether the owner might have been the driver instead.

After Sermeno was convicted for a felony hit-and-run, evidence emerged casting further doubt on Tighe's theory that the passenger was protecting Sermeno and not the far more logical suspect: The car's registered owner, whom she had denied knowing, was the father of her newborn baby.

The prosecution opposed granting Sermeno a new trial nonetheless. His court-appointed appellate attorney, Sheri Cohen, became baffled by the system's unwillingness to recognize her client's innocence. ``When I would go to a party and talk to people about the case, they couldn't believe that this man had been convicted and that officials were fighting to keep him convicted,'' she recalled.

A 6th District panel affirmed the conviction but ordered a hearing to consider the impact of the public defender's failure to call the children in the car as witnesses.

Finally, supervisors in the district attorney's office elected to drop the charges rather than retry Sermeno. By then, more than two years had passed since Sermeno's conviction and he had long since served his eight-month term in jail.

But the district attorney's office never formally acknowledged his innocence. In a recent interview, after hearing a reporter recount the reasons to question Sermeno's guilt, District Attorney Kennedy responded: ``If you have concluded he is innocent, I accept that.''

## Holding back
### • Crucial evidence often withheld from defense

Few cases in the Mercury News' review were as thoroughly twisted by a series of transgressions as Sermeno's. But the review demonstrates that such errors widely infect criminal cases, from before the trial through the appeal.

Perhaps the most contentious area involves the obligations of prosecutors and defense attorneys to exchange evidence promptly before trial, a process called discovery.

These disputes often begin with a complaint from a defense attorney that prosecutors ignored their legal obligation to turn over material needed to prepare the defense case. In dozens of cases reviewed by the Mercury News, judges stepped in to order prosecutors to turn over additional evidence; often they chastised the prosecutors for not being more cooperative.

Discovery issues continue post-trial as well; 25 appellate cases reviewed by the Mercury News involved significant concerns that prosecutors withheld evidence that might have cast doubt on the defendant's guilt. Over and over again, defense attorneys learned only after the case was tried that prosecution witnesses had questionable backgrounds that cast doubt on their credibility; that scientific reports were not as conclusive as juries were led to believe; that there was evidence that someone other than the defendant had committed the crime.

To defense lawyers, such issues are especially troubling for two reasons. They complain there is no way to know the number of cases in which evidence that might have changed the outcome was withheld. And they express distrust about prosecutors' motives, suggesting some evidence is intentionally hidden.

But after reviewing the cases raised by the Mercury News, chief assistant district attorney Sinunu said evidence often was withheld not for nefarious reasons, but because of mistakes or because the prosecutor was not aware of its existence. Kennedy said he believes appellate defense attorneys regularly exaggerate claims of withheld evidence, in a desperate effort to overturn convictions. Kennedy and Sinunu both said that their office policy is to err in favor of turning over evidence and that attorneys who fail to do so are warned about such conduct.

Still, problems persist.

Apolonio Solorio spent five months in jail, accused of a February 2003 robbery at a liquor store in San Jose, after the store owner identified him as one of the culprits. It took defense attorney Andy Gutierrez months, and request after

request, before a clear copy of a store videotape that captured the robbers was turned over. After the tape was digitally enhanced, the deputy district attorney quickly realized Solorio was the wrong man and moved to dismiss the charges.

It might seem an exceptional situation: A defendant's alleged crime is on videotape, and yet his attorney must fight to get this crucial evidence. But it wasn't exceptional for Gutierrez. Five years earlier, a similar thing happened when he represented Shehabeddin Elmarouk, charged with assaulting officers in the Santa Clara County jail.

The videotape that was initially provided showed only an inconclusive portion of the incident. Three weeks before trial, after six months of trying, Gutierrez obtained the full videotape, which showed the corrections officers brutally beating his client. A jury acquitted Elmarouk, who later received $110,000 after suing the county over the incident.

But when evidence of importance to the defense does not surface in a timely way, jurors are left with a misleading picture of the case as they deliberate.

Take the case of Mark Crawford, who had five prior drug-related convictions when he was arrested in January 1998. In his house, police armed with a search warrant found a duffel bag containing methamphetamine under a staircase. They also found drug paraphernalia elsewhere in the house and methamphetamine in Crawford's system.

Only one thing complicated the case. Inside the duffel bag were a motorcycle repair receipt and a traffic ticket, both bearing the name Richard Hara.

The prosecutor, Troy Benson, was undeterred. He called a police sergeant at trial to testify that drug dealers often stash false identity papers with their drugs.

The defense presented no evidence. In his closing argument, defense attorney Eben Kurtzman argued to the jury that the drugs belonged to Hara. Benson rebutted that argument by telling the jury, ``The fact is, you have no evidence that Richard Hara possessed these drugs. The only evidence that you have are two receipts. You have no evidence that Richard Hara ever lived in this house or was ever in this house."

What Benson never did, he acknowledged to the Mercury News, was conduct inquiries into Hara. Neither did Kurtzman, who, like at least 18 other defense attorneys in cases reviewed by the Mercury News, failed to take simple steps to investigate or prepare for trial. He later said he did not hire an investigator because Crawford had no money for one.

Yet as an appellate attorney discovered after Crawford's conviction, there was plenty of easily obtainable evidence that the drugs may not have been Crawford's.

Witnesses were available to testify that Hara stayed in the apartment and that the duffel bag was his. And at the very time the charges against Crawford were pending, Hara himself was arrested in Santa Clara County for allegedly possessing methamphetamine. Months before Benson would hint to a jury there was no evidence that Hara existed, his office agreed to a deal that sentenced Hara to four months in jail and a required rehabilitation program. Benson said he did not know of Hara's arrest and therefore had no information to provide during discovery.

Asked by the Mercury News to review the case, top officials in the district attorney's office were not perturbed by evidence that Hara existed after all, and offered a new theory of the crime: Hara and Crawford probably were involved in drugs together, so the evidence implicating Hara did not necessarily exonerate Crawford.

To date no court has been willing to say that Crawford was denied a fair trial. He remains in prison, having never had the opportunity to present the evidence on Hara to a jury.

## `Again and again'
### • Frequency, nature of problems worry experts

Withholding evidence is just one of many types of questionable prosecutorial conduct documented by the newspaper review. In 37 cases, prosecutors or their witnesses revealed evidence that the judge had banned from the trial; in more than 40 cases, prosecutors misstated the law, disparaged the defendant or his attorney, or made other sorts of improper statements during closing arguments; in eight cases, prosecutors took advantage of judicial rulings, telling jurors that no evidence existed to support a defense argument when the truth was the judge had prohibited the defense from presenting the evidence.

In more than 50 other cases, judges endorsed the prosecutors' behavior, making the questionable conduct the judges' own responsibility.

5

Experts who reviewed the Mercury News findings said the number and nature of the issues involving prosecutors suggest that some of the conduct was deliberate -- or at least was not being effectively prevented. Of particular concern was some conduct that occurred in patterns.

` ` When you see something happening again and again, you have to question if it isn't happening by design," said Gershman, the law professor at Pace.

Prosecutors in nine cases trivialized ` `reasonable doubt" in ways that drew criticism from the appellate court. Using strikingly similar analogies, these prosecutors sought to convince juries that it was easy to overcome such doubt, comparing it to the minor doubt one might have about the risk of an accident when driving through a green light, or making a left turn, or getting on an elevator, or boarding an airplane.

In 16 cases, prosecutors or their witnesses revealed to juries that defendants were in custody, or on probation, or on parole, generally despite specific orders from a judge not to do so. Judges typically prohibit evidence that could bias the jury against a defendant when it has no direct connection to the crime.

Sinunu, the chief assistant district attorney, admitted that the improper disclosure of evidence does recur. But, she noted, sometimes it is inadvertent -- lawyers and witnesses on occasion blunder as they try to follow the rulings. And at times, she said, witnesses -- police and victims, especially -- wrongly think they are helping the prosecutor when they blurt out information the jury is not supposed to learn.

But after reviewing the Mercury News findings, University of California-Berkeley law Professor David A. Sklansky, a former federal prosecutor, said the number of such improper revelations seemed high. ` `This is the type of thing that prosecutors should be able to stop if they wanted to, by making it clear to witnesses that it will not help and is improper to say."

Asked about Sklansky's conclusion, Kennedy conceded it was ` `a fair point."

Another matter of concern, experts said, are cases in which a single prosecutor engages in a series of questionable actions. Such cases suggest, they said, that the deputy district attorney either did not respect ethical boundaries or had, in the heat of the courtroom battle, lost a sense of fair play.

In 2001, Joey Villarreal was charged with possessing methamphetamine for sale after the police found him with a duffel bag of drugs and, when patting him down, a pocketknife. Before trial, Judge Marliese Kim told Deputy District Attorney Sumerle Pfeffer Davis to instruct her witnesses that the knife was not to be mentioned.

Nevertheless, during trial, Davis asked a police officer what he found when he patted down Villarreal. He responded, ` `I remember locating a large pocketknife in his pocket."

Away from the jury, Davis told the judge she had failed to advise the officer of the judge's order.

But that was not Davis' only mistake. In a sharply critical ruling, the 6th District also found that Davis had failed to provide to the defense statements by Villarreal at the time of his arrest, and that she overstated, in opening and closing arguments, the amount of methamphetamine in evidence. Even as the appellate panel upheld the verdict, it stated that Davis' ` `repeated failures -- to uphold her duties as an officer of the court -- were injurious to the dignity and integrity of our criminal justice system and raise questions about her ability or willingness to adhere to the laws of this state.".

Sinunu, the chief assistant district attorney, said that although Davis had erred at trial -- and had received training on courtroom conduct as a result -- officials in her office believed that the 6th District had unfairly exaggerated the error.

## Excusing mistakes
### • Appeals court routinely justifies alleged errors

Although the court's language in the Villarreal case was unusually sharp, its conclusion was typical. In a system in which errors can lead to disastrous consequences, the ultimate check on most questionable conduct -- the 6th District Court of Appeal -- routinely excuses it.

The 6th District, which covers Santa Clara, Santa Cruz, Monterey and San Benito counties, was carved more than two decades ago out of the 1st District Court of Appeal, which oversees the rest of the Bay Area. It has long been regarded as the most conservative appellate court overseeing an urban area in California -- a reputation stemming in part from the role of law-and-order Gov. George Deukmejian, a former attorney general, in appointing its first eight justices.

Supervising Assistant District Attorney David Tomkins said he remains convinced of Butler's guilt, despite the court's ruling and the problems with the evidence. Defense attorney Patrick Kelly is no happier.

Although colleagues offered Kelly congratulations on winning freedom for Butler, he told a reporter, `` I feel horrible about it. I believe my client was innocent, and that makes it impossible to feel good about this outcome.''

## Refusing to act
### ● Court says most errors are too small to matter

The Butler case stands out as one of the rare instances in which the appellate court was concerned enough about the evidence of guilt to overturn the verdict. More commonly, the court concludes the evidence is so overwhelming that whatever errors marred the trial do not matter.

The Mercury News' analysis of five years of appeals showed that in at least 107 instances, the court agreed that a prosecutor, defense attorney or judge had erred, but it called the errors harmless. In 79 other instances, the appellate court said there was no need to determine whether an error had occurred, because it would have been harmless anyway.

The U.S. Supreme Court has made clear that some level of error is acceptable: Defendants are not entitled to perfect trials, an impossible goal, but to fair trials.

But experts note there are dangers when a court routinely upholds convictions in the face of serious errors. For one thing, the appellate court is doing less than it might to discourage misconduct. If the appellate court, for instance, regularly finds that trivializing reasonable doubt is harmless, prosecutors are not necessarily deterred from doing so.

Even worse is the danger that the justices may wrongly assess the impact the errors had on the case. Not only is it difficult to determine how much an error influenced the jury, but justices also may misjudge the strength of the case themselves because of evidence that was excluded or wrongly included.

Nowhere is the court's tendency to shrug off errors more striking than in cases that involved heinous, high-profile crimes, where a reversal might lead to the release of a dangerous criminal.

One powerful example is the appeal of Sonya Daniels, a Milpitas resident whose young son, Jory, starved to death in 1994. The case was shocking, and created outrage in the community.

Daniels was tried along with her husband, Brian. The two were convicted of second-degree murder and sentenced to 15 years to life in prison. But both the trial and appellate courts reacted contemptuously to Sonya Daniels' argument that her role in Jory's death could not be considered without appreciation for her status as a battered wife.

In a three-month trial in 1998, the jury heard a sordid story of child abuse. Jory, 5, weighed 19 pounds at the time of his death and was so thin that the shape of his bones could be seen through his skin.

The jury heard that Jory and his younger brother often complained of being hungry and were sometimes denied food and water as punishment. They also heard that the abuse had a long history -- as an infant, Jory had been removed from his parents because of a fractured skull and leg.

But an equally sordid tale was not told at trial. Sonya Daniels claimed she experienced extreme abuse at the hands of her husband, including rape, sodomy and beatings with a belt. Once, angry over her refusal to have an abortion, she said, Brian Daniels had locked her in a closet and deprived her of her food and water for three days.

A 1991 state law encourages judges to admit testimony about Battered Women's Syndrome and its effects on the behavior of victims of domestic violence, but Superior Court Judge Thomas Hastings ruled that law did not apply in this case. He refused to permit a psychotherapist who specialized in family violence to testify that Sonya Daniels had been battered so severely that she was not aware of the danger to her children, and that she lived in fear that made her incapable of protecting them.

In a highly emotional scene, the prosecutor repeatedly asked Sonya Daniels why she failed to protect her son from starvation, knowing she could not mention her claims of abuse. Over and over, Hastings reprimanded her and threatened contempt as she complained that she was not allowed to answer.

Her attorney, James Leininger, continued to complain to Hastings. But Leininger's efforts, which later drew a rebuke from the appellate court for showing `` appalling disrespect'' to the judge, failed to persuade Hastings to change his ruling.

7

But Sonya Daniels' difficulties in presenting her defense were just beginning. After both she and her husband were convicted of second-degree murder, Leininger introduced her parents to another attorney, Brenda Malloy, who Leininger contended would be a good choice for the appeal. She would turn out to be a better choice for Leininger than for Sonya Daniels.

Malloy told her it would cost $25,000 for the appeal, and months later, according to court records, the first $10,000 was countersigned and deposited in Leininger's account.

Malloy filed an appellate brief on Sonya Daniels' behalf that was thoroughly lacking in legal research, offering only the barest indication of past court decisions that would normally be the heart of any appeal. The attorney general, in a rare step, argued that the appeal's discussion of the battered-woman issue was not coherent enough to warrant a response.

Then, on July 21, 2001 -- the day that the case was scheduled for oral argument before a panel of justices -- Malloy failed to show up altogether, and the argument went ahead without Sonya Daniels being represented.

Malloy was out of the country at the time, and was being investigated by the State Bar of California concerning allegations of shoddy representation of other Santa Clara County defendants. She eventually gave up the practice of law, state records show, after the state bar disciplined her as a result of its investigation.

Reached in Ireland, Malloy twice hung up when a reporter asked about the Daniels case. Leininger did not return phone calls.

Sonya Daniels found a new attorney days after the oral argument, but the 6th District would not permit her to file a new brief.

Seven weeks later, the appellate court issued its opinion, one that stands out even for a court that has routinely dismissed appeals. Even as it sharply criticized the work of Leininger and ridiculed the appeal of Malloy, the three-justice panel rejected the idea that better legal work might have made a difference.

The court said it would consider the question of whether Hastings improperly restricted Daniels' defense even though Malloy's brief was below ``the standards of competent appellate counsel,'' because at least she had ``presented some discernible arguments.''

But it rejected other issues Malloy sought to raise, saying her woeful submission did not merit consideration on those issues.

The court went on to endorse Hastings' ruling barring the battered-woman defense, and to affirm the convictions of Brian and Sonya Daniels. Sonya Daniels appealed without success to the California Supreme Court and has now turned to federal court.

The 6th District rulings ``completely distorted the process,'' said Janice Lagerlof, who now represents Sonya Daniels. ``Instead of hearing the issues properly argued, they made up what the arguments should have been, and then answered those arguments. Sonya Daniels was kept from defending herself at trial, and then 6th District denied her the chance to present her case on appeal.''

© 2006 MercuryNews.com and wire service sources. All Rights Reserved.
http://www.mercurynews.com

## APPELLATE SUMMARY SHEET

**APPELLANT'S NAME:**    **RAUL UVALLES**
**A.K.A.:**

**CO-D:**

**DCA NUMBER:**    **H024674A1**
**COUNTY:**    SANTA CLARA    **COUNTY #:** CC121250

**JUDGE:**    Thomas C. Hastings    **TRIAL ATTY:**    Charlie Gillan,
Public Defender

**MOTIONS:**    Marsden, denied, 6-14-02
**PROCEEDINGS:**    6 day jury trial
**SENTENCE:**    25 years to Life
**CONVICTIONS:**    PC 187(a): First degree murder;
PC 211-212.5: Second degree robbery

**ENHANCEMENTS:**

**VOP:**
**STRIKES:**
**CERT OF PC:**

**FACTS:**

On August 19, 2001, San Jose police made contact with the defendant and victim on the Alameda as they were walking, looking for an ATM machine. Both were asked for identification, released and given directions to the closest ATM machine. Approximately eight (8) hours later, police receive a call regarding a dead person at the Bellarmine High School Football Field. Officers recognized the victim as the person they stopped earlier with the defendant. The police go to the defendant's house to make contact.

The defendant gave the police consent to search his residence, and they found in his bedroom the jeans and shoes the defendant wore the night before. The defendant was not truthful when talking to police about his contact with the victim, and the police take the defendant into custody. Laboratory tests conclude that the blood on the defendant's pants and shoes match that of the victim. Video tape from an ATM showed the victim and defendant using the victim's ATM card at Bank of America. The defendant put the victim's ATM card in his pocket after they got money from the ATM.

The defendant told the police that the defendant and victim were later walking on the overpass at Hedding when the victim asked for her ATM card back. The defendant fled the scene with the card still in his possession. The victim chased after the defendant and they began to wrestle. The victim jumped on top of the defendant as she was trying to get her card back, making the defendant hit the guardrail, causing her to let go of the defendant and fall to the track below. The defendant went down to check on the victim, panicked and left the scene without calling 911.

9

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

SUPPLEMENTAL INFORMATION:

None

SUMMARY OF OFFENSE:

The court is familiar with the facts in this case having presided
over the jury trial.

On August 19, 2001, at approximately 11:15 p.m., Officers of the
San Jose police department made contact with victim Maria
Mancera, and the defendant, as they walked westbound on the
Alameda near Sunol.  Both individuals appeared to be under the
influence of alcohol and were asked for identification.  Maria
gave officers her identification and informed them she and the
defendant were looking for an ATM.  The defendant, who was also
asked for his identification, said he was unable to provide it as
his driving privileges had previously been suspended.  He
provided his name and date of birth and informed officers he
lived with his sister on Cleaves Ave.  A field interview card was
completed on the defendant and officers directed them to an ATM
machine located on the Alameda at Pershing.

Less than eight hours later, at 6:30 a.m. on the morning of
August 20, 2001 officers responded to the report of a "person
down" at the Bellarmine High School Football field.  Officers who
responded to the scene recognized victim Maria Mancera from
contact made the night before.  Investigation revealed the
defendant's address and officers subsequently responded to
question him about the victim.

Officers arrived at the defendant's residence and made contact
with him.  Officers requested and received consent to search the
defendant's residence.  Found within the defendant's bedroom was
a pair of pants and shoes owned by the defendant, which later
laboratory tests revealed to have the bloodstains of the victim's
blood on them.  During police questioning the defendant made
several contradictory statements regarding his last contact with
the victim.  The defendant was arrested and booked into the Santa
Clara County Main Jail.

Additional investigation revealed video footage of the victim and
defendant using the victim's ATM card at the Bank of American on
the Alameda at 11:35 p.m. on the evening of August 19th.  In
addition, the defendant was found on video attempting to use the
victim's ATM card at 12:48 a.m. on August 20 at the Union Bank on
the Alameda and then again at 12:55 a.m. on the Bank of America
on Hester Ave.  No monies were dispensed at either location as
the incorrect pin was entered.  The victim's ATM card was found
in a trash can on the Alameda between the Bank of America and the
defendant's house.

202

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

An autopsy conducted report later determined victim Maria Mancera
was born, and remained at time of death, biologically, a male.
The cause of death was determined to be multiple blunt force
trauma caused by the fall from the overpass.  Additionally, it
was determined the victim was alive prior to her fall and the
body had been moved from the original point of impact.

STATEMENT OF NEXT OF KIN: (will be present-statement attached)

Correspondence has been sent to the victim(s) family in this case
advising of the date, time, and place of sentencing, the right to
be present and to be heard pursuant to Section 1191.1 and 1191.3
of the Penal Code, as well as requesting information regarding
any losses suffered.

Yvonne Rodriguez, the victim's sister,  is the spokesperson for
the family.  She reports the murder of her sister has been
extremely difficult for the family and the tragedy was further
compounded by the victim's representation in the media.  On the
day her sister was discovered, the newspaper reported that a
man's body had been found.  Maria was born biologically a male
but had been living as a transgender female for over twenty
years.  Many people in Maria's life including her coworkers,
nieces and nephews were unaware of this and knew her only as
Maria.  Ms. Rodriguez and her family were hurt and troubled with
the insensitivity of the media regarding the issue of the
victim's sexual orientation.  They have included copies of the
newspaper articles they found offensive in regard to the
reference to the gender of the victim.

Ms. Rodriguez reports all of Maria's funeral expenses were
covered by insurance through Maria's work.  The family is seeking
no restitution at this time.  With regard to sentencing, she and
the family believe the defendant should be punished to the
fullest extent of the law.  A eulogy describing Maria has also
been submitted and attached for the courts review.

DEFENDANT'S STATEMENT:

The defendant was interviewed by the undersigned officer at the
Santa Clara County Main Jail on May 28, 2002.  Throughout the
probation interview, the defendant referred to the victim as
"he".  For consistency in this report, the victim's name has been
used.

On the evening of the present offense he was walking from his
house downtown, looking for someone to "party" with.  While
walking down the Alameda he came upon the victim who was lying
intoxicated in the gutter.  He helped Maria up and asked her if
she wanted to "party".  Together they got high by smoking
cocaine.

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

The victim told him they could go together to get money out of
the ATM machine to purchase more cocaine.  While walking down the
Alameda, they were stopped by two police officers who directed
them to an ATM machine.  He and Maria went to the ATM machine
where Maria withdrew $40.  She was too intoxicated to complete
the transaction, so she gave him the card and asked him to
complete the withdrawal.  Once completed, he placed the ATM card
in his pocket.   The defendant said he then attempted to call his
drug connection but was unable to contact him.  After another
attempt to contact his connection, he and Maria began to walk up
the overpass at Hedding.  On the top, Maria confronted him and
asked if he was her ATM card.  The defendant explained that it was at
that moment that he attempted to flee with the card.  He does not
know why he was stealing the card, because he did not need the
money.  As he was running away from Maria, Maria grabbed his
shirt and when he turned around he threw her to the ground.
Again, he attempted to run, at which time Maria jumped on his
back.  As he was trying to remove Maria from his back, he began
knocking her against the guardrail, ultimately causing her to let
go and fall to the track below.

The defendant maintains he immediately ran down to check on
Maria.  When he found her, he observed the extent of her
injuries.  Prior to leaving, he realized he did not have his
wallet with him and went through Maria's purse in an attempt to
locate it.  He did not call an ambulance or attempt to give first
aid to the victim because he got scared and panicked.  He
immediately went to get additional money to get high.  He
maintains he spent the rest of the evening getting high before
returning home to his house in the morning.

The defendant explained he did not need money when he met Maria
and does not know why he decided to rob her when she requested
her ATM card back.  He further explained her death as an accident
and his actions being that of self-defense.  He did not
intentionally push her over the bridge and was only trying to
flee with the ATM card when he was attacked physically by the
victim.  In addition, he feels terrible for what happened and
would like her family to know he is truly sorry.  He believes he
is not guilty of the crime of first degree murder, but rather the
lesser charge of involuntary manslaughter.

With regard to sentencing, the defendant would like the judge to
know he does not believe his attorney provided him a defense and
wishes he had been able to go on the stand and tell his side of
the story.  Although he admits to lying to police initially, he
believes had his post Miranda statements been admissible, the
jury would have understood this was not an intentional act.  In
addition, he believes the jury was hand selected by the district
attorney and as there were no minorities on the jury, it was not
a jury of his peers.  In closing, the defendant would like the
court to know he is not trying to avoid punishment for taking the

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

victim's life, but rather the crime he was convicted of is not
the crime he committed.

With regard to substance abuse, the defendant, now age 39, began
the use of alcohol at the age of 12.  By the age of 17 he was
drinking daily.  He continued to drink daily until his arrest for
his involvement in the present offenses.  He began the use of
marijuana also at the age of 12 and by his late teens was using
the substance daily.  He continued to use the substance daily
until his involvement in the present offenses.  He was introduced
to methamphetamines at the age of 21 and used the substance daily
until the age of 37.  He began the use of Heroin at the age of 21
and used the substance daily until the age of 30. At the time of
the present offense he was using the substance every couple of
months.  He began the use of cocaine at the age of 25 and used
the substance daily until his involvement in the present offense.
The defendant also admits to using PCP, LSD and mushroom in his
twenties.  He estimates his drug habit cost him $500 a month to
support and he did so through legitimate earnings and the sale of
personal property.  The defendant believes his significant
substance abuse contributed to the demise of his marriage as well
as contributed to his involvement in the present offense.

INTERESTED PARTIES:

None

JUDICIAL COUNCIL RULES 4.414, 4.421, 4.423    : (attached)

CASE EVALUATION:

Appearing before the court for sentencing is 39 year old Raul
Uvalles after being found guilty by jury of Murder in the First
Degree and Robbery in the Second Degree.  The present offense
involves the defendant stealing the victim's ATM card and killing
her.

The defendant admits to robbing the victim and being responsible
for her death.  He describes his actions as self-defense, which
the result of him accidentally knocking her over the railing of
the overpass where she fell to her death.  After committing this
act, the defendant said he went to the victim and rummaged
through her purse rather than attempting to administer first aid
or contact emergency personnel to possibly assist the victim.

The defendant is a divorced father of two who reports steady
employment as a Mover at the time of the offenses.  A review of
his criminal record reveals eleven misdemeanor convictions which
include exhibition of a deadly weapon, battery (2), possession of
controlled substance paraphernalia, being under the influence of
a controlled substance(3), fighting in public, driving under the

13                                              205

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

influence of alcohol causing bodily injury, hit and run resulting
in property damage, and resisting a public officer.

