*E-FILED - 9/16/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL UVALLES, | No. C 05-2779 RMW (PR) |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |
| vs. | |
| WARDEN ROBERT HOREL, | |
| Respondent. | |

Petitioner, a California prisoner proceeding pro se, filed a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition should not be granted. After staying the petition to permit petitioner to exhaust his state claims, the court re-opened this action when petitioner filed his amended petition on July 25, 2007. Respondent filed an answer and a supporting memorandum of points and authorities addressing the merits of the amended petition. Petitioner filed a traverse.[1] Having reviewed the papers and the underlying record, the court concludes that petitioner is not entitled to habeas corpus relief and will deny the amended petition.

## BACKGROUND

The evidence at trial showed that on August 19, 2001, around 11:15 p.m., San Jose Police

---

[1] Petitioner's application for leave to file an oversized brief is GRANTED. Petitioner's request for an evidentiary hearing is DENIED as unnecessary.

Officer Joaquin Barreto was on foot patrol with his partner when they came upon petitioner and Maria Mancera, the victim, walking along. (RT 132, 150.) Barreto asked what they were doing, and Mancera said that they were looking for an ATM machine. (RT 133.) Barreto believed that both petitioner and Mancera were intoxicated based on their demeanor, smell, and the fact that both admitted they had been drinking. (RT 134, 135, 154.) Baretto also recalled that they had dilated pupils, which is often an indication of stimulant use. (RT 144.) Even though intoxicated, Barreto did not believe that their level of intoxication was such that he needed to arrest them for being drunk in public. (RT 135.)

Barreto conducted records checks on both petitioner and Mancera and filled out a field identification card for petitioner. (RT 134, 139.) Barreto eventually directed them to the Bank of America down the street near Hester Street where there was an ATM machine. (RT 137.)

At 6:30 a.m. the following morning, Barreto heard a radio broadcast that there was a person who had been beaten near Bellarmine High School. (RT 140.) When Barreto got to the school, he saw Mancera lying there and recognized her as one of the people he had spoken with the night before. (RT 141-142.) She was wearing the same clothes but her pockets had been turned inside out. (RT 147, 249-250.) A review of the Bank of America's videotape where petitioner and Mancera had gone the night before revealed petitioner and Mancera approaching the ATM and withdrawing $41.50 at 11:35 p.m. (RT 153-154.)

When police initially arrived at the crime scene, Officer Bruce Wiley observed that the body was found below the Hedding Street overpass that crossed over the athletic fields of the high school. (RT 158.) The overpass is a walkway that is approximately 31 feet above ground. (RT 189-190.) It has a railing that is approximately 29 inches high. (RT 168.) Near Mancera's body were a few personal items. (RT 163-167.) Approximately 60 feet from Mancera's body was her purse with all of its contents spewn about. (RT 169, 190, 225.) Wiley made a cast of a shoe print found close to the purse. (RT 174-176.)

A search of petitioner's home revealed a pair of gray pants with traces of blood on them. (RT 178-180.) Petitioner's landlord said that he did not arrive home until around 4:38 a.m. (RT 231.) Mancera's ATM card was eventually found in the trash approximately 20 yards from the

1  ATM at the Bank of America near Hester. (RT 188.)

2  Petitioner was taken to the police station that night where he asked an officer, "So what
3  do you think, is this going to be a life sentence or what?" (RT 267.) Petitioner continued, "I'm
4  really screwed this time. I'll be here for life. Shit like this follows me all the time." (RT 267-
5  269.)

6  An investigation into Mancera's bank account along with corresponding bank
7  surveillance cameras revealed that petitioner used the ATM machine at 12:46 a.m., after he and
8  Mancera had used the ATM machine approximately an hour before at the Bank of America near
9  Hester. (RT 254, 291-292.) Mancera's ATM card was also used at 12:46 a.m. (RT 255.)
10 Between 12:48 a.m. and 12:56 a.m., seven more attempts were made to withdraw money from
11 Mancera's account via ATM. (RT 293-296.) The last three attempts occurred at the Bank of
12 America where Mancera had taken out $40.00 when she was with petitioner. (RT 295-296.) All
13 attempts failed because the PIN was entered incorrectly. (RT 293.)

14 An autopsy of Mancera determined that she was biologically a man. (RT 198-199.) Her
15 blood alcohol level was .22, which meant that she had consumed approximately 10 drinks within
16 a few hours. (RT 219.) The Chief Medical Examiner ("CME") estimated that because
17 Mancera's body was in full rigor mortis between 11:10 a.m. and 12:20 p.m., she had died
18 approximately six to eight hours earlier. (RT 213.) Based upon the blood on the track and in the
19 body, the CME guessed that Mancera was alive at the time she fell down to the track. (RT 205.)
20 It also appeared that after Mancera fell down to the track, someone had moved her body to a
21 different location. (RT 206-207.) The CME also opined that Mancera was likely unconscious
22 after the fall but did not die for several minutes. (RT 212.)