The undersigned recommends probation be denied.  Given the
seriousness of these crimes and their tragic consequences, the
undersigned officer feels the defendant presents a serious threat
to society and is deserving of incarceration for a significant
period of time.  It is felt the sentence being recommended will
serve to adequently punish the defendant and protect the
community.

SUGGESTED TERM:

| CHARGE | MIT | AGG | RANGE | ENHANCEMENTS | TOTAL TERM |
|--------|-----|-----|-------|--------------|------------|
| Ct. 1<br>187 PC | N/A | N/A | 25 years<br>to life | | 25 years to<br>life |
| Ct. 2<br>211-<br>212.5(c)PC | No | No | 2,3,5<br>years | | 3 years c/c |
| | | | | TOTAL TERM: | 25 years to<br>life |

**206**

Raul Uvalles, #T59954/81-202
P.O. Box 3030
Susanville, CA 96127-3030

7/23/06

Sixth District Appellate Program
Attn: Lori A. Quick, Attorney
100 N. Winchester Blvd., Ste. 310
Santa Clara, CA 95050

Dear Ms. Quick:

I trust this reaches you in the best of health and spirits.

While in the possession of a jailhouse lawyer who was assisting me on habeas corpus, my records on appeal (all transcripts and anything that was later augmented) were thrown out by prison staff. As you served as counsel of record on my 2002, Santa Clara County appeal, would it be possible to get another copy from you or advice on how I would go about doing so? Thank you.

Sincerely,
Raul Uvl.

15



B1 – 2024

SIXTH DISTRICT
APPELLATE PROGRAM
100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050

SDAP

Raul Uvalles
T-59954
High Desert State Prison
P.O. Box 3030
Susanville, CA 96127-3030

First Class Mail

MAR 10 2003

Dear Mrs. Quick,                                                    3-6-03

I recieved your letter and packet and I want you in fact to pursue the avennue of the writ of habeas corpus. I strongly believe that if I had been able to testify it would have brought a whole new set of jury instructions for the jury to concider and in fact would have been more favorable out come I also want you to look into the possibility of ineffective assistance of Council the reason being mr Guillen was told that this was a self defence/accidental incident and choose not to bring it to the D.A. or the courts attention I believe this is a direct violation of my rights to give me a fair trial not presenting all or any evidence in my behalf I myself told him that I needed to testify because the evidence against me was overwelming. the judge in his decision to exculde the tapes of my interview commented on record that if the tapes were used it was clearly accidental instead Mr Guillen chose to as he put it punch holes in the DA's case which obviously resulted in the worst possible senero all through the trial evidence to support a accidental/self defence from the coroner's initial testimony to the DAs own expert witness I don't understand why this is so dificult to see I would like to be sent the trial transcript including the mansden motion transcrips at sentencing and also I want to know what time restraints I have. I would appreciate your cooperation and if my ssumption of inaffective assistance of Council is vague please enlighten me to cause and effect and I will explain more indepth but as ince I have not gotten any responce from you as to the other uestions Ive asked in previous letters pertaining to this case. I await a responce to questions asked in the near future Sincerly Raul Uball

17

# SIXTH DISTRICT APPELLATE PROGRAM
A Non-Profit Corporation

100 N Winchester Blvd., Suite 310                    (408) 241-6171 - Main
Santa Clara, CA 95050                                (408) 241-2877 - Fax

**Executive Director**                               **Assistant Director**
*Michael A. Kresser*                                 *Dallas Sacher*

**Law Office Manager**                               **Staff Attorneys**
*Yolanda G. Edwards*                                 *Lori A. Quick*
                                                     *Vicki I. Firstman*
                                                     *William M. Robinson*
                                                     *Jonathan Grossman*
                                                     *Paul Couenhoven*

October 17, 2002


Charlie Gillan, Esq.
Office of the Public Defender
120 West Mission Street
San Jose, CA  95110

Re:  People v. Raul Uvalles
Santa Clara County Superior Court #CC121250
Court of Appeal #H024674

Dear Mr. Gillan,

I was talking to Raul the other day, and he told me that the probation officer's report contained many factual inaccuracies. According to Raul, his story of how the death occurred was very different from what the probation officer put in her report. Raul told me that he wrote his own letter containing his version of events which was given to the court. It is not part of the record on appeal. Raul told me that you would have a copy of the letter. Depending on what the letter says, it could be very important to Raul's appeal. Please send me a copy of the letter as soon as possible. If you don't have a copy, please give me a call so that we can discuss the issue, and I can try to obtain it elsewhere.

Thank you in advance for your anticipated cooperation. Please feel free to contact me if you have any questions.

Sincerely,

Lori A. Quick
Staff Attorney

18

# SIXTH DISTRICT APPELLATE PROGRAM
A Non-Profit Corporation

---

100 N Winchester Blvd., Suite 310
Santa Clara, CA 95050

(408) 241-6171 - Main
(408) 241-2877 - Fax

Executive Director
*Michael A. Kresser*

Assistant Director
*Dallas Sacher*

Law Office Manager
*Yolanda G. Edwards*

Staff Attorneys
*Lori A. Quick*
*Vicki I. Firstman*
*William M. Robinson*
*Jonathan Grossman*
*Paul Couenhoven*

January 13, 2003

Raul Uvalles
T-59954
High Desert State Prison
P.O. Box 3030
Susanville, CA  96127-3030

Dear Mr. Uvalles,

I am still working on potential issues. I don't believe we will have much to raise on direct appeal, but there may be some issues to raise in a petition for a writ of habeas corpus. One important question if have for you is this. I am very concerned about whether you believed you could testify even if Mr. Gillan didn't want you to. Did he ever tell you that it was your right to testify, no matter what he wanted you to do, and that it was your call to make?

I have reviewed what you told the court at the <u>Marsden</u> hearing, and it's a little confusing. It seems to me that what you told the judge is that Mr. Gillan said "it's your decision." If in fact he told you that it was your decision, then we don't have an issue regarding whether you were deprived of your right to testify on your own behalf. Mr. Gillan told the court that you told him you wanted to testify, that each time you said that, the two of you discussed the issue and decided that it was not in your best interests. However, you still seemed to be saying that you had told Mr. Gillan that you wanted to testify and that he said no.

It is very important that you tell me exactly what happened. When you told him you wanted to testify, did he advise you that you had the right to testify, although he thought that you should not? Or did he make the decision for you, without making sure you understood that it was your call

1

to make?

Please call me collect or write as soon as possible to let me know exactly what happened. I look forward to hearing from you soon.

Sincerely,

Lori A. Quick
Staff Attorney

# SIXTH DISTRICT APPELLATE PROGRAM
**A Non-Profit Corporation**

100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050

**(408) 241-6171 - Main**
**(408) 241-2877 - Fax**

**Executive Director**
*Michael A. Kresser*

**Assistant Director**
*Dallas Sacher*

**Law Office Manager**
*Yolanda G. Edwards*

**Staff Attorneys**
*Lori A. Quick*
*Vicki I. Firstman*
*William M. Robinson*
*Jonathan Grossman*
*Paul Couenhoven*

January 9, 2003

Charlie Gillan, Esq.
Office of the Public Defender
120 West Mission Street
San Jose, CA 95110

Re: <u>People v. Raul Uvalles</u>
Santa Clara County Superior Court #CC121250
Court of Appeal #H024674

Dear Mr. Gillan,

I received the FAX you sent the other day. Thank you for providing Raul's letter.

Having reviewed it, I have determined that I need to review your entire trial file. I would be happy to either have my paralegal come and pick it up, or you can send it to me. Of particular interest is Raul's story to you about how the homicide occurred. I would appreciate it if you would either call me or send in writing, in as much detail as you can, answers to the following questions.

1. What was Raul's story **to you** prior to trial and during trial about how the homicide occurred?

2. What was it that made you decide to advise him against testifying?

I would very much appreciate the file and answers to the above questions as soon as possible. Thank you in advance for your anticipated cooperation. Please feel free to contact me if you have any questions.

Sincerely,

Lori A. Quick
Staff Attorney

21

## PROOF OF SERVICE BY PERSON IN STATE CUSTODY

I the undersigned, hereby declare that I am over the age of eighteen (18), and that I am incarcerated at High Desert State Prison in Susanville, California, that [x] I am [ ] am not a party to this action, and that on the ___4___ day of ___OcT___, 200_6_, I served a true and complete copy of the following:

```
(
(        PETITION FOR WRIT OF HABEAS CORPUS
(                                                                      )
(                                                                      )
(                                                                      )
(                                                                      )
(_____)
```

by handing it to institutional staff with First Class Postage prepaid in full for mailing to the following address(s):

```
(
(     Bill Lockyer
(     Attorney General                                                 )
(     455 Golden Gate Avenue                                           )
(     Suite 11,000                                                     )
(     San Francisco, CA 94101-7004                                     )
(                                                                      )
(_____)
```

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON ___OcT 4th 2006___, in Susanville, California.

___RAUL UVALLES___
(Print Name)            _____
                         (Signature)

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10               IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13
    **RAUL UVALLES,**                        C 05-2779 MJJ (PR)
14
                             Petitioner,
15
          v.
16
    **D.L. RUNNELS, Warden,**
17
                             Respondent.
18

19       **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT G-2

ORIGINAL

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

Court of Appeal - Sixth App. Dist.

FILED

NOV 15 2006

MICHAEL J. YERLY, Clerk

By _____

DEPUTY

In re RAUL UVALLES,

on Habeas Corpus.

H030758
(Santa Clara County
Super. Ct. No. CC121250)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,

participated in this decision.)

Dated    NOV 15 2006 _____ Acting P.J.

G - 2

## AFFIDAVIT OF TRANSMITTAL

I am a citizen of the United States, over 18 years of age, and not a party to the within action: that my business address is 333 West Santa Clara Street, Suite 1060, San Jose, CA 95113; that I served a copy of the attached material in envelopes addressed to those persons noted below.

That said envelopes were sealed and shipping fees fully paid thereon, and thereafter were sent as indicated via the U.S. Postal System from San Jose, CA 95113.

I certify under penalty of perjury that the foregoing is true and correct.

Michael J. Yerly, Clerk of the Court

NOV 15 2006

_____                    _____
Deputy Clerk                                        Date

CASE NUMBER: H030758

Office of the County Clerk                          Material Sent YES: _____
Santa Clara County Superior Court
191 North First Street
San Jose, CA 95113


Raul Uvalles
CDC:T-59954
High Desert State Prison
P.O.Box 3030
Susanville, CA 96130
                                                    Material Sent YES: _____


Office of the Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
                                                    Material Sent YES: _____

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | MARK S. HOWELL
Deputy Attorney General
6 | State Bar No. 95125
  455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-3664
Telephone: (415) 703-5969
8 | Fax: (415) 703-1234
Email: mark.howell@doj.ca.gov
9 | Attorneys for Respondent

10 | IN THE UNITED STATES DISTRICT COURT

11 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 | SAN FRANCISCO DIVISION

13 |

**RAUL UVALLES,**

C 05-2779 MJJ (PR)

14 |

Petitioner,

15 |

v.

16 |

**D.L. RUNNELS, Warden,**

17 |

Respondent.

18 |

19 | **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# EXHIBIT H-1

ORIGINAL

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

# S148301

THE PEOPLE OF THE STATE OF CALIFORNIA,

    Plaintiff and Respondent,

vs.

RAUL UVALLES,

    Defendant and Appellant.

Crim. No. _____

[Sixth Appellate Dist.
No. H024674] H030758
[Santa Clara County Super. Ct.
No. CC121250]

SUPREME COURT
**FILED**

NOV 2 7 2006

Frederick K. Ohlrich Clerk

DEPUTY

RECEIVED
NOV 27 2006

## PETITION FOR REVIEW

RAUL UVALLES T-59927
H.D.S.P. B-1-202
P.O.Box 3030
Susanville, CA 96127

Pro se

H-1

## ISSUES PRESENTED FOR REVIEW

PAGE

STATEMENT OF THE CASE. .......................................... 2

STATEMENT OF FACTS ............................................... 4

I.     NO EVIDENCE PROVED THE CONVICTION AND
       SENTENCE OF FIRST DEGREE MURDER. ...................... 15

II.    PETITIONER'S STATEMENT TO THE POLICE WAS
       USED INTO EVIDENCE IN VIOLATION OF
       MIRANDA V. ARIZONA. .................................. 27

III.   PETITIONER IS REQUESTING A COPY OF
       HIS TRIAL TRANSCRIPTS ................................ 31

IV.    PETITIONER WAS DENIED HIS PRESENCE
       DURING THE READBACK. ................................. 34

V.     TRIAL COUNSEL RENDERED INEFFECTIVE
       ASSISTANCE BY FAILING TO PRESENT
       THE DEFENSE OF SELF-DEFENSE. ......................... 36

A.     Trial Counsel Prevented Petitioner
       From Testifying. ..................................... 39

B.     Failure To Request Jury Instruction of
       the Defense of Self-Defense. ......................... 40

VI.    APPELLATE COUNSEL RENDERED INEFFECTIVE
       ASSISTANCE. .......................................... 42

       CONCLUSION ........................................... 44

       EXHIBIT A

       PROOF OF SERVICE

i

1

## TABLE OF AUTHORITIES

2

| CASES | PAGE |
|---|---|
| Rogers v. Richmond 365 U.S. 534 (1951) | 15 |
| Dowd v. United States ex rel Cook, 340 U.S. 206 (1951) | 15 |
| In re Bonner 151 U.S. 242 (1894) | 15 |
| Mike v. Borg 947 F.2d 353 (9th Cir. 1991) | 15 |
| Jackson v. Virginia 443 U.S. 307 (1979) | 15,17 |
| Walter v. Maass 45 F.3d 1355 (9th Cir. 1995) | 15 |
| In re Winship 90 S.Ct. 1069 (1970) | 16,17,19 |
| Duncan v. Louisiana 391 U.S. 145 (1968) | 16 |
| Miles v. Unites States 103 U.S. 304 (1881) | 16 |
| Davis v. United States 160 U.S. 469 (1895) | 16 |
| Wilson v. United States 232 U.S. 563 (1914) | 16,18 |
| Brinegar v. United States 338 U.S. 160 (1949) | 16,18 |
| Leland v. Oregon 343 U.S. 790 (1952) | 16,18 |
| Holland v. United States 348 U.S. 121 (1954) | 18 |
| Spenser v. Randall 357 U.S. 513 (1958) | 18 |
| Coffin v. United States 156 U.S. 432 (1895) | 18 |
| People v. Korbin (1995) 11 Cal.4th 416 | 19 |
| People v. Johnson (1980) 26 Cal.3d 557 | 19 |
| People v. Cuevas (1995) 12 Cal.4th 252 | 19 |
| People v. Reilly (1970) 3 Cal.3d 421 | 19 |
| People v. Culver (1973) 10 Cal.3d 548 | 20 |
| People v. Barnes (1986) 42 Cal.3d 284 | 20 |
| In re Federick G., (1979) 96 Cal.App.3d 353 | 20 |
| People v. Bolin (1998) 18 Cal.4th 297 | 20 |
| Miranda v. Arizona (1966) 284 U.S. 436 | 27,30 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

TABLE OF AUTHORITIES

2

| CASES | PAGE |
|---|---|
| Colorado v. Connelly (1986) 479 U.S. 157 | 29 |
| Stansbury v. California (1994) 511 U.S. 318 | 30 |
| Michigan v. Tucker (1974) 417 U.S. 433 | 30 |
| People v. Clair (1992) 2 Cal.4th 629 | 30 |
| King v. Bell 378 F.3d 550 (6th Cir. 2004) | 32 |
| Keenan v. Bagley 400 F.3d 421 (6th Cir. 2005) | 32 |
| Holloway v. Roe 31 Fed.Appx. 376 (9th Cir. 2002) | 32 |
| Whalem/Hunt v. Early 233 F.3d 1146 (9th Cir. 2000) | 32 |
| Miles v. Prunty 187 F.3d 1104 (9th Cir. 1999) | 32 |
| Morrison v. Mahoney 31 Fed.Appx. 389 (9th Cir. 2002) | 33 |
| Cohen v. Senkowski 290 F.3d 485 | 35 |
| Rushen v. Spain 464 U.S. 114, 2005 L.W 1728 (2005) | 35 |
| In re Hall 30 Cal.3d 408 | 37 |
| Thelen v. United States 131 Fed.Appx. 61 (6th Cir. 2005) | 37 |
| West v. Seabold 73 F.3d 81 (6th Cir. 1996) | 38 |
| United States v. Morrow 977 F.2d 222 (6th Cir. 1992) | 38 |
| Grevley v. Mills 87 F.3d 779 (6th Cir. 1996) | 38 |
| Rock v. Arkansas 483 U.S. 44 (1987) | 39 |
| United States v. Moreno 102 F.3d 994 (9th Cir. 1986) | 39 |
| United States v. Teague 908 F.2d 488 (11th Cir. 1990) | 39 |
| United States v. Span 75 F.3d 1383 (9th Cir. 1996) | 40 |
| Willis v. Smith 351 F.3d 741 (6th Cir. 2003) | 42 |
| Ballard v. United States 400 F.3d 404 (6th Cir. 2005) | 42 |
| Cover v. Straub 349 F.3d 340 (6th Cir. 2003) | 42 |
| Murray v. Carrier 477 U.S. 478 (1986) | 43 |

iii

1

TABLE OF AUTHORITIES

2

CASES                                                          PAGE

3    Ellis v. Hargett 303 F.3d 1183 (10th Cir. 2002)          43

4    UNITED STATES CONSTITUTION

5    Fifth Amendment                                          passim

6    Sixth Amendment                                          passim

7    Fourteenth Amendment                                     passim

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2          IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

3

4    THE PEOPLE OF THE STATE OF              Crim. No._____
     CALIFORNIA,
5
               Plaintiff and Respondent,    [Sixth Appellate Dist.
6                                            No. ~~H024674~~  H03e958
                                             [Santa Clara County Super. Ct.
7    vs.                                      No. CC121250]

8    RAUL UVALLES,

9               Defendant and Appellant.

10   _____

11                   **PETITION FOR REVIEW**

12

13        TO:  THE HONORABLE RONALD GEORGE, CHIEF
               JUSTICE, AND THE HONORABLE ASSOCIATE
14             JUSTICES OF THE CALIFORNIA SUPREME
               COURT
15

16        California Rules of Court Rule 28 (a)(1).  A party may file

17   a petition in the Supreme Court for review of any decision of the

18   Court of Appeal.

19        California Rules of Court Rule 28 (e)(1).  A petition for

20   review must be served and filed within 10 days after the Court

21   of appeal decision is final in that Court under rule 24.

22        On *November 15,* 2006, the Court of Appeal, denied petitioner's

23   writ of habeas corpus.  On *November 20,* 2006, petitioner gave to

24   the Correctional Officer for mailing the present petition for

25   review.  Pursuant to the "Prison Delivery Rule," it deemed timely

26   filed.  See In re Jordan, (1992) 13 Cal.Rptr.2d 878.

27

28

                                    1

1

## STATEMENT OF THE CASE

2      On January 11, 2002, an information was filed in Santa Clara

3   County Superior Court charging petitioner in Count 1 with murder

4   in violation of Penal Code section 187, and in Count 2 with

5   robbery in the second degree in violation of Penal Code section

6   211 and 212.5, subdivision (c)  (CT 61-62.)

7      On May 3, 2002, jury trial began with motion in limine.

8   (CT 108-110.)  It was stipulated that the victim, known as Maria

9   Mancera, was in fact a man named John Mancera.  (CT 108.)

10      On May 6, 2006, the trial court ruled that petitioner's

11  statements to police had been taken in violation of Miranda v.

12  Arizona, (1966) 284 U.S. 436 and could not be introduced in the

13  prosecution's case in chief.  (CT 117; RT 94.)  The court also

14  ruled, however, that because the statements did not appear to

15  be involuntary, they could be used for impeachment in the even

16  that petitioner testified.  (RT 94.)

17      On May 7, 2002, testimony began.  (CT 121.)  On May 8, 2002,

18  the parties entered into four stipulations: that a blood sample

19  was properly drawn from petitioner and accurately analyzed by

20  the Santa Clara County Crime Laboratory and was determined to be

21  positive for "BE"; that a blood sample was properly drawn from

22  the body of Mancera, accurately analyzed by the Santa Clara County

23  Crime Laboratory, and was positive for both cocaine and alcohol,

24  the blood alcohol level being measured at .22%; that Mancera's

25  bank records were admissible; and that on August 20, 2001 at

26  12:48 a.m., Mancera's ATM card was used at an automatic teller

27  machine at the Union Bank in San Jose, and at 12:55 a.m. at the

28  Bank of America-Hester Branch in San Jose, that the video tapes

2

1    taken during each transaction accurately reflected the transaction,
2    and that photographs were accurately made from the video tape taken
3    during the transaction.  (CT 124.)

4        The jury began deliberations on the afternoon of May 13, 2002
5    and concluded on the afternoon of May 14, 2002 at which time it
6    found petitioner guilty of murder in the first degree in violation
7    of Penal Code section 187, and second degree robbery in violation
8    of Penal Code section 211-212.5, subdivision (c).  (CT 191-195.)

9        On June 13, 2002, a hearing was held pursuant to People v.
10   Marsden, (1970) 2 Cal.3d 118 (CT 200.)

11       On June 14, 2002, the Marsden motion was denied, petitioner
12   was then sentenced to serve 25 years to life for Count 1, and
13   three years for Count 2, to be served concurrently, for a total
14   prison commitment of 25 years to life.  (CT 235-237.)

15       Notice of appeal was timely filed on June 14, 2002.  (CT 238.)

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF FACTS

A.  The Prosecution Case

   1.  Events Leading Up To The Discovery Of The Homicide

At approximately 11:15 p.m. on August 19, 2001, San Jose Police Officer Joaquin Barreto was on foot patrol in the area of the Alameda and Hedding Street.  (RT 129-130.)  He and his partner, Officer Keith Neumer, were standing on the Alameda at Sunol Street when they saw petitioner and Maria Mancera walking on the Alameda. (RT 132, 150.)  They seemed to be "ambling alone" with no specific direction.  (RT 132.)

Barreto approached the pair and asked what they were doing. (RT 133.)  Mancera replied that they were looking for an ATM machine, and pulled an ATM card out of the purse she was carrying. (RT 133.)  Barreto observed that the card was emblazoned with the name "Maria Mancera."  (RT 134.)  It was obvious to Barreto that Mancera was a man presenting himself as a woman.  (RT 135-136, 144-145.)  She did not have any injuries, and appeared to have all of her front teeth.  (RT 138, 145.)  Her hands were durty.  (RT 146.)  Mancera and petitioner appeared to be friendly with each other.  (RT 136.)

While speaking to them, Barreto believed they were both under the influence of alcohol.  (RT 134, 144.)  He based this upon the fact that there was an odor of alcohol on them, their eyes were watery and bloodshot, and they were somewhat unsteady on their feet.  (RT 135.)  Neumer also smelled alcohol, and recalled that they admitted they had been driking.  (RT 154.)  They also had dilated pupils, which Barreto knew was a sympton of stimulant use.  (RT 144.)  Barreto did not see anything that he immediately

4

1    recognized as symptoms of cocaine use, but it was possible that
2    they were under the influence of cocaine as well.  (RT 148.)
3    Barreto thought they were both at about the same level of intoxica-
4    tion.  (RT 135.)  They did not have trouble communicating with
5    him, and their level of intoxication was not severe enouhg to
6    warrant booking them for being drunk in public or booking them
7    into a non-custodial detention facility to sober up.  (RT 135.)

8        Barreto conducted records checks on both Mancera and petitioner
9    to confirm their identities.  (RT 134.)  He also filled out a
10   field identification card for petitioner.  (RT 139.)  These cards
11   are used to conduct field interviews when police believe there
12   may be some criminal activity occurring, and contains such informa-
13   tion as name, date of birth, address, whether the subject is on
14   parole or probation, and a general clothing description.  (RT 139.)
15   During the course of this procedure, petitioner told Neumer that
16   he lived on Cleaves Street.  (RT 150.)  At the conclusion of the
17   encounter, Barreto directed them to the Arena Hotel to find an
18   ATM.  (RT 136.)  Within a few minutes, the two emerged from the
19   Arena Hotel parking lot, and told Barreto that there was no ATM
20   machine there.  (RT 137.)  Barreto then told them that there was
21   a Bank of America down the street, and directed them to the
22   Bank of America near Hester Street.  (RT 137.)  They thanked
23   Barreto and headed in that direction.  (RT 138.)  Barreto and
24   Neumer continued with their regular duties.  (RT 139.)

25       At approximately 6:30 a.m. on Monday, August 20, 2001, as
26   Barreto was preparing to end his chift, he heard a radio broacast
27   that there had been a report of a beaten person near Bellarmine
28   High School.  (RT 140.)  Because this area was in the district

1  covered by Barreto, he felt he needed to investigate since it had
2  happened while he was on duty.  (RT 140.)  When he arrived at
3  Bellarmine High School, he saw the body of Maria Mancera lying
4  beside the high school running track.  (RT 141.)  Barreto immedia-
5  tely recognized her as the person he had spoken to the previous
6  night.  (RT 142.)  She was still wearing the same clothing, but
7  her pockets were turned inside out.  (RT 147, 249-250.)  The body
8  was in full rigor mortis, meaning death had occurred approximately
9  six to eight hours earlier.  (RT 212-213.)  He notified his
10  supervisor  and passed on to the investigating detectives the
11  information he had gathered during his encounter with Mancera
12  and petitioner, including the field identification card.  (RT 142-
13  143.)

14      Neumer also went to Bellarmine High School when news of
15  Mancera's death reached him.  (RT 150.)  He then went to the
16  Bank of America near Hester to see whether there was a videotape
17  of petitioner and Mancera at the ATM.  (RT 150-151.)  Upon revie-
18  wing the videotape, Neumer saw Mancera and petitioner approaching
19  the ATM.  (RT 151, 153-154.)  In the video, petitioner wore a
20  hat which had a number on it.  (RT 153-154.)  A withdrawal of
21  $41.50 had been made via that ATM at 11:35 p.m. on August 19,
22  2001.  The bank videotape, from which still photos were made,
23  accurately reflected that transaction.  (RT 152.)

24      2.  The Investigation

25          a. The Crime Scene

26      Mario Lejes worked for a painting company on Hedding Street.
27  (RT 258.)  When he arrived at work at about 6:30 a.m. on August
28  20, he saw someone lying on the running track of Bellarmine High

1    School.  (RT 259.)  Lejes and a co-worker approached the body and
2    saw that there was blood around the mouth and the back of the
3    head.  (RT 260.)  Lejes touched the right kneecap and noticed that
4    it was cold.  (RT 260-261.)  Lejes did not move or take anything
5    at the scene, nor did he move the body.  (RT 261-263.)