23 The defense called one witness who testified that at 6:30 a.m. on the morning that
24 Mancera's body was found, he was working for a concrete company next to Ballarmine High
25 School when he saw a Hispanic man jump the fence and run quickly away from the track. (RT
26 312-313.) Then the witness saw the police arrive in the same area approximately 45 minutes
27 later. (RT 315.)

28 On January 11, 2002, petitioner was charged with first degree murder and second degree

1  robbery.  (Resp. Memo. at 1.)  On May 14, 2002, the jury found petitioner guilty of both counts.
2  The trial court sentenced petitioner to a term of 25 years plus a concurrent 3 years in state prison.
3  In 2003, on direct appeal, the state appellate court affirmed the judgment but stayed the 3-year
4  term.  Petitioner filed several unsuccessful state habeas petitions in the state court.

## DISCUSSION

**A.**    **Standard of Review**

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings.  Under the AEDPA, a federal court may not grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'"  Id. at 409.  In examining whether the state court decision was objectively unreasonable, the inquiry may require analysis of the state court's method as well as its result.

1  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).  The "objectively unreasonable"
2  standard does not equate to "clear error" because "[t]hese two standards . . . are not the same.
3  The gloss of clear error fails to give proper deference to state courts by conflating error (even
4  clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

5        A federal habeas court may grant the writ if it concludes that the state court's
6  adjudication of the claim "resulted in a decision that was based on an unreasonable
7  determination of the facts in light of the evidence presented in the State court proceeding."  28
8  U.S.C. § 2254(d)(2).  The court must presume correct any determination of a factual issue made
9  by a state court unless the petitioner rebuts the presumption of correctness by clear and
10 convincing evidence.  28 U.S.C. § 2254(e)(1).

11       When there is no reasoned opinion from the highest state court to consider the
12 petitioner's claims, the federal habeas court looks to the last reasoned opinion in conducting its
13 analysis under Section 2254(d).  See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  The
14 standard of review under AEDPA is somewhat different where the state court gives no reasoned
15 explanation of its decision on a petitioner's federal claim and there is no reasoned lower court
16 decision on the claim.  In such a case, a review of the record is the only means of deciding
17 whether the state court's decision was objectively reasonable.  See Plascencia v. Alameida, 467
18 F.3d 1190, 1197-98 (9th Cir. 2006).  When confronted with such a decision, a federal court
19 should conduct "an independent review of the record" to determine whether the state court's
20 decision was an objectively unreasonable application of clearly established federal law.  Id. at
21 1198.  Here, the state courts have not issued a reasoned decision on any of petitioner's claims.
22 Thus, this court shall conduct an independent review of the record.

23 **B.    Petitioner's Claims**

24       As grounds for federal habeas relief petitioner claims:  (1) the evidence was insufficient
25 to convict him of first degree murder; (2) his statement to the police was taken in violation of
26 Miranda and therefore, should not have been used at trial; (3) ineffective assistance of counsel
27 for (a) failing to present a self-defense theory and requesting a jury instruction on self-defense,
28 and (b) preventing petitioner from testifying; and (4) ineffective assistance of appellate counsel

for failing to raise any meritorious claims on appeal.[2]

### 1. Sufficiency of the evidence

Petitioner claims that the evidence was insufficient to support a guilty verdict for first degree murder. Specifically, he alleges that the police and prosecution fabricated their version of the story. (Am. Pet. at 6F.) Petitioner states that the prosecution told the jury that petitioner ran away with Mancera's ATM card, which made her chase petitioner, and then a struggle occurred. (Id.) Petitioner asserts that this is false. He insists that both he and Mancera were under the influence of alcohol and cocaine and the killing was purely accidental after Mancera attacked him. (Id. at 6K, 6L.)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim which, if proven, entitles him to federal habeas relief. See Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" See id. (quoting Jackson, 443 U.S. at 319). Only if no rational trier of fact could have found proof of

---

[2] Petitioner raises a myriad of additional claims in his traverse. For example, he alleges that the prosecutor committed misconduct by expressing his personal opinion and misleading the jury; that he received ineffective assistance of counsel by failing to uphold petitioner's right to a speedy trial, failing to investigate and prepare for trial, failing to suppress evidence, failing to move for a mistrial, failing to provide an opening statement, failing to object to the prosecutor's statements during arguments; and that he received ineffective assistance of appellate counsel for failing to raise cumulative errors and failing to inform petitioner as to the status of his appeal. This court will not address claims raised for the first time in a traverse. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).

guilt beyond a reasonable doubt, may the writ be granted. See Jackson, 443 U.S. at 324. The Jackson standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Sarausad v. Porter, 479 F.3d 671, 678 (9th Cir. 2007).