6        When police initially arrived on the scene, photographs were
7    taken of Mancera's body and all items found around it.  (RT 157-
8    158.)  Officer Bruce Wiley arrived at the site where the body was
9    found, which was below the Hedding Street overpass that crosses
10    over the athletic fields of Bellarmine High School.  (RT 158.) The
11    overpass is a pedestrian    walkway which rises some 31 feet
12    above the ground.  (RT 189-190.)  It has a railing which is
13    approximately 29 inches high.  (RT 168.)  Near the body were
14    found a black leather belt (RT 163), a California identification
15    card in the name of Michael George Photopoulas (RT 164, 167), a
16    fragment of a tooth (RT 164), a red plastic disposable lighter
17    (RT 164), and white metal digital wristwatch with a black leather
18    band.  (RT 164.)  There were bloodstains on the running track
19    approximately five and one-half to six feet from Mancera's right
20    foot.  (RT 165.)  All of these items were within approximately
21    two feet of each other.  (RT 166.)

22        In a sandy area beneath the overpass approximately 60 feet
23    from Mancera's body was found her purse with its contents spilled
24    out.  (RT 169, 190, 225.)  These included makeup and personal
25    hygiene products, miscellaneous papers, notes, business cards,
26    photographs, some costume jewelry, and address book, a checkbook,
27    a California identification card in Mancera's name, and four
28    dollars and six cents in coins.  (RT 170.)  The purse and its

7

1    contains were not visible from the overpass.  (RT 171.)

2        Some shoe prints were located near Mancera's body.  (RT 172.)

3    Wiley photographed them and also made a cast of one of the shoe

4    prints which was actually closer to the purse.  (RT 174-176, 189.)

5            b.   The Search Of Petitioner's Residence

6        The next day, Wiley went to petitioner's home at 152 Cleaves

7    Avenue in San Jose.  (RT 178.)  According to petitioner's landlord,

8    petitioner had not arrived home until 4:37 on the morning of

9    August 20.  (RT 231.)  In petitioner's bedroom Wiley found a gray

10   pants which had what appeared to be traces of blood on them.

11   (RT 178-180.)  Also collected was a pair of white Thom McAn tennis

12   shoe (RT 181-182, 184), a pair of boots (RT 185), a black baseball

13   cap with a maroon brim across the front of which was the logo

14   "Carpenters Local" and "Santa Clara and San Benito Counties",

15   with the number 405 in the middle.  (RT 182-184), and a t-shirt

16   with the logo "MAX AIR" across the front.  (RT 183.)

17       Also searched was a municipal trash can at the northwest

18   corner of Hester Street and the Alameda.  (RT 187.)  Inside was

19   located an ATM card in the name of Maria R. Mancera.  (RT 187-188.)

20   The trash can was approximately 20 yards from the ATM at the

21   Bank of America near Hester.  (RT 188.)

22            c.   The Arrest Of Petitioner

23        Petitioner was taken to the preprocessing unit at 6:53 p.m.

24   (RT 264.)  While photos were being taken of him, he asked

25   Sergeant Vallecilla "So what do you think, is this going to be a

26   life sentence or what?"  (RT 267.)  Vallecilla replied that he

27   did not know, at which point petitioner said "I'm 39 years old.

28   I'm really screwed this time.  I'll be here for life.  Shit like

8

1  this follows me all the time." (RT 267-269.) A blood sample was

2  drawn from petitioner. (RT 270.) A test indicated the presence

3  of cocaine metabolite, meaning he had must likely ingested cocaine

4  more than six hour earlier. (RT 270-276-277.)

5      d.  The Investigation Of

6          Mancera's Bank Account Activity

7      San   Jose  Police Sergeant   Gilbert  Vizzusi

8  was the detective assigned to investigate Mancera's death.

9  (RT 247.) Vizzusi noticed that Mancera's pockets were turned

10  inside out, and there was an ATM receipt on or near the body.

11  (RT 249-250.) He ascertained that the ATM card was not on or

12  near Mancera, though her checkbook was. (RT 250-251.) Using the

13  account number from the checkbook vizzusi investigated whether

14  there had been any activity on the account. (RT 251.) Vizzusi

15  also viewed videotapes taken by security cameras at the bank,

16  which revealed that petitioner had used the ATM machine at 12:46

17  a.m. on August 20. (RT 254.) Mancera's ATM card had been used

18  at the same time. (RT 255.) Bank records indicated that

19  $40.00 had been successfully withdrawn from Mancera's checking

20  account through an ATM at the Hester Branch of the Bank of

21  America at 11:45 p.m. (RT 291-292.) They further indicated that

22  at 12:49:07 a.m., and 12:49:21 a.m. on August 20, 2001, three

23  attempts were made at the ATM at Union Bank to withdraw $300.00

24  from Mancera's account. The attempts were unsuccessful because

25  the user had entered an incorrect personal identification number,

26  or "PIN". (RT 293.) A fourth attempt at the same ATM at 12:49:

27  41 resulted in a rejection of the card by the ATM. (RT 294.)

28  At 12:55:37, an attempt was made to withdraw $100.00 from the

1  Hester Street Bank of America, resulting in a message by the

2  ATM that the number of PIN tries had been exceeded.  (RT 295.)

3  Two more unsuccessful attempts   were made at 12:56:09 a.m. and

4  12:56:50 a.m.  (RT 296.)

5      3.  The Autopsy

6      Gregory Schmunk is the Chief Medical Examiner and Coroner for

7  Santa Clara County who is an expert in the area of forensic

8  pathology and wound recognition.  (RT 196-198.)  He performed an

9  autopsy on Mancera's body, during which he discovered that Mancera

10  was in fact a man.  (RT 198-199.)  Mancera's blood alcohol level

11  had been determined to be .22.  (RT 280-281.)  The blood alcohol

12  level of .22% indicated to Schmunk that Mancera had consumed

13  approximately 10 drinks within a few hours.  (RT 219.)  Such a

14  blood alcohol level would result in signs of gross intoxication,

15  such as slurred speech and loss of balance with difficulty

16  standing and walking.  (RT 273-274, 282-283.)  He noted that

17  between 11:10 a.m. and 12:20 p.m. on August 20, Mancera's body

18  was in full rigor mortis, meaning that she had died approximately

19  six to eight hours earlier.  (RT 213.)  The level of lividity

20  present at the same time was not fixed, as would be expected

21  eight to 12 hours after death.  (RT 215-216.)

22      With respect to external injuries, Schmunk observed that

23  the upper jaw was fractured, and there were abrasions or scrapes,

24  and bruises of the skin.  (RT 201.)  There were abrasions on the

25  neck and upper shoulders, the right back, the left lower back,

26  the right side and front of the chest.  There was bruising around

27  the left eye and an abrasion at the left side of the jaw.  (RT

28  201.)  Bruises or areas of bleeding were inside the white of the

10

1  left eye, and there was bruising tearing on the inside of the

2  mouth, especially on the left side of the cheek, which was

3  consistent with a blow to that area, and inconsistent with a fall.

4  (RT 201, 220.)  Other abrasions were present on the front and

5  left side of the chest and arms and legs.  (RT 201-202.)  The

6  left upper arm was broken, the pelvis was fractured, and there

7  were rib body fractures  on both sides of the chest.  (RT 202.)

8  An internal examination revealed the pelvic and  rib fractures,

9  bruising to the brain with blood on the surface of the brain,

10  and a basilar skull fracture.  (RT 203.)  The liver was lacerated

11  and there was a small amount of blood in the body.  (RT 203.)

12      Additionally, Schmunk noted that Mancera's teeth were in

13  very poor repair.  Mainly only the front teeth were present and

14  they were badly rotted.  Most of the back teeth were missing and

15  those that were present were decaying.  (RT 210.)  There were

16  lacerations and bruising around the left eye and some redness

17  in the area of the right eye.  (RT 210.)  There were a few

18  abrasions and some bruising over the forehead and right cheek.

19  (RT 210.)

20      Many of the injuries were consistent with a fall of 27 to 31

21  feet.  (RT 204.)  One exception was the injury to the inside of

22  the mounth.  (RT 204.)  According to Schmunk, while it was

23  possible to suffer injuries to the inside of the mouth in a

24  fall, one would also expect to see an injury to the skin furface

25  due to impact on the ground.  (RT 204.)  Because Mancera did

26  not have such an injury,  Schmunk thought it could reasonably

27  be concluded that another, softer impack, such as a punch, had

28  caused this injury prior to the fall.  (RT 204-205, 220.)

11

1  Schmunk could not exclude the possibility that the injury happened
2  within a few minutes after the fall, but believed it more logical
3  to conclude that it happened before the fall. (RT 205, 220-221.)
4  Schmunk felt that at most, this injury had occurred within a
5  maximum of a few hours of death, but he could not exclude the
6  possibility that it had occurred within an hour or slightly more
7  than an hour before death. (RT 223-224.)

8      Schmunk opined that Mancera was alive at the time of the fall
9  based on the large amount of blood both on the track and inside
10 the body. (RT 205.)  In addition, the arm fracture had some
11 soft-tissue swelling which would not have occurred without blood
12 pressure. (RT 205-206.)  Other factors which led Schmunk to
13 believe that Mancera was alive before hitting the ground were
14 bleeding on the surface of the brain, in the deep chest, at the
15 rib fractures, and in the abdominal cavity. (RT 206.)

16     A study of the bloodstains on the track indicated to Schmunk
17 that the body had lain in one position on the track, bleeding,
18 for some period of time, and was then moved to the location
19 where it was found. (RT 206-207.)  Contributing to this opinion
20 was the presence of "pattern injuries" on Mancera's abdomen.
21 (RT 208.)  Schmunk also observed in the photograph of the body
22 what happened to be drag marks below the impression of one of
23 the arms. (RT 209-210.)  He did not believe that Mancera would
24 have been able to move herself. (RT 225.)

25     Schmunk was of the opinion that Mancera's back pelvic region,
26 and left arm hit the ground first, based on the injuries he
27 observed. (RT 211.)  If in fact she was alive when she fell,
28 Schmunk believed that she would have been unconscious from the

12

1    the moment of impact, though her heart and respiration would not

2    have stopped for several minutes.  (RT 212.)  Schmunk concluded

3    that the manner of death was homicide.  (RT 226.)

4        4.  Other Forensic Evidence

5        Santa Clara County Criminalist John Bourke, an expert in the

6    area of shoeprint analysis and comparison, compared three pairs

7    of shoes submitted by the detectives in the Mancera case against

8    an impression taken of shoeprints at the scene.  (RT 235-236.)

9    Based on this comparison, Bourke included the right shoe of the

10   pair of Thom McAn tennis shoes taken from petitioner's residence

11   as a possible source of the shoeprints.  (RT 243-246.)

12       Nancy Marte, a Criminalist at Santa Clara County Crime Labora-

13   tory conducted a DNA analysis on blood sample collected from a

14   pair of gray pants and from fingernail swabbings.  (RT 299-300.)

15   Her conclusion was that Mancera was the source of three bloodstains

16   on the pants.  (RT 302.)  Petitioner was the source of one.

17   (RT 302.)  Mancera was also the source of the blood sample obtained

18   from the fingernail swabbing, which had been taken from Mancera's

19   hand.  (RT 302.)

20       B.  The Defense Case

21       Andrew Marr worked at a concrete company on the other side

22   of the railroad tracks by Bellarmine High School.  (RT 312.)  At

23   about 6:30 a.m. on August 20, 2001, he noticed a Hispanic male

24   clearing the fence.  Once he hit the ground, he ran off at a

25   high rate of speed.  (RT 313.)  Marr described the man as having

26   a long black braided ponytail and wearing a white-shirt and faded

27   blue jeans.  (RT 313.)  About 30 to 45 minutes later, Marr noticed

28   the police activity.  (RT 315.)  He walked over to see what was

13

I.

## NO EVIDENCE PROVED THE CONVICTION AND SENTENCE OF FIRST DEGREE MURDER

Reasonable doubt is defined in California Penal Code § 1096 as follows:

"It is not a mere possible doubt; because everything relating to human affairs ... is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they ... cannot say they feel an abiding conviction ... of the truth of the charge."

In 1894. . . the court interpreted the predecessor of 28 U.S.C. § 2243 as vesting federal courts "with the largest power to control and direct the form of judgment to be entered in cases brought up before it on Habeas Corpus." Rogers v. Richmond, 365 U.S. 534, 549 (1951); Dowd v. United States ex rel Cook, 340 U.S. 206, 210 (1951); In re Bonner, 151 U.S. 242, 261-62 (1894).

The United States Court of Appeals for the Ninth Circuit and the United States Supreme Court of the United States indicated, our standards of review for addressing the sufficiency of the evidence to support a conviction is the same on habeas review as it is on direct appeal. See Mike v. Borg, 947 F.2d 353, 356 n. 5 (9th Cir. 1991); see also Jackson v. Virginia, 443 U.S. 307, 309, 99 S.CT. 2781, 2789 61 L.Ed.2d 560 (1979) (setting forth standard in a habeas corpus proceeding). Quoting Walter v. Maass, 45 F.3d 1355 (9th Cir. 1995).

15

1    In re Winship, (1970) 90 S.CT. 1068, 1071, the requirement

2  that guilt of a criminal charge be established by proof  beyond

3  a reasonable doubt dates at least from our early years as a Nation.

4  The "demand for higher degree of persuasion in criminal cases was

5  recurrently expressed fron ancient times, [though] its crystalliza-

6  tion into the formula 'beyond a reasonable doubt' seems to have

7  occurred as late as 1798.  Its now accepted in common law

8  jurisdictions as the measure of persuasion by which the prosecution

9  must convince the trier of all the essential elements of guilt."

10  C. McCormick, Evidence section 321, pp. 681-682 (1954); See also

11  9 J. Wigmore, Evidence, section 2497 (3d ed. 1940).  Although

12  virtually unanimous adherence to the reasonable-doubt standard

13  in  common law jurisdictions may not conclusively establish it

14  as a requirement of due process, such adherence does "reflect a

15  profound judgment about the way in which law should be enforced

16  and justice administere." Duncan v. Louisiana, 391 U.S. 145, 155,

17  88 S.CT. 1444, 1451, 20 L.Ed.2d 491 (1968).

18    Expressions in many opinions of the United States Supreme

19  Court indicate that it has long been assumed that proof of a

20  criminal charge be a reasonable doubt is constitutionally

21  required.  See, for example, Miles v. United States, 103 U.S. 304,

22  312, 26 L.Ed. 481 (1881); Davis v. United States, 160 U.S. 469,488,

23  16 S.CT. 353, 358, 40 L.Ed. 499 (1895); Holt v. United States,

24  218 U.S. 245, 253, 31 S.CT. 2, 6, 54 L.Ed. 1021 (1910); Wilson v.

25  United States, 232 U.S. 563, 569-570, 34 S.CT. 347, 349, 350, 58

26  L.Ed. 728 (1914); Brinegar v. United States, 338 U.S. 160, 174, 69

27  S.CT. 1302, 1310, 93 L.Ed. 1879 (1949); Leland v. Oregon, 343 U.S.

28  790, 795, 72 S.CT. 1002, 1005, 1006, 96 L.Ed. 1320 (1952);

16

1  reasonable doubt whether he was capable in law of committing
2  crime. * * *  No man should be deprived of his life under the
3  forms of law unless the jurors who try him are able, upon their
4  consciences, to say that the evidence before them * * *  is
5  sufficient to show beyond a reasonable doubt the existence of
6  every fact necessary to constitute the crime charged."  Id., at
7  484, 493, 16 S.CT., at 357, 360.  quoting, In re Winship, supra,
8  (90 S.CT., at 1071-1072.

9      Mr. Justice HARLAN, concurring.  I view the requirement of
10  proof beyond a reasonable doubt in a criminal case as bottomed on
11  a fundamental value determination of our society that it is far
12  worse to convict an innocent man than to let a guilty man go free.
13  It is only because the nearly complete and long-standing accep-
14  tance of the reasonable-doubt standard by the States in criminal
15  trials that the Court has not before today had to hold explicitly
16  that due process, as an expression of fundamental procedural
17  fairness, requires a more stringer standard for criminal trials
18  than for ordinary civil litigation.  In re Winship, supra, 90 S.CT.,
19  at  1077.

20      In Jackson v. Virginia, (1979) 443 U.S. 307, the United States
21  Supreme Court announced the constitutionally mandated standard
22  applicable to review of the sufficiency of the evidence to support
23  a conviction in a criminal case.  The Supreme Court held that the
24  Due Process Clause of the Fourteenth Amendment to the United States
25  Constitution protects a criminal defendant against conviction
26  "except upon proof- defined as evidence necessary to convince a
27  trier of fact beyond a reasonable doubt of the existence of every
28  element of the offense." (Id. at p. 315.)  Thus, the constitutiona-

17

1 | _Holland v. United States_, 348 U.S. 121, 138, 75 S.CT. 127, 136, 137,
2 | 99 L.Ed. 150 (1954); _Spenser v. Randall_, 357 U.S. 513, 525-526,
3 | 78 S.CT. 1332, 1342, 2 L.Ed.2d 1460 (1958). Cf. _Coffin v. United_
4 | _States_, 156 U.S. 432, 15 S.CT. 394, 39 L.Ed. 481 (1895). Mr.
5 | Justice Frankfurter stated that "[i]t is the duty of the government
6 | to establish * * * guilt beyond a reasonable doubt. This notion-
7 | basic in our law and rightly one of the boasts of a free society-is
8 | a requirement and a safeguard of due process of law in the historic,
9 | procedural content of 'due process.'" _Leland v. Oregon_, supra,
10 | 343 U.S. at 802-803, 72 S.CT., at 1009 (dissenting opinion). In
11 | a similar vein, the Court said in _Brinegar v. United States_, supra,
12 | 338 U.S., at 174, 69 S.CT., at 1310, that "[g]uilt in a criminal
13 | case must be proved beyond a reasonable doubt and by evidence
14 | confined to that which long experience in the common-law tradition,
15 | to some extent embodied in the constitution, has crystallized
16 | into rules of evidence consistent with that standard. These rules
17 | are historically grounded rights of our system, developed to
18 | safeguard men from dubious and unjust convictions with resulting
19 | forfeitures of life, liberty, and property." _Davis v. United_
20 | _States_, supra, 160 U.S., at 488, 16 S.CT., at 358 stated that the
21 | requirement is implicit in "constitutions * * * [wich] recognize
22 | the fundamental principles that are deemed essential for the
23 | protection of life and liberty." In _Davis_ a murder conviction was
24 | reversed because the trial judge instructed the jury that it was
25 | their duty to convict when the evidence was equally balanced
26 | regarding the sanity of the accused. The United States Supreme
27 | Court said: "On the contrary, he is entitled to an acquittal of
28 | the specific crime charged, if upon all the evidence, there is

1   lly required standard applicable to determining a claim of insuffi-
2   ciency of the evidence in a criminal case is "whether, after
3   viewing the evidence in the light most favorable to the prosecution,
4   any rational trier of fact could have found the essential elements
5   of the crime charged beyond a reasonable doubt." (Id. at p. 320.)
6   The opinion in Jackson represents a continuing, consistent, and
7   unequivocal line of U.S. Supreme Court decisions giving contour
8   to due process and Sixth Amendment imperatives from In re Winship,
9   to the present. (See, e.g., People v. Korbin (1995) 11 Cal.4th
10  416, 422-423.) Thus, for a period spanning 30 years, the rule has
11  been the prosecution has the burden of proving every fact necessary
12  to constitute the crime charged beyond a reasonable doubt. (In re
13  Wiship, (1970) 397 U.S. 358, 364.)
14      California case law is substantially in accord with the standards
15  established by the United States Supreme Court. The test is whether,
16  reviewing the whole record in the light most favorable to the
17  judgment below, substantial evidence is disclosed such that a
18  reasonable trier of fact could find the essential elements of the
19  crime beyond a reasonable doubt. (People v. Johnson, (1980) 26
20  Cal. 3d 557, 578.) Substantial evidence is that which is "reasona-
21  ble, credible, and of solid value." (Ibid.) The focus of the
22  substantial evidence test is on the whole record of evidence
23  presented to the trier of fact, rather than on isolated bits of
24  evidence torn from the record. (People v. Cueveas, (1995) 12
25  Cal.4th 252, 261.) The reviewing court must "presume in support
26  of the judgment the existence of every fact the trier could
27  reasonably deduce from the evidence. (People v. Reilly, (1970)
28  3 Cal.3d 421, 425.) The reviewing court may not reweigh the

19

1  evidence.  (People v. Culver, (1973) 10 Cal.3d 542, 548), reappraise

2  the credibility of the witnesses (People v. Barnes, (1986) 42 Cal.

3  3d 284, 303-304), or resolve factual conflicts, since these are

4  functions reserved for the trier of fact (In re Federick G., (1979)

5  96 Cal.App.3d 353, 367).  Reversal is not warranted unless it

6  appears "'that upon no hypothesis whatsoever is there sufficient

7  substantial evidence to support [the conviction].' [Citation.]

8  (People v. Bolin, (1998) 18 Cal.4th 297, 331.)

9      The evidence presented by the people is insufficient on the

10  following areas:

11     The prosecution and the police claimed that petitioner ran with

12  the victim's ATM card and that victim chased petitioner, then

13  a  struggling occurred.  Petitioner never ran with the ATM card.

14  The police and the prosecution invented this story.  The police and

15  the prosecution knew that if the victim chased petitioner to retrieve

16  the ATM card and then the victim died, that is evidence to convict

17  petitioner to first degree murder.  In short, the police and the

18  prosecution  falsely told the jury that the petitioner ran with

19  the victim's ATM card, and that constituted a robbey because the

20  victim was killed in the process of getting her ATM card, and  that

21  constituted a first degree murder even if the victim attacked

22  petition.

23     Is a fact that the victim withdrawed $40 from ATM card at the

24  Bank of America. See Exhibit A at page 9.  Also this page shows that

25  petitioner put Mancera's ATM card in his pocket.  This petitioner

26  denied because he does not remember having putting the card in

27  his pocket.  Petitioner thinks that the putting of the card in his

28  pocket is another fabrication of the police and the prosecution.

1     In 2003, two men convicted of Santa Clara County murders were

2     set free amid judicial findings that police or prosecutor miscon-

3     duct helped convict people who were probably innonce.  One involved

4     Glen "Buddy" Nickerson, who served 19 years before U.S. District

5     Judge Marilyn Hall Patel overturned his conviction.  The second

6     was Quedellis Ricardo "Ricky" Walker, who spent nearly 12 years

7     in prison before top prosecutors acknowledged that improper deals

8     with unreliable witnesses had caused an injustice.  Please see

9     Exhibit A at p. 3 paragraph 7.

10    Is the custom of the police and the prosecutor in Santa Clara

11    to work in concert to convict innocent people.  Petitioner is

12    not the one  saying this.  The Mercuryd News said it.  In the

13    present case the prosecution and the police fabricated the story

14    that petitioner ran with the victim's ATM card and then the

15    victim chased petitioner and then a struggling occurred and the

16    victim was killed in the struggling.  The police and the prosecu-

17    tion knew that placing petitioner running with the victim's

18    ATM card constituted a robbery.  And if the victim was killed

19    after a fight for the card did not constituted a manslaughter.

20    These people are very experienced, and they knew the importance

21    of placing petitioner running with the victim's ATM card and the

22    victim chasing petitioner to retrieve it.  But the truth is that

23    petitioner never ran with the victim's ATM card.  The victim

24    never chased petitioner to retrieve the ATM card.  The struggling

25    and killing of the victim was in self-defense because for some

26    reason unknown to petitioner, they fought and the victim fell

27    and was killed.  The prosecution claimed that petitioner tried to

28    used the ATM card of Mancera.  That is not true.  Like the Mercury

21

1  News said that the prosecution of Santa Clara County like to fabrica-
2  te evidence to convict people.    The prosecution has an obligation
3  to prove beyond a reasonable doubt that petitioner killed the
4  victim for the whole purpose to take the ATM card.  in this case
5  the prosecution had failed to prove the above.

6      Maria Mancera A.K.A John Mancera's blood alcohol level had
7  been determined to be. .22.  (RT 280-281.)  The blood alcohol
8  level of .22% indicated to Chief Medical Examiner Gregory Schmunk
9  that Mancera had consumed approximately 10 drinks within a few
10 hours of her death.  (RT 219.)  Such a blood alcohol level would
11 result in signs of gross intoxication, such as slurre speech and
12 loss of balance with difficulty standing and walking.  (RT 273-274,
13 282-283.)  Mr. Schmunk noted that between 11:10 a.m. and 12:20
14 p.m. on August 20, Mancera's body was in full rigor mortis,
15 meaning that she had died approximately six to eight hours earlier.
16 (RT 213.)  The level of lividity present at the same time was
17 not fixed, as would be expected eight to 12 hours after death.
18 (CT 215-216.)  Mr. Schmunk indicated that many of the injuries
19 were consistent with a fall of 27 to 31 feet.  (RT 204.) Mr.
20 Schmunk opined that Mancera was alive at the time of the fall
21 based on the large amount of blood on the track and inside the
22 body.  (RT 205.)  In addition, the arm fracture had some-tissue
23 swelling which would not have occurred without blood pressure.
24 (RT 205-206.)  Other factors which led Schmunk  to believe that
25 Mancera was alive before hitting the ground were bleeding on the
26 surface of the brain, in the deep chest, at the rib fractures,
27 and in the abdominal cavity.  (RT 206.)

28      On May 7, 2002, testimony began.  (CT 121.)  On May 8, 2002,

1    the parties entered into four stipulations: that a blood sample
2    was properly drawn from petitioner and accurately analyzed by
3    the Santa Clara County Crime Laboratory and was determined to be
4    positive of "BE"; that a blood sample was properly drawn from
5    the body of Mancera, accurately analyzed by the Santa Clara County
6    Crime Laboratory, and was positive for both cocaine and alcohol,
7    the blood alcohol level being measured at .22%; that Mancera's
8    bank records were admissible; and that on August 20, 2001 at
9    12:48 a.m., Mancera's ATM card was used at an automatic teller
10   machine at the Union Bank in San Jose, and at 12:55 a.m. at the
11   Bank of America-Hester Branch in San Jose, that the video tapes
12   taken during each transaction accurately reflected the transaction,
13   and that photograph were accurately made from the video taken
14   during the transaction.  (CT 124.)

15       At approximately 11:15 p.m. on August 19, 2001, San Jose
16   Police Officer Joaquin Barreto was on foot patrol in the area
17   of the Alameda and Hedding Street.  (RT 129-130.)  He and his
18   partner, Officer Keith Neumer, were standing on the Alameda at
19   Sunol Street when they saw petitioner and Maria Mancera walking
20   on the Alameda.  (RT 132, 150.)  They seemed to be "ambling along"
21   with no specific direccion.  (RT 132.)