To the extent that petitioner is arguing that his version of events is more accurate than that presented by the prosecution, his claim fails. A jury's credibility determinations are entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, Jackson does not permit a federal habeas court to revisit credibility determinations. See id. (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); see also People of the Territory of Guam v. McGravey, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

Moreover, there was sufficient evidence to convict petitioner of first degree murder. A theory of felony-murder based on robbery,[3] requires only that the victim be killed during the course of the robbery, accidentally or otherwise, and not that the victim be killed for the purpose of the robbery. See People v. Wilson, 43 Cal. 4th 1, 16-17 (2008). In California, robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211.

The evidence at trial showed that approximately one hour after petitioner and Mancera went to the ATM, petitioner was videotaped at other ATM machines with Mancera's ATM card attempting to withdraw money from her account. The CME estimated that Mancera died minutes after she fell to the ground, and that her death occurred after Mancera left the ATM machine and probably before the time petitioner was caught on videotape at the ATM machines.

---

[3] Because the prosecution presented its case under a first degree premeditated murder and, alternatively, a first degree felony murder, Petitioner's conviction can be sustained if substantial evidence supports either a first degree premeditated murder or a felony murder based on robbery. See Griffin v. United States, 502 U.S. 46, 56-57 (1991) (finding no due process violation if the verdict is legally supportable as to least one theory of liability).

1  The CME noted that her injuries were consistent with falling 27 feet to the ground, however,
2  there was one injury that was more consistent with a punch or some other impact right before the
3  fall. Petitioner's shoe print was found near Mancera's body and petitioner's clothes had
4  Mancera's bloodstains on them. When police discovered Mancera's body, her pockets had been
5  turned out and her purse emptied. Mancera's ATM card was found in a trash can near the Bank
6  of America where petitioner was last recorded trying to withdraw money from her account.
7  Viewing the evidence in the light most favorable to the prosecution, the jury could have
8  concluded that after petitioner accompanied Mancera to the ATM, he formed the intent to rob
9  her and during the course of the robbery, Mancera was killed.

10  Accordingly, there was sufficient evidence by which a rational juror could convict
11  petitioner of first degree murder.

12      2.    <u>Miranda violation</u>

13  Petitioner claims that his statements to the police were admitted into evidence in
14  violation of <u>Miranda v. Arizona</u>, 284 U.S. 436 (1996). The trial court ruled that while the
15  statements were voluntary, the prosecution could not introduce petitioner's statements[4] into its
16  case-in-chief pursuant to <u>Miranda</u>. (RT 92-94.)

17  Where statements taken in violation of <u>Miranda</u> are used as evidence of guilt and there is
18  no proper instruction to the jury regarding the limited use of such statements, there is the
19  possibility of federal constitutional error. <u>Hinman v. McCarthy</u>, 676 F.2d 343, 348-49 (9th Cir.
20  1982). Habeas relief should be granted if the admission of statements in violation of <u>Miranda</u>
21  "had a substantial and injurious effect or influence in determining the jury's verdict." <u>Calderon</u>
22  <u>v. Coleman</u>, 525 U.S. 141, 147 (1998); <u>see, e.g.</u>, <u>Arnold v. Runnels</u>, 421 F.3d 859, 869 (9th Cir.
23  2005) (granting habeas relief where the prosecutor specifically emphasized in his opening

---

[4] Essentially, petitioner gave four different versions of what happened that night during his interview. First, he said he did not go to the Bellarmine overpass. Then, he said he saw someone else throw Mancera off the bridge. Also, he said Mancera fell off the bridge accidentally. And finally, he said he pushed her off the bridge after she grabbed his buttocks and then when she came at him again, he ducked out of the way and she toppled over the bridge. (CT 85.)

statement and closing argument the petitioner's invocation of silence, which had been admitted at trial in violation of Miranda, and the court could not say that the evidence had no substantial influence upon the jury); Jackson v. Giurbino, 364 F.3d 1002, 1011-1012 (9th Cir. 2004) (granting habeas relief where evidence was admitted against petitioner in patent violation of Miranda and he suffered "substantial prejudice" as a result).