22       Barreto approached the pair and asked them what they were
23   doing.  (RT 133.)  Mancera replied that they were looking for
24   an ATM machine, and pulled an ATM card out of the purse she was
25   carrying.  (RT 133.)  Barreto observed that the card was
26   emblazoned with the name "Maria Mancera."  (RT 134.)  It was
27   obvious to Barreto that Mancera was a man presenting himself as
28   a woman.  (RT 135-136, 144-145.)  She did not have any injuries

23

1    and appeared to have all of her teeth.  (RT 138, 145.)  Her hands

2    were dirty.  (RT 146.)  Mancera and petitioner appeared to be

3    friendly with each other.  (RT 136.)

4        While speaking to them, Barreto believed they were both under

5    the influence of alcohol.  (RT 134-144.)  He based this upon the

6    fact that there was an odor of alcohol on them, their eyes were

7    watery and bloodshot, and they were somewhat unsteady on their

8    feet.  (RT 135.)  Neumer also smelled alcohol, and recalled that

9    they admitted they had been drinking.  (RT 154.)  They also had

10   delated pupils, which Barreto knew was a sympton of stimulant use.

11   (RT 144.)  Barreto did not see anything that he immediately

12   recognized as symptoms of cocaine use, but it was possible that

13   they were under the influence of cocaine as well.  (RT 148.)

14   Barreto thought they were both at about the same level of intoxi-

15   cation.  (RT 135.)  They did not have trouble communication with

16   him, and their level of intoxication was not severe enough to

17   warrant booking them for being drunk in public or booking into

18   a non-custodial  detention facility to sober up.  (RT 135.)

19       Petitioner's conviction is one of manslaughter.  The evidence

20   in this case only proves that two drunkers fought together for

21   not apparent reasons.  To convict petitioner for first degree

22   murder is ludicrous because there is no evidence beyond a reaso-

23   nable doubt that petitioner killed Mancera  intentionally, with

24   premeditation aforethought.  In short the fall of Mancera  was no

25   intentional.  The evidence that petitioner ran with the ATM card

26   and Mancera  chasing petitioner to retrieve the ATM card from

27   petitioner came from the police and the prosecution.  The police

28   said that petitioner told them that he ran with the ATM card

24

1    and that Mancera chased petitioner for the purpose to retrieve

2    the ATM card.  That is ludicrous, because petitioner never told

3    the police the above.  Petitioner fought with Mancera because

4    Mancera attacked petitioner without a reason.  Mancera attacked

5    petitioner because Mancera was under the influence of cocaine and

6    alcohol as petitioner too was.  The police and the prosecution

7    claimed that petitioner took items from the purse of Mancera after

8    she fell to the track below.  The prosecution and the police claims

9    are not   true.      Petitioner is only guilty of accidentally

10   killing Mancera when Mancera jumped on petitioner back and

11   petitioner tried to take Mancera from his back and accidentally

12   Mancera fell to the track below.  See Exhibit A at page 9.

13      The police and the prosecution of the Santa Clara County had

14   a custom of working in concert to convict people said the Mercury

15   News.  See Exhibit A at page 3 paragraph 7.

16       The police said in this case that petitioner told them that

17   he fled the scene with the card still in his possession.  The

18   victim chased after the defendant and they began to wrestle.

19   The victim jumped on top of the defendant as she was trying to

20   get her card back, making the defendant hit the guardrail, causing

21   her to let go of the fefendant and fall to the track below.  The

22   defendant went down to check on the victim, panicked and left

23   the scene without calling 911.  Please see Exhibit A at page 9.

24   The last paragraph is a pure fabrication of the police and the

25   prosecution because petitioner never said what the last paragraph

26   said.  These people are very experienced and they knew that

27   petitioner can be convicted of first degree murder if the victim

28   died while she was trying to retrieve the ATM card even thought

1    the victim died during the struggling.

2        A review of the interrogation will show that the police and

3    the prosecution of the County of Santa Clara are lying just for

4    the purpose of convicting petitioner to first degree murder.  The

5    statement of petitioner to the police shall be reviewed very

6    closely to clarifying the fabrication of these people.  Petitioner

7    is REQUESTING AN EVIDENTIARY HEARING ON ISSUE ONE TO REVIEW THE

8    STATEMENT OF PETITIONER TO THE POLICE.  And after the evidentiary

9    hearing, petitioner is requesting a reversal of his conviction

10   and senteceing of first degree murder.  Petitioner is only guilty

11   of accidentally killing Mancera, while both of them were under

12   the influence of alcohol and cocaine.  Petitioner's right of

13   the Federal Due Process Clause of the Fourteenth Amendment had

14   been violated.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.

## PETITIONER'S STATEMENT TO THE POLICE WAS USED
## INTO EVIDENCE IN VIOLATION OF MIRANDA V. ARIZONA

On May 6, 2002, the trial court ruled that petitioner's state-ments to police had been taken in violation of Miranda v. Arizona, 284 U.S. 436 (1966) and could not be introduced in the prosecution's case in chief.  (CT 117; RT 94.)

The trial court gave the order to the prosecution not to use the statements of petitioner to the police.  But because is the custom of the prosecution in the County of Santa Clara to ignoring the orders of the judges, the prosecution in this case told the jury that petitioner ran with the ATM card of Mancera, then Mancera chased after petitioner to retrieve her card, and Mancera fell to the truck killing herself.  But all because she was trying to have possession of her card.  The prosecution's comments were false and a refusal to obey the orders of the judge not to use the statements of petitioner in his case in chief because it was obtained in violation of Miranda.

When petitioner was interviewed by the police, he was under the influence of alcohol and cocaine.  The waiver of petitioner's Miranda rights were not voluntary, intelligent, and knowingly made because of petitioner's condition when he was interviewed. The police claimed that petitioner told them that he ran with the ATM card of Mancera.  Petitioner does not remember saying that to the police.  Is more likely that the police is fabricating the running of petitioner with Mancera's card.  After all, the police and the prosecution of Santa Clara County had the custom of working together to convict people even if they are innocent.  See what

1   the Mercury News said in Exhibit A at page 3 paragraph 7.

2   Petitioner is not saying the above, the Mercury news says it.

3       When petitioner was interrogated, a blood sample was drawn

4   from him. (RT 270.)  A test indicated the presence of cacaine

5   metabolite, meaning he had most likely ingested cocaine more than

6   six hours earlier.  (RT 270, 276-277.)  This is evidence that

7   petitioner was under the influence of cocaine and alcohol when

8   he was interviewed by the police.

9       The police and the prosecutoon kept saying that petitioner

10  told the police that he ran with the card of Mancera, then Mancera

11  chased after petitioner to retrieve the card, then both fought and

12  in the process, Mancera fell the track below and killed herself.

13  Well if petitioner told the police that he ran with the card of

14  Mancera, petitioner is requesting an examination of the Original

15  tape of the recorded statement to the police that petitioner made.

16  If what the police and the prosecution claimed is true, the

17  original tape of petitioner's statement to the police should

18  reflect this.  But petitioner is requesting an expert to examine

19  the tape recorded of the original tape of his statements to the

20  police.  The reason petitioner is requesting the service of an

21  expert to examine the original tape of his statements is because

22  the police and the prosecution are inventing that petitioner told

23  them that he ran with the card of Mancera and then Mancera chased

24  him.  That is false.  Petitioner does not remember saying that

25  to the police.

26      If an expert on cassette says that the original tape of

27  petitioner's statements to the police says that petitioner says

28  in the recorded statements that he ran with the card of Mancera

28

1   and Mancera chased after him to retrieve her card.   Then petitioner

2   will accept the expert findings.   But if not expert on cassettes

3   examine the original tape of the statements recorded of petitioner's

4   statements to the police, petitioner will not accept that he ran

5   with the card of Mancera and Mancera chased after him to retrieve

6   the card.   Petitioner fought with Mancera because both were drunk

7   or under the influence of cocaine and alcohol.   Petitioner never

8   ran with the card of Mancera.   The police and the prosecution are

9   inventing this story.

10      The reason petitioner is requesting the service of an expert

11   on cassette is because petitioner wants to challenge the authenti-

12   city of the original tape recorded of his statements to the police.

13   The Mercury News says that the Santa Clara County police and the

14   prosecution work in concert to convict people that are innocent.

15   Like indicated above, is the position of petitioner that he never

16   told the police that he ran with the card of Mancera.   The police

17   is not been candid.

18      If any part in the case in chief was used by the prosecution,

19   petitioner's conviction then should be reversed because the trial

20   court found that petitioner's statements violated his Miranda

21   rights.   Petitioner did not testify.   Then any part of his state-

22   ment that was used was a violation of his Fifth Amendment.

23      The people bear the burden of proving by a preponderance of

24   evidence that a defendant's custodial statement complied with

25   Miranda.   (Colorado v. Connelly, (1986) 479 U.S. 157, 168-169

26   [107 S.Ct. 515, 93 L.Ed.2d 473].

27      Criminal defendants undergoing custodial interrogations by

28   the police must be advised of their constitutional right to

29

1   remain silent, have an attorney present during the interrogation,

2   have an attorney appointed if the defendant is indigent, and of

3   the state's ability to use incriminating statements against them.

4   (Stansbury v. California,(1994) 511 U.S. 318, 321 [114 S.Ct. 1526,

5   128 L.Ed.2d 293]; Miranda v. Arizona, 384 U.S. 436, 444 (1966);

6   People v. Aguilera, (1996) 51 Cal.App.4th 1151, 1161.)  Unless

7   the defendant waives these constitutional rights, any statements

8   obtained during a custodial interrogation are inadmissible to

9   establish a defendant's guilty.  (Michigan v. Tucker, (1974) 417

10  U.S. 433, 444, 446 [94 S.Ct. 2357, 41 L.Ed.2d 182]; Miranda v.

11  Arizona, supra, 384 U.S. at p. 444; People v. Aguilera supra,

12  51 Cal.4th at p. 1161; People v. Clair, (1992) 2 Cal.4th 629,

13  678.)

14      This case is being done without any aid from the trial

15  transcripts.  It been done just with the aid of Appellant's

16  Opening Brief that was sent by Appellate Counsel on 9/12/06  See

17  Exhibit A pages 15-16.

18      PETITIONER REQUESTS AN EXPERT ON CASSETTE, AND AN EVIDENTIARY

19  HEARING ON ISSUE TWO.  Petitioner also is requesting a reversal

20  of his conviction.  Petitioner's right under the Fifth Amendment

21  to the United States Constitution had been violated.

22

23

24

25

26

27

28

III.

## PETITIONER IS REQUESTING A COPY OF HIS TRIAL TRANSCRIPTS.

A Jailhouse Lawyer, whose name is not available right now, but will be provided in the future, was doing the case of petitioner. The Jailhouse Lawyer went to the hole (SHU). Petitioner did an appeal (602) requesting to the authorities to retrieve his trial transcripts from the Jailhouse Lawyer. The appeal (602) was responded and petitioner was told that he should have done the appeal (602) within 15 days from the day the Jail-house Lawyer went to the hole.

This prison should not have refused to retrieve the trial transcripts from the Jailhouse Lawyer because they are very vital to petitioner. Now petitioner is doing this case without the trial transcripts. Petitioner received the Appellant's Opening Brief from his appellate counsel on September 12, 2006. Please see Exhibit A at page 16. On July 23, 2006 petitioner requested a copy of his trial transcripts to Ms. Lori A. Quick (Appellate Counsel) Please see Exhibit A at page 15. Like petitioner is saying in his letter that he needs a copy of the trial transcripts because a Jailhouse Lawyer have them and the Jailhouse Lawyer informed petitioner that the trial transcripts were taken from him and thrown away when he (Jailhouse Lawyer) went to the hole.

If petitioner does not have his trial transcripts is the fault of High Desert State Prison because it thrown them away. The High Desert State Prison's Warden, Thomas Felker is an arm or branch of the Government of the State of California. Therefore this Court should provide a copy of the trial transcripts to

31

1   petitioner.

2        In King v. Bell, 378 F.3d 550 (6th Cir. 2004) the United

3   States Court of Appeals for the Sixth Circuit ordered an evidentiary

4   hearing because the government delayed in providing petitioner

5   with the trial transcripts.  See also Keenan v. Bagley, 400 F.3d

6   421 (6th Cir. 2005)

7        In Holloway v. Roe, 31 Fed.Appx. 376, 377 (9th Cir. 2002)

8   Holloway his Jailhouse Lawyer died, he did not prepare a timely

9   petition because, his (Holloway') Jailhouse Lawyer had all the

10  files and records.  The United States Court of Appeals for the Ninth

11  Circuit  remand     for further development of the record and

12  consideration of the equitable tolling claim in view of the record.

13  See Whalem/Hunt v. Early, 233 F.3d 1146, 1148 (9th Cir. 2000)

14  (en banc) (remand appropriate where there are "circumstances

15  consistent with petitioner's petition and declaration under which

16  he would be entitled to a finding of . . . . equitable tolling.")

17       Morrison contends that the district court erred by not granting

18  him equitable tolling for the period during which he was incarce-

19  rated outside of Montana and denied access to necessary materials.

20  See Miles v. Prunty, 187 F.3d 1104, 1105, 1107 (9th Cir. 1999)

21  (concluding that when external forces rather than the petitioner's

22  lack of deligence, account for the failure to file a timely claim,

23  equitable tolling may be appropriate).  Because the district

24  court did not have the benefit of our en banc decision in

25  Whalem/Hunt v. Early, 233 F.3d 1146 (9th Cir. 2000) (en banc)

26  (per curiam), and no evidentiary hearing was held, we reversed

27  and remand to the district court for appropriate development of

28  the record and factual findings.  Id. at 1148. (determining that

1    where it cannot be said that there are no circumstance consistent
2    with petitioner's petition and declaration under which he would
3    be entitled to equitable tolling, reversal is proper). <u>Morrison</u>
4    <u>v. Mahoney</u>, 31 Fed.Appx. 389, 390 (9th Cir. 2002).

5        If this Court fails to provide the trial transcripts to
6    petitioner, he will be entitled to submit another petition in the
7    future after petitioner gets the transcripts.  This Court should
8    provide the trial transcripts to petitioner now to prevent that
9    the tax payers resources be spent unnecessary in the future.
10   Petitioner has been raised the present issues without the trial
11   transcripts and due to that, the issues are not properly done.
12   **PETITIONER IS REQUESTING AN EVIDENTIARY HEARING ON THIS ISSUE**
13   **THREE.**  After it, petitioner is requesting a reversal of his
14   conviction because his Fourteenth Amendment right to transcript
15   had been violated by the Warden Thomas Felker when his subordinates
16   took and threw away the trial transcripts of petitioner that were
17   in possession of petitioner's Jailhouse Lawyer.

18
19
20
21
22
23
24
25
26
27
28

33

IV.

## PETITIONER WAS DENIED HIS
## PRESENCE DURING THE READBACK.

On May 14, 2002, 9:39 A.M. Not reported- The Jury informs the deputy that they have a question. The Court is notified. The Court instructs the deputy to enter the deliberation room and ask the jury to be more specific as to the question.

9:50 a.m. Not reported- the jury inform the deputy that they have specified the area requested. The court and counsel are notified.

10:23    not reported the jury informs the deputy that they have another question. The court and counsel are notified.

10:38 a.m. not reported, Cindy Mohr, enters the deliberation room to do the readback requested by the jury and to provide the written answer to the second question requested.

10:40 a.m. not reported the reporter leaves the deliberation room after completing the readback. The jury continue delibera-ting.

11:01 a.m. Court is in session with both counsel present. the Court reviews the first question received from the jury this morning. Defense Attorney Gillan is heard regarding his odjection. the People are heard briefly.

11:04 a.m. The court reads the second question received and reads the answer which was provided to the jury. **Defense counsel Gillan waives the defendant's presence.** Both counsel stipulate that the reporter may enter the deliberation room for readback. See (CT 193.)

Defendant has a constitutional right to be present at all

34

1  stages of the trial where his absence might frustrate the fairness

2  of the proceedings-<u>Cohen v. Senkowski</u>, 290 F.3d 485; see also

3  Rushen v. Spain, 464 U.S. 114 (1983) 2005 L.W. 1728, 6/7/05.

4      Petitioner did not waive his presence.  Therefore, his convic-

5  tion should be reversed.  **PETITIONER IS REQUESTING AN EVIDENTIARY**

6  **HEARING ON ISSUE SIX.**  Petitioner's right under the Sixth Amend-

7  ment has been violated.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35

V.

## TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE
## BY FAILING TO PRESENT THE DEFENSE OF SELF-DEFENSE.

Maria Mancera A.K.A John Mancera's blood alcohol level had been determined to be .22%. (RT 280-281.)  The blood alcohol level of .22% indicated Chief Medical Examiner Gregory Schmunk that Mancera had consumed approximately 10 drinks within a few hours of her death.  (RT 219.)  Such a blood alcohol level would result of signs of gross intoxication, such as slurs speech and loss of balance with difficulty standing and walking.  (RT 273-274, 282-283.)

Officer Barreto on the day of the incident spoke with Mancera and petitioner.  Barreto believed that Mancera and petitioner were both under the influence of alcohol.  (RT 134-144.)  He based this upon the fact that there was an odor of alcohol on them, their eyes were watery and bloodshot,  and they were somewhat unsteady on their feet.  (RT 135.)  Officer Neumer also smelled alcahol, and recalled that they admitted they had been driking.  (RT 154.)  They also had delated pupils, which Barreto knew was a sympton of stimulant use.  (RT 144.)  Barreto did not see anything that he immediately recognized as symptons of cocaine use, but it was possible that they were under the influence of cocaine as well.  (RT 148.)  Barreto thought they were both at about the same level of intoxication.  (RT 135.)

Petitioner fought with Mancera after she jumped on petitioner for no apparent reasons.  Mancera fought with petitioner because she was under the influence of alcohol and cocaine.  At no time petitioner tried to run with the ATM card of Mancera as the

36

1  police and prosecution claimed.  Was the position of the prosecu-

2  tion that Mancera was killed when she was trying to retrieve her

3  card from petitioner when petitioner was running with it.  That

4  is a pure fabrication that Mancera was chasing after petitioner

5  for her card.

6     Petitioner told trial counsel that he fought with Mancera

7  for no apparent reasons.  Petitioner told trial counsel that

8  during the struggling Mancera fell the track down and killed

9  herself during the fall.  Trial counsel refused to argue that

10 petitioner had killed Mancera in the heat of passion, and that

11 the charged offense is a pure manslaughter.  If trial counsel

12 would have used the defense of self-defense, the result of the

13 proceeding would have been different.

14    In In re Hall, 30 Cal.3d 408, 179 Cal.Rptr. 223.  (Defendant

15 was denied competent counsel by failing to prepare case)  Court

16 granted defendant's habeas corpus petition because of a combina-

17 tion of newly discovered evidence and trial counsel's failure to

18 adequately prepare the defense.  Court went to considerable

19 length in detailings the failings of defense to properly prepare

20 and investigate the defense of the case.

21    Thelen has been granted a certificate of appealability by the

22 United States Court of Appeals for the Sixth Circuit to seek

23 review of the issue of whether his trial counsel rendered

24 ineffective assistance by failing to object to the use of a 1986

25 Oklahoma deferred sentence which occurred more than ten years

26 prior to the commencement of the instant offense as a predicate to

27 a career offender enhancement.  Thelen v. United States, 131 Fed.

28 Appx. 61-63 (6th Cir. 2005).

37

1     Deferential standard of review applies to ineffective assis-

2    tance claims.  A defendant must show that counsel's representation

3    was so "thoroughly ineffective that defeat was 'snatched from

4    the jaws of victory.'"  West v. Seabold, 73 F.3d 81, 84 (6th Cir.

5    1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th

6    Cir. 1992) (en banc).

7     Inexperience and inattention can be enough to constitute

8    constitutional deficient performance.  Grevley v. Mills, 87 F.3d

9    779, 786 (6th Cir. 1996).

10     Petitioner's conviction should be reversed.  **PETITIONER IS**

11    **REQUESTING AN EVIDENTIARY HEARING ON ISSUE FIVE.**  Petitioner's

12    right under the Sixth Amendment had been violated.

A.    Trial Counsel Prevented Petitioner From Testifying.

If petitioner would have been let to testifying, he would have told the jury that Mancera never chased after him to try to retrieve his ATM card.  Petitioner  would have told the jury that because both were under the influence of cocaine and alcohol, they fought for no apparent reasons.  Petitioner would have told the jury that he never told the interrogation officers that he ran with the card of Mancera and that police invented the story that petitioner ran with the card of Mancera.  Petitioner would have told the jury that Mancera and him started the fight over the track and then accidentally, Mancera fell below the track.

Trial counsel told petitioner that he was no let him to testify because petitioner was going to be impeached with his priors if he testify.  Petitioner told trial counsel that he wanted to testify even though he could be impeached with his priors.

The constitutional right to testify is found in the Due Process Clause, the Fifth Amendment's guarantee against compelled testimony, and the Sixth Amendment.  Rock v. Arkansas, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2708-10, 97 L.Ed.2d 37 (1987).  Quoting United States v. Moreno, 102 F.3d 994, 998 (9th Cir. 1986); see also Nicholas v. Batler, (1990) 917 F.2d 518; United States v. Teague, 908 F.2d 488 (11th Cir. 1990).

Petitioner's conviction should be reversed.  **PETITIONER IS REQUESTING AN EVIDENTIARY HEARING ON ISSUE V(A).**    Petitioner has been denied his Fifth and Sixth Amendments of the United States Constitution.

B.  Failure To Request Jury Instruction of the
defense of Self-Defense.


In U.S. v. Span, 75 F.3d 1383 (9th Cir. 1996) (Counsel's failure
to request instructions on viable defense theory denies defendant
right to effective counsel).  Defendants were charged and convicted
of assaulting federal marshalls.  Although counsel had requested
jury instructions covering the affirmative defense of self-defense
and mistake of fact, and privilege to resist an unlawfull arrest,
he neglected to see instructions on the theory that a person has
a right to resist an officer who is using excessive force.
Court here found that counsel's failure to seek instructions on
this theory which given the evidence, was defendants' only viable
defense and one that had a strong likely of success, was ineffecti-
ve assistance of counsel.

In the present case, trial counsel neglected to seek instruc-
tions on the theory that Mr. Uvalles has a right to resist the
attack of Mancera who was using excessive force against petitioner.

Gregory Schmunk is the Chief Medical Examiner and Coroner
for Santa Clara County who is an expert in the area of forensic
pathology and wound recognition.  (RT 196-198.)  He performed an
autopsy on Mancera's body during which he discovered that Mancera
was in fact a man.  (RT 198-199.)  Mancera's blood alcohol level
had been determined to be .22.  (RT 280-281.)  The blood alcohol
level of .22% indicated to Schmunk that Mancera had consumed
approximately 10 drinks within a few hours.  (RT 219.)  Such a
blood alcohol level would result in signs of gross intoxication,
such as slurred speech and loss of balance with difficulty

40

1   standing and walking. (RT 273-274, 282-283.) He noted that

2   between 11:10 a.m. and 12:20 p.m. on August 20, Mancera's body

3   was in full rigor mortis, meaning that she had died approximately

4   six to eight hours earlier. (RT 213.) The level of livility

5   present at the same time was not fixed, as would be expected

6   eight to 12 hours after death. (RT 215-216.)

7      Mancera was a man, He must have been violent because for no

8   reason attacked petitioner. Maybe Mancera was violent due to

9   the amount of alcohol and cocaine in his system. Trial counsel

10   never investigated Mancera for any pattern of violence. Mancera

11   was a violent person and due to that he attacked petitioner. Or

12   like petitioner indicated above, maybe the alcohol and the cocaine

13   made Mancera to be violent. The only thing petitioner can say

14   is that Mancera attacked him and he defended himself. And trial

15   counsel would have requested the instruction that petitioner had

16   a right to defend the attack of Mancera. Also trial counsel

17   would have requested the instruction of the defense of self-defen-

18   se. Because he failed to do so. He was ineffective.

19      Petitioner's conviction should be reversed. **PETITIONER IS**

20   **REQUESTING AN EVIDENTIARY HEARING ON ISSUE FIVE(B).** Petitioner's

21   rights under the Sixth Amendment to the United States Constitu-

22   tion had been violated.

23

24

25

26

27

28

41

VI.

APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE

If this Court finds any issue raised in this petition merito-
rious, them this Court will find that appellate counsel was
ineffective by failing to raise the meritorious issue that this
Court finds that have merits.

In evaluating a claim of ineffective assistance of appellate
counsel, we look to the analysis established by the United States
Supreme Court in Strickland v. Washington, 466 U.S. 668, 688 104
S.Ct. 2052, 80 L.Ed.2d 674 (1984).  See also Willis v. Smith,
351 F.3d 741, 745 (6th Cir. 2003).  The Strickland involves two
prongs: the "performance prong," where a petitioner is required
to show that her attorney's representation "fell below an objective
standard of reasonableness," Id, and the "prejudiced prong,"
which requires the petitioner to demonstrate that there exists
"a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different,"
id, (emphasis added).  Ballard v. United States, 400 F.3d 404,
407 (6th Cir. 2005).

The question presented here is whether an appellate counsel
prejudices a client where the attorney fails to raise on appeal
a [meritorious] claim.  We answer in the affirmative, because
but for the appellate counsel's ineffectiveness, there is a
reasonable probability that the result of the [] appeal may have
been different.  Cover v. Straub, 349 F.3d 340, 349-50 (6th Cir.
2003).  Quoting Ballard v. United States, supra, 400 F.3d 404,
409 (6th Cir. 2005).

42

1    A showing that a defendant received ineffective assistance of

2  counsel will establish cause excusing a procedural default.

3  Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 379

4  (1986) quoting Ellis v. Hargett, 303 F.3d 1183, 1186 (10th Cir.

5  2002).

6    Petitioner's conviction should be reversed. **PETITIONER IS**

7  **REQUESTING AN EVIDENTIARY HEARING ON ISSUE EIGHT.** Petitioner's

8  right under the Sixth and Fourteenth Amendments have been denied.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CONCLUSION</u>

2      Petitioner's conviction should be reversed.

3

4   DATED:  *November 20, 2006*

5                                          Respectfully submitted,

6

7                                          RAUL UVALLES

8                                          Pro se

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   --------------------

25      This case is been done by Jailhouse Lawyer Renato Obando C-63369
     High Desert State Prison Facility B-4-213, P.O.Box 3030, Susanville,
26   California 96127, because petitioner is layman at law and indigent.