As respondent notes, the record does not demonstrate, and petitioner does not point to, any improper admission of petitioner's statements given during his police interview. Moreover, even if the prosecutor had introduced petitioner's statements improperly, petitioner points to nowhere in the record where he objected to such admission. Cf. Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005) (noting that a failure to object to an alleged error contemporaneously at trial results in the claim being procedurally barred and thus, subject to dismissal in federal court). In petitioner's traverse, he complains that the prosecution should not have been able to introduce Mancera's ATM card, testimony regarding where the ATM card was found, and should not have introduced petitioner's statements, "So what do you think, is this going to be a life sentence or what? I really screwed up this time." (Traverse at 4, 6.)

The introduction of the ATM card did not violate Miranda. See, e.g., United States v. Patane, 542 U.S. 630, 645 (2004) (Kennedy and O'Connor, JJ, concurring in the judgment) (admission of nontestimonial physical evidence does not run risk of admission of coerced incriminating statements; in light of evidentiary value of physical evidence, "doubtful" that exclusion could be justified by deterrence rationale); United States v. Sandoval, 894 F.2d 1043, 1047-48 (9th Cir. 1990) (non-testimonial physical evidence discovered as result of statements obtained in violation of Miranda not inadmissible as "fruit of poisonous tree" where statements were not involuntary and due process was not violated). The admission of petitioner's statement, "So what do you think, is this going to be a life sentence or what? I really screwed up this time," did not violate Miranda because at the time petitioner made the statements, he was at the preprocessing center to be pre-booked at the police station, petitioner was not being interrogated, and the circumstances were not reasonably likely to illicit an incriminating response. See Rhode Island v. Innis, 446 U.S. 291, 301 (1979) (carving out an exception to mandated Miranda

warnings for actions on part of the police that are "normally attendant to arrest and custody"); see, e.g., Mickey v. Ayers, 606 F.3d 1223, 1235 (9th Cir. 2010) ("Casual conversation is generally not the type of behavior that police should know is reasonably likely to elicit an incriminating response.") (internal citation omitted).

Accordingly, the state court decision denying this claim was not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d).

### 3. Ineffective Assistance of Counsel

Petitioner claims that counsel rendered ineffective assistance for failing to present a theory of self-defense and failing to request self-defense instructions. Petitioner also claims that counsel was ineffective for preventing him from testifying.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

Petitioner claims that he fought with Mancera because she jumped on him for no reason. (Am. Pet. at 6V.) During the struggle, petitioner says that Mancera fell down to the track and was accidentally killed. (Id. at 6W.) Based on this evidence alone, counsel was reasonable not to pursue a self-defense theory. In order to justify self-defense, petitioner must show that he had an actual and reasonable belief that Mancera intended to kill or seriously harm him and that he was in imminent danger. See CALJIC 5.13. Here, petitioner offered no evidence that he reasonably believed that he was in imminent danger. Thus, counsel's strategic decision not to pursue such a defense theory does not equate to ineffective assistance of counsel. See Raley v. Ylst, 470 F.3d 792, 799 (9th Cir. 2006) ("strategic choices made after thorough investigation of law and facts relevant to plausible options [and] are virtually unchallengeable") (citing Strickland, 466 U.S. at 690).

1   Moreover, a defendant is entitled to a jury instruction only "if the theory is legally
2   cognizable and there is evidence upon which the jury could rationally find for the defendant."
3   United States v. Morton, 999 F.2d 435, 437 (9th Cir. 1993) (holding that a "mere scintilla" of
4   evidence supporting a defendant's theory is not sufficient to warrant a requested defense
5   instruction). As there was no evidence that petitioner acted in self-defense and substantial
6   evidence to the contrary, it was not ineffective for counsel not to request self-defense jury
7   instruction.

8   Finally, petitioner claims that counsel prevented him from testifying.[5] A defendant has
9   "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her
10  own behalf, or take an appeal." Jones v. Barnes, 463 U.S. 745, 751 (1983). Concerning those
11  decisions, an attorney must both consult with the defendant and obtain consent to the
12  recommended course of action. Florida v. Nixon, 543 U.S. 175, 187 (2004). The Strickland
13  standard is applicable when a petitioner claims his attorney was ineffective by denying him his
14  constitutional right to testify. Medley v. Runnels, 506 F.3d 857, 861 (9th Cir. 2007).

15  Petitioner alleges that trial counsel would not allow him to testify because counsel did not
16  want petitioner to be impeached with his priors. (Am. Pet. at 6Y.) Petitioner informed counsel
17  that he still wanted to testify even with the potential impeachment. (Id.) Petitioner claims that
18  he repeatedly told counsel that he wished to testify and counsel repeatedly ignored him or told
19  him "not now." (Traverse at 34.) Petitioner claims that had he known that the right to testify
20  ultimately rested with him, he would have insisted on testifying despite counsel's advice. (Id.)