27

28

44

# CALIFORNIA APPELLATE COURTS

### Case Information



Welcome

Search

E-mail

Calendar

Help

Opinions

C|C

home

## 6th Appellate District

Change court

Court data last updated: 11/27/2006 02:05 PM

**Case Summary   Docket   Scheduled Actions   Briefs
Disposition   Parties and Attorneys   Trial Court**

## Docket (Register of Actions)

**Uvalles on Habeas Corpus**
**Case Number H030758**

| Date | Description | Notes |
|---|---|---|
| 10/23/2006 | Petition for a writ of habeas corpus filed. | |
| 11/15/2006 | Case fully briefed. | |
| 11/15/2006 | Order denying petition filed. | Petition for writ of habeas corpus is denied (PBM, NM, RJM) |
| 11/15/2006 | Case complete. | |

**Click here** to request automatic e-mail notifications about this case.

© 2004 Judicial Council of California

## PROOF OF SERVICE BY PERSON IN STATE CUSTODY

I the undersigned, hereby declare that I am over the age of eighteen (18), and that I am incarcerated at High Desert State Prison in Susanville, California, that [x] I am [ ] am not a party to this action, and that on the _20_ day of _NOVEMBER_, 200_6_, I served a true and complete copy of the following:

```
(        PETITION FOR REVIEW                              )
(                                                         )
(                                                         )
(                                                         )
(                                                         )
(                                                         )
(_____)
```

by handing it to institutional staff with First Class Postage prepaid in full for mailing to the following address(es):

```
(                                                         )
(     Bill Lockyer                                        )
(     Attorney General                                    )
(     455 Golden Gate Avenue                              )
(     Suite 11,000                                        )
(     San Francisco, CA 94101-7004                        )
(                                                         )
(                                                         )
(_____)
```

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON _NOVEMBER 20, 2006_, in Susanville, California.

RAUL UVALLES
    (Print Name)                    (Signature)

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
      Telephone: (415) 703-5969
8     Fax: (415) 703-1234
      Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14  **RAUL UVALLES,**                         C 05-2779 MJJ (PR)

                                    Petitioner,
15

16            v.

    **D.L. RUNNELS, Warden,**
17
                                    Respondent.
18

19       **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT H-2

*Walter, Raul*

Court of Appeal, Sixth Appellate District - No. H030758
**S148301**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re RAUL UVALLES on Habeas Corpus

Petition for review DENIED.

Moreno, J., was absent and did not participate.

SUPREME COURT
**FILED**

JAN 1 7 2007

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE

Chief Justice

H-2

EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
MARK S. HOWELL
Deputy Attorney General
State Bar No. 95125
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-3664
  Telephone: (415) 703-5969
  Fax: (415) 703-1234
  Email: mark.howell@doj.ca.gov
Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **RAUL UVALLES,**<br><br>                              Petitioner,<br><br>        **v.**<br><br>**D.L. RUNNELS, Warden,**<br><br>                              Respondent. | C 05-2779 MJJ (PR) |

**NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

# EXHIBIT I-1

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name    Uvalles                    Raul                    (Initial)
            (Last)                  (First)

Prison Number    T-59954

Institutional Address    H.D.S.P. B-3-130 P.O.Box 3030 Susanville, CA 96127

RECEIVED

FEB 15 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAUL UVALLES

Full Name of Petitioner

    vs.

THOMAS FELKER, Warden,

Name of Respondent
(Warden or jailor)

Case No.    C-05-2779-MJJ (PR)
(To be supplied by the Clerk,
U.S. District Court)

C 07    1064

PETITION FOR WRIT OF HABEAS CORPUS

C 05-2779 MJJ (PR)

Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted and
sentenced in one of these counties: Alameda, Contra Costa, Del Norte,
Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa
Clara, Santa Cruz, San Francisco, San Mateo, and Sonoma.

    If you file in the Northern District because you are now in a prison
in this District but you were not convicted and sentenced in one of the
above-named fifteen counties, your petition will likely be transferred
to the United States District Court in which is located the State Court
which convicted and sentenced you. The Federal District Courts in
California prefer that a petition should be considered in the district
of conviction and sentencing. The records can be more easily consulted
and witnesses are available if a hearing is necessary.

1

## Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county, or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the State judgment against which you seek relief but may be subject to such custody in the future (e.g. detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the State in which the judgment you seek to attack was entered.

## PART A - JURISDICTION

The federal district court can only consider your petition if you satisfy certain jurisdictional requirements. The information below will allow the court to determine whether those requirements are met.

1. For what crime were you sentenced? (If you seek habeas corpus based upon a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are seeking habeas corpus as to more than one sentence, a different petition should be filed for each sentence.)

Alleged first degree murder, and alleged second degree robbery
_____
_____
_____

2. The sentence from which you seek relief is as follows:

(a) Name and location of court which imposed sentence (for example; Alameda County Superior Court, Oakland):

Sup. Ct. of Santa Clara County 190 W. Hedding St. San Jose, CA 95110
         **Court**                                **Location**

(b) Case number, if known ___CC121250_____

(c) Date and terms of sentence ___June 14, 2002, 25 years to life___

(d) Are you now in custody serving this term? Yes _X__ No ____

(Custody means being in jail, on parole or probation. You are not in custody if you are released on bail, on your own recognizance or if there is a stay of execution of sentence.)

Where? ___H.D.S.P. Susanville, CA 96127_____
         **(Name of Institution)**                  **(Address)**

3.   What post-conviction relief have you sought?

APPEAL

(a)   Did you take an appeal from your conviction?   Yes _x_   No ____

(b)   To what court(s)?   Check

Court of Appeal   Yes _x_   No ____   Oct. 28, 2003 denied
                                      ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                      (Give year)   (Result)

Supreme Court of   Yes ____   No _x_
California                             ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                      (Give year)   (Result)

Any other court   Yes ____   No _x_
                                      ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                      (Give year)   (Result)

(c)   If you appealed, were the grounds the same as those which will be
set forth in this petition?   Yes ____   No _x_

(d)   Was any opinion rendered?   Yes _x_   No ____

(e)   If you did not appeal, what were your reasons?

_____

_____

_____

(f)   Did you seek permission to file a late appeal under Rule 31(a)?
      Yes ____   No _x_

If you answered "Yes" give _____
                                      (Name of Court)

_____
                           (and result)

OTHER POST-CONVICTION REVIEW

(g)   Other than appeals, have you previously filed any petitions,
applications or motions with respect to this conviction in any court,
state or federal?   Yes _x_   No ____

(h)   If you answered "Yes" give the following information about each
proceeding.

3

I.   **Name of Court** Superior Court of Santa Clara County

    **Type of Proceeding** Petition for writ of habeas corpus

    **Grounds raised (Be brief and specific):**

    a. Prosecutor   misconduct

    b. Ineffective assistance of trial counsel

    c.

    d.

    e.

    **Result** denied      **Date of Result** Not available

    **Citation of opinion, if any and known** CC121250

II.   **Name of Court** Court of Appeal Sixth Appellate District

    **Grounds raised (Be brief and specific):**

    a. Prosecutor   misconduct

    b. Ineffective assistance of trial counsel

    c.

    d.

    e.

    **Result** denied      **Date of Result** Not available

    **Citation of opinion, if any and known** Not available

III.   **Name of Court** Supreme Court of California

    **Grounds raised (Be brief and specific):**

    a. Prosecutor   misconduct

    b. Ineffective assistance of trial counsel

    c.

    d.

    e.

Result __denied_____    Date of Result __Not available__

    Citation of opinion, if any and known __N/A_____
(Use back side of this page if you need more space.  Fill in the same
questions for each.)

(i)  If you answered "No" explain briefly why you have not sought any
post-conviction review?

_____

_____

(j)  Is any petition or other post-conviction proceeding now pending in
any court?  Yes __x__    No _____

United States Dist. Ct Northern Dist. of CA 950 Golden Gate Ave. San F.
                         **(Name and location of Court)**

## PART B - TRIAL INFORMATION

4.  Check if any of the following were held in your case:

Arraignment:  Yes __x__  No ____    Preliminary Hearing:  Yes __x__  No ____

Motion to Suppress:  Yes ____  No __x__

5.  Check whether a finding of guilty was made after a plea of

    Guilty _____        Not Guilty __x__        Nolo Contendere _____

    Any other plea _____
                                 (Specify)

6.  Check kind of trial:

    Jury __x__          Judge alone _____

    Judge alone on a transcript _____

7.  Did you testify at your trial?  Yes ____         No __x__

## PART C - GROUNDS FOR RELIEF FROM CONVICTION

State briefly and concisely every ground which you believe supports your
claim that you are being held in unlawful confinement.  This means
telling the court the facts upon which you rely.  You should avoid legal
arguments with numerous case citations.  Thus, what legal right or
privilege were you deprived of in your case?  What happened to deprive
you of this right?  Who made the error of which you complain?  What did
he do wrong?  When did he do it?  If you lack space to state all your
grounds, use the back side of the page.

**NOTE WELL:**  You must present ALL of your claims in your first federal habeas petition.  Subsequent petitions are subject to dismissal without review on the merits for abuse of the writ.  <u>McCleskey v. Zant</u>, 111 S.Ct. 1454 (1991), 113 L.Ed. 2d 517, 59 U.S.L.W. 4288.

8.  Grounds for Relief

    (a)  Ground One:  <u>SEE PAGE 6A</u>

        Supporting Facts:  <u>SEE PAGE 6F THROUGH PAGE 6L</u>

    (b)  Ground Two:  <u>SEE PAGE 6M</u>

        Supporting Facts:  <u>SEE PAGE 6M THROUGH PAGE 6P</u>

    (c)  Ground Three:  <u>SEE PAGE 6Q</u>

        Supporting Facts:  <u>SEE PAGE 6Q THROUGH PAGE 6S</u>

9.  If any of the grounds listed were not previously presented to any other court, state briefly which grounds were not so presented and why:

All the present grounds were presented in the California Court of

Appeal and in the Supreme Court of California

I.

## NO EVIDENCE PROVED THE CONVICTION AND SENTENCE OF FIRST DEGREE MURDER

Reasonable doubt is defined in California Penal Code § 1096 as follows:

> "It is not a mere possible doubt; because everything
> relating to human affairs ... is open to some
> possible or imaginary doubt.  It is that state
> of the case, which, after the entire comparison and
> consideration of all the evidence, leaves the minds
> of jurors in that condition that they ... cannot say
> they feel an abiding conviction ... of the truth of
> the charge."

In 1894. . . the court interpreted the predecessor of 28 U.S.C. § 2243 as vesting federal courts "with the largest power to control and direct the form of judgment to be entered in cases brought up before it on Habeas Corpus." Rogers v. Richmond, 365 U.S. 534, 549 (1951); Dowd v. United States ex rel Cook, 340 U.S. 206, 210 (1951); In re Bonner, 151 U.S. 242, 261-62 (1894).

The United States Court of Appeals for the Ninth Circuit and the United States Supreme Court of the United States indicated, our standards of review for addressing the sufficiency of the evidence to support a conviction is the same on habeas review as it is on direct appeal.  See Mike v. Borg, 947 F.2d 353, 356 n. 5 (9th Cir. 1991); see also Jackson v. Virginia, 443 U.S. 307, 309, 99 S.CT. 2781, 2789 61 L.Ed.2d 560 (1979) (setting forth standard in a habeas corpus proceeding). Quoting Walter v. Maass, 45 F.3d 1355 (9th Cir. 1995).

1    In re Winship, (1970) 90 S.CT. 1068, 1071, the requirement

2    that guilt of a criminal charge be established by proof  beyond

3    a reasonable doubt dates at least from our early years as a Nation.

4    The "demand for higher degree of persuasion in criminal cases was

5    recurrently expressed fron ancient times, [though] its crystalliza-

6    tion into the formula 'beyond a reasonable doubt' seems to have

7    occurred as late as 1798.  Its now accepted in common law

8    jurisdictions as the measure of persuasion by which the prosecution

9    must convince the trier of all the essential elements of guilt."

10    C. McCormick, Evidence section 321, pp. 681-682 (1954); See also

11    9 J. Wigmore, Evidence, section 2497 (3d ed. 1940).  Although

12    virtually unanimous adherence to the reasonable-doubt standard

13    in  common law jurisdictions may not conclusively establish it

14    as a requirement of due process, such adherence does "reflect a

15    profound judgment about the way in which law should be enforced

16    and justice administere." Duncan v. Louisiana, 391 U.S. 145, 155,

17    88 S.CT. 1444, 1451, 20 L.Ed.2d 491 (1968).

18    Expressions in many opinions of the United States Supreme

19    Court indicate that it has long been assumed that proof of a

20    criminal charge be a reasonable doubt is constitutionally

21    required.  See, for example, Miles v. United States, 103 U.S. 304,

22    312, 26 L.Ed. 481 (1881); Davis v. United States, 160 U.S. 469,488,

23    16 S.CT. 353, 358, 40 L.Ed. 499 (1895); Holt v. United States,

24    218 U.S. 245, 253, 31 S.CT. 2, 6, 54 L.Ed. 1021 (1910); Wilson v.

25    United States, 232 U.S. 563, 569-570, 34 S.CT. 347, 349, 350, 58

26    L.Ed. 728 (1914); Brinegar v. United States, 338 U.S. 160, 174, 69

27    S.CT. 1302, 1310, 93 L.Ed. 1879 (1949); Leland v. Oregon, 343 U.S.

28    790, 795, 72 S.CT. 1002, 1005, 1006, 96 L.Ed. 1320 (1952);

1  reasonable doubt whether he was capable in law of committing
2  crime. * * *  No man should be deprived of his life under the
3  forms of law unless the jurors who try him are able, upon their
4  consciences, to say that the evidence before them * * *  is
5  sufficient to show beyond a reasonable doubt the existence of
6. every fact necessary to constitute the crime charged." Id., at
7  484, 493, 16 S.CT., at 357, 360.  quoting, In re Winship, supra,
8  (90 S.CT., at 1071-1072.

9      Mr. Justice HARLAN, concurring.  I view the requirement of
10 proof beyond a reasonable doubt in a criminal case as bottomed on
11 a fundamental value determination of our society that it is far
12 worse to convict an innocent man than to let a guilty man go free.
13 It is only because the nearly complete and long-standing accep-
14 tance of the reasonable-doubt standard by the States in criminal
15 trials that the Court has not before today had to hold explicitly
16 that due process, as an expression of fundamental procedural
17 fairness, requires a more stringer standard for criminal trials
18 than for ordinary civil litigation.  In re Winship, supra, 90 S.CT.,
19 at  1077.

20      In Jackson v. Virginia, (1979) 443 U.S. 307, the United States
21 Supreme Court announced the constitutionally mandated standard
22 applicable to review of the sufficiency of the evidence to support
23 a conviction in a criminal case.  The Supreme Court held that the
24 Due Process Clause of the Fourteenth Amendment to the United States
25 Constitution protects a criminal defendant against conviction
26 "except upon proof- defined as evidence necessary to convince a
27 trier of fact beyond a reasonable doubt of the existence of every
28 element of the offense." (Id. at p. 315.)  Thus, the constitutiona-

1  Holland v. United States, 348 U.S. 121, 138, 75 S.CT. 127, 136, 137,

2  99 L.Ed. 150 (1954); Spenser v. Randall, 357 U.S. 513, 525-526,

3  78 S.CT. 1332, 1342, 2 L.Ed.2d 1460 (1958).  Cf. Coffin v. United

4  States, 156 U.S. 432, 15 S.CT. 394, 39 L.Ed. 481 (1895).  Mr.

5  Justice Frankfurter stated that "[i]t is the duty of the government

6  to establish * * * guilt beyond a reasonable doubt.  This notion-

7  basic in our law and rightly one of the boasts of a free society-is

8  a requirement and a safeguard of due process of law in the historic,

9  procedural content of 'due process.'"  Leland v. Oregon, supra,

10  343 U.S. at 802-803, 72 S.CT., at 1009 (dissenting opinion).  In

11  a similar vein, the Court said in Brinegar v. United States,  supra,

12  338 U.S., at 174, 69 S.CT., at 1310, that "[g]uilt in a criminal

13  case must be proved beyond a reasonable doubt and by evidence

14  confined to that which long experience in the common-law tradition,

15  to some extent embodied in the constitution, has crystallized

16  into rules of evidence consistent with that standard.  These rules

17  are historically grounded rights of our system, developed to

18  safeguard men from dubious and unjust convictions with resulting

19  forfeitures of life, liberty, and property."  Davis v. United

20  States, supra, 160 U.S., at 488, 16 S.CT., at 358 stated  that the

21  requirement is implicit in "constitutions * * *  [wich] recognize

22  the fundamental principles that are deemed essential for the

23  protection of life and liberty."  In Davis a murder conviction was

24  reversed because the trial judge instructed the jury that it was

25  their duty to convict when the evidence was equally balanced

26  regarding the sanity of the accused.  The United States Supreme

27  Court said:  "On the contrary, he is entitled to an acquittal of

28  the specific crime charged, if upon all the evidence, there is

6D

1    lly required standard applicable to determining a claim of insuffi-

2    ciency of the evidence in a criminal case is "whether, after

3    viewing the evidence in the light most favorable to the prosecution,

4    any rational trier of fact could have found the essential elements

5    of the crime charged beyond a reasonable doubt." (Id. at p. 320.)

6    The opinion in Jackson represents a continuing, consistent, and

7    unequivocal line of U.S. Supreme Court decisions giving contour

8    to due process and Sixth Amendment imperatives from In re Winship,

9    to the present. (See, e.g., People v. Korbin (1995) 11 Cal.4th

10   416, 422-423.) Thus, for a period spanning 30 years, the rule has

11   been the prosecution has the burden of proving every fact necessary

12   to constitute the crime charged beyond a reasonable doubt. (In re

13   Wiship, (1970) 397 U.S. 358, 364.)

14       California case law is substantially in accord with the standards

15   established by the United States Supreme Court. The test is whether,

16   reviewing the whole record in the light most favorable to the

17   judgment below, substantial evidence is disclosed such that a

18   reasonable trier of fact could find the essential elements of the

19   crime beyond a reasonable doubt. (People v. Johnson, (1980) 26

20   Cal. 3d 557, 578.) Substantial evidence is that which is "reasona-

21   ble, credible, and of solid value." (Ibid.) The focus of the

22   substantial evidence test is on the whole record of evidence

23   presented to the trier of fact, rather than on isolated bits of

24   evidence torn from the record. (People v. Cueveas, (1995) 12

25   Cal.4th 252, 261.) The reviewing court must "presume in support

26   of the judgment the existence of every fact the trier could

27   reasonably deduce from the evidence. (People v. Reilly, (1970)

28   3 Cal.3d 421, 425.) The reviewing court may not reweigh the

6E

1    evidence. (People v. Culver, (1973) 10 Cal.3d 542, 548), reappraise

2    the credibility of the witnesses (People v. Barnes, (1986) 42 Cal.

3    3d 284, 303-304), or resolve factual conflicts, since these are

4    functions reserved for the trier of fact (In re Federick G., (1979)

5    96 Cal.App.3d 353, 367). Reversal is not warranted unless it

6    appears "'that upon no hypothesis whatsoever is there sufficient

7    substantial evidence to support [the conviction].' [Citation.]

8    (People v. Bolin, (1998) 18 Cal.4th 297, 331.)

9        The evidence presented by the people is insufficient on the

10   following areas:

11       The prosecution and the police claimed that petitioner ran with

12   the victim's ATM card and that victim chased petitioner, then

13   a  struggling occurred.  Petitioner never ran with the ATM card.

14   The police and the prosecution invented this story.  The police and

15   the prosecution knew that if the victim chased petitioner to retrieve

16   the ATM card and then the victim died, that is evidence to convict

17   petitioner to first degree murder.  In short, the police and the

18   prosecution  falsely told the jury that the petitioner ran with

19   the victim's ATM card, and that constituted a robbey because the

20   victim was killed in the process of getting her ATM card, and  that

21   constituted a first degree murder even if the victim attacked

22   petition.

23       Is a fact that the victim withdrawed $40 from ATM card at the

24   Bank of America.  See Exhibit A at page 9.  Also this page shows that

25   petitioner put Mancera's ATM card in his pocket.  This petitioner

26   denied because he does not remember having putting the card in

27   his pocket.  Petitioner thinks that the putting of the card in his

28   pocket is another fabrication of the police and the prosecution.

                                    6F

1    In 2003, two men convicted of Santa Clara County murders were

2    set free amid judicial findings that police or prosecutor miscon-

3    duct helped convict people who were probably innonce.  One involved

4    Glen "Buddy" Nickerson, who served 19 years before U.S. District

5    Judge Marilyn Hall Patel overturned his conviction.  The second

6    was Quedellis Ricardo "Ricky" Walker, who spent nearly 12 years

7    in prison before top prosecutors acknowledged that improper deals

8    with unreliable witnesses had caused an injustice.  Please see

9    Exhibit A at p. 3 paragraph 7.

10   Is the custom of the police and the prosecutor in Santa Clara

11   to work in concert to convict innocent people.  Petitioner is

12   not the one  saying this.  The Mercuryd News said it.  In the

13   present case the prosecution and the police fabricated the story

14   that petitioner ran with the victim's ATM card and then the

15   victim chased petitioner and then a struggling occurred and the

16   victim was killed in the struggling.  The police and the prosecu-

17   tion knew that placing petitioner running with the victim's

18   ATM card constituted a robbery.  And if the victim was killed

19   after a fight for the card did not constituted a manslaughter.

20   These people are very experienced, and they knew the importance

21   of placing petitioner running with the victim's ATM card and the

22   victim chasing petitioner to retrieve it.  But the truth is that

23   petitioner never ran with the victim's ATM card.  The victim

24   never chased petitioner to retrieve the ATM card.  The struggling

25   and killing of the victim was in self-defense because for some

26   reason unknown to petitioner, they fought and the victim fell

27   and was killed.  The prosecution claimed that petitioner tried to

28   used the ATM card of Mancera.  That is not true.  Like the Mercury

6G

1    News said that the prosecution of Santa Clara County like to fabrica-

2    te evidence to convict people.    The prosecution has an obligation

3    to prove beyond a reasonable doubt that petitioner killed the

4    victim for the whole purpose to take the ATM card.   in this case

5    the prosecution had failed to prove the above.

6       Maria Mancera A.K.A John Mancera's blood alcohol level had

7    been determined to be. .22.  (RT 280-281.)  The blood alcohol

8    level of .22% indicated to Chief Medical Examiner Gregory Schmunk

9    that Mancera had consumed approximately 10 drinks within a few

10   hours of her death.  (RT 219.)  Such a blood alcohol level would

11   result in signs of gross intoxication, such as slurre speech and

12   loss of balance with difficulty standing and walking.  (RT 273-274,

13   282-283.)  Mr. Schmunk noted that between 11:10 a.m. and 12:20

14   p.m. on August 20, Mancera's body was in full rigor mortis,

15   meaning that she had died approximately six to eight hours earlier.

16   (RT 213.)  The level of lividity present at the same time was

17   not fixed, as would be expected eight to 12 hours after death.

18   (CT 215-216.)  Mr. Schmunk indicated that many of the injuries

19   were consistent with a fall of 27 to 31 feet.  (RT 204.) Mr.

20   Schmunk opined that Mancera was alive at the time of the fall

21   based on the large amount of blood on the track and inside the

22   body.  (RT 205.)  In addition, the arm fracture had some-tissue

23   swelling which would not have occurred without blood pressure.

24   (RT 205-206.)  Other factors which led Schmunk  to believe that

25   Mancera was alive before hitting the ground were bleeding on the

26   surface of the brain, in the deep chest, at the rib fractures,

27   and in the abdominal cavity.  (RT 206.)

28       On May 7, 2002, testimony began.  (CT 121.)  On May 8, 2002,

6H

1    the parties entered into four stipulations: that a blood sample

2    was properly drawn from petitioner and accurately analyzed by

3    the Santa Clara County Crime Laboratory and was determined to be

4    positive of "BE"; that a blood sample was properly drawn from

5    the body of Mancera, accurately analyzed by the Santa Clara County

6    Crime Laboratory, and was positive for both cocaine and alcohol,

7    the blood alcohol level being measured at .22%; that Mancera's

8    bank records were admissible; and that on August 20, 2001 at

9    12:48 a.m., Mancera's ATM card was used at an automatic teller

10   machine at the Union Bank in San Jose, and at 12:55 a.m. at the

11   Bank of America-Hester Branch in San Jose, that the video tapes

12   taken during each transaction accurately reflected the transaction,

13   and that photograph were accurately made from the video taken

14   during the transaction.  (CT 124.)

15       At approximately 11:15 p.m. on August 19, 2001, San Jose

16   Police Officer Joaquin Barreto was on foot patrol in the area

17   of the Alameda and Hedding Street.  (RT 129-130.)  He and his

18   partner, Officer Keith Neumer, were standing on the Alameda at

19   Sunol Street when they saw petitioner and Maria Mancera walking

20   on the Alameda.  (RT 132, 150.)  They seemed to be "ambling along"

21   with no specific direccion.  (RT 132.)

22       Barreto approached the pair and asked them what they were

23   doing.  (RT 133.)  Mancera replied that they were looking for

24   an ATM machine, and pulled an ATM card out of the purse she was

25   carrying.  (RT 133.)  Barreto observed that the card was

26   emblazoned with the name "Maria Mancera."  (RT 134.)  It was

27   obvious to Barreto that Mancera was a man presenting himself as

28   a woman.  (RT 135-136, 144-145.)  She did not have any injuries

1    and appeared to have all of her teeth. (RT 138, 145.) Her hands
2    were dirty. (RT 146.) Mancera and petitioner appeared to be
3    friendly with each other. (RT 136.) .

4    　　While speaking to them, Barreto believed they were both under
5    the influence of alcohol. (RT 134-144.) He based this upon the
6    fact that there was an odor of alcohol on them, their eyes were
7    watery and bloodshot, and they were somewhat unsteady on their
8    feet. (RT 135.) Neumer also smelled alcohol, and recalled that
9    they admitted they had been drinking. (RT 154.) They also had
10   delated pupils, which Barreto knew was a sympton of stimulant use.
11   (RT 144.) Barreto did not see anything that he immediately
12   recognized as symptoms of cocaine use, but it was possible that
13   they were under the influence of cocaine as well. (RT 148.)
14   Barreto thought they were both at about the same level of intoxi-
15   cation. (RT 135.) They did not have trouble communication with
16   him, and their level of intoxication was not severe enough to
17   warrant booking them for being drunk in public or booking into
18   a non-custodial detention facility to sober up. (RT 135.)