21  Petitioner states that had he testified, he would have told the jury that Mancera never
22  chased him to try to get her ATM card back. He would have testified that both Mancera and he

---

[5] Petitioner asserts that his Marsden motion has been unsealed and submits an order from the Superior Court of Santa Clara County dated October 21, 2008 granting petitioner's motion to unseal his Marsden hearing. (Dkt. 71.) Petitioner requests an expansion of the record to include the transcript of the hearing, however, he fails to provide one. The superior court's order states, "The motion is granted insofar as the transcript is unsealed as to Petitioner." (Dkt. 71.) Respondent alleges that it was not privy to the Marsden hearing and has not had access to the sealed transcript. (Resp. Memo. at 1, n.2.) Thus the court denies petitioner's request to expand the record.

were under the influence of alcohol and cocaine and they fought for no apparent reason. Petitioner would have disputed that he told the police that he was running from Mancera with her ATM card, and testified that he and Mancera were fighting by the track and Mancera accidentally fell over the railing.

        Petitioner fails to meet the prejudice prong of Strickland. Had petitioner testified, he would have been subject to cross-examination regarding why he was seen with Mancera's ATM card and attempted to withdraw money from her account a number of times only an hour after she had already withdrawn money. Petitioner would have also had to explain how he ended up with Mancera's ATM card at all. Had petitioner testified, he would have been impeached with his statements to the police that the trial court prohibited from being introduced during the prosecution's case in chief. See Harris v. New York, 401 U.S. 222, 225 (1971) (noting that voluntary statements even taken in violation of Miranda may be used to impeach a defendants' credibility even though they are inadmissible as evidence of guilt). Specifically, petitioner admitted to Officer Vizzusi that he and Mancera smoked cocaine and went to get money from her ATM so that they could buy more drugs. (Resp. Ex. A at 10.) Petitioner stated that Mancera was very intoxicated so she asked him to withdraw money when they were at the Bank of America and she gave him her PIN number to do so. (Id. at 11.) Petitioner then told Vizzusi different versions of how Mancera came to be underneath the track at Bellarmine. (Id. at 12.) First, he said that Mancera wanted to hitch a ride so he left her at the bridge but he did not actually walk onto the bridge. (Id.) Then he said that actually, Mancera wanted to hitch a ride and a white guy pulled up in a white pick up truck, Mancera got in, and petitioner watched them drive to the top of the bridge where the driver got out and threw Mancera over the bridge. (Id. at 13.) Petitioner then said that he realized his wallet was missing so ran down to the bottom where Mancera had fallen and searched through her purse to see if his wallet was there. (Id.) When petitioner was asked whether he had used Mancera's ATM card, he initially denied it and then admitted that he had. (Id. at 14.) Petitioner then changed his story again and stated that he and Mancera went to the top of the bridge and she was showing him something when she somehow fell off the bridge accidentally. (Id. at 15-16.) He stated that he did not know what happened as

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.05\Uvalles779habeas.wpd     12

they were not fighting at all. (Id. at 17.) Then, petitioner changed his story and said that Mancera grabbed his buttocks and even after he told her to stop, she did it again so petitioner punched her. (Id.) When Mancera tried to punch him, he ducked and she went over his shoulder off the bridge. (Id.)

The defense theory was that the prosecution did not have sufficient evidence to prove petitioner's guilt beyond a reasonable doubt and inject the possibility that someone else, namely the Hispanic man seen running away from the track, robbed Mancera. Petitioner's statements to the police were completely inconsistent with the defense theory, inconsistent with petitioner's intended testimony, and inconsistent with each version of events. Had petitioner testified, the effect of cross-examination and impeachment evidence would have been so damaging that the result of trial would not have been different. See Medley, 506 F.3d at 861-862 (where petitioner was not prejudiced because he would have been impeached on prior convictions and his testimony was inconsistent with the theory of the case).

Accordingly, the state court decision was not contrary to or an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d), and petitioner's claims are denied.

## CONCLUSION

For the reasons set forth above, the court concludes that petitioner has failed to show a violation of his federal constitutional rights in the underlying state criminal proceedings. Accordingly, the petition for writ of habeas corpus is DENIED. The clerk shall terminate all pending motions and close the file.

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009). For the reasons set out in the discussion above, petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

1  IT IS SO ORDERED.

2  DATED: 9/16/10

3  _____
RONALD M. WHYTE
United States District Judge

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.05\Uvalles779habeas.wpd    14