19   　　Petitioner's conviction is one of manslaughter. The evidence
20   in this case only proves that two drunkers fought together for
21   not apparent reasons. To convict petitioner for first degree
22   murder is ludicrous because there is no evidence beyond a reaso-
23   nable doubt that petitioner killed Mancera intentionally, with
24   premeditation aforethought. In short the fall of Mancera was no
25   intentional. The evidence that petitioner ran with the ATM card
26   and Mancera chasing petitioner to retrieve the ATM card from
27   petitioner came from the police and the prosecution. The police
28   said that petitioner told them that he ran with the ATM card

6J

1    and that Mancera chased petitioner for the purpose to retrieve

2    the ATM card.  That is ludicrous, because petitioner never told

3    the police the above.  Petitioner fought with Mancera because

4    Mancera attacked petitioner without a reason.  Mancera attacked

5    petitioner because Mancera was under the influence of cocaine and

6    alcohol as petitioner too was.  The police and the prosecution

7    claimed that petitioner took items from the purse of Mancera after

8    she fell to the track below.  The prosecution and the police claims

9    are not true.        Petitioner is only guilty of accidentally

10   killing Mancera when Mancera jumped on petitioner back and

11   petitioner tried to take Mancera from his back and accidentally

12   Mancera fell to the track below.  See Exhibit A at page 9.

13       The police and the prosecution of the Santa Clara County had

14   a custom of working in concert to convict people said the Mercury

15   News.  See Exhibit A at page 3 paragraph 7.

16       The police said in this case that petitioner told them that

17   he fled the scene with the card still in his possession.  The

18   victim chased after the defendant and they began to wrestle.

19   The victim jumped on top of the defendant as she was trying to

20   get her card back, making the defendant hit the guardrail, causing

21   her to let go of the fefendant and fall to the track below.  The

22   defendant went down to check on the victim, panicked and left

23   the scene without calling 911.  Please see Exhibit A at page 9.

24   The last paragraph is a pure fabrication of the police and the

25   prosecution because petitioner never said what the last paragraph

26   said.  These people are very experienced and they knew that

27   petitioner can be convicted of first degree murder if the victim

28   died while she was trying to retrieve the ATM card even thought

6K

1   the victim died during the struggling.

2      A review of the interrogation will show that the police and

3   the prosecution of the County of Santa Clara are lying just for

4   the purpose of convicting petitioner to first degree murder.  The

5   statement of petitioner to the police shall be reviewed very

6   closely to clarifying the fabrication of these people.  Petitioner

7   is REQUESTING AN EVIDENTIARY HEARING ON ISSUE ONE TO REVIEW THE

8   STATEMENT OF PETITIONER TO THE POLICE.  And after the evidentiary

9   hearing, petitioner is requesting a reversal of his conviction

10  and sentecing of first degree murder.  Petitioner is only guilty

11  of accidentally killing Mancera, while both of them were under

12  the influence of alcohol and cocaine.  Petitioner's right of

13  the Federal Due Process Clause of the Fourteenth Amendment had

14  been violated.

II.

PETITIONER'S STATEMENT TO THE POLICE WAS USED
INTO EVIDENCE IN VIOLATION OF MIRANDA V. ARIZONA

On May 6, 2002, the trial court ruled that petitioner's state-ments to police had been taken in violation of Miranda v. Arizona, 284 U.S. 436 (1966) and could not be introduced in the prosecution's case in chief. (CT 117; RT 94.)

The trial court gave the order to the prosecution not to use the statements of petitioner to the police. But because is the custom of the prosecution in the County of Santa Clara to ignoring the orders of the judges, the prosecution in this case told the jury that petitioner ran with the ATM card of Mancera, then Mancera chased after petitioner to retrieve her card, and Mancera fell to the truck killing herself. But all because she was trying to have possession of her card. The prosecution's comments were false and a refusal to obey the orders of the judge not to use the statements of petitioner in his case in chief because it was obtained in violation of Miranda.

When petitioner was interviewed by the police, he was under the influence of alcohol and cocaine. The waiver of petitioner's Miranda rights were not voluntary, intelligent, and knowingly made because of petitioner's condition when he was interviewed. The police claimed that petitioner told them that he ran with the ATM card of Mancera. Petitioner does not remember saying that to the police. Is more likely that the police is fabricating the running of petitioner with Mancera's card. After all, the police and the prosecution of Santa Clara County had the custom of working together to convict people even if they are innocent. See what

6M

1   the Mercury News said in Exhibit A at page 3 paragraph 7.

2   Petitioner is not saying the above, the Mercury news says it.

3       When petitioner was interrogated, a blood sample was drawn

4   from him.  (RT 270.)  A test indicated the presence of cacaine

5   metabolite, meaning he had most likely ingested cocaine more than

6   six hours earlier.  (RT 270, 276-277.)  This is evidence that

7   petitioner was under the influence of cocaine and alcohol when

8   he was interviewed by the police.

9       The police and the prosecutoon kept saying that petitioner

10  told the police that he ran with the card of Mancera, then Mancera

11  chased after petitioner to retrieve the card, then both fought and

12  in the process, Mancera fell the track below and killed herself.

13  Well if petitioner told the police that he ran with the card of

14  Mancera, petitioner is requesting an examination of the Original

15  tape of the recorded statement to the police that petitioner made.

16  If what the police and the prosecution claimed is true, the

17  original tape of petitioner's statement to the police should

18  reflect this.  But petitioner is requesting an expert to examine

19  the tape recorded of the original tape of his statements to the

20  police.  The reason petitioner is requesting the service of an

21  expert to examine the original tape of his statements is because

22  the police and the prosecution are inventing that petitioner told

23  them that he ran with the card of Mancera and then Mancera chased

24  him.  That is false.  Petitioner does not remember saying that

25  to the police.

26      If an expert on cassette says that the original tape of

27  petitioner's statements to the police says that petitioner says

28  in the recorded statements that he ran with the card of Mancera

1    and Mancera chased after him to retrieve her card. Then petitioner
2    will accept the expert findings. But if not expert on cassettes
3    examine the original tape of the statements recorded of petitioner's
4    statements to the police, petitioner will not accept that he ran
5    with the card of Mancera and Mancera chased after him to retrieve
6    the card. Petitioner fought with Mancera because both were drunk
7    or under the influence of cocaine and alcohol. Petitioner never
8    ran with the card of Mancera. The police and the prosecution are
9    inventing this story.

10    The reason petitioner is requesting the service of an expert
11    on cassette is because petitioner wants to challenge the authenti-
12    city of the original tape recorded of his statements to the police.
13    The Mercury News says that the Santa Clara County police and the
14    prosecution work in concert to convict people that are innocent.
15    Like indicated above, is the position of petitioner that he never
16    told the police that he ran with the card of Mancera. The police
17    is not been candid.

18    If any part in the case in chief was used by the prosecution,
19    petitioner's conviction then should be reversed because the trial
20    court found that petitioner's statements violated his Miranda
21    rights. Petitioner did not testify. Then any part of his state-
22    ment that was used was a violation of his Fifth Amendment.

23    The people bear the burden of proving by a preponderance of
24    evidence that a defendant's custodial statement complied with
25    Miranda. (Colorado v. Connelly, (1986) 479 U.S. 157, 168-169
26    [107 S.Ct. 515, 93 L.Ed.2d 473].

27    Criminal defendants undergoing custodial interrogations by
28    the police must be advised of their constitutional right to

6'0'

1  remain silent, have an attorney present during the interrogation,
2  have an attorney appointed if the defendant is indigent, and of
3  the state's ability to use incriminating statements against them.
4  (Stansbury v. California,(1994) 511 U.S. 318, 321 [114 S.Ct. 1526,
5  128 L.Ed.2d 293]; Miranda v. Arizona, 384 U.S. 436, 444 (1966);
6  People v. Aguilera, (1996) 51 Cal.App.4th 1151, 1161.)  Unless
7  the defendant waives these constitutional rights, any statements
8  obtained during a custodial interrogation are inadmissible to
9  establish a defendant's guilty.  (Michigan v. Tucker, (1974) 417
10  U.S. 433, 444, 446 [94 S.Ct. 2357, 41 L.Ed.2d 182]; Miranda v.
11  Arizona, supra, 384 U.S. at p. 444; People v. Aguilera supra,
12  51 Cal.4th at p. 1161; People v. Clair, (1992) 2 Cal.4th 629,
13  678..)

14      This case is being done without any aid from the trial
15  transcripts.  It been done just with the aid of Appellant's
16  Opening Brief that was sent by Appellate Counsel on 9/12/06  See
17  Exhibit A pages 15-16.

18      PETITIONER REQUESTS AN EXPERT ON CASSETTE, AND AN EVIDENTIARY
19  HEARING ON ISSUE TWO.  Petitioner also is requesting a reversal
20  of his conviction.  Petitioner's right under the Fifth Amendment
21  to the United States Constitution had been violated.

III.

**PETITIONER IS REQUESTING A COPY OF
HIS TRIAL TRANSCRIPTS.**

A Jailhouse Lawyer, whose name is not available right now, but will be provided in the future, was doing the case of petitioner. The Jailhouse Lawyer went to the hole (SHU). Petitioner did an appeal (602) requesting to the authorities to retrieve his trial transcripts from the Jailhouse Lawyer. The appeal (602) was responded and petitioner was told that he should have done the appeal (602) within 15 days from the day the Jail-house Lawyer went to the hole.

This prison should not have refused to retrieve the trial transcripts from the Jailhouse Lawyer because they are very vital to petitioner. Now petitioner is doing this case without the trial transcripts. Petitioner received the Appellant's Opening Brief from his appellate counsel on September 12, 2006. Please see Exhibit A at page 16. On July 23, 2006 petitioner requested a copy of his trial transcripts to Ms. Lori A. Quick (Appellate Counsel) Please see Exhibit A at page 15. Like petitioner is saying in his letter that he needs a copy of the trial transcripts because a Jailhouse Lawyer have them and the Jailhouse Lawyer informed petitioner that the trial transcripts were taken from him and thrown away when he (Jailhouse Lawyer) went to the hole.

If petitioner does not have his trial transcripts is the fault of High Desert State Prison because it thrown them away. The High Desert State Prison's Warden, Thomas Felker is an arm or branch of the Government of the State of California. Therefore this Court should provide a copy of the trial transcripts to

1    petitioner.

2        In King v. Bell, 378 F.3d 550 (6th Cir. 2004) the United

3    States Court of Appeals for the Sixth Circuit ordered an evidentiary

4    hearing because the government delayed in providing petitioner

5    with the trial transcripts.  See also Keenan v. Bagley, 400 F.3d

6    421 (6th Cir. 2005)

7        In Holloway v. Roe, 31 Fed.Appx. 376, 377 (9th Cir. 2002)

8    Holloway his Jailhouse Lawyer died, he did not prepare a timely

9    petition because, his (Holloway') Jailhouse Lawyer had all the

10   files and records.  The United States Court of Appeals for the Ninth

11   Circuit  remand     for further development of the record and

12   consideration of the equitable tolling claim in view of the record.

13   See Whalem/Hunt v. Early, 233 F.3d 1146, 1148 (9th Cir. 2000)

14   (en banc) (remand appropriate where there are "circumstances

15   consistent with petitioner's petition and declaration under which

16   he would be entitled to a finding of . . . . equitable tolling.")

17       Morrison contends that the district court erred by not granting

18   him equitable tolling for the period during which he was incarce-

19   rated outside of Montana and denied access to necessary materials.

20   See Miles v. Prunty, 187 F.3d 1104, 1105, 1107 (9th Cir. 1999)

21   (concluding that when external forces rather than the petitioner's

22   lack of deligence, account for the failure to file a timely claim,

23   equitable tolling may be appropriate).  Because the district

24   court did not have the benefit of our en banc decision in

25   Whalem/Hunt v. Early, 233 F.3d 1146 (9th Cir. 2000) (en banc)

26   (per curiam), and no evidentiary hearing was held, we reversed

27   and remand to the district court for appropriate development of

28   the record and factual findings.  Id. at 1148. (determining that

6R

1  where it cannot be said that there are no circumstance consistent

2  with petitioner's petition and declaration under which he would

3  be entitled to equitable tolling, reversal is proper). Morrison

4  v. Mahoney, 31 Fed.Appx. 389, 390 (9th Cir. 2002).

5       If this Court fails to provide the trial transcripts to

6  petitioner, he will be entitled to submit another petition in the

7  future after petitioner gets the transcripts. This Court should

8  provide the trial transcripts to petitioner now to prevent that

9  the tax payers resources be spent unnecessary in the future.

10 Petitioner has been raised the present issues without the trial

11 transcripts and due to that, the issues are not properly done.

12 **PETITIONER IS REQUESTING AN EVIDENTIARY HEARING ON THIS ISSUE**

13 **THREE.** After it, petitioner is requesting a reversal of his

14 conviction because his Fourteenth Amendment right to transcript

15 had been violated by the Warden Thomas Felker when his subordinates

16 took and threw away the trial transcripts of petitioner that were

17 in possession of petitioner's Jailhouse Lawyer.

18

19

20

21

22

23

24

25

26

27

28

6S

IV.

PETITIONER WAS DENIED HIS
PRESENCE DURING THE READBACK.

On May 14, 2002, 9:39 A.M. Not reported- The Jury informs
the deputy that they have a question.  The Court is notified.
The Court instructs the deputy to enter the deliberation room and
ask the jury to be more specific as to the question.

9:50 a.m. Not reported- the jury inform the deputy that they
have specified the area requested.  The court and counsel are
notified.

10:23      not reported the jury informs the deputy that
they have another question.  The court and counsel are notified.

10:38 a.m. not reported, Cindy Mohr, enters the deliberation
room to do the readback requested by the jury and to provide the
written answer to the second question requested.

10:40 a.m. not reported the reporter leaves the deliberation
room after completing the readback.  The jury continue delibera-
ting.

11:01 a.m. Court is in session with both counsel present.
the Court reviews the first question received from the jury this
morning.  Defense Attorney Gillan is heard regarding his odjection.
the People are heard briefly.

11:04 a.m. The court reads the second question received
and reads the answer which was provided to the jury.  **Defense
counsel Gillan waives the defendant's presence.**  Both counsel
stipulate that the reporter may enter the deliberation room for
readback.  See (CT 193.)

Defendant has a constitutional right to be present at all

6T

1    stages of the trial where his absence might frustrate the fairness

2    of the proceedings-Cohen v. Senkowski, 290 F.3d 485; see also

3    Rushen v. Spain, 464 U.S. 114 (1983) 2005 L.W. 1728, 6/7/05.

4        Petitioner did not waive his presence.  Therefore, his convic-

5    tion should be reversed.  **PETITIONER IS REQUESTING AN EVIDENTIARY**

6    **HEARING ON ISSUE SIX.**  Petitioner's right under the Sixth Amend-

7    ment has been violated.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

V.

## TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE
## BY FAILING TO PRESENT THE DEFENSE OF SELF-DEFENSE.

Maria Mancera A.K.A John Mancera's blood alcohol level had been determined to be .22%. (RT 280-281.)  The blood alcohol level of .22% indicated Chief Medical Examiner Gregory Schmunk that Mancera had consumed approximately 10 drinks within a few hours of her death.  (RT 219.)  Such a blood alcohol level would result of signs of gross intoxication, such as slurs speech and loss of balance with difficulty standing and walking.  (RT 273-274, 282-283.)

Officer Barreto on the day of the incident spoke with Mancera and petitioner.  Barreto believed that Mancera and petitioner were both under the influence of alcohol.  (RT 134-144.)  He based this upon the fact that there was an odor of alcohol on them, their eyes were watery and bloodshot, and they were somewhat unsteady on their feet.  (RT 135.)  Officer Neumer also smelled alcahol, and recalled that they admitted they had been driking.  (RT 154.)  They also had delated pupils, which Barreto knew was a sympton of stimulant use.  (RT 144.)  Barreto did not see anything that he immediately recognized as symptons of cocaine use, but it was possible that they were under the influence of cocaine as well.  (RT 148.)  Barreto thought they were both at about the same level of intoxication.  (RT 135.)

Petitioner fought with Mancera after she jumped on petitioner for no apparent reasons.  Mancera fought with petitioner because she was under the influence of alcohol and cocaine.  At no time petitioner tried to run with the ATM card of Mancera as the

1    police and prosecution claimed.  Was the position of the prosecu-
2    tion that Mancera was killed when she was trying to retrieve her
3    card from petitioner when petitioner was running with it.  That
4    is a pure fabrication that Mancera was chasing after petitioner
5    for her card.

6        Petitioner told trial counsel that he fought with Mancera
7    for no apparent reasons.  Petitioner told trial counsel that
8    during the struggling Mancera fell the track down and killed
9    herself during the fall.  Trial counsel refused to argue that
10   petitioner had killed Mancera in the heat of passion, and that
11   the charged offense is a pure manslaughter.  If trial counsel
12   would have used the defense of self-defense, the result of the
13   proceeding would have been different.

14       In In re Hall, 30 Cal.3d 408, 179 Cal.Rptr. 223.  (Defendant
15   was denied competent counsel by failing to prepare case)  Court
16   granted defendant's habeas corpus petition because of a combina-
17   tion of newly discovered evidence and trial counsel's failure to
18   adequately prepare the defense.  Court went to considerable
19   length in detailings the failings of defense to properly prepare
20   and investigate the defense of the case.

21       Thelen has been granted a certificate of appealability by the
22   United States Court of Appeals for the Sixth Circuit to seek
23   review of the issue of whether his trial counsel rendered
24   ineffective assistance by failing to object to the use of a 1986
25   Oklahoma deferred sentence which occurred more than ten years
26   prior to the commencement of the instant offense as a predicate to
27   a career offender enhancement.  Thelen v. United States, 131 Fed.
28   Appx. 61-63 (6th Cir. 2005).

1    Deferential standard of review applies to ineffective assis-

2    tance claims.  A defendant must show that counsel's representation

3    was so "thoroughly ineffective that defeat was 'snatched from

4    the jaws of victory.'"  West v. Seabold, 73 F.3d 81, 84 (6th Cir.

5    1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th

6    Cir. 1992) (en banc).

7    Inexperience and inattention can be enough to constitute

8    constitutional deficient performance.  Grevley v. Mills, 87 F.3d

9    779, 786 (6th Cir, 1996).

10    Petitioner's conviction should be reversed.  **PETITIONER IS**

11    **REQUESTING AN EVIDENTIARY HEARING ON ISSUE FIVE.**  Petitioner's

12    right under the Sixth Amendment had been violated.

6X

1      **A.    Trial Counsel Prevented Petitioner From Testifying.**

2

3          If petitioner would have been let to testifying, he would

4      have told the jury that Mancera never chased after him to try to

5      retrieve his ATM card.  Petitioner  would have told the jury that

6      because both were under the influence of cocaine and alcohol, they

7      fought for no apparent reasons.  Petitioner would have told the

8      jury that he never told the interrogation officers that he ran

9      with the card of Mancera and that police invented the story that

10     petitioner ran with the card of Mancera.  Petitioner would have

11     told the jury that Mancera and him started the fight over the

12     track and then accidentally, Mancera fell below the track.

13         Trial counsel told petitioner that he was no let him to

14     testify because petitioner was going to be impeached with his

15     priors if he testify.  Petitioner told trial counsel that he wanted

16     to testify even though he could be impeached with his priors.

17         The constitutional right to testify is found in the Due Process

18     Clause, the Fifth Amendment's guarantee against compelled testimony,

19     and the Sixth Amendment.  Rock v. Arkansas, 483 U.S. 44, 51-53,

20     107 S.Ct. 2704, 2708-10, 97 L.Ed.2d 37 (1987).  Quoting United

21     States v. Moreno, 102 F.3d 994, 998 (9th Cir. 1986); see also

22     Nicholas v. Batler, (1990) 917 F.2d 518; United States v. Teague,

23     908 F.2d 488 (11th Cir. 1990).

24         Petitioner's conviction should be reversed.  **PETITIONER IS**

25     **REQUESTING AN EVIDENTIARY HEARING ON ISSUE V(A).**    Petitioner

26     has been denied his Fifth and Sixth Amendments of the United

27     States Constitution.

28

                              6Y

B.    Failure To Request Jury Instruction of the
defense of Self-Defense.

In U.S. v. Span, 75 F.3d 1383 (9th Cir. 1996) (Counsel's failure
to request instructions on viable defense theory denies defendant
right to effective counsel). Defendants were charged and convicted
of assaulting federal marshalls. Although counsel had requested
jury instructions covering the affirmative defense of self-defense
and mistake of fact, and privilege to resist an unlawfull arrest,
he neglected to see instructions on the theory that a person has
a right to resist an officer who is using excessive force.
Court here found that counsel's failure to seek instructions on
this theory which given the evidence, was defendants' only viable
defense and one that had a strong likely of success, was ineffecti-
ve assistance of counsel.

In the present case, trial counsel neglected to seek instruc-
tions on the theory that Mr. Uvalles has a right to resist the
attack of Mancera who was using excessive force against petitioner.

Gregory Schmunk is the Chief Medical Examiner and Coroner
for Santa Clara County who is an expert in the area of forensic
pathology and wound recognition. (RT 196-198.) He performed an
autopsy on Mancera's body during which he discovered that Mancera
was in fact a man. (RT 198-199.) Mancera's blood alcohol level
had been determined to be .22. (RT 280-281.) The blood alcohol
level of .22% indicated to Schmunk that Mancera had consumed
approximately 10 drinks within a few hours. (RT 219.) Such a
blood alcohol level would result in signs of gross intoxication,
such as slurred speech and loss of balance with difficulty

1   standing and walking. (RT 273-274, 282-283.) He noted that

2   between 11:10 a.m. and 12:20 p.m. on August 20, Mancera's body

3   was in full rigor mortis, meaning that she had died approximately

4   six to eight hours earlier. (RT 213.) The level of livility

5   present at the same time was not fixed, as would be expected

6   eight to 12 hours after death. (RT 215-216.)

7       Mancera was a man, He must have been violent because for no

8   reason attacked petitioner. Maybe Mancera was violent due to

9   the amount of alcohol and cocaine in his system. Trial counsel

10  never investigated Mancera for any pattern of violence. Mancera

11  was a violent person and due to that he attacked petitioner. Or

12  like petitioner indicated above, maybe the alcohol and the cocaine

13  made Mancera to be violent. The only thing petitioner can say

14  is that Mancera attacked him and he defended himself. And trial

15  counsel would have requested the instruction that petitioner had

16  a right to defend the attack of Mancera. Also trial counsel

17  would have requested the instruction of the defense of self-defen-

18  se. Because he failed to do so. He was ineffective.

19      Petitioner's conviction should be reversed. **PETITIONER IS**

20  **REQUESTING AN EVIDENTIARY HEARING ON ISSUE FIVE(B).** Petitioner's

21  rights under the Sixth Amendment to the United States Constitu-

22  tion had been violated.

23

24

25

26

27

28

6AA

VI.

APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE

If this Court finds any issue raised in this petition merito-
rious, them this Court will find that appellate counsel was
ineffective by failing to raise the meritorious issue that this
Court finds that have merits.

In evaluating a claim of ineffective assistance of appellate
counsel, we look to the analysis established by the United States
Supreme Court in Strickland v. Washington, 466 U.S. 668, 688 104
S.Ct. 2052, 80 L.Ed.2d 674 (1984). See also Willis v. Smith,
351 F.3d 741, 745 (6th Cir. 2003). The Strickland involves two
prongs: the "performance prong," where a petitioner is required
to show that her attorney's representation "fell below an objective
standard of reasonableness," Id, and the "prejudiced prong,"
which requires the petitioner to demonstrate that there exists
"a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different,"
id, (emphasis added). Ballard v. United States, 400 F.3d 404,
407 (6th Cir. 2005).

The question presented here is whether an appellate counsel
prejudices a client where the attorney fails to raise on appeal
a [meritorious] claim. We answer in the affirmative, because
but for the appellate counsel's ineffectiveness, there is a
reasonable probability that the result of the [] appeal may have
been different. Cover v. Straub, 349 F.3d 340, 349-50 (6th Cir.
2003). Quoting Ballard v. United States, supra, 400 F.3d 404,
409 (6th Cir. 2005).

6BB

1     A showing that a defendant received ineffective assistance of

2  counsel will establish cause excusing a procedural default.

3  Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 379

4  (1986) quoting Ellis v. Hargett, 303 F.3d 1183, 1186 (10th Cir.

5  2002).

6     Petitioner's conviction should be reversed.  **PETITIONER IS**

7  **REQUESTING AN EVIDENTIARY HEARING ON ISSUE EIGHT**.  Petitioner's

8  right under the Sixth and Fourteenth Amendments have been denied.

10. Supporting cases, if any. List by name and citation only, the cases which you think are close factually to yours so that it is an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

SEE PAGES 6A THROUGH PAGE 6CC

---

---

---

---

---

**PART D - ATTORNEY INFORMATION**

11. Give the name and address of each attorney who represented you in the following proceedings:

(a) Arraignment  Not available

(b) At preliminary hearing  Not available

(c) At time of plea  Not available

(d) At trial  Charlie Gillan PD 120 West Mission St. San Jose, CA 95110

(e) At sentencing  Same as above mentioned

(f) On appeal  Lori A. Quick 100 N. Winchester Blvd. #310 Santa Clara, CA 95050

(g) Other post-conviction proceeding  Jailhouse Lawyers help me with

my case before and now.

12. Was the attorney hired by you or your family?  Yes ____  No  x

   Appointed by the Court?  Yes ____  No  x

   Are you alleging as one ground for relief that your attorney gave you ineffective legal assistance? If so, who and at what stage?

Trial counsel and appellate counsel rendered ineffective assistance

13. If you did not have an attorney represent you, did you represent yourself?  Yes ____  No  x

   With consent of the Court?  Yes ____  No  x

14. Are you represented by an attorney in this petition?
                                        Yes ____ No  x

7

If you answered "Yes" give name and address of your attorney

Not applicable

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

Executed at _H. D. S. P._____ Dated: _Feb. 11, 2007_

_Raul Uvalles_
Signature of Petitioner

## FORMA PAUPERIS AFFIDAVIT
### (See Instructions Attached to This Form)

I hereby apply for leave to proceed with this habeas corpus petition without prepayment of fees or costs or security therefor. In support of my application, I state that the following facts are true:

(1)  I am the petitioner in said petition, and I believe I am entitled to redress.

(2)  I am unable to pay the costs of said action or give security because:

Signature of Petitioner
(Sign here only if you seek to proceed without payment of fees)

STATE OF _____ )

COUNTY OF _____ )

I declare under penalty of perjury that the foregoing is true and correct.

Signed on _____
                  (Date)

Signature of Petitioner

8

EXHIBIT A

Review of more than 700    \als finds problems throughout the ju    system    Page 1 of 9

Posted on Sun, Jan. 22, 2006

**FIRST OF FIVE PARTS**

## Review of more than 700 appeals finds problems throughout the justice system

**By Fredric N. Tulsky**
**Mercury News**

The Santa Clara County criminal justice system failed Miguel Sermeno.

Sermeno was arrested on felony hit-and-run charges after walking the half-block from his house to the scene of an accident. An overzealous deputy district attorney ignored evidence that pointed to a more likely suspect, instead winning a wrongful conviction.

The system failed Bobby Herrera.

Herrera pleaded guilty to assault for a shooting he did not commit, buckling to pressure from an incompetent lawyer who bled his family for thousands of dollars but never investigated the case. Even after the key witness admitted she falsely accused him, indifferent state appellate court justices let his five-year prison sentence stand without explanation.

The system failed Frederick Brown. Brown was sentenced to 26 years to life for possessing stolen property, after he hauled away a truck that had been stripped of parts as it sat idly near his home for a year. The trial judge refused to instruct the jury on a key point of law: Brown was not guilty if he believed the truck was abandoned.

The three cases are among hundreds examined in an unprecedented three-year Mercury News investigation of the Santa Clara County criminal justice system that shows a disturbing truth:

A dramatic number of cases were infected with errors by prosecutors, defense attorneys and judges, and those errors were routinely tolerated. In dozens of cases, the errors robbed defendants of their right to a fair trial. And in a small number of the very worst cases, they led people to be wrongly convicted.

The study reveals ``a basic truth about how the criminal justice system operates," said Laurie Levenson, a former federal prosecutor who teaches criminal law and ethics at Loyola Law School in Los Angeles. Levenson was one of seven experts in criminal procedures and ethics who reviewed the Mercury News findings. ``A lot of sausage gets pushed through that machine. Errors that help the prosecution are common. The uneven nature of criminal justice is a serious concern."

The Mercury News began its investigation in late 2002, as concerns emerged about the quality of justice in a series of high-profile cases. To test how the system worked more broadly, the newspaper reviewed the records of five years of criminal jury trial appeals decided by the California 6th District Court of Appeal -- 727 cases in all. In addition, the newspaper uncovered about 200 cases of questionable conduct that were not part of the study period, by reviewing files and interviewing lawyers.

The result is an unparalleled look at the extent, nature and impact of errors in a criminal justice system.

The review established that in 261 of the appellate cases reviewed -- more than one in every three of the total -- the criminal trial had been marred by questionable conduct that worked against the defendant. In only about one in 20 cases did the defendant win meaningful relief -- either a new trial or a significantly reduced sentence -- from higher courts.

The problems occurred at every phase of a trial, and in every part of the system.

• **Prosecutors.** In nearly 100 cases, the prosecution engaged in questionable conduct that bolstered its effort to win convictions, the examination revealed. Some Santa Clara County prosecutors withheld evidence that could have helped defendants, some defied judge's orders and some misled juries during closing arguments.

◀

But they did not act in a vacuum. In an adversary system in which defense attorneys and judges are responsible for guarding against prosecutors' excesses, the newspaper study found, those checks on the system too often fall short.

• **Defense attorneys.** In 100 cases, defense attorneys acted in ways that harmed their clients. In nearly 50 cases, the attorneys failed to take the most basic of measures, from properly investigating their case to presenting the evidence they gathered. Defense attorneys failed in dozens more cases to object as prosecutors or judges engaged in questionable conduct, in effect excusing the mistakes.

• **Trial judges.** In more than 150 cases, judges made missteps or questionable rulings that favored the prosecution. Violating legal precedents, trial judges allowed evidence that unfairly tainted defendants and prohibited evidence that might have supported their defense. Repeatedly, judges failed to properly instruct jurors on legal principles, instead offering direction that made a guilty verdict more likely.

• **The appellate court.** The 6th District Court of Appeal, the primary court of review for Santa Clara County cases, upheld verdicts in more than 100 cases even as it acknowledged errors had occurred. The appellate court simply concluded those errors made no difference in the outcome of the case. Sometimes those conclusions were appropriate, but a review of the appellate record and consultations with experts established that in more than 50 cases the court misstated facts, twisted logic and devised questionable rationales to dismiss the error.

In nearly all the cases, the 6th District designates its opinions as ``not to be published'' -- a distinction that means they are not to be cited as legal authority in subsequent cases, and thus have little relevance beyond the parties to a case. The Mercury News found that higher courts are extremely unlikely to review unpublished opinions, making the 6th District the final word on most criminal trials in Santa Clara County.

The unpublished designation also has served to shield the cases from outside review. Past academic and journalistic studies of criminal justice, here and elsewhere, have examined published opinions, even though they represent a tiny proportion of court decisions. The Mercury News review is unprecedented in its comprehensive analysis of criminal decisions, published and unpublished alike.

State court statistics show the 6th District over time has published a smaller portion of its criminal cases -- 2 percent -- than any other appellate district in the state. The statewide average is 4 percent.

Taken together, the Mercury News findings offer a picture of a system that often turns on its head the presumption that defendants are innocent until proven guilty. Prosecutors, defense attorneys, judges and appellate justices often act in ways that cause defendants' rights to be violated.

The newspaper study points to a ``skewed system that disproportionately bends over backward to help the DA win,'' said Bennett Gershman, a former prosecutor and professor of criminal law at Pace University School of Law who has written on prosecutorial and judicial ethics. ``Admitting and excluding evidence unevenhandedly and overlooking serious errors is not a pretty state of affairs if one is concerned about fair trials. Nor if one is concerned about the appearance of justice.''

Another outside check on the system -- media attention -- also has largely failed. The few defendants with money or connections often can command attention for their complaints against the system. But the overwhelming number of cases in the Mercury News examination, even involving the most serious allegations of error or misconduct, have received scant publicity, if any.

To be sure, the review established that the system usually works. Most of the county's more than 300 criminal jury trials annually are marked by judicial rulings that correctly interpret and administer the law, and prosecutors who faithfully follow court rules and judges' rulings. In most appeals, the justices properly apply the law to the facts before them. And even in cases tainted by error, there is rarely reason to doubt the guilt of those convicted.

But Gershman and other experts say the problems exposed in the Mercury News examination are serious and reflect a nationwide trend in criminal justice. The expansion of the rights of the accused identified with U.S. Supreme Court decisions through the term of Chief Justice Earl Warren in the 1950s and '60s has waned in recent years. The public mood, worried about crime and clamoring for more safety, is reflected in tougher laws and court decisions. Prosecutors and judges who fail to lock up violent criminals do so at their own political peril.

## Defending conduct
### • DA reiterates concern for ethics

It was not possible to compare Santa Clara County directly to other areas, because of the lack of similar studies in any other jurisdiction. But this county has long been conservative on law-and-order issues and prides itself on a remarkably

low crime rate. The district attorney takes an aggressive approach to charging dangerous criminals, statistics show, and enjoys one of the highest conviction rates in the state. Judges in the county dismiss fewer cases than most of their counterparts elsewhere.

District Attorney George Kennedy and his assistants emphasize their concern for ethics and fairness, and say they have taken many steps to ensure that trial deputies care more about justice than about winning convictions at all costs. ``The tenor in the office, for fairness and ethics, is better than anywhere I know,'' Kennedy said.

His top assistant, Karyn Sinunu, reviewed with the Mercury News more than 100 cases in which concerns were raised about the prosecutor's behavior, and conceded that she was troubled by some of the conduct. But she said that in many instances, proper conduct was wrongly criticized, and that in other cases, the problems amounted to nothing more than honest mistakes.

But the Mercury News review uncovered a series of cases that raised more troubling questions about the conduct of prosecutors and whether the district attorney's office is doing enough to curb questionable behavior. While many errors were isolated incidents, others fell into patterns that suggested broader problems. And certain prosecutors engaged in questionable behavior in multiple cases, suggesting either sloppiness or a deliberate disregard for ethical rules. The Mercury News found repeated instances of troubling conduct in the career of one of the county's highest-profile prosecutors, Benjamin Field, including withholding evidence, making misleading arguments at trial and violating judicial orders.

Instances in which prosecutors, defense attorneys or judges err generally have little impact on the outcome of a case -- while any error raises, at least marginally, the likelihood of conviction, few cases go to trial without overwhelming evidence of guilt. But the Mercury News examination shows a number of cases in which the problems seemed to have greater impact.

``The system is built to tolerate errors,'' said Levenson, the former prosecutor. ``One problem is that errors increase the small risk that innocent people can be convicted. And no one can say for sure how often that happens.''

In 2003, two men convicted of Santa Clara County murders were set free amid judicial findings that police or prosecutor misconduct helped convict people who were probably innocent. One involved Glen ``Buddy'' Nickerson, who served 19 years before U.S. District Judge Marilyn Hall Patel overturned his conviction. The second was Quedellis Ricardo ``Ricky'' Walker, who spent nearly 12 years in prison before top prosecutors acknowledged that improper deals with unreliable witnesses had caused an injustice.

The newspaper probe identified several other cases in which doubts about guilt lingered after trials marred by questionable conduct. Some of those convictions were ultimately overturned in subsequent proceedings, although without the public notice the Walker and Nickerson cases drew. In two of those cases, the decision not to retry the defendant occurred as prosecutors reviewed concerns raised by the Mercury News.

After the Walker case, the district attorney's office took several significant steps, including mandatory training of assistants, to re-emphasize the need to be vigilant against wrongful prosecutions.

Kennedy said he has sought to guard against wrongful prosecutions since he took office in 1990. But, he said, the Walker case was a revelation to him. ``I thought before Ricky Walker that it was impossible'' for an innocent defendant to be convicted and lose a motion for a new trial. ``I thought it was impossible. Now I know that it isn't.''

## Worst nightmare
### • Mistakes lead to jail in hit-and-run case

The case against Miguel Sermeno is the system's worst nightmare: A series of misjudgments and mistakes led to the wrongful conviction of a man who was in the wrong place at the wrong time.

The yearlong ordeal began as Sermeno stood among a small crowd around the scene of an East San Jose hit-and-run in August 1995. A group of three bystanders thought he resembled the driver, and told police.

The investigating officer approached a frightened passenger who remained with the hit-and-run vehicle after the driver fled. He told her she could be locked up if she tried to cover up a crime, and asked whether Sermeno was the driver. She said yes, then quickly recanted.

Prosecutor Terence Tighe developed a theory that the passenger was lying to protect Sermeno because of their ``relationship,'' even though there was no indication the two knew each other. Tighe overlooked evidence suggesting the registered owner of the car was the driver who fled, and then withheld information that could have helped the

3

defense find the owner.

The assistant public defender chose not to present testimony from the children who also were in the car -- and who maintained all along that Sermeno was not the driver.

The trial judge refused to accept as evidence a photograph of the registered owner of the car, and rebuffed the public defender's complaints that he had no opportunity to show the picture to the witnesses and ask whether the owner might have been the driver instead.

After Sermeno was convicted for a felony hit-and-run, evidence emerged casting further doubt on Tighe's theory that the passenger was protecting Sermeno and not the far more logical suspect: The car's registered owner, whom she had denied knowing, was the father of her newborn baby.

The prosecution opposed granting Sermeno a new trial nonetheless. His court-appointed appellate attorney, Sheri Cohen, became baffled by the system's unwillingness to recognize her client's innocence. ``When I would go to a party and talk to people about the case, they couldn't believe that this man had been convicted and that officials were fighting to keep him convicted,'' she recalled.

A 6th District panel affirmed the conviction but ordered a hearing to consider the impact of the public defender's failure to call the children in the car as witnesses.

Finally, supervisors in the district attorney's office elected to drop the charges rather than retry Sermeno. By then, more than two years had passed since Sermeno's conviction and he had long since served his eight-month term in jail.

But the district attorney's office never formally acknowledged his innocence. In a recent interview, after hearing a reporter recount the reasons to question Sermeno's guilt, District Attorney Kennedy responded: ``If you have concluded he is innocent, I accept that.''

## Holding back
## • Crucial evidence often withheld from defense

Few cases in the Mercury News' review were as thoroughly twisted by a series of transgressions as Sermeno's. But the review demonstrates that such errors widely infect criminal cases, from before the trial through the appeal.

Perhaps the most contentious area involves the obligations of prosecutors and defense attorneys to exchange evidence promptly before trial, a process called discovery.

These disputes often begin with a complaint from a defense attorney that prosecutors ignored their legal obligation to turn over material needed to prepare the defense case. In dozens of cases reviewed by the Mercury News, judges stepped in to order prosecutors to turn over additional evidence; often they chastised the prosecutors for not being more cooperative.

Discovery issues continue post-trial as well; 25 appellate cases reviewed by the Mercury News involved significant concerns that prosecutors withheld evidence that might have cast doubt on the defendant's guilt. Over and over again, defense attorneys learned only after the case was tried that prosecution witnesses had questionable backgrounds that cast doubt on their credibility; that scientific reports were not as conclusive as juries were led to believe; that there was evidence that someone other than the defendant had committed the crime.

To defense lawyers, such issues are especially troubling for two reasons. They complain there is no way to know the number of cases in which evidence that might have changed the outcome was withheld. And they express distrust about prosecutors' motives, suggesting some evidence is intentionally hidden.

But after reviewing the cases raised by the Mercury News, chief assistant district attorney Sinunu said evidence often was withheld not for nefarious reasons, but because of mistakes or because the prosecutor was not aware of its existence. Kennedy said he believes appellate defense attorneys regularly exaggerate claims of withheld evidence, in a desperate effort to overturn convictions. Kennedy and Sinunu both said that their office policy is to err in favor of turning over evidence and that attorneys who fail to do so are warned about such conduct.

Still, problems persist.

Apolonio Solorio spent five months in jail, accused of a February 2003 robbery at a liquor store in San Jose, after the store owner identified him as one of the culprits. It took defense attorney Andy Gutierrez months, and request after

request, before a clear copy of a store videotape that captured the robbers was turned over. After the tape was digitally enhanced, the deputy district attorney quickly realized Solorio was the wrong man and moved to dismiss the charges.

It might seem an exceptional situation: A defendant's alleged crime is on videotape, and yet his attorney must fight to get this crucial evidence. But it wasn't exceptional for Gutierrez. Five years earlier, a similar thing happened when he represented Shehabeddin Elmarouk, charged with assaulting officers in the Santa Clara County jail.

The videotape that was initially provided showed only an inconclusive portion of the incident. Three weeks before trial, after six months of trying, Gutierrez obtained the full videotape, which showed the corrections officers brutally beating his client. A jury acquitted Elmarouk, who later received $110,000 after suing the county over the incident.

But when evidence of importance to the defense does not surface in a timely way, jurors are left with a misleading picture of the case as they deliberate.

Take the case of Mark Crawford, who had five prior drug-related convictions when he was arrested in January 1998. In his house, police armed with a search warrant found a duffel bag containing methamphetamine under a staircase. They also found drug paraphernalia elsewhere in the house and methamphetamine in Crawford's system.

Only one thing complicated the case. Inside the duffel bag were a motorcycle repair receipt and a traffic ticket, both bearing the name Richard Hara.

The prosecutor, Troy Benson, was undeterred. He called a police sergeant at trial to testify that drug dealers often stash false identity papers with their drugs.

The defense presented no evidence. In his closing argument, defense attorney Eben Kurtzman argued to the jury that the drugs belonged to Hara. Benson rebutted that argument by telling the jury, ``The fact is, you have no evidence that Richard Hara possessed these drugs. The only evidence that you have are two receipts. You have no evidence that Richard Hara ever lived in this house or was ever in this house.''

What Benson never did, he acknowledged to the Mercury News, was conduct inquiries into Hara. Neither did Kurtzman, who, like at least 18 other defense attorneys in cases reviewed by the Mercury News, failed to take simple steps to investigate or prepare for trial. He later said he did not hire an investigator because Crawford had no money for one.

Yet as an appellate attorney discovered after Crawford's conviction, there was plenty of easily obtainable evidence that the drugs may not have been Crawford's.

Witnesses were available to testify that Hara stayed in the apartment and that the duffel bag was his. And at the very time the charges against Crawford were pending, Hara himself was arrested in Santa Clara County for allegedly possessing methamphetamine. Months before Benson would hint to a jury there was no evidence that Hara existed, his office agreed to a deal that sentenced Hara to four months in jail and a required rehabilitation program. Benson said he did not know of Hara's arrest and therefore had no information to provide during discovery.

Asked by the Mercury News to review the case, top officials in the district attorney's office were not perturbed by evidence that Hara existed after all, and offered a new theory of the crime: Hara and Crawford probably were involved in drugs together, so the evidence implicating Hara did not necessarily exonerate Crawford.

To date no court has been willing to say that Crawford was denied a fair trial. He remains in prison, having never had the opportunity to present the evidence on Hara to a jury.

### `Again and again'
### • Frequency, nature of problems worry experts

Withholding evidence is just one of many types of questionable prosecutorial conduct documented by the newspaper review. In 37 cases, prosecutors or their witnesses revealed evidence that the judge had banned from the trial; in more than 40 cases, prosecutors misstated the law, disparaged the defendant or his attorney, or made other sorts of improper statements during closing arguments; in eight cases, prosecutors took advantage of judicial rulings, telling jurors that no evidence existed to support a defense argument when the truth was the judge had prohibited the defense from presenting the evidence.

In more than 50 other cases, judges endorsed the prosecutors' behavior, making the questionable conduct the judges' own responsibility.

Experts who reviewed the Mercury News findings said the number and nature of the issues involving prosecutors suggest that some of the conduct was deliberate -- or at least was not being effectively prevented. Of particular concern was some conduct that occurred in patterns.

``When you see something happening again and again, you have to question if it isn't happening by design," said Gershman, the law professor at Pace.

Prosecutors in nine cases trivialized ``reasonable doubt" in ways that drew criticism from the appellate court. Using strikingly similar analogies, these prosecutors sought to convince juries that it was easy to overcome such doubt, comparing it to the minor doubt one might have about the risk of an accident when driving through a green light, or making a left turn, or getting on an elevator, or boarding an airplane.

In 16 cases, prosecutors or their witnesses revealed to juries that defendants were in custody, or on probation, or on parole, generally despite specific orders from a judge not to do so. Judges typically prohibit evidence that could bias the jury against a defendant when it has no direct connection to the crime.

Sinunu, the chief assistant district attorney, admitted that the improper disclosure of evidence does recur. But, she noted, sometimes it is inadvertent -- lawyers and witnesses on occasion blunder as they try to follow the rulings. And at times, she said, witnesses -- police and victims, especially -- wrongly think they are helping the prosecutor when they blurt out information the jury is not supposed to learn.

But after reviewing the Mercury News findings, University of California-Berkeley law Professor David A. Sklansky, a former federal prosecutor, said the number of such improper revelations seemed high. ``This is the type of thing that prosecutors should be able to stop if they wanted to, by making it clear to witnesses that it will not help and is improper to say."

Asked about Sklansky's conclusion, Kennedy conceded it was ``a fair point."

Another matter of concern, experts said, are cases in which a single prosecutor engages in a series of questionable actions. Such cases suggest, they said, that the deputy district attorney either did not respect ethical boundaries or had, in the heat of the courtroom battle, lost a sense of fair play.

In 2001, Joey Villarreal was charged with possessing methamphetamine for sale after the police found him with a duffel bag of drugs and, when patting him down, a pocketknife. Before trial, Judge Marliese Kim told Deputy District Attorney Sumerle Pfeffer Davis to instruct her witnesses that the knife was not to be mentioned.

Nevertheless, during trial, Davis asked a police officer what he found when he patted down Villarreal. He responded, ``I remember locating a large pocketknife in his pocket."

Away from the jury, Davis told the judge she had failed to advise the officer of the judge's order.

But that was not Davis' only mistake. In a sharply critical ruling, the 6th District also found that Davis had failed to provide to the defense statements by Villarreal at the time of his arrest, and that she overstated, in opening and closing arguments, the amount of methamphetamine in evidence. Even as the appellate panel upheld the verdict, it stated that Davis' ``repeated failures -- to uphold her duties as an officer of the court -- were injurious to the dignity and integrity of our criminal justice system and raise questions about her ability or willingness to adhere to the laws of this state."

Sinunu, the chief assistant district attorney, said that although Davis had erred at trial -- and had received training on courtroom conduct as a result -- officials in her office believed that the 6th District had unfairly exaggerated the error.

## Excusing mistakes
• Appeals court routinely justifies alleged errors

Although the court's language in the Villarreal case was unusually sharp, its conclusion was typical. In a system in which errors can lead to disastrous consequences, the ultimate check on most questionable conduct -- the 6th District Court of Appeal -- routinely excuses it.

The 6th District, which covers Santa Clara, Santa Cruz, Monterey and San Benito counties, was carved more than two decades ago out of the 1st District Court of Appeal, which oversees the rest of the Bay Area. It has long been regarded as the most conservative appellate court overseeing an urban area in California -- a reputation stemming in part from the role of law-and-order Gov. George Deukmejian, a former attorney general, in appointing its first eight justices.

Supervising Assistant District Attorney David Tomkins said he remains convinced of Butler's guilt, despite the court's ruling and the problems with the evidence. Defense attorney Patrick Kelly is no happier.

Although colleagues offered Kelly congratulations on winning freedom for Butler, he told a reporter, ``I feel horrible about it. I believe my client was innocent, and that makes it impossible to feel good about this outcome."

## Refusing to act
### • Court says most errors are too small to matter

The Butler case stands out as one of the rare instances in which the appellate court was concerned enough about the evidence of guilt to overturn the verdict. More commonly, the court concludes the evidence is so overwhelming that whatever errors marred the trial do not matter.

The Mercury News' analysis of five years of appeals showed that in at least 107 instances, the court agreed that a prosecutor, defense attorney or judge had erred, but it called the errors harmless. In 79 other instances, the appellate court said there was no need to determine whether an error had occurred, because it would have been harmless anyway.

The U.S. Supreme Court has made clear that some level of error is acceptable: Defendants are not entitled to perfect trials, an impossible goal, but to fair trials.

But experts note there are dangers when a court routinely upholds convictions in the face of serious errors. For one thing, the appellate court is doing less than it might to discourage misconduct. If the appellate court, for instance, regularly finds that trivializing reasonable doubt is harmless, prosecutors are not necessarily deterred from doing so.

Even worse is the danger that the justices may wrongly assess the impact the errors had on the case. Not only is it difficult to determine how much an error influenced the jury, but justices also may misjudge the strength of the case themselves because of evidence that was excluded or wrongly included.

Nowhere is the court's tendency to shrug off errors more striking than in cases that involved heinous, high-profile crimes, where a reversal might lead to the release of a dangerous criminal.

One powerful example is the appeal of Sonya Daniels, a Milpitas resident whose young son, Jory, starved to death in 1994. The case was shocking, and created outrage in the community.

Daniels was tried along with her husband, Brian. The two were convicted of second-degree murder and sentenced to 15 years to life in prison. But both the trial and appellate courts reacted contemptuously to Sonya Daniels' argument that her role in Jory's death could not be considered without appreciation for her status as a battered wife.

In a three-month trial in 1998, the jury heard a sordid story of child abuse. Jory, 5, weighed 19 pounds at the time of his death and was so thin that the shape of his bones could be seen through his skin.

The jury heard that Jory and his younger brother often complained of being hungry and were sometimes denied food and water as punishment. They also heard that the abuse had a long history -- as an infant, Jory had been removed from his parents because of a fractured skull and leg.

But an equally sordid tale was not told at trial. Sonya Daniels claimed she experienced extreme abuse at the hands of her husband, including rape, sodomy and beatings with a belt. Once, angry over her refusal to have an abortion, she said, Brian Daniels had locked her in a closet and deprived her of food and water for three days.

A 1991 state law encourages judges to admit testimony about Battered Women's Syndrome and its effects on the behavior of victims of domestic violence, but Superior Court Judge Thomas Hastings ruled that law did not apply in this case. He refused to permit a psychotherapist who specialized in family violence to testify that Sonya Daniels had been battered so severely that she was not aware of the danger to her children, and that she lived in fear that made her incapable of protecting them.

In a highly emotional scene, the prosecutor repeatedly asked Sonya Daniels why she failed to protect her son from starvation, knowing she could not mention her claims of abuse. Over and over, Hastings reprimanded her and threatened contempt as she complained that she was not allowed to answer.

Her attorney, James Leininger, continued to complain to Hastings. But Leininger's efforts, which later drew a rebuke from the appellate court for showing ``appalling disrespect" to the judge, failed to persuade Hastings to change his ruling.

But Sonya Daniels' difficulties in presenting her defense were just beginning. After both she and her husband were convicted of second-degree murder, Leininger introduced her parents to another attorney, Brenda Malloy, who Leininger contended would be a good choice for the appeal. She would turn out to be a better choice for Leininger than for Sonya Daniels.

Malloy told her it would cost $25,000 for the appeal, and months later, according to court records, the first $10,000 was countersigned and deposited in Leininger's account.

Malloy filed an appellate brief on Sonya Daniels' behalf that was thoroughly lacking in legal research, offering only the barest indication of past court decisions that would normally be the heart of any appeal. The attorney general, in a rare step, argued that the appeal's discussion of the battered-woman issue was not coherent enough to warrant a response.

Then, on July 21, 2001 -- the day that the case was scheduled for oral argument before a panel of justices -- Malloy failed to show up altogether, and the argument went ahead without Sonya Daniels being represented.

Malloy was out of the country at the time, and was being investigated by the State Bar of California concerning allegations of shoddy representation of other Santa Clara County defendants. She eventually gave up the practice of law, state records show, after the state bar disciplined her as a result of its investigation.

Reached in Ireland, Malloy twice hung up when a reporter asked about the Daniels case. Leininger did not return phone calls.

Sonya Daniels found a new attorney days after the oral argument, but the 6th District would not permit her to file a new brief.

Seven weeks later, the appellate court issued its opinion, one that stands out even for a court that has routinely dismissed appeals. Even as it sharply criticized the work of Leininger and ridiculed the appeal of Malloy, the three-justice panel rejected the idea that better legal work might have made a difference.

The court said it would consider the question of whether Hastings improperly restricted Daniels' defense even though Malloy's brief was below ``the standards of competent appellate counsel,'' because at least she had ``presented some discernible arguments.''

But it rejected other issues Malloy sought to raise, saying her woeful submission did not merit consideration on those issues.

The court went on to endorse Hastings' ruling barring the battered-woman defense, and to affirm the convictions of Brian and Sonya Daniels. Sonya Daniels appealed without success to the California Supreme Court and has now turned to federal court.

The 6th District rulings ``completely distorted the process,'' said Janice Lagerlof, who now represents Sonya Daniels. ``Instead of hearing the issues properly argued, they made up what the arguments should have been, and then answered those arguments. Sonya Daniels was kept from defending herself at trial, and then 6th District denied her the chance to present her case on appeal.''

© 2006 MercuryNews.com and wire service sources. All Rights Reserved.
http://www.mercurynews.com

## APPELLATE SUMMARY SHEET

**APPELLANT'S NAME:**    RAUL UVALLES
**A.K.A.:**

**CO-D:**

**DCA NUMBER:**    H024674A1
**COUNTY:**    SANTA CLARA    **COUNTY #:**  CC121250

**JUDGE:**    Thomas C. Hastings    **TRIAL ATTY:**    Charlie Gillan,
                                                       Public Defender

**MOTIONS:**    Marsden, denied, 6-14-02
**PROCEEDINGS:**    6 day jury trial
**SENTENCE:**    25 years to Life
**CONVICTIONS:**    PC 187(a): First degree murder;
                    PC 211-212.5: Second degree robbery

**ENHANCEMENTS:**

**VOP:**
**STRIKES:**
**CERT OF PC:**

**FACTS:**

On August 19, 2001, San Jose police made contact with the defendant and victim on the Alameda as they were walking, looking for an ATM machine. Both were asked for identification, released and given directions to the closest ATM machine. Approximately eight (8) hours later, police receive a call regarding a dead person at the Bellarmine High School Football Field. Officers recognized the victim as the person they stopped earlier with the defendant. The police go to the defendant's house to make contact.

The defendant gave the police consent to search his residence, and they found in his bedroom the jeans and shoes the defendant wore the night before. The defendant was not truthful when talking to police about his contact with the victim, and the police take the defendant into custody. Laboratory tests conclude that the blood on the defendant's pants and shoes match that of the victim. Video tape from an ATM showed the victim and defendant using the victim's ATM card at Bank of America. The defendant put the victim's ATM card in his pocket after they got money from the ATM.

The defendant told the police that the defendant and victim were later walking on the overpass at Hedding when the victim asked for her ATM card back. The defendant fled the scene with the card still in his possession. The victim chased after the defendant and they began to wrestle. The victim jumped on top of the defendant as she was trying to get her card back, making the defendant hit the guardrail, causing her to let go of the defendant and fall to the track below. The defendant went down to check on the victim, panicked and left the scene without calling 911.

9

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

SUPPLEMENTAL INFORMATION:

None

SUMMARY OF OFFENSE:

The court is familiar with the facts in this case having presided
over the jury trial.

On August 19, 2001, at approximately 11:15 p.m., Officers of the
San Jose police department made contact with victim Maria
Mancera, and the defendant, as they walked westbound on the
Alameda near Sunol.  Both individuals appeared to be under the
influence of alcohol and were asked for identification.  Maria
gave officers her identification and informed them she and the
defendant were looking for an ATM.  The defendant, who was also
asked for his identification, said he was unable to provide it as
his driving privileges had previously been suspended.  He
provided his name and date of birth and informed officers he
lived with his sister on Cleaves Ave.  A field interview card was
completed on the defendant and officers directed them to an ATM
machine located on the Alameda at Pershing.

Less than eight hours later, at 6:30 a.m. on the morning of
August 20, 2001 officers responded to the report of a "person
down" at the Bellarmine High School Football field.  Officers who
responded to the scene recognized victim Maria Mancera from
contact made the night before.  Investigation revealed the
defendant's address and officers subsequently responded to
question him about the victim.

Officers arrived at the defendant's residence and made contact
with him.  Officers requested and received consent to search the
defendant's residence.  Found within the defendant's bedroom was
a pair of pants and shoes owned by the defendant, which later
laboratory tests revealed to have the bloodstains of the victim's
blood on them.  During police questioning the defendant made
several contradictory statements regarding his last contact with
the victim.  The defendant was arrested and booked into the Santa
Clara County Main Jail.

Additional investigation revealed video footage of the victim and
defendant using the victim's ATM card at the Bank of American on
the Alameda at 11:35 p.m. on the evening of August 19th.  In
addition, the defendant was found on video attempting to use the
victim's ATM card at 12:48 a.m. on August 20 at the Union Bank on
the Alameda and then again at 12:55 a.m. on the Bank of America
on Hester Ave.  No monies were dispensed at either location as
the incorrect pin was entered.  The victim's ATM card was found
in a trash can on the Alameda between the Bank of America and the
defendant's house.

202

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

An autopsy conducted report later determined victim Maria Mancera
was born, and remained at time of death, biologically, a male.
The cause of death was determined to be multiple blunt force
trauma caused by the fall from the overpass. Additionally, it
was determined the victim was alive prior to her fall and the
body had been moved from the original point of impact.

STATEMENT OF NEXT OF KIN: (will be present-statement attached)

Correspondence has been sent to the victim(s) family in this case
advising of the date, time, and place of sentencing, the right to
be present and to be heard pursuant to Section 1191.1 and 1191.3
of the Penal Code, as well as requesting information regarding
any losses suffered.

Yvonne Rodriguez, the victim's sister, is the spokesperson for
the family. She reports the murder of her sister has been
extremely difficult for the family and the tragedy was further
compounded by the victim's representation in the media. On the
day her sister was discovered, the newspaper reported that a
man's body had been found. Maria was born biologically a male
but had been living as a transgender female for over twenty
years. Many people in Maria's life including her coworkers,
nieces and nephews were unaware of this and knew her only as
Maria. Ms. Rodriguez and her family were hurt and troubled with
the insensitivity of the media regarding the issue of the
victim's sexual orientation. They have included copies of the
newspaper articles they found offensive in regard to the
reference to the gender of the victim.

Ms. Rodriguez reports all of Maria's funeral expenses were
covered by insurance through Maria's work. The family is seeking
no restitution at this time. With regard to sentencing, she and
the family believe the defendant should be punished to the
fullest extent of the law. A eulogy describing Maria has also
been submitted and attached for the courts review.

DEFENDANT'S STATEMENT:

The defendant was interviewed by the undersigned officer at the
Santa Clara County Main Jail on May 28, 2002. Throughout the
probation interview, the defendant referred to the victim as
"he". For consistency in this report, the victim's name has been
used.

On the evening of the present offense he was walking from his
house downtown, looking for someone to "party" with. While
walking down the Alameda he came upon the victim who was lying
intoxicated in the gutter. He helped Maria up and asked her if
she wanted to "party". Together they got high by smoking
cocaine.

11                                                    203

In the Case of RAUL UVALLES
Info. #: CC121250                                     June 13, 2002

The victim told him they could go together to get money out of
the ATM machine to purchase more cocaine. While walking down the
Alameda, they were stopped by two police officers who directed
them to an ATM machine. He and Maria went to the ATM machine
where Maria withdrew $40. She was too intoxicated to complete
the transaction, so she gave him the card and asked him to
complete the withdrawal. Once completed, he placed the ATM card
in his pocket. The defendant said he then attempted to call his
drug connection but was unable to contact him. After another
attempt to contact his connection, he and Maria began to walk up
the overpass at Hedding. On the top, Maria confronted him and
asked if he her ATM card. The defendant explained that it was at
that moment that he attempted to flee with the card. He does not
know why he was stealing the card, because he did not need the
money. As he was running away from Maria, Maria grabbed his
shirt and when he turned around he threw her to the ground.
Again, he attempted to run, at which time Maria jumped on his
back. As he was trying to remove Maria from his back, he began
knocking her against the guardrail, ultimately causing her to let
go and fall to the track below.

The defendant maintains he immediately ran down to check on
Maria. When he found her, he observed the extent of her
injuries. Prior to leaving, he realized he did not have his
wallet with him and went through Maria's purse in an attempt to
locate it. He did not call an ambulance or attempt to give first
aid to the victim because he got scared and panicked. He
immediately went to get additional money to get high. He
maintains he spent the rest of the evening getting high before
returning home to his house in the morning.

The defendant explained he did not need money when he met Maria
and does not know why he decided to rob her when she requested
her ATM card back. He further explained her death as an accident
and his actions being that of self-defense. He did not
intentionally push her over the bridge and was only trying to
flee with the ATM card when he was attacked physically by the
victim. In addition, he feels terrible for what happened and
would like her family to know he is truly sorry. He believes he
is not guilty of the crime of first degree murder, but rather the
lesser charge of involuntary manslaughter.

With regard to sentencing, the defendant would like the judge to
know he does not believe his attorney provided him a defense and
wishes he had been able to go on the stand and tell his side of
the story. Although he admits to lying to police initially, he
believes had his post Miranda statements been admissible, the
jury would have understood this was not an intentional act. In
addition, he believes the jury was hand selected by the district
attorney and as there were no minorities on the jury, it was not
a jury of his peers. In closing, the defendant would like the
court to know he is not trying to avoid punishment for taking the

In the Case of RAUL UVALLES
Info. #: CC121250                              June 13, 2002

victim's life, but rather the crime he was convicted of is not
the crime he committed.

With regard to substance abuse, the defendant, now age 39, began
the use of alcohol at the age of 12.  By the age of 17 he was
drinking daily.  He continued to drink daily until his arrest for
his involvement in the present offenses.  He began the use of
marijuana also at the age of 12 and by his late teens was using
the substance daily.  He continued to use the substance daily
until his involvement in the present offenses.  He was introduced
to methamphetamines at the age of 21 and used the substance daily
until the age of 37.  He began the use of Heroin at the age of 21
and used the substance daily until the age of 30.  At the time of
the present offense he was using the substance every couple of
months.  He began the use of cocaine at the age of 25 and used
the substance daily until his involvement in the present offense.
The defendant also admits to using PCP, LSD and mushroom in his
twenties.  He estimates his drug habit cost him $500 a month to
support and he did so through legitimate earnings and the sale of
personal property.  The defendant believes his significant
substance abuse contributed to the demise of his marriage as well
as contributed to his involvement in the present offense.

INTERESTED PARTIES:

None

JUDICIAL COUNCIL RULES 4.414, 4.421, 4.423    :  (attached)

CASE EVALUATION:

Appearing before the court for sentencing is 39 year old Raul
Uvalles after being found guilty by jury of Murder in the First
Degree and Robbery in the Second Degree.  The present offense
involves the defendant stealing the victim's ATM card and killing
her.

The defendant admits to robbing the victim and being responsible
for her death.  He describes his actions as self-defense, which
the result of him accidentally knocking her over the railing of
the overpass where she fell to her death.  After committing this
act, the defendant said he went to the victim and rummaged
through her purse rather than attempting to administer first aid
or contact emergency personnel to possibly assist the victim.

The defendant is a divorced father of two who reports steady
employment as a Mover at the time of the offenses.  A review of
his criminal record reveals eleven misdemeanor convictions which
include exhibition of a deadly weapon, battery (2), possession of
controlled substance paraphernalia, being under the influence of
a controlled substance(3), fighting in public, driving under the

13                                              205

In the Case of RAUL UVALLES
Info. #: CC121250                                    June 13, 2002

influence of alcohol causing bodily injury, hit and run resulting
in property damage, and resisting a public officer.

The undersigned recommends probation be denied.  Given the
seriousness of these crimes and their tragic consequences, the
undersigned officer feels the defendant presents a serious threat
to society and is deserving of incarceration for a significant
period of time.  It is felt the sentence being recommended will
serve to adequently punish the defendant and protect the
community.

SUGGESTED TERM:

| CHARGE | MIT | AGG | RANGE | ENHANCEMENTS | TOTAL TERM |
|--------|-----|-----|-------|--------------|------------|
| Ct. 1<br>187 PC | N/A | N/A | 25 years<br>to life | | 25 years to<br>life |
| Ct. 2<br>211-<br>212.5(c)PC | No | No | 2,3,5<br>years | | 3 years c/c |
| | | | | TOTAL TERM: | 25 years to<br>life |

14

**206**

Raul Uvalles, # T59954/81-202
P.O. Box 3030
Susanville, CA 96127-3030

7/23/06

Sixth District Appellate Program
Attn: Lori A. Quick, Attorney
100 N. Winchester Blvd., Ste. 310
Santa Clara, CA 95050

Dear Ms. Quick:

I trust this reaches you in the best of health and
spirits.
While in the possession of a Jailhouse lawyer who was
assisting me on Habeas Corpus, my records on Appeal (all transcripts
and anything that was later augmented) were thrown out by
prison staff. As you served as counsel of record on my 2002,
Santa Clara County Appeal, would it be possible to get another
copy from you or advice on how I would go about doing so?
Thank you.

Sincerely,
Raul Uvl.

15

MAR 10 2003

Dear Mrs. Quick,                                                    3-6-03

I recieved your letter and packet and I want you in fact to
pursue the avennue of the writ of habeas corpus. I strongly believe
that if I had been able to testify it would have brought a whole new
set of jury instructions for the jury to concider and in fact would
have been more favorable out come I also want you to look into
the possibility of inieffective Assistance of Council the reason being
Mr Guillen was told that this was a self defence/accidental
incident and choose not to bring it to the D.A. or the
courts attention I believe this is a direct violation of my
rights to give me a fair trial not presenting all or any evidence
in my behalf I myself told him that I needed to testify
because the evidence against me was overwelming. The judge in
his decision to exculde the tapes of my interview commented on
record that if the tapes were used it was clearly accidental
instead Mr Guillen chose to as he put it punch holes in
the DA's case which obviously resulted in the worst possible
tenord all through the trial evidence to support a accidental/
off Defence from the coraner's initial testimony to the DA's own
expert wittness I don't understand why this is so dificult to see
I would like to be sent the trial transcripst including the maxsden
motion transcrips at sentencing and also I want to know what time
restraints I have. I would appreciate your cooperation and if my
ssumpion of inaffective Assistance of Council is inque please enlighten
me to cause and effect and I will explain more indepth but as
ince I have not gotten any responce from you as to the other
uestions I've asked in previous letters pertaining to this case. I await

SDAP

⚖

**SIXTH DISTRICT
APPELLATE PROGRAM**
100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050

Raul Uvalles
T-59954
High Desert State Prison
P.O. Box 3030
Susanville, CA 96127-3030

First Class Mail

LEGAL MAIL
Attorney - Client
Correspondence

PRIORITY
MAIL
UNITED STATES POSTAL SERVICE ™
www.usps.gov

LABEL 107R, OCT 1997

Case 5:05-cv-02779-RMW    Document 29-4    Filed 04/10/2008    Page 110 of 123
Case 3:05-cv-02779-MJJ    Document 19    Filed 07/25/2007    Page 56 of 61
01/08/2003 17:34 FAX 408 998 8265                                    ☑002

# SIXTH DISTRICT APPELLATE PROGRAM
A Non-Profit Corporation

---

100 N Winchester Blvd., Suite 310                    (408) 241-6171 - Main
Santa Clara, CA 95050                                 (408) 241-2877 - Fax

Executive Director                                    Assistant Director
*Michael A. Kresser*                                  *Dallas Sacher*

Law Office Manager        ·                           Staff Attorneys
*Yolanda G. Edwards*                                  *Lori A. Quick*
                                                      *Vicki I. Firstman*
                                                      *William M. Robinson*
                                                      *Jonathan Grossman*
                                                      *Paul Couenhoven*

October 17, 2002


Charlie Gillan, Esq.
Office of the Public Defender
120 West Mission Street
San Jose, CA 95110

Re: <u>People v. Raul Uvalles</u>
Santa Clara County Superior Court #CC121250
Court of Appeal #H024674

Dear Mr. Gillan,

I was talking to Raul the other day, and he told me that the probation officer's report contained many factual inaccuracies. According to Raul, his story of how the death occurred was very different from what the probation officer put in her report. Raul told me that he wrote his own letter containing his version of events which was given to the court. It is not part of the record on appeal. Raul told me that you would have a copy of the letter. Depending on what the letter says, it could be very important to Raul's appeal. Please send me a copy of the letter as soon as possible. If you don't have a copy, please give me a call so that we can discuss the issue, and I can try to obtain it elsewhere.

Thank you in advance for your anticipated cooperation. Please feel free to contact me if you have any questions.

Sincerely,

Lori A. Quick
Staff Attorney

18

# SIXTH DISTRICT APPELLATE PROGRAM
A Non-Profit Corporation

---

| 100 N Winchester Blvd., Suite 310 | (408) 241-6171 - Main |
| Santa Clara, CA 95050 | (408) 241-2877 - Fax |

Executive Director
*Michael A. Kresser*

Assistant Director
*Dallas Sacher*

Law Office Manager
*Yolanda G. Edwards*

Staff Attorneys
*Lori A. Quick*
*Vicki I. Firstman*
*William M. Robinson*
*Jonathan Grossman*
*Paul Couenhoven*

January 13, 2003

Raul Uvalles
T-59954
High Desert State Prison
P.O. Box 3030
Susanville, CA  96127-3030

Dear Mr. Uvalles,

I am still working on potential issues. I don't believe we will have much to raise on direct appeal, but there may be some issues to raise in a petition for a writ of habeas corpus. One important question if have for you is this. I am very concerned about whether you believed you could testify even if Mr. Gillan didn't want you to. Did he ever tell you that it was your right to testify, no matter what he wanted you to do, and that it was your call to make?

I have reviewed what you told the court at the <u>Marsden</u> hearing, and it's a little confusing. It seems to me that what you told the judge is that Mr. Gillan said "it's your decision." If in fact he told you that it was your decision, then we don't have an issue regarding whether you were deprived of your right to testify on your own behalf. Mr. Gillan told the court that you told him you wanted to testify, that each time you said that, the two of you discussed the issue and decided that it was not in your best interests. However, you still seemed to be saying that you had told Mr. Gillan that you wanted to testify and that he said no.

It is very important that you tell me exactly what happened. When you told him you wanted to testify, did he advise you that you had the right to testify, although he thought that you should not? Or did he make the decision for you, without making sure you understood that it was your call

1

to make?

     Please call me collect or write as soon as possible to let me know exactly what happened. I look forward to hearing from you soon.

Sincerely,

Lori A. Quick
Staff Attorney

2

# SIXTH DISTR..  T APPELLATE PRC .. .AM
A Non-Profit Corporation

_____

100 N. Winchester Blvd., Suite 310                      (408) 241-6171 - Main
Santa Clara, CA 95050                                   (408) 241-2877 - Fax


Executive Director                                      Assistant Director
*Michael A. Kresser*                                    *Dallas  Sacher*

Law Office Manager                                      Staff Attorneys
*Yolanda G. Edwards*                                    *Lori A. Quick*
                         January 9, 2003                *Vicki I. Firstman*
                                                        *William M. Robinson*
                                                        *Jonathan Grossman*
                                                        *Paul Couenhoven*


Charlie Gillan, Esq.
Office of the Public Defender
120 West Mission Street
San Jose, CA  95110


Re: <u>People v. Raul Uvalles</u>
Santa Clara County Superior Court #CC121250
Court of Appeal #H024674


Dear Mr. Gillan,

    I received the FAX you sent the other day. Thank you for providing Raul's letter.

    Having reviewed it, I have determined that I need to review your entire trial file. I would be happy to either have my paralegal come and pick it up, or you can send it to me. Of particular interest is Raul's story to you about how the homicide occurred. I would appreciate it if you would either call me or send in writing, in as much detail as you can, answers to the following questions.

    1.  What was Raul's story **to you** prior to trial and during trial about how the homicide occurred?

    2.  What was it that made you decide to advise him against testifying?

I would very much appreciate the file and answers to the above questions as soon as possible. Thank you in advance for your anticipated cooperation. Please feel free to contact me if you have any questions.

Sincerely,

Lori A. Quick
Staff Attorney


21

Court of Appeal, Sixth Appellate District - No. H030758
**S148301**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re RAUL UVALLES on Habeas Corpus

Petition for review DENIED.

Moreno, J., was absent and did not participate.

SUPREME COURT
**FILED**

JAN 1 7 2007

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE

Chief Justice

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

RAUL UVALLES
_____

**PLAINTIFF or PETITIONER**


v.

**Case Number:** C-05-2779-MJJ (PR)

THOMAS FELKER, Warden,
_____

**Defendant or Respondent**


## PROOF OF SERVICE

_____

I hereby certify that on ___Feb. 11,___ , 20 _07_, I served a copy
of the attached ___PETITION FOR WRIT OF HABEAS CORPUS___ , by  placing a copy in
a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope
in the United States Mail at ___H.D.S.P.___ :

        Mark S. Howell
        Deputy Atttorney General
        455 Golden Gate Ave. Suite 11000
        San Francisco, CA 94102-5969


I declare under penalty of perjury that the foregoing is true and correct.

_Raul Uvalles_
_____

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
      Telephone: (415) 703-5969
8     Fax: (415) 703-1234
      Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13 | **RAUL UVALLES,** | C 05-2779 MJJ (PR) |
14 |                Petitioner, |
15 |        **v.** |
16 | **D.L. RUNNELS, Warden,** |
17 |                Respondent. |
18 

19    **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20

21

22

23

24

25

26

27

28

# EXHIBIT I-2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RAUL UVALLES, | ) | No. C 07-1064 MJJ (PR) |
| Petitioner, | ) | **ORDER OF DISMISSAL;** |
| | ) | **DIRECTING CLERK TO FILE** |
| vs. | ) | **PETITION ON CASE NO. 05-** |
| | ) | **2779 MJJ (PR)** |
| D.L. RUNNELS, | ) | |
| Respondent. | ) | **(Docket No. 3)** |
| | ) | |

On February 21, 2007, this action was opened as a new action when petitioner filed a

pro se habeas corpus petition pursuant to 28 U.S.C. § 2254.  Petitioner included in the

caption of his petition Case No. 05-2779 MJJ, the case number of a prior habeas action filed

by petitioner in this court.  In Case No. 05-2779 MJJ, petitioner was granted a stay while he

exhausted his state court remedies, and was informed that once he did so, and he should file

an amended petition in that case containing his newly exhausted claims and the stay was

lifted.  It appears that petitioner did so with the present petition, but instead of refiling it in

05-2779 MJJ, the Clerk opened a new case.

Accordingly, the Court hereby orders as follows:[1]

1.  The Clerk shall file the petition in this action as an AMENDED PETITION in Case

No. 05-2779 MJJ.

---

[1]Concurrently filed herewith is an order lifting the stay, reopening the case and to
show cause in Case No. 05-2779 MJJ.

N:\MJJ\HC Orders\uvalles.dsm.wpd

I-2

1       2. As there is no need to proceed with a separate and second case for the same

2   petition, the instant action is hereby DISMISSED.

3       3. The application to proceed in forma pauperis is DENIED and no fee is due.

4   This order terminates Docket No. 3.

5   The Clerk shall close the file.

6   IT IS SO ORDERED.

7   DATED: 7/23/2007

8

9                           _____
                            MARTIN J. JENKINS
                            United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

N:\MJJ\HC Orders\uvalles.dsm.wpd            2

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | MARK S. HOWELL
Deputy Attorney General
6 | State Bar No. 95125
   455 Golden Gate Avenue, Suite 11000
7 |  San Francisco, CA 94102-3664
   Telephone: (415) 703-5969
8 |  Fax: (415) 703-1234
   Email: mark.howell@doj.ca.gov
9 | Attorneys for Respondent

10 | IN THE UNITED STATES DISTRICT COURT

11 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 | SAN FRANCISCO DIVISION

13 |

**RAUL UVALLES,**                                     C 05-2779 MJJ (PR)

14 |                                      Petitioner,

15 |            v.

16 | **D.L. RUNNELS, Warden,**

17 |                                     Respondent.

18 |

19 |       **NOTICE OF LODGING AND INDEX OF EXHIBITS IN SUPPORT OF**

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# EXHIBIT J-1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOC...
SAN F...

JUL 3 0 2007

By: 700540/376

**FILED**

JUL 25 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAUL UVALLES,              )   No. C 05-2779 MJJ (PR)
                           )
         Petitioner,       )   **ORDER LIFTING STAY;**
                           )   **REOPENING CASE; TO SHOW**
    vs.                     )   **CAUSE**
                           )
D.L. RUNNELS,              )
                           )
         Respondent.       )
                           )

United States District Court
For the Northern District of California

Petitioner, a California prisoner, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the petition should not be granted based on petitioner's claims of ineffective assistance of counsel. Thereafter, the Court granted respondent's motion to dismiss on the ground that certain of these claims were been exhausted under 28 U.S.C. § 2254(b)-(c), and also granted petitioner's motion for a stay so he could exhaust his unexhausted claims in state court. The Court directed petitioner to, following exhaustion, file an amended petition in this Court. Petitioner did so, but it was inadvertently filed as a new case, see No. 07-1064 MJJ. In an order filed in Case No. 07-1064, and filed concurrently herewith, the Court has directed the Clerk to file the petition in Case No. 07-1064 MJJ as an amended petition in the instant action.

After reviewing said petition, the Court finds it contains cognizable claims, when

G:\PRO-SE\MJJ\HC.05\valles.sc2.wpd

J-1

liberally construed.

Accordingly, the Court hereby orders as follows:

1.     Good cause appearing, the stay is hereby LIFTED.

2.     Respondent shall file with the Court and serve on petitioner, <u>within 90 days of the date this order is filed</u>, an answer conforming in all respects to Rule 5 of the Rules Governing Section 2254 Cases, showing cause why a writ of habeas corpus should not be granted based on the claims set forth in the petition filed on February 21, 2007 in Case No. 07-1064 MJJ (PR).[1]  Respondent shall file with the answer and serve on petitioner a copy of all portions of the state trial record that have been transcribed previously and that are relevant to a determination of the issues presented by the petition.

If petitioner wishes to respond to the answer, he shall do so by filing a traverse with the Court and serving it on respondent within 30 days of his receipt of the answer.

3.     Respondent may file a motion to dismiss on procedural grounds in lieu of an answer, as set forth in the Advisory Committee Notes to Rule 4 of the Rules Governing Section 2254 Cases.  If respondent files such a motion, petitioner shall file with the Court and serve on respondent an opposition or statement of non-opposition within 30 days of receipt of the motion, and respondent shall file with the Court and serve on petitioner a reply within 15 days of receipt of any opposition.

4.     Petitioner is reminded that all communications with the Court must be served on respondent by mailing a true copy of the document to respondent's counsel.

5.     It is petitioner's responsibility to prosecute this case.  Petitioner must keep the Court and respondent informed of any change of address and must comply with the Court's orders in a timely fashion.  Failure to do so may result in the dismissal of this action for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b).

6     Upon a showing of good cause, requests for a reasonable extension of time will be granted as long as they are filed on or before the deadline which they seek to extend.

---

[1] The Court notes that a proof of service attached to said petition indicates it was served upon respondent's attorney, the Attorney General of the State of California.

1    The Clerk shall REOPEN this case.

2        IT IS SO ORDERED.

3  DATED: 7/23/2007

4

5                              MARTIN J. JENKINS
                               United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

G:\PRO-SE\MJJ\HC.05\valles.sc2.wpd                3

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

UVALLES,

            Plaintiff,

v.

RUNNELS et al,

            Defendant.
                                   /

Case Number: CV05-02779 MJJ

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 25, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Mark S. Howell
Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004

Raul Uvalles
High Desert State Prison
Prisoner Id T59954
P.O. Box 3030
Susanville, CA 96127

Dated: July 25, 2007

Edward P. Butler

Richard W. Wieking, Clerk
By: Edward Butler, Deputy Clerk